EXHIBIT S

1              UNITED STATES DISTRICT SUPERIOR COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4                      --oOo--

5   NETCENTIVES, INC.,                    )

                                          )

6              Plaintiff,                 )

         vs.                              )Nos. C-00-0669-CAL

7                                         )      C-00-0986-CAL

    THE SPERRY & HUTCHINSON COMPANY, )      C-00-2637-CAL

8   INC., et al.,                         )

                                          )

9              Defendants.                )

    _____)

10                                        )

    NETCENTIVES, INC.,                    )

11                                        )

               Plaintiff,                 )

12        vs.                             )  DEPOSITION OF

                                          )

13  MASSMEDIUM.COM, INC., et al.,         )THOMAS W. STOREY

                                          )

14             Defendants.                ) April 3, 2001

    _____)

15                                        ) Volume II

    NETCENTIVES, INC., and THOMAS         )Pages 158 - 303

16  W. STOREY,                            )

               Plaintiffs,                )NOTICING ATTORNEY:

17          vs.                        ) RONALD J. SCHUTZ

                                       )

18   BEENZ.COM, INC., et al.,          )

                                       )

19              Defendants.            )

     _____)

20

21      REPORTED BY:  DIANE L. FREEMAN, CSR NO. 5884

22              GOLDEN GATE REPORTERS

            35 Mitchell Boulevard, Suite 8

23            San Rafael, CA 94903-2010

          1-800-442-4622 * (415) 491-4611

24                (415) 491-4635

25   email:ggr@depos.com     web:http://www.depos.com/

                                              158

1              BE IT REMEMBERED that, pursuant to

2   notice, and on Tuesday, April 3, 2001, commencing at

3   9:11 a.m. thereof, at Crosby, Heafey, Roach & May,

4   Two Embarcadero Center, San Francisco, California,

5   before me DIANE L. FREEMAN, a Certified Shorthand

6   Reporter, personally appeared

5       Cathay Pacific here has notes which show

6   that they had a way to allow you to register as a

7   Cathay Pacific cyber traveler, but that wasn't

8   online, and you were then automatically entered into

9   the mileage millionaire contest, which was just an

10  offline contest that they ran.

11      And then we note down here I note down

12  here, which Jackie transcribed for me, their web

13  address.

14      Q.  Did you find any online incentive programs

15  in your internet research?

16      A.  I was not able to find any online internet-

17  based or web-page-based online interactive incentive

18  programs which fully integrated the product catalog,

19  the awards catalog, the credit check routine, the

20  awards redemption routine or any of the elements

21  that are claimed in the '870 patent.

22      Q.  Now, you've used the term "fully

23  integrated" several times.  Can you tell us what you

24  mean by that?

25      A.  Fully integrated, I'd like to look at the

206

1   '870 patent, because I believe we talk in the '870

2   patent about fully integrated.

3          If you go to the patent '870, and you look

4   at the flow chart that is at the bottom of that

5   page --

6       Q.  On the cover sheet?

7       A.  Yes.

8          -- and the subsequent flow charts which, as

9   you can see, the arrows pointing off here relate to

10  these next pages, to create a link so that all of

11  these pieces are fit together.

12         What fully integrated means in the '870

13  patent is that the purchaser of a good or service

14  who is accessing the '870 invention, either directly

15  through a web page on the internet or through an

16  online provider web page on the internet, which is

17  summarized here as No. 30 Internet Access, that

18  individual who is paying for a product or service

19  for their own consumption in that session has the

20  ability to interact with any aspect of this

21  invention while they are in that online session at

22  that point of access.

23         And so what they are able to do is they are

24  able to, while they are in that session, interact

25  with the program home page, and fully integrated --

                                                        207

1  interactive, and fully integrated means, in that

2   environment, that they cannot only view that program

3   home page, but they can actually change aspects of

4   that program home page in realtime in that session.

5        Q.  What do you mean by "change aspects" of it?

6        A.  I'd like to finish, then we can go back and

7   ask questions.

8        Q.  Oh, okay.

9        A.  Concurrently to that, in that session, they

10  may also go to a product information home page,

11  which could be an implementation of a catalog, and a

12  catalog, the typical printed catalog for products

13  would you have pictures and detailed in-depth

14  descriptions.

15            While they are in that session, they can go

16  to the product catalog page and interact directly

17  with that page.  By interact I mean in that

18  environment that, while they are sitting on a web

19  page, they can change the nature of what is in that

20  web page and what comes back will change as well.

21            In addition, if you look at Figure 2, while

22  they are in that session, they will be interacting

23  online -- and by online again I mean in an internet

24  or a web-page-based environment, they will be

25  checking -- they will have their credit checked, so

208

1  they will perform an action, input a credit card

2  number, and a specific response will come back which

3  they can then again interact with.

4          They also, in that same session at that

5  same time, can interface with their current -- and

6  by current I mean up to the date, within the last

7  possible moment of time, their current awards

8  schedule and enrollment information.

