IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AFFINION NET PATENTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 04-360-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| MARITZ INC., | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant. | ) | |

## ANSWERING CLAIM CONSTRUCTION BRIEF OF MARITZ INC.

Rudolf E. Hutz (#484)
Patricia Smink Rogowski (#2632)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

J. Bennett Clark
David W. Harlan
Jennifer E. Hoekel
Marc W. Vander Tuig
SENNIGER POWERS
One Metropolitan Square, 16th Floor
St. Louis, MO 63102
(314) 231-5400

Attorneys for Maritz Inc.

Original Filed: May 24, 2006
Redacted Version Filed: June 5, 2006

## TABLE OF CONTENTS

I. Introduction ...................................................................................................................... 1

II. Argument ........................................................................................................................... 1

   A. Backdrop to Initial Patent Application ......................................................................... 2

   B. Affinion's Claim Construction Hinges to Significant Degree on the False
       Premise that Mr. Storey Solved Two Separate Shortcomings of Prior Art
       Systems ........................................................................................................................ 4

       1. The '412 Patent is Directed to a System Designed to Enable Patrons to
           Instantly Earn and Redeem Award Points for Shopping On-Line, *i.e.* the
           "Immediacy Effect" ............................................................................................ 4

       2. The Prosecution History Reflects that the '412 Patent is Directed to a Single
           Invention ............................................................................................................ 6

       3. The Vague Attorney Statements Cited by Affinion Do Not Support its
           Position .............................................................................................................. 7

   C. "On-Line" ..................................................................................................................... 8

       1. Applicable Law ................................................................................................. 9

       2. Language of the '412 Patent Claims ................................................................. 9

       3. Prosecution History ......................................................................................... 10

   D. "Incentive Program" .................................................................................................. 11

       1. Affinion Mischaracterizes the Specification .................................................. 11

           a. The Specification Only Addresses Frequency Programs ....................... 12

           b. Affinion Mischaracterizes the Specification's Discussion of "Gross
              Salary" .................................................................................................. 13

       2. The Extrinsic Evidence Confirms that "Incentive Program" Means
           "Frequency Program" ...................................................................................... 14

   E. "On-Line Incentive Program" .................................................................................... 15

       1. All Aspects of the Claimed "Incentive Program" Must be On-Line ..................... 15

i

2.  Affinion's Focus on the "Program Homepage" is a Red Herring and, if Adopted, Would Render Numerous Claim Terms Superfluous ............................. 16

  a.  Affinion Provides No Basis for its Interpretation of "On-Line Incentive Program" ................................................................................................. 17

  b.  Affinion's Definition Impermissibly Renders Other Claim Language Superfluous ...................................................................................... 19

  c.  Claim 1 Supports Maritz's Proposed Construction of Claim 10, Not Affinion's .......................................................................................... 20

3.  If the Drafter Intended to Claim Online Redemption Only, Affinion's Strained Claim Construction Would not be Necessary ............................................ 21

4.  Affinion's Definition of "On-line Incentive Program" Contradicts its Ordinary Meaning as Understood by One of Ordinary Skill in the Art ................. 24

F.  The Issuance, and Availability for Redemption, of Points Must Be Immediate .......... 25

G.  "That Issues Award Points to Users" ........................................................................ 26

H.  "On-Line Interactive Communications" ...................................................................... 28

I.  "Redeemable Award" ................................................................................................. 29

J.  "Users" ....................................................................................................................... 30

K.  Affinion's Proposed Revision of Claim 12 is Futile, and Claims 12, 13, 29, and 30 are Indefinite, and Thus Invalid .......................................................................... 31

  1.  Claims 29 and 30 are Indefinite .......................................................................... 32

  2.  The Court Should Not Adopt Affinion's Proposed Claim 12 Revision ................. 34

    a.  Legal Standard for Correcting an Erroneously Drafted Claim ........................... 34

    b.  Affinion's Suggested Revision Would Render Claim 12 Indefinite ................. 35

    c.  The *Hoffer* Case is Inapposite ....................................................................... 36

L.  "Awards Catalog" and "Catalog of Awards" ............................................................. 36

M. Affinion's Interpretation of "On-Line Link to an Award Computer" Would Render Other Claim Elements Superfluous, and is Premised on a Mischaracterization of the Specification .................................................................. 38

1. Claim 10 Already Contains an Internet "Link" Between the System and the User .................................................................................................................... 38

2. The Specification Makes Clear that the Award Computer is a Fulfillment House or Product Manufacturer .......................................................................... 39

III. Conclusion ............................................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
    239 F.3d 1343 (Fed. Cir. 2001)................................................................................ 30

*Biogen Inc. v. Berlex Laboratories, Inc.,*
    318 F.3d 1132 (Fed. Cir. 2003)................................................................................. 8

*Catalina Marketing Int'l v. Coolsavings.com, Inc.,*
    289 F.3d 801 (Fed. Cir. 2002).................................................................................. 21

*Datamize, LLC v. Plumtree Software, Inc.,*
    417 F.3d 1342 (Fed. Cir. 2005)................................................................................ 31

*Elekta Instrument S.A. v. O.U.R. Scientific Intern., Inc.,*
    214 F.3d 1302 (Fed. Cir. 2000)................................................................................ 18

*Ethicon Endo-Surgery Inc. v. U.S. Surgical Corp.,*
    93 F.3d 1572 (Fed. Cir. 1996).................................................................................. 9

*Hoffer v. Microsoft Corp.,*
    405 F.3d 1326 (Fed. Cir. 2005)........................................................................... iii, 36

*Honeywell Int'l, Inc. v. ITC,*
    341 F.3d 1332 (Fed. Cir. 2003)................................................................................ 33

*IMS Tech., Inc. v. Haas Automation, Inc.,*
    206 F.3d 1422 (Fed. Cir. 2000)................................................................................ 21

*Novo Indus., L.P. v. Micro Molds Corp.,*
    350 F.3d 1348 (Fed. Cir. 2003)................................................................................ 35

*On Demand Machine Corp. v. Ingram Indus., Inc.,*
    442 F.3d 1331 (Fed. Cir. 2006)................................................................................ 11

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)........................................................................... 2, 14

*Salazar v. P&G Co.,*
    414 F.3d 1342 (Fed. Cir. 2005)................................................................................. 7

*Southwest Software, Inc. v. Harlequin Inc.,*
    226 F.3d 1280 (Fed. Cir. 2000)................................................................................ 34

*Texas Instruments Inc. v. International Trade Comm'n,*

988 F.2d 1165 (Fed. Cir. 1991)................................................................... 19

*U.S. v. Telectronics, Inc.,*
  857 F.2d 778 (Fed. Cir. 1988).................................................................. 39

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996).................................................................. 18

## Statutes

35 U.S.C. § 112, ¶ 2 .................................................................. 31, 33, 40

35 U.S.C. § 254................................................................................. 34, 35

35 U.S.C. §255.................................................................................. 34

## Other Authorities

Manual of Patent Examining Procedure § 708.02 ............................................ 6

<u>ANSWERING CLAIM CONSTRUCTION BRIEF OF MARITZ INC.</u>

## I.     INTRODUCTION

Following the initial round of *Markman* briefing, the parties dispute the meaning

of 13 claim terms or phrases, appearing in Claims 10 - 17, 27 - 34, and 36 of the '412

Patent.  The parties' respective interpretations are set forth in a chart attached as Exhibit

15,[1] for the Court's convenience.

As described more fully below, plaintiff commits a variety of claim construction

sins in attempting to impermissibly broaden the scope of the claims.  These include:

- Ignoring the extensive description of patented subject matter contained in the specification, in direct contravention of controlling Federal Circuit precedent;

- Disregarding statements made during prosecution of the Storey patents, including particularly those of the patent examiners considering those applications;

- Relying on vague prosecution history claims of its attorneys, which as a matter of law cannot be the basis for expanding claim scope;

- Proffering interpretations which would render claim limitations superfluous and violate principles of claim differentiation; and

- Taking positions contrary to those reflected in probative extrinsic evidence, including for example representations made by its predecessors-in-interest concerning the scope of the '412 Patent.

In this brief Maritz explains in detail why, as a matter of Federal Circuit law, the

interpretations it offers should be accepted and those of Affinion set to the side.

## II.     ARGUMENT

To make a case for infringement, Affinion faces a daunting claim construction

task.  Its fundamental problem, which it confronts time and again, is that it must argue

that the clear teachings of the specification should be ignored —an approach that would

---

[1]   Exhibit numbers in this brief are a continuation of those employed in Markman's Opening
Claim Construction Brief.  Exhibits 1 - 14 were submitted with the first brief.

violate the mandate of controlling Federal Circuit precedent. *See Phillips v. AWH Corp.*,
415 F.3d 1303, 1315-1317 (Fed. Cir. 2005). In arguing away from the specification --
not to mention the prosecution history and relevant extrinsic evidence -- Affinion
essentially seeks to recast the (purported)[2] inventive subject matter in an effort to state
even a colorable case of infringement.