9          So they can in that session online, while

10  they are doing everything else, they can change

11  their home address, they can decide that they want

12  to try to get a particular award, they can review

13  not only their points balances but their points

14  history, and every transaction that they have had

15  related to the '870 invention.

16          In addition, in that same session, at the

17  same time, on a web page, they are in a position and

18  can in realtime go to a awards catalog which could

19  be a very rich, detailed description, set of

20  pictures, it could even be videos of various awards,

21  and in realtime, while they are doing all these

22  other things, they can actually select an award,

23  decide that they would like to receive that award,

24  and they can have an electronic message delivered to

25  an awards provider at that point in time to receive

1  that award.

2        And, concurrent with all of that, while

3  that is happening, their awards balance can either

4  be increased or decreased.

5        So, in one session, somebody could sit down

6  and purchase a product, pay for it, receive points,

7  and, at the same time, get their new balance.  They

8  could redeem the points for an award, order the

9  award, review the award, and change any aspect of

10  their profile within the program.

11        That is what I mean when I talk about an

12  online interactive fully integrated award program.

13        Q.  What's a session?  You said the same

14  session, what do you mean by that?

15        A.  I view a session to be -- and people

16  skilled in the art of the internet, and this patent

17  talks very specifically about the internet --I

18  believe people skilled in the art would view a

19  session as when an individual sits down at their

20  computer, which is connected to the internet and

21  either directly accesses the internet or signs onto

22  the internet through an internet provider, and

23  performs whatever set of transactions that they want

24  to perform and then at the completion of that time

25  logs off of the internet.

210

1    Q. So a session could last a day?

2    A. A session could last five seconds or a day

3 or never end.

4    Q. I have continuous access to the internet on

5 my modem, I'm always online. So is that a single

6 session in your view?

7    A. I think when people typically think of a

8 session, and what I was referring to, was not the

9 fact that you are just logged on, but the fact that

10 you are actually sitting at your terminal, in an

11 environment where you are logged on to the internet

12 and you are performing functions.

13        And it's highly unlikely to me that you

14 would be in a session for a week. You would be in a

15 session for a relatively short period of time. By

16 that I mean most sessions probably, probably are

17 less than five hours.

18    Q. In your definition of a fully integrated

19 system, does the home page have to reside on the

20 same server as the product information page?

21    A. Could you repeat the question, please?

22        (Record read.)

23    THE WITNESS:   Which home page are you

24 referring to, and which product information page?

25    MR. SCHUTZ:   Q.   I'm just using -- well, be

211

1    more specific here.   In your patent in Figure 2,

2    you've got a program home page labeled 300 and a

3    product -- the info home page doesn't have a number

4    on it.  Do those home page -- does the program home

5    page have to reside on the same server as the

6    product info home page for it to be a fully

7    integrated system?

8        A.  For it to be a fully integrated system, the

9    home page and any other aspect of the system as

10   described in this patent --

11       Q.  Which home page, sir?

12       A.  The home page you referred to in Figure 2.

13       Q.  Well, there are two.  There is a program

14   home page and a product home page.

15       A.  Okay.

16       Q.  I want to know if -- I'll make sure my

17   question --

18       A.  For it to be fully integrated --

19   MR. WALLACE:   I don't want you both talking at

20   once.  Let Ron clarify his question, then I want you

21   to give your complete answer.  Then, if he has

22   clarifying questions he's going to wait until your

23   answer is out.  Please clarify your question.

24    MR. SCHUTZ:    Q.    There are two home pages

25  listed on Figure 2 of the '870 patent; do you see

212

1  that, Mr. Storey?

2      A.  Yes.

3        Q.  I want to know if the program home page has

4  to reside on the same server as the product

5  information home page in order for it to be a fully

6  integrated system.

7        A.  For it to be a fully integrated web-based

8  or online interactive system, the capability needs

9  to exist to allow the product or service purchaser

10  to interact directly with any aspect of the home

11  page, whether it is a program home page or a product

12  home page, in realtime.  Which my definition of

13  realtime is within the constraints of the internet

14  in its latest embodiment.  And there are a number of

15  ways technically that those skilled in the art would

16  be able to accomplish that.

17        Q.  Thanks for your answer, but my question was

18  does the program home page have to reside on the

19  same server as the product home page for it to be a

20  fully integrated system.  If you could just answer

21  that question.  Or, if you can't answer it, just say

22  you can't answer.

23     A.  I believe you could create a fully

24  integrated system without having the program home

25  page and the product information home page on the

213

1  same server; but, in order for it to meet the

2  criteria of interactive, the individual interacting

3  through the internet with either or both home pages,

4  irrespective of where they are located, would have

5  to be able to cause a change in the information

6  available and, hence, a set of steps for either home

7  page at the same time.

8     Q.  In what you've defined as a fully

9  integrated system, can the program home page be on

10  one server, the product home page be on another

11  server, and the database with the users and the

12  points be on yet another server?