    As the following section shows, from the outset Mr. Storey viewed his claimed
invention in a manner different than that argued by Affinion these many years later.

**A.     Backdrop to Initial Patent Application**

    In 1995, Thomas Storey retained attorney Joseph Bach to file a patent application
relating to a business idea he claimed to have conceived for a start-up venture, called
"ADDemup." Mr. Storey described ADDemup as an invention for rewarding people for
computer-based behavior. Ex. 16 at 27, ll. 11-18. Mr. Storey's ADDemup business card
summarized the notion in five words: "online shopping and award program."



*"online shopping and award program"*

Ex. 37.

    Mr. Storey was working on ADDemup in his spare time while employed by
DoubleTree Hotels. *Id.* at 187, ll. 1-12. Mr. Bach, an associate at a Washington, D.C.
law firm, agreed to draft the patent application out of his home for Mr. Storey, on the

---

[2]  Maritz believes the '412, and other Storey patents, are invalid and unenforceable for reasons
that will be addressed in separate briefing.

side, and at a reduced rate. Ex. 18 at 33, l. 14-34, l.5; at 38, l. 24-39, l. 3. The two never met face to face. Ex. 16 at 245, ll. 19-21, 230, l. 18-231, l. 5. Mr. Storey provided Mr. Bach a chart reflecting details of the ADDemup program. Ex. 17; Ex. 16 at 242, l. 20-246, l. 16; at 230, l. 18-231, l. 5.

Mr. Storey also opted to search for prior art himself, rather than use the assistance of a search firm. He testified that he felt his invention was different from the prior art, because his search efforts turned up no on-line incentive programs— to use his words, programs that "fully integrated the product catalog" and "awards catalog." Ex. 16 at 206, ll. 14-21. Mr. Storey contended that the fully integrated nature of the ADDemup program distinguished it from the prior art of which he was aware, most notably the Look to Book program claimed in U.S. Patent No. 5,483,444.[3] Ex. 16 at 15, l. 7-17.

Based on one or more discussions with Mr. Storey and the ADDemup flow chart sent to him by Storey, Mr. Bach drafted the patent application, which eventually led to all three patents-in-suit. Ex. 16 at 245, l. 10 246, l. 16. This application was filed on December 14, 1995. Although the owners of the rights to Mr. Storey's ADDemup idea and the patent attorneys prosecuting the patent applications claiming Mr. Storey's idea have changed substantially through the years, the specification of the original patent application remains constant. And it is the content of that specification, when viewed as a backdrop to the claims and in light of the prosecution history, which undermines the various labored interpretations advanced by Affinion in its opening brief.

---

[3] Mr. Storey is a named co-inventor of the '444 Patent, which was conceived by several employees of Radisson Hotels while Mr. Storey was employed there. The non-disclosure of this program and Mr. Storey's then-pending patent application relating to the Look to Book program, and related suppression of inventorship information during prosecution of the patents in suit here, forms part of the basis for Maritz's allegations of inequitable conduct, unclean hands, and patent misuse in this case.

B.    **Affinion's Claim Construction Hinges to Significant Degree on the False Premise that Mr. Storey Solved Two Separate Shortcomings of Prior Art Systems**

As demonstrated in our opening brief (referenced herein as "Mar. Br."), the purported invention of the patents-in-suit is a fully-integrated frequency program, with on-line purchasing activity, accompanied by immediate receipt of award points, and the ability to immediately redeem such points for a reward on-line. Affinion, in contrast, attempts to separate the patent claims into two *separate* inventions which exist independent of the other.

According to Affinion, Mr. Storey's first invention—awarding points for on-line purchases—was his solution to the delay customers experienced between the time they made their purchase and when they were awarded points. Opening Brief of Plaintiff Affinion Loyalty Group, Inc. ("Aff. Br.") at 2. Affinion then asserts that a "second shortcoming" existed in the prior art—"the delay and inconvenience that occurred" when a participant who wanted to redeem his or her points "had to go through the process of obtaining a physical certificate or credit instrument." *Id.* at 2-3. In response to this supposed shortcoming (which is belied by the art referenced below), Affinion alleges that Mr. Storey came up with a "second invention," allowing the redemption of points on-line.

1.    **The '412 Patent is Directed to a System Designed to Enable Patrons to Instantly Earn and Redeem Award Points for Shopping On-Line, *i.e.* the "Immediacy Effect"**

There are major problems with Affinion's argument. For starters, neither of the alleged shortcomings in the prior art identified by Affinion actually existed. The '444 Patent and its commercial embodiment, the Look to Book program, directly addressed

both of these shortcomings.  Mr. Storey, as a named inventor of the '444 Patent, was obviously quite aware of the Look to Book program's functionality.

The first alleged shortcoming identified by Affinion, the delay in awarding points, is addressed by the '444 Patent and Look to Book program.  Upon receiving a travel related reservation from an enrolled user, the system "then calculates the credits ... and displays the credits awarded ... to the travel agent."  Ex. 2, Col. 4, ll. 58-64.  In other words, the system immediately calculates the points to be awarded and generates a message that displays those credits to the user.  *Id.  See also* Figs. 2, 8.  In order to prevent fraud, however, the '444 Patent and Look to Book program intentionally incorporated a delay period between the issuance of points and their availability for redpemption.  *Id.* at Col. 5, ll. 21-24.  Thus, the travel agent had to wait for a "verification of the credit," such as confirmation that the traveler actually used the reservation, before issued points could be redeemable.  *Id.* at 5:18-34.

Once the earned points were redeemable, the '444 Patent and Look to Book program also directly addressed Affinion's second alleged shortcoming; namely the delay and inconvenience that occurred when a participant who wanted to redeem his or her points "had to go through the process of obtaining a physical certificate or credit instrument."[4]  The '444 Patent and Look to Book program, however, did not require "physical certificates" or "credit instruments" for redemption.  Instead, the travel agent wishing to redeem his/her points could review an online award catalog and call the

---

[4] Other prior art systems had also eliminated this second alleged shortcoming.  For example, one system issued a credit or debit instrument to the participant *before* he or she even earned any points and then "loaded" the instrument with points that could be redeemed immediately upon redemption.  *See* Ex. 22, Ex. 23.  In another system, a participant could use his or her telephone to directly access an incentive company's computer system to place redemption orders.  *See e.g.* Ex. 24.  Or a participant could fax his or her redemption order.  *See e.g.* Ex. 19.  Even immediate redemption through on-line award catalogs was known.  Ex. 25, Ex. 8.

"Program Awards Headquarters" using a toll free number to redeem points. Ex. 20 at

TRL-MTZ 44093. Thus, once the travel agent's points were available for redemption,

there was no delay or inconvenience in the redemption procedure.

Thus, the only "shortcoming" that actually existed in the prior art was the delay

between issuing the points and the ability to redeem them. And, most significantly for

present purposes, the specification of the patents-in-suit makes plain that this was the

single unitary problem that Mr. Storey's business idea was touted as solving: absence of

an "immediacy effect." Ex. 2, col. 1, ll. 57-59. Contrary to Affinion's arguments, on-

line redemption alone simply does not solve this problem.

### 2. The Prosecution History Reflects that the '412 Patent is Directed to a Single Invention

Another problem with Affinion's argument is that Netcentives (then owner of the

rights to Mr. Storey's idea) never disclosed to the Patent Office any view that the

application encompassed two separate inventions addressing different shortcomings in

the art. Much to the contrary, Netcentives assured the Patent Office that "all claims

pending the present application are directed to a single invention." Ex. 26 at 1.[5]

Netcentives made this "single invention" representation to expedite the Patent

Office's consideration of its application. If the claims had not been directed to a single

invention, or if Netcentives had refused to make an election as to one invention,

Netcentives' Petition to Make Special would have been denied. *See* Ex. 27, Manual of

Patent Examining Procedure § 708.02 ("The petition [to make special] will be denied on

the ground that the claims are not directed to a single invention, and the application will

---

[5] Netcentives' representation to the Patent Office is consistent with many other representations
Netcentives has made to the public regarding the scopes of the claims of the '412 Patent. *See*
Mar. Br. at 10, Ex. 7; *infra,* at Section II.D.2 and II.E.4.

await action in its regular turn."). The examiner agreed with Netcentives that the claims were directed to a single invention and granted the petition ... *without* issuing a restriction requirement. Ex. 28.

Additional prosecution history evidence shows that Affinion has manufactured the alleged "second invention" for purposes of this litigation. As discussed in Maritz's Opening Brief, the Examiner of the '412 Patent issued a double patenting rejection, finding that Claim 10's requirement of an Internet webpage was the **only difference** between it and Claim 17 of the '870 Patent. Mar. Br. at 8-9; Ex. 4. Now, however, Affinion seeks to expand the scope of Claim 10 (and the other claims addressed here) to make it much broader than Claim 17 of the '870 Patent. This directly contradicts the Examiner's assessment of Claim 10's scope.