13     A.  One of the benefits of the internet and the

14  convention of HTML language, which you referenced

15  earlier and which is the internet, which is

16  fundamental to my patent, the '870 patent, and which

17  is not reflected in any part of the '444 patent, is

18  the fact that the internet -- and what makes the

19  internet so powerful is that the internet provides a

20  vehicle through the HTML language to convert

EXHIBIT T

(C) Applications for reissues, particularly those involved in stayed litigation (37 CFR 1.176).

(D) Applications remanded by an appellate tribunal for further action.

(E) An application, once taken up for action by an examiner according to its effective filing date, should be treated as special by an examiner, art unit or Technology Center to which it may subsequently be transferred; exemplary situations include new cases transferred as the result of a telephone election and cases transferred as the result of a timely reply to any official action.

(F) Applications which appear to interfere with other applications previously considered and found to be allowable, or which will be placed in interference with an unexpired patent or patents.

(G) Applications ready for allowance, or ready for allowance except as to formal matters.

(H) Applications which are in condition for final rejection.

(I) Applications pending more than 5 years, including those which, by relation to a prior United States application, have an effective pendency of more than 5 years. See MPEP § 707.02.

(J) Reexamination proceedings, MPEP § 2261 >and § 2661<.

See also MPEP § 714.13, § 1207 and § 1309.

## 708.02    Petition To Make Special    [R-3]

*37 CFR 1.102. Advancement of examination.*

(a) Applications will not be advanced out of turn for examination or for further action except as provided by this part, or upon order of the Director to expedite the business of the Office, or upon filing of a request under paragraph (b) of this section or upon filing a petition under paragraphs (c) or (d) of this section with a showing which, in the opinion of the Director, will justify so advancing it.<

(b) Applications wherein the inventions are deemed of peculiar importance to some branch of the public service and the head of some department of the Government requests immediate action for that reason, may be advanced for examination.

**>.

(c) A petition to make an application special may be filed without a fee if the basis for the petition is:

(1) The applicant's age or health; or

(2) That the invention will materially:

(i) Enhance the quality of the environment;

(ii) Contribute to the development or conservation of energy resources; or

(iii) Contribute to countering terrorism.<

(d) A petition to make an application special on grounds other than those referred to in paragraph (c) of this section must be accompanied by the fee set forth in § 1.17(h).

New applications ordinarily are taken up for examination in the order of their effective United States filing dates. Certain exceptions are made by way of petitions to make special, which may be granted under the conditions set forth below.>Any statement in support of a petition to make special must be based on a good faith belief that the invention in fact qualifies for special status. See 37 CFR 1.56 and 10.18.<

## I.    MANUFACTURE

An application may be made special on the ground of prospective manufacture upon the filing of a petition accompanied by the fee under 37 CFR 1.17(h) and a statement by the applicant, assignee or an attorney/agent registered to practice before the Office alleging:

(A) The possession by the prospective manufacturer of sufficient presently available capital (stating approximately the amount) and facilities (stating briefly the nature thereof) to manufacture the invention in quantity or that sufficient capital and facilities will be made available if a patent is granted;

If the prospective manufacturer is an individual, there must be a corroborating statement from some responsible party, as for example, an officer of a bank, showing that said individual has the required available capital to manufacture;

(B) That the prospective manufacturer will not manufacture, or will not increase present manufacture, unless certain that the patent will be granted;

(C) That the prospective manufacturer obligates himself, herself or itself, to manufacture the invention, in the United States or its possessions, in quantity immediately upon the allowance of claims or issuance of a patent which will protect the investment of capital and facilities; and

(D) That the applicant or assignee has made or caused to be made a careful and thorough search of the prior art, or has a good knowledge of the pertinent prior art.

Applicant must provide one copy of each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record.

**708.02**                    MANUAL OF PATENT EXAMINING PROCEDURE

## II. INFRINGEMENT

Subject to a requirement for a further showing as may be necessitated by the facts of a particular case, an application may be made special because of actual infringement (but not for prospective infringement) upon payment of the fee under 37 CFR 1.17(h) and the filing of a petition accompanied by a statement by the applicant, assignee, or an attorney/agent registered to practice before the Office alleging:

(A) That there is an infringing device or product actually on the market or method in use;

(B) That a rigid comparison of the alleged infringing device, product, or method with the claims of the application has been made, and that, in his or her opinion, some of the claims are unquestionably infringed; and

(C) That he or she has made or caused to be made a careful and thorough search of the prior art or has a good knowledge of the pertinent prior art.

Applicant must provide one copy of each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record.

Models or specimens of the infringing product or that of the application should not be submitted unless requested.

## III. APPLICANT'S HEALTH

An application may be made special upon a petition by applicant accompanied by any evidence showing that the state of health of the applicant is such that he or she might not be available to assist in the prosecution of the application if it were to run its normal course, such as a doctor's certificate or other medical certificate. No fee is required for such a petition. See 37 CFR 1.102(c).