And, contrary to the opinion of Affinion's expert, Mr. Petersen,[6] the Examiner's understanding of these claims is relevant to claim interpretation. *See Salazar v. P&G Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005) (stating that statements by an examiner during prosecution "may be evidence of how one of skill in the art understood the term at the time the application was filed").

### 3.    The Vague Attorney Statements Cited by Affinion Do Not Support its Position

Affinion submits that vague attorney statements in the Petition to Make Special support its "second invention" argument. Aff. Br. at 18-19 ("Any ambiguity as to

---

[6] While being asked about the Examiner's double patenting rejection, Mr. Petersen testified that, in his opinion, nothing that happened before the patent issued was relevant to the claim construction exercise. Ex. 29 at 155, l. 20-157, l. 5. Affinion relies heavily on Mr. Petersen's opinion to support its definition of "on-line incentive program." Aff. Br. at 16-17 (citations to Petersen's Report—Affinion's Ex. K—at page 5). Yet Mr. Petersen only "glanced" at the intrinsic evidence of the prosecution history and he did not factor it into his claim construction analysis because it occurred before the patent issued. Ex. 29 at 155, l. 20-157, l. 5.

whether Claims 10, 27 and 36 require on-line purchase of products is eliminated by the statements made by the applicant during the prosecution history."). These statements, however, beg the real question—what is an "on-line incentive program," as that term is used in the claims.[7]

In any event, these statements cannot be used by Affinion to change the scope of the claims or specification as written. *See Biogen Inc. v. Berlex Laboratories, Inc.*, 318 F.3d 1132, (Fed. Cir. 2003) ("Representations during prosecution cannot enlarge the content of the specification").

Faced with clear prosecution history indications that all the claims are directed to a single invention, Affinion's reliance on vague attorney statements falls flat. The asserted claims are, naturally enough, addressed to Mr. Storey's ADDemup program -- a fully integrated on-line incentive program that provides an "immediacy effect" by awarding points for on-line product purchases and making those points instantly redeemable.

C.    "On-Line"

Affinion asserts that "on-line" means "accessible through the Internet."[8] Aff. Br. at 9. This definition directly contradicts the claim language, specification, and prosecution history.

---

[7] As shown in our opening brief, the only such program described in the patent is a fully-integrated frequency program, with on-line purchasing activity, accompanied by immediate receipt of award points, and the ability to immediately redeem such points for a reward on-line. Mar. Br. at 6-10.

[8] The motivation for Affinion's strained interpretation is obvious. The claims of the '870 and '012 patents that Affinion seeks to remove from this case do not contain the "Internet" limitation, which heightens their exposure to Maritz's invalidity and unenforceability counterclaims.

1.    **Applicable Law**

First, Affinion argues that its definition is supported by the fact that the terms "on-line" and "Internet webpage" are used "in conjunction" with each other. But conflating two different terms in the same claim ignores controlling Federal Circuit precedent to the contrary. *See Ethicon Endo-Surgery Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996) (holding that, when different terms are used in the same claim, they should not be interpreted to be synonymous). Instead, the presumption is that, because the drafter used two separate terms, they have different meanings. Affinion cites no precedent for its argument, which turns the relevant claim construction principle on its head.

2.    **Language of the '412 Patent Claims**

Affinion's "conjunction" argument also ignores how on-line is used in other claims of the '412 Patent. For example, asserted Claims 13 and 30, as well as non-asserted Claims 8, 9, 25 and 26, have limitations that require various "on-line" links be made between an on-line incentive program computer to other computers. These links serve the purpose of (a) communicating product purchase orders to the product company in real time (Claims 8 and 25), (b) communicating award redemption orders to a fulfillment house or product manufacturer in real time (Claims 13 and 30), and (c) performing a credit check during an on-line product purchase in real time. *See* Ex. 2 '412 Patent, col. 4, ll. 63-65; col. 5, ll. 33-43; col. 10, ll. 9-11. *None* of these "on-line" links are limited to the Internet.

3.    **Prosecution History**

Contrary to Affinion's careless representation,[9] the prosecution history forecloses Affinion's proposed definition of "on-line." Aff. Br. at 12. During prosecution of the '412 Patent, the Examiner issued a double patenting rejection, citing the '870 Patent (the parent of the '412 Patent). Ex. 4. In that rejection, the Examiner made clear that "on-line" was not limited to "accessible through the Internet":

> [C]laim 17 [of the '870 Patent] **does not specifically claim [an] Internet webpage** for on-line interactive communication. However, patented Claim **17 shows providing user on-line access** to catalogs and forms....Claim 40 [which issued as Claim 10 of the '412 Patent] is similar to patented Claim 17. Claim 40 differs from patented Claim 17 in that Claim **17 does not specifically show [an] Internet webpage**.

*Id*. at 3 (emphasis added).[10]

Netcentives further relied on the difference between "on-line" and Internet webpages as the basis for patentability in arguments made to the Patent Office. In its Petition to Make Special, Netcentives described and distinguished U.S. Patent No. 5,761,648. Ex. 26, at 5.[11] Despite the '648 Patent's teaching of a system that permitted a user to redeem awards "on-line," Netcentives argued that the claims of the '412 Patent

---

[9] Affinion asserts that "there is nothing in the prosecution history of the '412 Patent (or any of the related patents) that suggests that 'on-line' should be given any different construction" than "accessible through the Internet." Aff. Br., at 12. The opinion of counsel cited by Affinion is not part of the prosecution history and provides no support for Affinion's misrepresentation of the intrinsic record.

[10] As discussed in Maritz's Opening Brief, Netcentives circumvented this rejection by filing a terminal disclaimer. Ex. 5.

[11] The '648 Patent discloses a system that facilitates the on-line interactive awarding and redeeming of "electronic certificates" issued to consumers. Ex. 30 (fig. 1, col. 1, ll. 5-19; col. 1, l. 64-col. 2, l. 64; col. 3, l. 56-col. 4, l. 39). These "electronic certificates" included electronic embodiments of coupons, gifts, or awards. *Id*. at col. 8, ll. 8-16. The '648 Patent disclosed that this system could be used with "various online software, including America Online®, Prodigy® and Microsoft®." *Id*. at col. 7, ll. 59-61.

were patentable because the '648 Patent did "not disclose or suggest a system that permits a user, *via an Internet web pag*e, to redeem award points for an award associated with an on-line incentive program." Ex. 26 at 5. Because Netcentives emphasized the difference between on-line and Internet before the Patent Office, Affinion should not now be permitted to conflate these terms in an effort to avoid invalidity.

Affinion's proposed claim construction of "on-line" is irreconcilable with the usage of this term in the intrinsic evidence, and should be rejected.

## D.    "Incentive Program"

In arguing that the claim term "incentive program" includes both frequency and employee programs, Affinion badly mischaracterizes the specification of the '412 Patent. Affinion's position also contradicts clear representations by its predecessors-in-interest that the scope of '412 Patent only encompasses frequency programs. Contrary to Affinion's arguments, these sources eliminate any doubt regarding the proper scope of the term "incentive program" in the '412 Patent.

### 1.    Affinion Mischaracterizes the Specification

"[T]he claims cannot be of broader scope than the invention that is set forth in the specification." *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006). The '412 Patent only discloses a frequency program that awards points to users for making on-line product purchases. *See* Mar. Br. at 7-8.

This conclusion is so inescapable that Affinion and its retained expert—whose expertise is limited to "loyalty and frequency" programs—simply cannot avoid using the "frequency program" label when describing the program claimed in the '412 Patent! *See* Affinion's Opening Brief, at 15 ("[t]he **central feature** of the '412 patent is the use of the

technology of Internet access and homepages to permit the participant in a **frequency** and award redemption program to interact directly with the program") (emphasis added). [12]

### a.    The Specification Only Addresses Frequency Programs

Affinion argues that the specification describes prior art related to both "consumer" programs and "employee programs." Aff. Br. at 12-13 (*citing* col. 1, ll. 12-24 as an example of both types of programs). The example cited by Affinion, however, is a "**frequent** flyer program," which the specification explicitly states is an example of "**frequency programs** ... developed by the travel industry to promote **customer loyalty**" (emphasis added). The applicant's own language undermines Affinion's position here.

Affinion also mischaracterizes the specification's discussion of European Patent (EP) 0 308 224. Plaintiff states that EP 0 308 224 discloses programs in which the participants are employees. Aff. Br. at 13. The drafter of the '412 Patent specification, however, included EP 0 308 224 as an example of a consumer based frequency program:

> According to another type of **frequency** and award program, a credit instrument is provided and credit points are accumulated instead of the millage [*sic*] points. In such programs, bonus points are awarded by using a formula in which **a price paid for merchandise is a parameter. Thus, upon each purchase a certain number of bonus points are awarded.** According to these programs, the **customer** receives a credit instrument which may be acceptable by many enrolled retailers, so that the selection of prizes is enhanced. **An example of such a program is disclosed in E.P.A. 308,224.**

Col. 1, ll. 41-51 (emphasis added). Nowhere in the specification of the '412 Patent is reference made to any employee-based program being disclosed by the cited reference.