>Personal/medical information submitted as evidence to support the petition will be available to the public if the application file and contents are available to the public pursuant to 37 CFR 1.11 or 1.14. If applicant does not wish to have this information become part of the application file record, the information must be submitted pursuant to MPEP § 724.02.<

## IV. APPLICANT'S AGE

An application may be made special upon filing a petition including any evidence showing that the applicant is 65 years of age, or more, such as a birth certificate or applicant's statement. No fee is required with such a petition. See 37 CFR 1.102(c).

>Personal/medical information submitted as evidence to support the petition will be available to the public if the application file and contents are available to the public pursuant to 37 CFR 1.11 or 1.14. If applicant does not wish to have this information become part of the application file record, the information must be submitted pursuant to MPEP § 724.02.<

## V. ENVIRONMENTAL QUALITY

The U.S. Patent and Trademark Office will accord "special" status to all patent applications for inventions which materially enhance the quality of the environment of mankind by contributing to the restoration or maintenance of the basic life-sustaining natural elements, i.e., air, water, and soil.

All applicants desiring to participate in this program should petition that their applications be accorded "special" status. **>The petition under 37 CFR 1.102 must state that special status is sought because the invention materially enhances the quality of the environment of mankind by contributing to the restoration or maintenance of the basic life-sustaining natural elements.< No fee is required for such a petition. See 37 CFR 1.102(c). >If the application disclosure is not clear on its face that the claimed invention materially enhances the quality of the environment by contributing to the restoration or maintenance of one of the basic life-sustaining natural elements, the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the materiality standard is met. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could materially enhance the quality of the environment. Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may enhance the quality of the environment.<

## VI. ENERGY

The U.S. Patent and Trademark Office will, on petition, accord "special" status to all patent applications for inventions which materially contribute to (A) the discovery or development of energy resources, or (B) the more efficient utilization and conservation of energy resources. Examples of inventions in category (A) would be developments in fossil fuels (natural gas, coal, and petroleum), hydrogen fuel technologies, nuclear energy, solar energy, etc. Category (B) would include inventions relating to the reduction of energy consumption in combustion systems, industrial equipment, household appliances, etc.

All applicants desiring to participate in this program should petition that their applications be accorded "special" status. **>The petition under 37 CFR 1.102 must state that special status is sought because the invention materially contributes to category (A) or (B) set forth above.< No fee is required for such a petition, 37 CFR 1.102(c).>If the application disclosure is not clear on its face that the claimed invention materially contributes to category (A) or (B), the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the materiality standard is met. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could materially contribute to category (A) or (B). Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may be directed to category (A) or (B).<

## VII. INVENTIONS RELATING TO RECOMBINANT DNA

In recent years revolutionary genetic research has been conducted involving recombinant deoxyribonucleic acid ("recombinant DNA"). Recombinant DNA research appears to have extraordinary potential benefit for mankind. It has been suggested, for example, that research in this field might lead to ways of controlling or treating cancer and hereditary defects. The technology also has possible applications in agriculture and industry. It has been likened in importance to the discovery of nuclear fission and fusion. At the same time, concern has been expressed over the safety

of this type of research. The National Institutes of Health (NIH) has released guidelines for the conduct of research concerning recombinant DNA. These "Guidelines for Research Involving Recombination DNA Molecules," were published in the *Federal Register* of July 7, 1976, 41 FR 27902-27943. NIH is sponsoring experimental work to identify possible hazards and safety practices and procedures.

In view of the exceptional importance of recombinant DNA and the desirability of prompt disclosure of developments in the field, the U.S. Patent and Trademark Office will accord "special" status to patent applications relating to safety of research in the field of recombinant DNA. Upon appropriate petition and payment of the fee under 37 CFR 1.17(h), the Office will make special patent applications for inventions relating to safety of research in the field of recombinant DNA. Petitions for special status should be accompanied by statements under 37 CFR 1.102 by the applicant, assignee, or statements by an attorney/agent registered to practice before the Office explaining the relationship of the invention to safety of research in the field of recombinant DNA research. The fee set forth under 37 CFR 1.17(h) must also be paid.

## VIII. SPECIAL EXAMINING PROCEDURE FOR CERTAIN NEW APPLICATIONS — ACCELERATED EXAMINATION

A new application (one which has not received any examination by the examiner) may be granted special status provided that applicant (and this term includes applicant's attorney or agent) complies with each of the following items:

(A) Submits a petition to make special accompanied by the fee set forth in 37 CFR 1.17(h);

(B) Presents all claims directed to a single invention, or if the Office determines that all the claims presented are not obviously directed to a single invention, will make an election without traverse as a prerequisite to the grant of special status.

The election may be made by applicant at the time of filing the petition for special status. Should applicant fail to include an election with the original papers or petition and the Office determines that a requirement should be made, the established telephone restriction practice will be followed.

If otherwise proper, examination on the merits will proceed on claims drawn to the elected invention.