---

[12] Ex. 31 at 2 (describing the state of the art of "frequency/loyalty programs in 1995").

Indeed, Affinion's expert relies on this characterization of the '412 Patent in his attempts to distinguish it from the prior art. *Id.* at 27 ("the Quinn article is referring to Maritz's incentives programs, **which are not frequent buyer programs at all**") ("The Look to Book program is not properly described as a 'frequent buyer program' but is instead an incentive program for partners in the distribution channel") (emphasis added).

Affinion insists that one of ordinary skill in the art reading the '412 Patent would realize that the description of E.P.A. 308,224 in the specification is inaccurate. Despite the specification's plain characterization of the reference as a frequency program, Affinion asserts, oddly, that the drafter included this reference to demonstrate that the invention was *not* limited to frequency programs. Affinion's argument only serves to highlight the lack of specification support for its position.

Affinion claims to find significant the fact that the specification does not distinguish E.P.A. 308,224 from the claimed on-line incentive program based on the type of behavior being incentivized. It is not surprising that the drafter did not distinguish the prior art on this basis. After all, *he believed the reference was a frequency program.*

### b.   Affinion Mischaracterizes the Specification's Discussion of "Gross Salary"

Affinion insists that the presence of the term "gross salary" in the specification equates to a disclosure of an employee-based program. Aff. Br. at 13-14 (*citing* '412 Patent, col. 4, ll. 1-33). A quick review of the referenced portion of the specification exposes Affinion's manipulation of language:

> The white incentive program can be accessible for enrollment by any approved user. On the other hand, the incentive company may allow limited access to the silver and gold incentive programs for providing information only, while enrollment may be restricted only to those users who satisfy set requirements. These requirements may relate, for example, **to a certain level of purchasing within a given period, credit rating, gross salary**, special company promotion program, etc.

Col. 4, ll. 21-28 (emphasis added). The applicant was referring to the gross salary of a *consumer* enrolled in the program, *not* the gross salary of an employee. This bit of legerdemain is telling. Despite Affinion's efforts to identify broadening language in the

specification, the description in the '412 Patent undermines Affinion's position.[13]  If the drafter wished to include anything beyond frequency award programs in his description, he could and would have done so expressly.  Instead, the only type of program covered by the patent is for frequent buyers.

### 2. The Extrinsic Evidence Confirms that "Incentive Program" Means "Frequency Program"

The Federal Circuit has stated that a district court may, in its discretion, consider extrinsic evidence.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).  In doing so, the Federal Circuit has identified several reasons why extrinsic evidence is generally less reliable than the patent and its prosecution history.  For example, extrinsic evidence often is not created at the time of the patent for the purpose of explaining the patent's scope and meaning; is not written for one of ordinary skill in the art; and can undermine the public notice function of the intrinsic record.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005).

None of these concerns are present with respect to the probative extrinsic evidence here.  This evidence is in the form of patent applications and other statements by Affinion's predecessor-in-interest, which  expressly explain the '412 Patent's scope

---

[13]Affinion contends that Maritz has admitted that "incentive program" includes more than just frequency programs.  Affinion cites one line of a Maritz expert report and the general use of the term "incentive program" by Maritz.  To the contrary, Maritz's expert's report differentiates between frequency and employee programs and explains why one of ordinary skill in the art would understand the term "incentive program" as it is used in the '412 Patent to mean a frequency program.  *See* Ex. N to Affinion's Opening Brief, Rebuttal Report of Bruce Bolger, at 13-14.  Neither Maritz nor its expert contends that the general meaning of "incentive" means "frequency."  Maritz does, however, contend that the only type of incentive program described and claimed in the '412 Patent is a frequency program, as demonstrated by both the intrinsic and extrinsic evidence.

and meaning, were written for those of ordinary skill in the art, and are consistent with the intrinsic record.

Affinion's predecessor in interest, Trilegiant,[14] filed a patent application titled "On-Line **Employee** Incentive System" on April 23, 2002, approximately 5 months after it acquired the '412 Patent. Ex. 32 (emphasis added). *In that application, Trilegiant clearly indicated that the '412 Patent was an example of a consumer frequency program:*

> Consumer-based points reward programs are common. One example is an airline frequent flyer program ... Similar programs exist in other **consumer markets. Consumer based incentive award programs are described in U.S. Patent No. 5,774,870 and U.S. Patent No. 6,009,412**

*Id.*, Paragraph 0008 (emphasis added).

REDACTED

These express statements to the Patent Office further undermine Affinion's attempt to broaden the patent claims to cover other than a consumer frequency program.

E.     "On-Line Incentive Program"

1.     All Aspects of the Claimed "Incentive Program" Must be On-Line

---

[14] The named inventors of the referenced application are Heather Hicks and Marti Lazear (Beller). Ms. Beller is now Affinion's President.

Affinion states that it is necessary for the Court to determine what aspects of the claimed incentive program are on-line. Aff. Br. at 15. The natural reading of the phrase, however, is to view the adjective "on-line" as modifying *all aspects* of its object, "incentive award program." For example, if instead the claim language read "implementing a live interview," surely the Court would not have to engage in the process of determining which aspects of the interview have to be live and which aspects do not have to be live. Instead, the Court would conclude that the claim requires the entire interview be live. Likewise, under a natural reading of the phrase "on-line incentive program," the Court need not engage in the process Affinion suggests. Instead, the Court should conclude that all aspects of the incentive program be on-line.[15]

At core, point-based incentive programs must include two main attributes: (1) allowing participants to earn points for certain behaviors, and (2) allowing participants to exchange their points for some award. These point "earn" and "burn" aspects are fundamental to all points-based incentive programs. The asserted claims of the '412 Patent require an "**on-line** incentive program." Therefore, these claims require that points be "earned" and "burned" **on-line**.

## 2. Affinion's Focus on the "Program Homepage" is a Red Herring and, if Adopted, Would Render Numerous Claim Terms Superfluous

As discussed above, if the phrase "on-line incentive program" is given its natural reading, all asserted claims of the '412 Patent would require implementing an incentive program, *every aspect of which is on-line*. Affinion seeks a different interpretation. Realizing that it cannot go so far as to blatantly ignore the adjective "on-line" altogether,

---

[15] In notable contrast, Affinion does not suggest that other claim language that includes the adjective "on-line" should be subjected to the odd analysis that it suggests for "on-line incentive program." For example, Affinion appears at ease requiring all aspects of the "redeeming form" or "link to an award computer" set forth in Claims 13 and 30 to be "on-line." *See* Aff. Br. at 29.

Affinion does not argue that no aspects of the claimed incentive program need to be on-line. However, Affinion evidently also appreciates the non-infringement impact of concluding all aspects of the claimed incentive program are modified by the adjective on-line. Therefore, in its brief Affinion hunts for middle ground.

Affinion has identified the "program homepage" as the on-line aspect of the claimed incentive program. It is unclear from Affinion's definition what additional limitations, if any, are required by a "program homepage." Affinion inconsistently refers to this middle-ground limitation as "program webpage" or "program homepage." *See* Aff. Br. at 15-17. And in other instances, Affinion suggests any Internet webpage is sufficient:

- "'[O]nline incentive program'" means an incentive program operated through an Internet webpage allowing for interaction between the users and the program" Aff. Br. at 16.

- "'[O]n-line incentive program" means the use of an Internet webpage for the operation of the incentive program that allows the user to communicate interactively with the program." *Id.* at 16-17.

Affinion thus provides no legitimate basis for its proposed definition of "on-line incentive program." And its proposed construction renders claim limitations superfluous, and conflates independent and dependent claims, in violation of the doctrine of claim differentiation.

        a.     **Affinion Provides No Basis for its Interpretation of "On-Line Incentive Program"**

All Internet web pages have a "homepage," which is reached by entering the main Internet address. *See e.g.* Ex. 2, col. 4, lines 2-5 ("It will be understood by those skilled in the art that PROGRAM HOMEPAGE 300 is the main internet address for the incentive program system"). After accessing a homepage, users may then link to other

secondary webpages. As Affinion acknowledges, this arrangement was well known in the prior art. *Id.* So Affinion's focus on the "centrality of the Program Homepage" to justify its strained definition of "on-line incentive program" is unpersuasive. Aff. Br. at 16.