If applicant refuses to make an election without traverse, the application will not be further examined at that time. The petition will be denied on the ground that the claims are not directed to a single invention, and the application will await action in its regular turn.

Divisional applications directed to the nonelected inventions will not automatically be given special status based on papers filed with the petition in the parent application. Each such application must meet on its own all requirements for the new special status;

(C) Submits a statement(s) that a pre-examination search was made, listing the field of search by class and subclass, publication, Chemical Abstracts, foreign patents, etc. The pre-examination search must be directed to the invention as claimed in the application for which special status is requested. A search made by a foreign patent office satisfies this requirement if the claims in the corresponding foreign application are of the same or similar scope to the claims in the U.S. application for which special status is requested;

(D) Submits one copy each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record; and

(E) Submits a detailed discussion of the references, which discussion points out, with the particularity required by 37 CFR 1.111 (b) and (c), how the claimed subject matter is patentable over the references.

In those instances where the request for this special status does not meet all the prerequisites set forth above, applicant will be notified and the defects in the request will be stated. The application will remain in the status of a new application awaiting action in its regular turn. In those instances where a request is defective in one or more respects, applicant will be given *one* opportunity to perfect the request in a renewed petition to make special. If perfected, the request will then be granted. If not perfected in the first renewed petition, any additional renewed petitions to make special may or may not be considered at the discretion of the Technology Center (TC) Special Program Examiner.

Once a request has been granted, prosecution will proceed according to the procedure set forth below;

there is no provision for "withdrawal" from this special status.

The special examining procedure of VIII (accelerated examination) involves the following procedures:

(A) The new application, having been granted special status as a result of compliance with the requirements set out above will be taken up by the examiner before all other categories of applications except those clearly in condition for allowance and those with set time limits, such as examiner's answers, etc., and will be given a complete first action which will include *all* essential matters of merit as to all claims. The examiner's search will be restricted to the *subject matter encompassed by the claims.* A first action rejection will set a 3-month shortened period for reply.

(B) During the 3-month period for reply, applicant is encouraged to arrange for an interview with the examiner in order to resolve, with finality, as many issues as possible. In order to afford the examiner time for reflective consideration before the interview, applicant or his or her representative should cause to be placed in the hands of the examiner at least one working day prior to the interview, a copy (clearly denoted as such) of the amendment that he or she proposes to file in response to the examiner's action. Such a paper will not become a part of the file, but will form a basis for discussion at the interview.

(C) Subsequent to the interview, or responsive to the examiner's first action if no interview was had, applicant will file the "record" reply. The reply at this stage, to be proper, must be restricted to the rejections, objections, and requirements made. Any amendment which would require broadening the search field will be treated as an improper reply.

(D) The examiner will, within 1 month from the date of receipt of applicant's formal reply, take up the application for final disposition. This disposition will constitute either a final action which terminates with the setting of a 3-month period for reply, or a notice of allowance. The examiner's reply to any amendment submitted after final rejection should be prompt and by way of form PTOL-303, by passing the application to issue, or by an examiner's answer should applicant choose to file an appeal brief at this time. The use of these forms is not intended to open the door to further prosecution. Of course, where relatively minor issues

or deficiencies might be easily resolved, the examiner may use the telephone to inform the applicant of such.

(E) A personal interview after a final Office action will not be permitted unless requested by the examiner. However, telephonic interviews will be permitted where appropriate for the purpose of correcting any minor outstanding matters.

After allowance, these applications are given top priority for printing. See MPEP § 1309.

## IX. SPECIAL STATUS FOR PATENT APPLICATIONS RELATING TO SUPERCONDUCTIVITY

In accordance with the President's mandate directing the U.S. Patent and Trademark Office to accelerate the processing of patent applications and adjudication of disputes involving superconductivity technologies when requested by the applicant to do so, the U.S. Patent and Trademark Office will, on request, accord "special" status to all patent applications for inventions involving superconductivity materials. Examples of such inventions would include those directed to superconductive materials themselves as well as to their manufacture and application. In order that the U.S. Patent and Trademark Office may implement this procedure, we invite all applicants desiring to participate in this program to request that their applications be accorded "special" status. Such requests should be accompanied by a statement under 37 CFR 1.102 that the invention involves superconductive materials. No fee is required.

## X. INVENTIONS RELATING TO HIV/AIDS AND CANCER

In view of the importance of developing treatments and cures for HIV/AIDS and cancer and the desirability of prompt disclosure of advances made in these fields, the U.S. Patent and Trademark Office will accord "special" status to patent applications relating to HIV/AIDS and cancer.

Applicants who desire that an application relating to HIV/AIDS or cancer be made special should file a petition and the fee under 37 CFR 1.17(h) requesting the U.S. Patent and Trademark Office to make the application special. The petition for special status should be accompanied by a statement explaining how the invention contributes to the diagnosis, treatment or prevention of HIV/AIDS or cancer.