At one point, Affinion suggests that the specification expressly *defines* "on-line incentive program." Aff. Br. at 15. Affinion has identified no language in the specification that even comes close to satisfying the standard for concluding the drafter, acting as his own lexicographer, expressly defined "on-line incentive program" as an incentive program with a program webpage.[16]

Affinion also cites the Petition to Make Special in support of its construction of "on-line incentive program." Aff. Br. at 16-17. But the citations relied on by Affinion are verbatim quotes of the second step of Claim 10 ("implementing an Internet webpage...for on-line interactive communications between said user and said Internet webpage"), and therefore do not shed light on "on-line incentive program," the claim term at issue:

> Although the '314 patent discloses a network sales system, it does not disclose an incentive system implemented with **on-line interactive communications between the user and an Internet webpage** as claimed in the present application.
> Claims [10-17, 27-34, and 36] also set forth limitations for an online incentive program conducted via **on-line interactive communications between a user and an Internet webpage.**

---

[16] *See Elekta Instrument S.A. v. O.U.R. Scientific Intern., Inc.,* 214 F.3d 1302, 1307 (Fed. Cir. 2000) ("[w]hile we have held many times that a patentee can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning, the written description in such a case must clearly redefine a claim term so as to put a reasonable competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that claim term"); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[i]f the patentee chooses to act as his or her own lexicographer, this special definition must be clearly stated within the patent specification or file history").

> The '372 Patent is not directed towards an on-line incentive program that operates **via on-line interactive communications between a user and an Internet webpage** as claimed in [Claim 10].

Ex. 26, at 8, 11.

Because these arguments relate to a *different* claim limitation than the one at issue, they do not support Affinion's proposed interpretation of "on-line incentive program." Nor does anything else in the specification or the prosecution history.

### b.    Affinion's Definition Impermissibly Renders Other Claim Language Superfluous

By incorporating a "program webpage which permits users to interact with the incentive program on-line" into its definition of "on-line incentive program," Affinion's proposed construction would eliminate the need for the second step of Claim 10. Such an interpretation cannot be correct. *See Texas Instruments Inc. v. International Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1991) ("To construe the claims in the manner suggested by [plaintiff] would read an express limitation out of the claims. This, we will not do because courts can neither broaden nor narrow claims to give the patentee something different than what he has set forth").

Claim 10 provides, *inter alia*, the following steps:

> implementing an **on-line incentive program** that issues award points to users, wherein said award points are redeemable by said user for an award;

> implementing an **Internet webpage** accessible, via a computer system, to at least one user of said on-line incentive program **for on-line interactive communications between said user and said Internet webpage ...**

Col. 11, ll. 13-29 (emphasis added). Affinion's proposed construction of the term "on-line incentive program" ("a program that uses the award of points that are redeemable for awards to incentivize certain behaviors and which **operates a program webpage which**

permits users to interact with the inventive program on-line") would render the second step of Claim 10[17] superfluous. This result violates basic claim construction principles and should not be countenanced by the Court.

        c.     **Claim 1 Supports Maritz's Proposed Construction of Claim 10, Not Affinion's**

Claim 1 provides: **A method for implementing an on-line incentive program**, said method comprising the steps of:

> providing an Internet webpage accessible to at least one user, via a computer system, for on-line interactive communications between said user and said Internet webpage;
>
> offering, on said Internet webpage, at least one product for sale to said user;
>
> determining whether said user qualifies for one or more award points based on said user's response to purchase said at least one product;
>
> calculating said award points according to a preprogrammed formula if said user qualifies for said award points; and
>
> issuing said award points to an account of said user if said user qualifies for said award points, wherein said award points are redeemable by said user for an award.

Col. 10, ll. 30-48 (emphasis added). Claims are part of the specification. In determining what the step of "implementing an on-line incentive program…" means, Claim 1 is quite instructive. Claim 1 uses this *exact* language to introduce the description that follows the preamble. Claim 1 discloses a "method of implementing an on-line incentive program" that involves issuing points to qualified users for making on-line purchases. As discussed

---

[17] Affinion defines the term "on-line interactive communications" as "communications via the Internet that allow the user to provide and receive information to and from the website." Aff. Br. at 21. Affinion further states that such communications are "central to the inventor's use of Internet technology to allow users to have the ability to **communicate directly with the incentive program**." *Id.* (emphasis added). Thus, Affinion provides the exact same definition for both "on-line incentive program" and "on-line interactive communications."

in Maritz's Opening Brief, this is the only method for implementing an on-line incentive program that is disclosed in the specification.

Affinion's argument concerning Claim 1 (Aff. Br. at 17-18) is untenable. It is based on the erroneous conclusion is that the preamble of Claim 1 is a limitation. To limit a claim, a preamble must be "necessary to give life, meaning, and vitality" to the claim. *Catalina Marketing Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). A preamble, such as the preamble of Claim 1, which merely gives a descriptive name to the set of limitations that follow, does not limit the claim. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000). Affinion has presented no basis for concluding that the preamble language of Claim 1 is anything other than a description of the steps involved in "implementing an on-line incentive program" that follow the phrase, "said method comprising the steps of."[18]

Equally untenable is Affinion's argument that Claim 10 cannot be construed to include details also contained in Claim 1. This especially so given the express representation made to the Patent Office that the claims of the '412 Patent were directed to a *single invention*. And, contrary to Affinion's argument, ***Claim 10 and Claim 1 would not be co-extensive under Maritz's claim construction***. For example, Claim 10 contains further limitations regarding on-line redemption, which are not addressed by Claim 1.

### 3. If the Drafter Intended to Claim Online Redemption Only, Affinion's Strained Claim Construction Would not be Necessary.

---

[18] In fact, if one were to accept Affinion's proposed construction of "on-line" incentive program (an incentive program that operates a program webpage that permits users to interact with the incentive program), one would expect the drafter to have included the step of "implementing an on-line incentive program." The fact that this step does not appear in Claim 1 further undermines Affinion's position.

As discussed above, Affinion's definition of "on-line incentive program" is contingent on several untenable assumptions, including:

- the drafter intended the adjective "on-line" to modify some, but not all, aspects of the claimed "incentive program"

- the drafter intended the adjective "on-line" to mean a "program homepage" or "program webpage"

- the drafter included the second step of Claim 10 ("implementing an Internet webpage…for on-line interactive communications between said user and said Internet webpage") even though he intended the first step ("implementing an on-line incentive program…") to include this step

- the drafter intended to describe an entirely separate invention in Claim 10 than what he described in Claim 1, but chose to nonetheless represent to the Patent Office that "[a]pplicant believes all claims pending in the present application are directed to a single invention"

Based on the plain language of Claim 10, it is evident that the drafter did not intend the meaning of "on-line incentive program" urged by Affinion. If the drafter wanted to claim a system that only required the on-line redemption of points, he could have easily done so. The following language, for example shows one way the drafter could have drafted a claim directed at on-line redemption only:[19]

A method for redeeming incentive awards in an ~~on-line~~ incentive program, said method comprising the steps of:

~~implementing an on-line incentive program that issues award points to users, wherein said award points are redeemable by said user for an award;~~

implementing an Internet webpage accessible, via a computer system, to at least one ~~user~~ participant of said ~~on-line~~ incentive program for on-line interactive communications between said ~~user~~ participant and said Internet webpage;

offering, on said Internet webpage, at least one redeemable award available to said ~~user~~ participant for exchange of ~~said~~ award points; and

permitting said ~~user~~ participant to initiate a process to receive said at least one redeemable award for exchange of said award points issued to said ~~user~~ participant through said ~~on-line~~ incentive program.

---

[19] Deletions are shown by marked-through text. Additions are shown by underlined text.

Assuming that a claim so drafted would have been allowed by the Patent Office,[20] Affinion's position as to the scope of its claim would flow from a natural reading of the claim language unencumbered by the problems discussed above.

When Affinion's predecessor-in-interest filed a patent application focused *solely* on features relating to on-line point redemption, it made its intention clear to the Patent Office. Exhibit 34 is a copy of a published non-provisional patent application, S/N 10/143,866, that was filed by Trilegiant on May 14, 2002—five months after it acquired the '412 Patent. The title of the application is "Interactive Online Point Redemption System." This application disclosed a system in which "[a] server interacts with customers and the loyalty database to execute redemption of rewards as selected by a customer based on the customer's loyalty account information and associated customer loyalty reward program data." *Id.* (Abstract). Users of this system could visit a "redemption website" and "redeem points for awards such as airline tickets, gift certificates, and merchandise." *Id.*, ¶4.

Because the '412 Patent (which is prior art to the pending '866 provisional application) has not yet been disclosed to the Patent Office for consideration, and because the Patent Office has not yet issued an office action, we are left to guess whether the Patent Office would consider this patent application to be distinct from Claim 10 of the '412 Patent. But by filing and maintaining this patent application for four years,

---

[20] As Maritz has noted, the Patent Office found that on-line award catalogs were known in the art. Ex. 8 (Notice of Allowability for the '012 Patent). The examiners involved in issuing the patents-in-suit have emphasized that it was only the combination of on-line award catalogs and on-line product catalogs, *i.e.* combining incentive programs and e-commerce systems, that was patentable over the prior art. *Id.*; Ex. 6 (Notice of Allowability for the '870 Patent).