## XI. INVENTIONS FOR COUNTERING TERRORISM

In view of the importance of developing technologies for countering terrorism and the desirability of prompt disclosure of advances made in these fields, the U.S. Patent and Trademark Office will accord "special" status to patent applications **>for inventions which materially contribute to countering terrorism<.

International terrorism as defined in 18 U.S.C. 2331 includes "activities that – (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; [and] (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by assassination or kidnapping...". The types of technology for countering terrorism could include, but are not limited to, systems for detecting/identifying explosives, aircraft sensors/security systems, and vehicular barricades/disabling systems.

**>All applicants desiring to participate in this program should petition that their applications be accorded special status. The petition under 37 CFR 1.102 must state that special status is sought because the invention materially contributes to countering terrorism. No fee is required for such a petition. See 37 CFR 1.102(c). If the application disclosure is not clear on its face that the claimed invention is materially directed to countering terrorism, the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the invention materiality contributes to countering terrorism. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could counter terrorism. Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may be directed to countering terrorism.<

Rev. 3, August 2005

## XII. SPECIAL STATUS FOR APPLICATIONS RELATING TO BIOTECHNOLOGY FILED BY APPLICANTS WHO ARE SMALL ENTITIES

Applicants who are small entities may request that their biotechnology applications be granted "special" status. Applicant must file a petition with the petition fee under 37 CFR 1.17(h) requesting the special status and must:

(A) state that small entity status has been established or include a statement establishing small entity status;

(B) state that the subject of the patent application is a major asset of the small entity; and

(C) state that the development of the technology will be significantly impaired if examination of the patent application is delayed, including an explanation of the basis for making the statement.

### FORMAL REQUIREMENTS OF PETITION TO MAKE SPECIAL

Any petition to make special should:

(A) be in writing; and

(B) identify the application by application number and filing date.

### HANDLING OF PETITIONS TO MAKE SPECIAL

Applications which have been made special will be advanced out of turn for examination and will continue to be treated as special throughout the entire prosecution in the Office.

Each petition to make special, regardless of the ground upon which the petition is based and the nature of the decision, is made of record in the application file, together with the decision thereon. The part of the Office that rules on a petition is responsible for properly entering that petition and the resulting decision in the file record. The petition, with any attached papers and supporting affidavits, will be given a single paper number and so entered in the "Contents" of the file. The decision will be accorded a separate paper number and similarly entered. To ensure entries in the "Contents" in proper order, the technical support staff in the TC will make certain that all papers prior to a petition have been entered and/or

listed in the application file before forwarding it for consideration of the petition. Note MPEP § 1002.02 (s). For Image File Wrapper (IFW) processing, see IFW Manual.

Petitions to make special are decided by the Special Program Examiner of the TC to which the application is assigned.

## 708.03     Examiner Tenders Resignation [R-2]

Whenever an examiner tenders his or her resignation, the supervisory patent examiner should see that the remaining time as far as possible is used in winding up the old complicated cases or those with involved records and getting as many of his or her amended cases as possible ready for final disposition.

If the examiner has considerable experience in his or her particular art, it is also advantageous to the Office if he or she indicates (in pencil) in the file wrappers of application in his or her docket, the field of search or other pertinent data that he or she considers appropriate. >For Image File Wrapper (IFW) processing, see IFW Manual.<

## 709     Suspension of Action [R-3]

*37 CFR 1.103: Suspension of action by the Office.*

(a) *Suspension for cause.* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph for good and sufficient cause. The Office will not suspend action if a reply by applicant to an Office action is outstanding. Any petition for suspension of action under this paragraph must specify a period of suspension not exceeding six months. Any petition for suspension of action under this paragraph must also include:

(1) A showing of good and sufficient cause for suspension of action; and

**>**

(2) The fee set forth in § 1.17(g), unless such cause is the fault of the Office.**<**

(b) *Limited suspension of action in a continued prosecution application (CPA) filed under § 1.53(d).* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph in a continued prosecution application filed under § 1.53(d) for a period not exceeding three months. Any request for suspension of action under this paragraph must be filed with the request for an application filed under § 1.53(d), specify the period of suspension, and include the processing fee set forth in § 1.17(i).

(c) *Limited suspension of action after a request for continued application (RCE) under § 1.114.* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph after the filing of a request for continued examina-