Affinion must believe that Claim 10 of the '412 Patent is distinct from its "Interactive Online Point Redemption System," as described in the '866 application.

### 4. Affinion's Definition of "On-line Incentive Program" Contradicts its Ordinary Meaning as Understood by One of Ordinary Skill in the Art

The Court needs to know that *Affinion's predecessors-in-interest have made repeated representations to the public and the Patent Office that "on-line incentive programs," such as the one claimed in the '412 Patent, are frequency programs that award points to users for on-line product purchases.* For example, in 2001 Netcentives defined the on-line incentive programs covered by the '412 Patent as "one in which consumers earn points for making on-line purchases, store and track points via computer, and then redeem points for various rewards..." Ex. 7.

Netcentives also made such a representation to the Patent Office; in a patent application for "An On Line Incentive System," Netcentives used the term "on-line incentive program" to describe a frequency program that awards points to users for on-line activity at a merchant's web site. Ex. 35. The application related to "the field of on-line incentive programs." *Id.* at 1, ll. 6-8. According to the application, incentive programs that award points to consumers for purchases were known in the art, but "it is desirable to implement an incentive program for use with the Internet." *Id.* at 3, lines 3-10. The specification of that application makes clear that an on-line incentive program is one where the user is awarded points for making on-line purchases at a merchant's web site. *Id.* at 4, ll. 14-19 ("[a]n on-line incentive system provides a means for a consumer to enter an earning activity to earn value from the merchant....the consumer's focus of activity remains at the merchant's web site"); at 9, ll. 1-3 ("the consumer 110 surfs up to

a web site of merchant 120, and the consumer 110 enters an "earning activity", specified

by the merchant 120"); at 11, l. 15 - 12, l. 1.

In another patent application, S/N 09/668,965, Affinion's predecessor-in-interest

characterized the subject matter of the '412 patent consistently with Maritz's proposed

definition:

> With the increasing amount of commerce conducted over the Internet,
> award programs have been extended and expanded to build strong **loyalty**
> relationships between **e-commerce buyers and on-line merchants.** For
> example, US Patent Number 6,009,412 entitled "Fully Integrated On-Line
> Interactive Frequency and Award Redemption Program" discloses an
> integrated incentive program **capable of awarding customers based on
> on-line transactions.**

Ex. 33, AFF-MTZ 004715 (emphasis added).

## F.    The Issuance, and Availability for Redemption, of Points Must Be Immediate

Despite plain statements in the specification and legal precedent to the contrary,

Affinion argues conclusorily that Claim 10 does not require both the immediate issuance

*and* immediate redeemability of points. Aff. Br. at 17.   But, as discussed below,

Affinion uses this very feature of the '412 Patent to distinguish it from the prior art.  *Id.* at

2. Once the specification is properly considered, it is clear that Claim 10 requires that

award points be both immediately issued and immediately available for redemption ("the

immediacy effect").

Affinion seeks to ignore repeated statements in the specification touting the

immediacy effect as an advantage of the claimed invention, while at the same time

criticizing the prior art as lacking this feature. *See* Col. 1, l. 56 - Col. 2., l. 17.  The

Federal Circuit has made clear that statements in the specification describing an

advantage of the invention that is said to be lacking in prior systems limits the scope of

the patent claims. *See* Mar. Br. at 12. Accordingly, the term "issues award points to

users, wherein said award points are redeemable by said user for an award" of Claim 10 should be interpreted to require the immediacy effect.

### G.    "That Issues Award Points to Users"

Claim 10 requires the step of "implementing an on-line incentive program *that issues award points to users*..." Affinion argues that the phrase "that issues award points to users" is limited to adding points to a user's account. Aff. Br. at 19. But the specification makes clear that *before the system can add points to a user's account, it must first determine if the user is an enrolled user and then calculate the points to be added to the user's account.* Affinion points to no evidence showing how one can implement an on-line incentive program that issues points to users without performing these three steps.

Affinion's argument that unasserted Claim 1 of the '412 Patent forbids construing "that issues award points to users" consistently with the specification is unfounded. Claim 1 provides specific details as to the various steps involved in awarding points to users for on-line purchases. But this does not support Affinion's conclusion that an "on-line incentive program that issues award points to users" does not require the steps of determining whether a user is an enrolled user and calculating the points.

Affinion's argument depends on equating the "issuing step" in Claim 1 with the phrase "that issues award points" in Claim 10. Aff. Br. at 20-21. Obviously, these claim phrases are not identical. And Affinion's argument further depends on its conclusion that the "issuing award points" step of Claim 1 "cannot include the steps of determining eligibility of calculating points." Aff. Br. at 20 (emphasis in original). Claim 1's step, however, expressly requires the determining step and necessarily requires the calculating

step. Claim 1's final step requires "issuing *said* award points to an account of said user *if said user qualifies for said award points…*"

How can one perform the issuing step of Claim 1—which only allows the system to add points to a user's account "if said user qualifies for said award points"—without first determining whether the user is qualified to earn points? And how can the system award points to a user without calculating the number of points his or her behavior warrants according to a preprogrammed formula? Does Affinion seriously contend that a system that awards points to users *randomly* properly incentivizes the user?

Contrary to Affinion's suggestion (Aff. Br. at 21), the figures in the specification provide no support for its position. That there are multiple processing steps depicted that correspond to one step claimed in the '412 Patent proves nothing. Instead, this a common convention in the '412 Patent. For example, the last step of Claim 10 — "permitting said user to initiate a process to receive said at least one redeemable award for exchange of said award points…"—is depicted as multiple processing steps in Figure 4. Ex. 2, fig. 4; col. 9, l. 51-col. 10, l. 12 (depicting the "REDEEM routine 500" as including at least processing steps 500, 510, 515, and 520 in Figure 4).

One skilled in the art following the flow chart of Figure 2 from 150P to 210 and the corresponding description in the specification would understand that the step of issuing award points to a user's account includes steps 170 and 180 (checking the user's information against the database of enrolled users to determine if the user is an enrolled user). 190 (calculating the award points according to a preprogrammed formula), and 200 (adding the calculated points to the enrolled user's account). *Id.* at fig. 2; col. 5, ll. 44-54.

The '412 Patent provides no alternative means to issue points to users. Affinion's faulty Claim 1 argument cannot trump the clear teaching of the specification.

**H.    "On-Line Interactive Communications"**

Maritz disagrees with Affinion's definition of "on-line interactive communications." Hanging onto its position that "on-line" means Internet, Affinion defines "on-line interactive communications" as "communications via the Internet that allow the user to provide and receive information to and from the website." Aff. Br. at 21. Nothing in the claim language "on-line interactive communications" or the specification, however, supports concluding that this phrase requires that the on-line interactive communications be "via the Internet."

This plain meaning is reinforced by a reading of the entire step of Claim 10 that includes this phrase: "*implementing an Internet webpage* accessible, via a computer system, to at least one user of said on-line incentive program *for on-line interactive communications* between said user and said Internet webpage." The affirmative step of "implementing an Internet webpage" is what triggers the requirement that the communications be via the Internet. There are many mechanisms for achieving "on-line interactive communications" besides the Internet. And, for the same reasons that one of ordinary skill in the art would not limit "on-line" to mean Internet (as discussed above and in our opening brief), one of ordinary skill in the art would not understand "on-line interactive communications" to be limited to communications via the Internet.

The phrase "on-line interactive communications" must be construed to mean communications that allow a user to provide and receive information to and from another computer via a computer network that allows for the real-time exchange of information.

The entire step that contains this phrase means implementing an Internet webpage that allows for the immediate two-way communication between the on-line incentive program and the user. Mar. Br. at 16-18.

I.    "Redeemable Award"

Affinion argues that the specification limits the scope of the limitation "redeemable award" to only "a product or service that can be obtained as a prize or award in exchange for award points." In this case, Affinion actually seeks to limit the scope of the claim to what is described in the specification. Maritz has no dispute with the affirmative definition of "redeemable award" quoted above.

Maritz does not, however, agree with the unwarranted "negative" limitation Affinion seeks to graft onto "redeemable award." Affinion proposes excluding programs that offer discounts on future purchases in exchange for points. *See* Aff. Br. at 22-23.[21] Although its approach is less than clear, Affinion apparently contends that a "redeemable award" is limited to products or services that can *only* be redeemed with points. In other words, the redemption transaction must be funded entirely with points and cannot be funded partially with points and partially with another non-point currency. If not, then Affinion is arguing a distinction without a difference.[22]

---

[21] Affinion's negative definition of "award" and its unpersuasive justification for reading such an odd limitation into the claim is motivated solely by its desire to avoid the invalidity implications of U.S. Patent No. 5,710,887 (Chelliah). The Chelliah patent teaches an on-line incentive program, which combines an e-commerce platform with a points-based frequent buyer program. As Maritz will demonstrate in its Motion for Summary Judgment of Invalidity, the Chelliah Patent anticipates the asserted claims of the '412 Patent. Affinion's negative definition of "award" is an attempt to conjure a distinction between the Chelliah patent and the asserted claims. And, even under Affinion's interpretation, Chelliah still invalidates the asserted claims.