# Chapter 800  Restriction in Applications Filed Under 35 U.S.C. 111; Double Patenting

**801**     **Introduction**
**802**     **Basis for Practice in Statute and Rules**
802.01      Meaning of "Independent" and "Distinct"
802.02      Definition of Restriction
**803**     **Restriction — When Proper**
803.01      Review by Examiner With at Least Partial Signatory Authority
803.02      * Markush Claims
803.03      * Transitional Applications
803.03(a)   Transitional Application — Linking Claim Allowable
803.03(b)   Transitional Application — Generic Claim Allowable
803.04      * Nucleotide Sequences
**804**     **Definition of Double Patenting**
804.01      Prohibition of Double Patenting Rejections Under 35 U.S.C. 121
804.02      Avoiding a Double Patenting Rejection
804.03      ** Commonly Owned *>Inventions< of Different Inventive Entities>; Non-Commonly Owned *>Inventions< Subject to a Joint Research Agreement<
804.04      Submission to Technology Center Director
**805**     **Effect of Improper Joinder in Patent**
**806**     **Determination of Distinctness or Independence of Claimed Inventions**
806.01      Compare Claimed Subject Matter
**
806.03      Single Embodiment, Claims Defining Same Essential Features
806.04      **>Genus and/or Species< Inventions
**
806.04(b)   Species May Be >Independent or< Related Inventions
**
806.04(d)   Definition of a Generic Claim
806.04(e)   Claims * >Limited< to Species
806.04(f)   **>Restriction Between< Mutually Exclusive *>Species<
806.04(h)   Species Must Be Patentably Distinct From Each Other
806.04(i)   Generic Claims Presented ** After Issue of Species
806.05      Related Inventions
806.05(a)   Combination and Subcombination **
**
806.05(c)   Criteria of Distinctness *>Between< Combination *>and< Subcombination **
806.05(d)   Subcombinations Usable Together
806.05(e)   Process and Apparatus for Its Practice *
806.05(f)   Process of Making and Product Made *

806.05(g)   Apparatus and Product Made *
806.05(h)   Product and Process of Using
806.05(i)   Product, Process of Making, and Process of Using **
>806.05(j)  Related Products; Related Processes
806.06      Independent Inventions<
**807**     **Patentability Report Practice Has No Effect on Restriction Practice**
**808**     **Reasons for Insisting Upon Restriction**
808.01      **>Reasons for Holding of Independence or Distinctness<
808.01(a)   Species
808.02      **>Establishing Burden<
**809**     **\* Linking **>Claims<**
**
809.02(a)   Election >of Species< Required
**
809.03      **>Restriction Between Linked Inventions<
**
**810**     **Action on the Merits**
**
**811**     **Time for Making Requirement**
811.02      *>New Requirement< After Compliance With Preceding Requirement
811.03      Repeating After Withdrawal Proper
811.04      Proper Even Though Grouped Together in Parent Application
**812**     **Who Should Make the Requirement**
812.01      Telephone Restriction Practice
**814**     **Indicate Exactly How Application Is To Be Restricted**
**815**     **Make Requirement Complete**
**
**817**     **Outline of Letter for Restriction Requirement**
**
**818**     **Election and Reply**
818.01      Election Fixed by Action on Claims
818.02      Election Other Than Express
818.02(a)   By Originally Presented Claims
818.02(b)   Generic Claims Only — No Election of Species
818.02(c)   By Optional Cancellation of Claims
818.03      Express Election and Traverse
818.03(a)   Reply Must Be Complete
818.03(b)   Must Elect, Even When Requirement Is Traversed
818.03(c)   Must Traverse To Preserve Right of Petition
818.03(d)   Traverse of **>Restriction Requirement With< Linking Claims
**
**819**     **Office Generally Does Not Permit Shift**
**

Rev. 3, August 2005

821    Treatment of Claims Held To Be Drawn to Non-elected Inventions
821.01    After Election With Traverse
821.02    After Election Without Traverse
821.03    Claims for Different Invention Added After an Office Action
821.04    Rejoinder
>821.04(a)    Rejoinder Between Product Inventions; Rejoinder Between Process Inventions
821.04(b)    Rejoinder of Process Requiring an Allowable Product<
822    Claims to Inventions That Are Not Distinct in Plural Applications of Same Inventive Entity
822.01    Copending Before the Examiner
823    Unity of Invention Under the Patent Cooperation Treaty

# 801    Introduction

This chapter is limited to a discussion of the subject of restriction and double patenting under Title 35 of the United States Code and Title 37 of the Code of Federal Regulations as it relates to national applications filed under 35 U.S.C. 111(a). The discussion of unity of invention under the Patent Cooperation Treaty Articles and Rules as it is applied as an International Searching Authority, International Preliminary Examining Authority, and in applications entering the National Stage under 35 U.S.C. 371 as a Designated or Elected Office in the U.S. Patent and Trademark Office is covered in Chapter 1800.

# 802    Basis for Practice in Statute and Rules

The basis for restriction and double patenting practices is found in the following statute and rules:

*35 U.S.C. 121. Divisional applications.*

If two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 of this title it shall be entitled to the benefit of the filing date of the original application. A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application. If a divisional application is directed solely to subject matter described and claimed in the original application as filed, the Director may dispense with signing and execution by the inventor. The validity of a patent shall not be questioned for failure of the Director to require the application to be restricted to one invention.