[22] Maritz's systems can allow participants to supplement their points during award redemption transactions. Affinion apparently asserts that such a program satisfies the "redeemable award" limitation of the asserted claims. Affinion cannot construe its claims one way to maintain its infringement claim and another to avoid invalidity. *Amazon.com, Inc. v. Barnesandnoble.com,*

J.    "Users"

Maritz contends that "users"—as this term is used in the asserted claims—means persons enrolled in the on-line incentive program. Affinion contends that "users" can include non-enrolled users, merchants, product manufacturers, and award program administrators. Aff. Br. at 23. Affinion relies on the specification's description of how merchants, product manufacturers, and award program administrators can gain privileged access to the program to change a product's price or enter new products. Exh. 2, col. 10, lines 13-25).

But Claim 10 makes plain that the claimed "users" are not product manufacturers or award program administrators. Instead, "users" are persons who (1) are issued award points, (2) access the on-line incentive program's webpage, (3) are offered an award in exchange for their points, and (4) are permitted to initiate a process to receive an award in exchange for their points.   The specification makes plain that only enrolled users can satisfy any of these claimed characteristics. *See id.* at col. 5, ll. 44-54; col. 9, l. 44-col. 10, l. 12. Affinion has provided no basis for concluding that product manufacturers or award program administrators are awarded points and allowed to exchange these points for awards, unless perhaps they are also enrolled in the on-line incentive program.

The fact that the drafter chose to use the word "user" in the asserted claims further supports Maritz's claim construction of "on-line incentive program." As discussed above, an "on-line incentive program" as used in the '412 patent is a frequency program that awards users for on-line product purchases. That the asserted claims award points to

---

*Inc.,* 239 F.3d 1343 (Fed. Cir. 2001) ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.").

"users," rather than "customers" or "employees" or "participants," provides significant contextual support for Maritz's definition.

The drafter's decision to describe the person being incentivized as a "user" shows that the on-line incentive program is incentivizing the "use" of something. The on-line product catalog or e-commerce system is the only thing, the use of which earns award points. The use of the "program homepage" does not entitle one to award points. The use of the on-line award catalog does not entitle one to award points. And a person that makes purchases at a merchant's brick and mortar location or an employee reaching a sales goal set by his or her employer is not aptly described as a "user." Affinion's construction of "on-line incentive program" is inconsistent with the drafter's claim language and should not be adopted.

**K.    Affinion's Proposed Revision of Claim 12 is Futile, and Claims 12, 13, 29, and 30 are Indefinite, and Thus Invalid**

Affinion asks this Court to revise Claim 12 to depend from Claim 11 instead of Claim 10. Affinion's proposed revision, however, is futile because revising Claim 12 as suggested would render it indefinite. Maritz requests that the Court find Claims 12, 13, 29, and 30[23] invalid as indefinite under 35 U.S.C. § 112, ¶ 2.

A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of the claims. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). A claim is indefinite if it is not amenable to construction. *Id.* General principles of claim construction apply to the indefiniteness inquiry. *Id.* at 1348.

---

[23] Claims 12, 13, 29, and 30 of the '412 Patent are dependent claims. Claims 12 and 13 are identical to Claims 29 and 30, except that Claims 29 and 30 claim software for performing the steps of Claims 12 and 13. Claims 13 and 30 depend from Claims 12 and 29 respectively.

### 1.    Claims 29 and 30 are Indefinite

Claim 29 incorporates all the limitations of Claim 28, which in turn incorporates all of the limitations of Claim 27. Claim 28, from which Claim 29 depends, reads as follows:

> 28.    The computer readable medium as set forth in Claim 27, wherein the step of permitting said user to initiate a process to receive a redeemable award comprises the steps of:
>
> accessing an account of said user;
>
> *redeeming a particular award for said user based on said points issued to said user if said user has earned sufficient points to qualify for said particular award*; and
>
> subtracting said points from said account of said user (emphasis added).

As written, Claim 28 provides further details about how the software for implementing an on-line incentive program permits a user to redeem his or her points for an award. The '412 Patent describes these steps relating to the "REDEEM routine." Ex. 2 at col. 9, l. 51-col. 10, l.11, fig. 4 (500, 510, 515, 520, and 530)).[24] Based on the plain meaning of the above-italicized language of Claim 28 and the corresponding description in the specification, one of ordinary skill in the art would have understood this limitation to mean checking the balance in a user's account to ensure there are sufficient points available to redeem a particular award. Ex. 36 at 7-8.

One of ordinary skill would also understand the steps of Claim 28 necessarily to occur sequentially: (1) First, the user's account—which is stored in the FREQUENCY DATABASE 515—is accessed; (2) next, the user's account balance is checked to determine if he or she has sufficient points to cover the selected award; and (3) finally,

---

[24] Figure 4 is described as "a flow chart showing the award redemption part of the program." Ex. 2, col. 2, ll. 49-51.

the user's account balance is decremented by the point value of the award redeemed.
Ex. 36 at 8.

Claim 29 purports to further modify the above-italicized second step of Claim 28,
the step of checking the user's point account balance:

> 29.    The computer readable medium as set forth in Claim 28, wherein the step
> of redeeming a particular award for said user comprises the steps of:
>
> displaying, via said Internet webpage, a catalog of awards redeemable
> with said award points of said on-line incentive system; and
>
> accepting a selection by said user that indicates an award from said
> catalog.

The step of "displaying, via said Internet webpage, a catalog of awards..." means
displaying one or more redeemable awards to the user on a webpage. The specification
describes such a webpage as the "AWARD CATALOGUE HOME PAGE 400." Ex. 2,
fig. 4, col. 8, ll. 8-21. And one of ordinary skill in the art would understand "accepting a
selection by said user..." to mean permitting users to select awards from the award
catalog. Ex. 36 at 8. Neither of these steps relate to checking a user's account balance to
authorize an award redemption transaction, much less further limit the scope of that step
as Claim 29 purports to do. Because of this, one of ordinary skill in the art would find
this claim ambiguous and would be unable to discern the scope of Claim 29. Ex. 36 at 6-
9. Claim 29 is therefore invalid under 35 U.S.C. § 112, ¶2. *Honeywell Int'l, Inc. v. ITC*,
341 F.3d 1332, 1338 (Fed. Cir. 2003) (Section 112, ¶2's definiteness requirement
"focuses on whether the claims, as interpreted in view of the written description,
adequately perform their function of notifying the public of the [scope of the] patentee's
right to exclude").

Claim 30 incorporates all of the limitations of Claims 27, 28, and 29 and provides additional steps to the ones described in those claims. Because Claim 30 depends from Claim 29, it incorporates the ambiguity discussed above for Claim 29. For the reasons discussed above, Claim 30 is invalid as indefinite because one of ordinary skill in the art would be unable to discern the scope of Claim 30.

### 2. The Court Should Not Adopt Affinion's Proposed Claim 12 Revision

Affinion recognizes that, as currently drafted, Claim 12 makes no sense. But its proposed fix for this claim would compound its indefiniteness. Claim 12 depends from Claim 10 and incorporates all of Claim 10's limitations. It then adds further limitations to the step of "redeeming a particular award for said users." However, Claim 10 does not contain this step. Affinion argues that Claim 12 contains an obvious typographical error on the part of the drafter that was overlooked by both the drafter and the Patent Office. Aff. Br. at 26-27. Affinion also urges the court to simply fix the mistake by changing the "10" in Claim 12 to an "11."

#### a. Legal Standard for Correcting an Erroneously Drafted Claim

Congress has provided a mechanism by which errors in a patent are to be remedied. That mechanism is 35 U.S.C. §§ 254 and 255.[25] Section 254 addresses correcting errors made by the Patent Office. And Section 255 addresses correcting errors made by the applicant. The Federal Circuit has noted that both sections envision

---

[25]Maritz notes that, at no time during the six plus years since the '412 Patent issued, have any of the owners approached the Patent Office to seek correction of this error that Affinion asserts is "apparent from the face of the patent." Aff. Br. at 26. Given that Congress has expressly provided a mechanism for correcting errors, it is reasonable to require Affinion to utilize this administrative route to correct errors in its patents. *See Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1296 (Fed. Cir. 2000) ("it does not seem to us to be asking too much to expect a patentee to check a patent when it is issued in order to determine whether it contains any errors that require the issuance of a certificate of correction").

correction by the Patent Office only, not by the courts. *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1356 (Fed. Cir. 2003). And allowing courts to revise errors in patents would "effectively write the nonretroactivity provisions out of sections 254 and 255." *Id.* at 1357.