*37 CFR 1.141.    Different inventions in one national application.*

(a) Two or more independent and distinct inventions may not be claimed in one national application, except that more than one species of an invention, not to exceed a reasonable number, may be specifically claimed in different claims in one national application, provided the application also includes an allowable claim generic to all the claimed species and all the claims to species in excess of one are written in dependent form (§ 1.75) or otherwise include all the limitations of the generic claim.

(b) Where claims to all three categories, product, process of making, and process of use, are included in a national application, a three way requirement for restriction can only be made where the process of making is distinct from the product. If the process of making and the product are not distinct, the process of using may be joined with the claims directed to the product and the process of making the product even though a showing of distinctness between the product and process of using the product can be made.

*37 CFR 1.142.    Requirement for restriction.*

(a) If two or more independent and distinct inventions are claimed in a single application, the examiner in an Office action will require the applicant in the reply to that action to elect an invention to which the claims will be restricted, this official action being called a requirement for restriction (also known as a requirement for division). Such requirement will normally be made before any action on the merits; however, it may be made at any time before final action.

(b) Claims to the invention or inventions not elected, if not canceled, are nevertheless withdrawn from further consideration by the examiner by the election, subject however to reinstatement in the event the requirement for restriction is withdrawn or overruled.

The pertinent Patent Cooperation Treaty (PCT) Articles and Rules are cited and discussed in Chapter 1800. Sections 1850, 1875, and 1893.03(d) should be consulted for discussions on unity of invention:

(A) before the International Searching Authority;

(B) before the International Preliminary Examining Authority; and

(C) in the National Stage under 35 U.S.C. 371.

# 802.01    Meaning of "Independent" and "Distinct" [R-3]

35 U.S.C. 121 quoted in the preceding section states that the *>Director< may require restriction if two or more "independent and distinct" inventions are

EXHIBIT U

Netcentives: ClickRewards@work

 **Netcentives**
Rewarding Relationships

Investor Relations | Press

About Us     Team     Jobs     FAQ     Contact Us     Home

## CLICKREWARDS@WORK

**PRODUCTS & SERVICES**

 **ClickRewards™**
- Merchants
- Rewards Suppliers
- www.clickrewards.com


- Programs
- Case Studies
- CR@Work in the News

 **Custom Loyalty Networks**

 **Professional Services**
- Training

**Online Demonstration**
ClickRewards@Work can work for you. Try the demo, then join ClickRewards and **earn 250 bonus ClickMiles** after completing your first purchase.

**Novell.**
uses http://web.archive.org/web/20000118171131/http://netcentives.com/crw/case.html#novell

**CISCO SYSTEMS**
EMPOWERING THE INTERNET GENERATION®
uses http://web.archive.org/web/20000118171131/http://netcentives.com/crw/case.html#cisco

### Simple, flexible and effective incentive tools for the enterprise

These days, it seems every facet of business happens faster than the speed of light. So how do you keep your employees, sales force and partners motivated and focused? ClickRewards@Work, part of our Enterprise Incentives Solutions, gives you a secure and reliable way to automatically award ClickMiles, a valuable digital currency, to employees, partners, vendors or anyone else you want to keep doing business with. Using your company's intranet, extranet or the Internet, the Netcentives suite of flexible incentive programs is customized to help you meet your company's goals. From retaining employees to increasing sales, Netcentives can help you meet your business objectives.

**Learn how ClickRewards@Work can be used for all aspects of your company.**

 CR@Work Programs

**ClickRewards@Work is:**

- **Flexible.** Programs can be set up to drive sales, aid human resources, improve customer service and fulfill an array of other objectives.
- **Simple.** ClickMiles are simple to award and manage.
- **Valuable.** ClickMiles are redeemable one-to-one for frequent flyer miles on 10 major airlines, as well as for other valuable rewards.
- **Accessible.** Everything is online. Employees can check their accounts and redeem ClickMiles 24/7.
- **Productive.** Quick access to ClickRewards@Work saves time and money.
- **Measurable.** The ClickRewards administrative system allows managers to see how well your incentive program is working.
- **Secure.** Our technology ensures that confidential information remains confidential.
- **Patented.** Netcentives' patented processes and secure scalable platform streamline the online consumer rewards process.
- **Branded.** The ClickRewards statement and reward catalog can be branded with your company's look and feel, producing a customized catalog that appeals specifically to your employees.

http://web.archive.org/web/20000118171131/http://netcentives.com/contact/contact_crw.html to find out how we can help you to motivate your employees.

Netcentives: ClickRewards@work

ClickRewards | http://web.archive.org/web/20000118171131/http://netcentives.com/crw/index.html | Custom Loyalty Networks | Professional Services | Investor Relations

About Us | Team | Jobs | FAQs | Contact Us | Home | Press

Copyright© 2000 Netcentives Inc., 690 Fifth Street, San Francisco, California 94107. All rights reserved. By accessing any information on this Web site, you agree to be bound by Netcentives' Terms of Use.

# EXHIBIT V

# REDACTED

# EXHIBIT W

# REDACTED

# EXHIBIT X

# REDACTED