The Federal Circuit only recognizes the authority of courts to correct errors in patents in one narrow situation: "A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Id.*

### b.    Affinion's Suggested Revision Would Render Claim 12 Indefinite

Affinion's suggested correction is subject to reasonable debate, based on consideration of the claim language and the specification. If corrected as suggested by Affinion, Claim 12 would suffer from the same indefiniteness problem described above for Claim 29. Because the further limitations of Claim 12 make no sense when applied to the referenced step in Claim 11, one of ordinary skill in the art would not recognize this as an obvious typographical error with an obvious solution.

The further limitations of Claims 12 and 29 would actually more appropriately further limit the step of "permitting said user to initiate a process to receive said at least one redeemable award..." present in Claims 10 and 27. But because Claims 12 and 29 expressly reference the "redeeming a particular award..." step that is not present in

Claims 10 and 27, one of ordinary skill in the art would find Claims 12 and 29 (and their dependent Claims 13[26] and 30) insolubly ambiguous and indefinite.

c.    The *Hoffer* Case is Inapposite

Affinion argues that *Hoffer v. Microsoft* justifies making its suggested revision. *Hoffer* is inapposite. In *Hoffer*, the patent application as originally filed contained independent Claim 38 and dependent Claim 39 (depending from 38). *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005). Both claims were allowed, but because earlier claims were cancelled during prosecution, the Patent Office had to renumber Claims 38 and 39 to Claims 21 and 22, respectively. *Id.* In doing so, the Patent Office failed to correct the reference in the body of Claim 22, referencing Claim 38. *Id.* The final patent contained no Claim 38.

Here, unlike *Hoffer*, the alleged typographical error in the '412 Patent was not the Patent Office's fault. And the referenced claim is present in the final version of the '412 Patent, so the error is not evident from its face. Finally, the applicant in *Hoffer* obtained a Certificate of Correction from the PTO, something no owner of the '412 Patent has done since it issued. *Id.* Contrary to Affinion's assertions, the *Hoffer* case is not "very similar" to this case. In *Hoffer*, the prosecution history made plain that the correction was not subject to reasonable debate. For the reasons discussed above, the same conclusion cannot be reached with respect to the error in Claim 12 of the '412 Patent.

L.    "Awards Catalog" and "Catalog of Awards"

---

[26] Claim 13 incorporates all of the limitations of Claims 10 and 12 and provides additional steps to the method described above in those claims. Because Claim 13 depends from Claim 12, it incorporates the ambiguity discussed above for Claim 12.

Affinion asserts that the terms "awards catalog" and "catalog of awards" that appear in Claim 12, 14, 29, and 31 mean "a compilation of award descriptions and point values." Maritz proposes a similar definition, but uses a simpler and more accurate definition of "catalog." Maritz's proposed definition also incorporates the definition of "redeemable award" discussed above. "Awards catalog" or "catalog of awards" means "a list providing details of products or services that can be obtained as a prize or award in exchange for award points."

Affinion further insists that the award catalog "must be separate from any product catalog offering products for sale on a webpage." Aff. Br. at 28. Affinion has no basis for grafting this further limitation onto "awards catalog." In fact, with respect to other claim elements, Affinion vehemently argues that none of the asserted claims require a product catalog or awarding points for on-line product purchases. Now, in an effort to avoid invalidity,[27] Affinion defines "award catalog" to be separate from a product catalog—something not even required by the claims. This claim construction is groundless.

Affinion's citations in support of this interpretation betray the weakness of its position. Affinion cites to claims of the '870 and '012 patents, *which expressly claim separate award and product catalogs.* And Affinion cites to an opinion letter drafted by Maritz's outside counsel addressing the claims of the '870 Patent, which expressly require this separateness. Aff. Br. at 28 and corresponding exhibits. The Court should reject

---

[27] The '887 Patent was discussed above and will be, in part, the subject of Maritz's Motion for Summary Judgment of Invalidity. The '887 Patent disclosed an e-commerce system that included a frequent buyer program that awarded points to on-line shoppers. These points could be redeemed by users for products or services as an award for patronizing the on-line merchant. Affinion's odd definition of "award catalog" is an attempt to manufacture some distinction between the '887 and the asserted claims.

Affinion's attempt to graft this limitation onto the construction of "awards catalog" or "catalog of awards."

**M.    Affinion's Interpretation of "On-Line Link to an Award Computer" Would Render Other Claim Elements Superfluous, and is Premised on a Mischaracterization of the Specification**

To stay consistent with its definition of "on-line," Affinion is forced to argue that the term "on-line link to an award computer" found in dependent Claims 13 and 30 should be interpreted to mean an Internet link from the user to the computer within the system that processes the award requests from the user through the on-line redeeming forms. Aff. Br. at 29.[28]  This interpretation, however, is contrary to the claim language and specification of the '412 Patent.

**1.    Claim 10 Already Contains an Internet "Link" Between the System and the User**

Claim 10, as discussed above, contains the step of "implementing an Internet webpage accessible, via a computer system, to at least one user of said on-line incentive program for on-line interactive communications between said user and said Internet webpage." Affinion's interpretation of Claim 13 would require again providing an Internet webpage for on-line interactive communications between the system and the user.[29]  Under this interpretation, Claim 13 would provide no further limitation to Claim

---

[28] Affinion also defines "on-line redeeming form" to be limited to an electronic form "accessible through the Internet." Aff. Br., p. 29. For the reasons discussed above and in Maritz's Opening Brief, the intrinsic evidence dictates that "on-line" should not be limited to the Internet. Maritz, therefore, requests the Court to construe "on-line redeeming form" to mean an electronic form that accepts entries during an on-line redemption.

[29] For example, Affinion's expert, Robert Young, states in his infringement report that this "on-line link to an awards computer" limitation is found in Maritz's Vault program because "[a]ll user communications with Vault is done through an Internet web browser, and as such, an Internet connection must be established between the user's computer and the Vault computer responsible for accepting user input whenever information needs to be exchanged." Ex. 38 at Claim Chart, p.

12, which depends from Claim 10. The Court should reject such an interpretation. *U.S. v. Telectronics, Inc.*, 857 F.2d 778, 783-84 (Fed. Cir. 1988) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.").

### 2. The Specification Makes Clear that the Award Computer is a Fulfillment House or Product Manufacturer

Affinion asks the Court to construe the term "award computer" to mean "the computer within the system that processes the award requests received from the user through the on-line redeeming form." Contrary to Affinion's assertion that the specification does not expressly discuss the "award computer," the specification clearly discloses that the "on-line link" is a real-time connection to a fulfillment house or product manufacturer.

The specification describes the "establishing an on-line link to an award computer" step as occurring after the REDEEM routine has been completed and the "proper amount of points [are] then subtracted from the user's account and an adjustment is made in the frequency database." Ex. 2, col. 10, ll. 7-9. After this adjustment is made, "[a] **link** is then established to the **fulfillment house or directly to the product manufacturer** and an award order is communicated." Ex. 2, col. 10, ll. 9-12 (emphasis added). This is the only "link" disclosed in the specification, thus making clear that the claimed "award computer" is a fulfillment house or product manufacturer's computer.

The specification also makes clear that this "link" must be a real-time link, as the system returns the user directly to the PROGRAM HOMEPAGE once the order is

---

1. Thus, according to Mr. Young, the same interactive communications that satisfy the limitations of Claim 10 also satisfy this limitation of Claim 13. As discussed below, construing this claim in such a way would directly conflict with Federal Circuit precedent.

communicated to the award computer.  Mar. Br. at 18-19.  Thus, Maritz submits that the

proper interpretation of the term "on-line link to an award computer" is a real-time

connection between a user and a fulfillment house or product manufacturer.

## III.   CONCLUSION

Maritz's claim constructions are based on the ordinary meaning the terms of the

asserted claims in light of the specification.  Affinion's proposed interpretations, on the

other hand, are inconsistent with the intrinsic and extrinsic evidence and violate

applicable law.  Maritz requests the Court to adopt its interpretations in the form

proposed.  Maritz also requests the Court to find Claims 12, 13, 29, and 30 invalid under

35 U.S.C. § 112, ¶2 as indefinite.

Respectfully submitted,

CONNOLLY BOVE LODGE & HUTZ

By: *Patricia J Rogowski*

Rudolf E. Hutz (#484)
Patricia Smink Rogowski (#2632)
The Nemours Building
1007 Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

J. Bennett Clark
David W. Harlan
Jennifer E. Hoekel
Marc W. Vander Tuig
SENNIGER POWERS
One Metropolitan Square, 16th Floor
St. Louis, MO 63102
(314) 231-5400

Attorneys for Maritz Inc.