UNDER SEAL
EXHIBITS 1 - 14

# EXHIBIT 15

**EXHIBIT 15**

| Claim Term | Maritz's Proposed Definition | Affinion's Proposed Definition |
| --- | --- | --- |
| "On-Line Incentive Program" | A frequency program that awards points to users for on-line product purchases. | A program that uses the award of points that are redeemable for awards to incentive certain behaviors and which operates a program webpage that permits users to interact with the incentive program on-line. |
| "Implementing" | "to carry out" or "to put into effect" | Affinion does not address this limitation in its Opening Brief. |
| "On-Line" | "Connected to a computer network that allows for the real-time exchange of information" | "Accessible through the Internet" |
| "Incentive Program" | A "frequency program," which is a program that awards points to users for making purchases | A program that uses the award of points (which may be denoted as miles, points, credits, or any other similar measurement) that are redeemable as awards to incentivize certain behaviors |
| "Issues Award Points to Users" | This limitation requires that the on-line incentive program: (1) determine if the user is an enrolled user; (2) calculate the award points according to a preprogrammed formula; and (3) add the calculated points to the user's account | Adds points to a user's account that are redeemable by said user for an award |

1

| Claim Term | Maritz's Proposed Definition | Affinion's Proposed Definition |
|---|---|---|
| "Wherein Said Award Points are Redeemable by Said User For an Award" | This element requires that award points be issued to the user's account immediately upon completion of a qualifying on-line purchase and that those points must be available for immediate redemption. | Affinion does not directly address this limitation, but does argue that points do not have to be immediately redeemable upon issuance. |
| "On-Line Interactive Communication" | Communications that allow a user to provide and receive information to and from another computer via a computer network that allows for the real-time exchange of information | Communications via the Internet that allow the user to provide and receive information to and from the website |
| "Redeemable Award" | A product or service that can be obtained as a prize or award in exchange for award points

Maritz does not believe the claim language should be further limited as Affinion suggests. | A product or service that can be obtained as a prize or award in exchange for award points

Affinion excludes from its definition products or services obtained only partially in exchange for award points (*i.e.* discounted products or services) |
| "Users" | Persons enrolled in the on-line incentive program | Persons enrolled in the incentive program as well as others who may be eligible to enroll in the incentive program, merchants, product manufacturers, and award program administrators |

| Claim Term | Maritz's Proposed Definition | Affinion's Proposed Definition |
|---|---|---|
| "Awards Catalog" and "Catalog of Awards" | A list providing details of products or services that can be obtained as a prize or award in exchange for award points<br><br>Maritz does not believe the claim language should be further limited as Affinion suggests. | A compilation of award descriptions and point values<br><br>Affinion further requests the Court to further require that the award catalog be "separate from any product catalog offering products for sale on a webpage." |
| "On-Line Link to an Award Computer" | "Award computer" - a computer operated by a fulfillment house or product manufacturer<br><br>As a whole, this limitation requires "a real time link to a computer operated by a fulfillment house or product manufacturer" | A link through the Internet to the computer that accepts award information from the user |
| "On-Line Redeeming Form" | An electronic form that accepts entries during an on-line redemption | An electronic form accessible through the Internet that specifies an award for redeeming award points |
| "Permitting a User to Preview Information About Said On-Line Incentive Program From Said Internet Webpage" | This limitation requires a webpage that contains information about the "on-line incentive program" | Affinion does not address this limitation in its Opening Brief. |

3

# EXHIBIT 16

UNITED STATES DISTRICT SUPERIOR COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

COPY

NETCENTIVES, INC.,

        Plaintiff,

    vs.

THE SPERRY & HUTCHINSON COMPANY, INC., et al.,

       Defendants.

 

Nos. C-00-0669-CAL
    C-00-0986-CAL
    C-00-2637-CAL

NETCENTIVES, INC.,

        Plaintiff,

    vs.

MASSMEDIUM.COM, INC., et al.,

       Defendants.

DEPOSITION OF

THOMAS W. STOREY

April 2, 2001

Volume I
Pages 1 - 157

NETCENTIVES, INC., and THOMAS W. STOREY,

        Plaintiffs,

    vs.

BEENZ.COM, INC., et al.,

       Defendants.

NOTICING ATTORNEY:

RONALD J. SCHUTZ

REPORTED BY:  DIANE L. FREEMAN, CSR NO. 5884

GOLDEN GATE REPORTERS
35 Mitchell Boulevard, Suite 8
San Rafael, CA 94903-2010
1-800-442-4622 * (415) 491-4611
(415) 491-4635

email:ggr@depos.com    web:http://www.depos.com/

**TRL-MTZ 13902**

Printed/copied on recycled paper

GOLDEN GATE REPORTERS
35 Mitchell Boulevard, Suite 8
San Rafael, California  94903
1-800-442-4611 * (415) 491-4611
FAX (415) 491-4635

April 17, 2001

Mr. Thomas Storey
c/o James H. Wallace, Esquire
Wiley, Rein & Fielding
1776 K Street, N.W.
Washington D.C.  20006

Re: NETCENTIVES vs. HUTCHINSON & SPERRY, et al.

Dear Mr. Storey:

          Your deposition taken in the above
matter has been transcribed.  This deposition will
be available at my office for reading and signing by
you for a period of 30 days.

          In the alternative, you may choose to
examine your attorney's copy, and if you have any
corrections or otherwise want to communicate with
this office about your deposition, you may send a
letter to us signed by you and mailed by certified
or registered mail with return receipt requested.  A
copy of that letter should be sent by first-class
mail to all parties attending the deposition.

          In the event you have not reviewed
your deposition within 30 days plus 5 days for
mailing, [CCP 2025 (q)(1)], the original transcript
will be sealed pursuant to CCP 2025(s)(1), and
thereafter mailed to the deposing attorney.

Very truly yours,

Diane L. Freeman
CSR # 5884


cc: Original transcript
    All counsel

TRL-MTZ 13903

1           BE IT REMEMBERED that, pursuant to

2   notice, and on Monday, April 2, 2001, commencing at

3   9:19 a.m. thereof, at Crosby, Heafey, Roach & May,

4   Two Embarcadero Center, San Francisco, California,

5   before me DIANE L. FREEMAN, a Certified Shorthand

6   Reporter, personally appeared

7

8               THOMAS W. STOREY,

9

10  called as a witness herein, who, having been first

11  duly  sworn, was examined and testified as follows:

12                  --oOo--

13

14      ROBINS, KAPLAN, MILLER & CIRESI LLP, 2800

15  LaSalle Plaza, 800 LaSalle Avenue, Minneapolis,

16  Minnesota 55402, represented by RONALD J. SCHUTZ and

17  EMMETT J. McMAHON, Attorneys at Law, appeared as

18  counsel on behalf of the Defendant Carlson

19  Companies.

20

21      WILEY, REIN & FIELDING, 1776 K Street, N.W.,

22  Washington, D.C., 20006, represented by JAMES H.

23  WALLACE, JR. and GREGORY R. LYONS, Attorneys at Law,

24  appeared as counsel on behalf of the Plaintiff

25  Netcentives, Inc.

**TRL-MTZ 13904**    2

| | | |
|---|---|---|
| 10:09 | 1 | ADDemup, A-D-D-e-m-u-p. |
| 10:09 | 2 | Q.    Is the company doing any work currently on |
| 10:09 | 3 | ADDemup? |
| 10:09 | 4 | A.    No. |
| 10:09 | 5 | Q.    Does the company have plans to do work on |
| 10:09 | 6 | ADDemup? |
| 10:09 | 7 | A.    No. |
| 10:09 | 8 | Q.    Is there any other product under |
| 10:09 | 9 | development by IPO? |
| 10:09 | 10 | A.    No. |
| 10:09 | 11 | Q.    ADDemup was conceived of as an incentive |
| 10:09 | 12 | program whereby the end user had to use a computer |
| 10:09 | 13 | as part of or a condition of receiving the |
| 10:09 | 14 | incentive, correct? |
| 10:10 | 15 | A.    ADDemup was conceived as a brand and a way |
| 10:10 | 16 | of using an invention which provided incentives for |
| 10:10 | 17 | people when changed their behavior through a |
| 10:11 | 18 | computer. |
| 10:11 | 19 | Q.    You are listed as an inventor on some |
| 10:11 | 20 | patents, correct? |
| 10:11 | 21 | A.    Yes. |
| 10:11 | 22 | MR. WALLACE:   Mark that Storey No. 1? |
| 10:11 | 23 | MR. SCHUTZ:    No.  Mark it Carlson No. 1. |
| 10:11 | 24 | (Carlson Exhibit 1 was |
| 10:11 | 25 | marked for identification.) |

TRL-MTZ 13929          27

UNITED STATES DISTRICT SUPERIOR COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

NETCENTIVES, INC.,                          )
                                            )
            Plaintiff,                      )
                                            )
      vs.                                   ) Nos. C-00-0669-CAL
                                            )       C-00-0986-CAL
THE SPERRY & HUTCHINSON COMPANY, )          C-00-2637-CAL
INC., et al.,                               )
                                            )
            Defendants.                     )
_____      )
                                            )
NETCENTIVES, INC.,                          )
                                            )
            Plaintiff,                      )
                                            )
      vs.                                   )   DEPOSITION OF
                                            )
MASSMEDIUM.COM, INC., et al.,               ) THOMAS W. STOREY
                                            )
            Defendants.                     ) April 3, 2001
_____      )
                                            ) Volume II
NETCENTIVES, INC., and THOMAS               ) Pages 158 - 303
W. STOREY,                                  )
            Plaintiffs,                     ) NOTICING ATTORNEY:
      vs.                                   ) RONALD J. SCHUTZ
                                            )
BEENZ.COM, INC., et al.,                    )
                                            )
            Defendants.                     )
_____      )

REPORTED BY:   DIANE L. FREEMAN, CSR NO. 5884

GOLDEN GATE REPORTERS
35 Mitchell Boulevard, Suite 8
San Rafael, CA 94903-2010
1-800-442-4622 * (415) 491-4611
(415) 491-4635

email:ggr@depos.com        web:http://www.depos.com/

TRL-MTZ 14060

158

Printed/copied on recycled paper

GOLDEN GATE REPORTERS
35 Mitchell Boulevard, Suite 8
San Rafael, California  94903
1-800-442-4611 * (415) 491-4611
FAX (415) 491-4635


April 19, 2001


Mr. Thomas Storey
c/o James H. Wallace, Esquire
Wiley, Rein & Fielding
1776 K Street, N.W.
Washington D.C.  20006

Re: NETCENTIVES vs. HUTCHINSON & SPERRY, et al.

Dear Mr. Storey:

        Your deposition taken in the above
matter has been transcribed.  This deposition will
be available at my office for reading and signing by
you for a period of 30 days.

        In the alternative, you may choose to
examine your attorney's copy, and if you have any
corrections or otherwise want to communicate with
this office about your deposition, you may send a
letter to us signed by you and mailed by certified
or registered mail with return receipt requested.  A
copy of that letter should be sent by first-class
mail to all parties attending the deposition.

        In the event you have not reviewed
your deposition within 30 days plus 5 days for
mailing, [CCP 2025 (q)(1)], the original transcript
will be sealed pursuant to CCP 2025(s)(1), and
thereafter mailed to the deposing attorney.

Very truly yours,

Diane L. Freeman
CSR # 5884


cc: Original transcript
    All counsel

TRL-MTZ 14061

1          BE IT REMEMBERED that, pursuant to

2     notice, and on Tuesday, April 3, 2001, commencing at

3     9:11 a.m. thereof, at Crosby, Heafey, Roach & May,

4     Two Embarcadero Center, San Francisco, California,

5     before me DIANE L. FREEMAN, a Certified Shorthand

6     Reporter, personally appeared

7

8                    THOMAS W. STOREY,

9

10    called as a witness herein, who, having been

11    previously duly sworn, was examined and testified as

12    follows:

13                      --oOo--

14

15         ROBINS, KAPLAN, MILLER & CIRESI LLP, 2800

16    LaSalle Plaza, 800 LaSalle Avenue, Minneapolis,

17    Minnesota 55402, represented by RONALD J. SCHUTZ and

18    EMMETT J. McMAHON, Attorneys at Law, appeared as

19    counsel on behalf of the Defendant Carlson

20    Companies.

21

22         WILEY, REIN & FIELDING, 1776 K Street, N.W.,

23    Washington, D.C., 20006, represented by JAMES H.

24    WALLACE, JR. and GREGORY R. LYONS, Attorneys at Law,

25    appeared as counsel on Plaintiff Netcentives

                                    **TRL-MTZ 14062**        159

| | | |
|--|--|--|
| 08:54 | 1 | Q.  Did you ever tell any of your superiors at |
| 08:54 | 2 | Doubletree that you were working on developing a |
| 08:54 | 3 | computerized incentive program? |
| 08:54 | 4 | A.  While I was working on the '87 -- what |
| 08:54 | 5 | became the '870 invention, on my personal time, |
| 08:54 | 6 | using my own personal resources, I ultimately did |
| 08:55 | 7 | communicate with the CEO of Doubletree, with the CFO |
| 08:55 | 8 | of Doubletree, and with the chief counsel of |
| 08:55 | 9 | Doubletree regarding the fact that I was developing |
| 08:55 | 10 | a product for the internet which would not be |
| 08:55 | 11 | competitive in any fashion that I could envision |
| 08:55 | 12 | with Doubletree for any of its related companies. |
| 08:55 | 13 | Q.  When did you tell them this? |
| 08:55 | 14 | A.  I can't recall the exact time I had the |
| 08:55 | 15 | conversations. |
| 08:55 | 16 | Q.  Why did you tell them this? |
| 08:56 | 17 | A.  Being an executive in a company is a very |
| 08:56 | 18 | demanding job from a time standpoint, and, as a |
| 08:56 | 19 | salaried employee, there is an expectation of a very |
| 08:56 | 20 | large time commitment to the company, although it's |
| 08:56 | 21 | never clearly defined what that amount of time |
| 08:56 | 22 | commitment is. |
| 08:56 | 23 | And I did not want any conflicts to arise |
| 08:56 | 24 | in the future among the officers of Doubletree where |
| 08:56 | 25 | any concerns could exist that I wasn't dedicating a |

TRL-MTZ 14090        187

| | | |
|---|---|---|
| 09:47 | 1 | program, and I wanted to do research in the public |
| 09:48 | 2 | domain to see if there were any other companies |
| 09:48 | 3 | which were doing any sort of web-based or internet- |
| 09:48 | 4 | based incentive programs. |
| 09:48 | 5 | Cathay Pacific here has notes which show |
| 09:48 | 6 | that they had a way to allow you to register as a |
| 09:49 | 7 | Cathay Pacific cyber traveler, but that wasn't |
| 09:49 | 8 | online, and you were then automatically entered into |
| 09:49 | 9 | the mileage millionaire contest, which was just an |
| 09:49 | 10 | offline contest that they ran. |
| 09:49 | 11 | And then we note down here I note down |
| 09:49 | 12 | here, which Jackie transcribed for me, their web |
| 09:49 | 13 | address. |
| 09:49 | 14 | Q.  Did you find any online incentive programs |
| 09:49 | 15 | in your internet research? |
| 09:49 | 16 | A.  I was not able to find any online internet- |
| 09:50 | 17 | based or web-page-based online interactive incentive |
| 09:50 | 18 | programs which fully integrated the product catalog, |
| 09:50 | 19 | the awards catalog, the credit check routine, the |
| 09:50 | 20 | awards redemption routine or any of the elements |
| 09:50 | 21 | that are claimed in the '870 patent. |
| 09:50 | 22 | Q.  Now, you've used the term "fully |
| 09:50 | 23 | integrated" several times.  Can you tell us what you |
| 09:50 | 24 | mean by that? |
| 09:50 | 25 | A.  Fully integrated, I'd like to look at the |

TRL-MTZ 14109          206

| | | |
|---|---|---|
| 10:12 | 1 | The ability to take information from many |
| 10:12 | 2 | different places and put it into a common language |
| 10:12 | 3 | in realtime and make that available to a purchaser |
| 10:12 | 4 | of products and services in a session online with |
| 10:12 | 5 | the internet is a unique ability. |
| 10:12 | 6 | And it wasn't until the advent of the |
| 10:12 | 7 | internet.  And this language, which is reflected in |
| 10:13 | 8 | the '870 patent, and not in the '444 patent, that |
| 10:13 | 9 | you could integrate in an internet online |
| 10:13 | 10 | environment all of these components of the purchase |
| 10:13 | 11 | of a product, the signing up for a program, and |
| 10:13 | 12 | changing the elements of your profile in that |
| 10:13 | 13 | program, the ability to redeem awards as well as |
| 10:13 | 14 | look at awards, pictures, hear the sound of an |
| 10:13 | 15 | award, until the advent of the internet, which is |
| 10:13 | 16 | fully reflected in this patent, you could not have |
| 10:13 | 17 | that kind of interactive capability. |
| 10:13 | 18 | And, in fact, if you look at the figures in |
| 10:13 | 19 | the '444 patent, which call out the types of screens |
| 10:14 | 20 | shown to the travel agent, you will see that all of |
| 10:14 | 21 | the screens show text-based language, and there is |
| 10:14 | 22 | not, to my recollection, any reference to |
| 10:14 | 23 | integrating all of these pieces. |
| 10:14 | 24 | Q.  Move to strike the answer as non- |
| 10:14 | 25 | responsive. |

**TRL-MTZ 14118**          215

| | | |
|---|---|---|
| 11:41 | 1 | interference. |
| 11:41 | 2 | A.  I can't recall specifically what was |
| 11:41 | 3 | discussed with respect to interference, but, looked |
| 11:41 | 4 | at in the context of these notes, we are talking |
| 11:41 | 5 | about in this area the patent application process |
| 11:41 | 6 | and how to go through and evaluate prior art, and my |
| 11:41 | 7 | interpretation of that is that for a patent to be |
| 11:41 | 8 | valid there can't be anything in the prior art that |
| 11:41 | 9 | was invented prior to the invention being applied |
| 11:41 | 10 | for. |
| 11:42 | 11 | Q.  Let's go back to the first page of Exhibit |
| 11:42 | 12 | 14.  About the middle of the page, it says "Need"; |
| 11:42 | 13 | do you see that? |
| 11:42 | 14 | A.  Yes. |
| 11:42 | 15 | Q.  And then some information under that.  Is |
| 11:42 | 16 | this what Mr. Bach said that he needed to put |
| 11:42 | 17 | together the patent application, generally speaking? |
| 11:42 | 18 | A.  I had asked Mr. Bach whether or not we |
| 11:42 | 19 | needed to have a commercial embodiment of the |
| 11:42 | 20 | invention prior to the patent application, and |
| 11:42 | 21 | Mr. Bach's response was: |
| 11:42 | 22 | "No, you do not need to have a commercial |
| 11:42 | 23 | embodiment, what you do need to have is the |
| 11:42 | 24 | following:  A flow chart that shows the program |
| 11:43 | 25 | designed in such a way that a programmer, or I guess |

**TRL-MTZ 14133**    230

| | | |
|---|---|---|
| 11:43 | 1 | somebody skilled in the art could develop the |
| 11:43 | 2 | program; you need to have the conceptual idea and |
| 11:43 | 3 | the steps in that conceptual idea; and then you have |
| 11:43 | 4 | to have somebody witness that this is in fact your |
| 11:43 | 5 | invention." And I believe that's what those three |
| 11:43 | 6 | steps are. |
| 11:43 | 7 | MR. WALLACE:  Counsel, mindful of your desire |
| 11:43 | 8 | to complete this examination prior to 12:30, we |
| 11:43 | 9 | have, and I'd be happy to provide you, a better copy |
| 11:43 | 10 | of page N 20. |
| 11:43 | 11 | MR. SCHUTZ:  Please.  Thank you. |
| 11:44 | 12 | MR. WALLACE:  You can use it when you want to. |
| 11:44 | 13 | MR. SCHUTZ:  He's got an extra copy. |
| 11:44 | 14 | MR. WALLACE:  Mine is highlighted or the |
| 11:44 | 15 | witness can read over my shoulder so we can proceed. |
| 11:44 | 16 | MR. SCHUTZ:  Let's mark this as Exhibit 12-A. |
| 11:44 | 17 | Q.  Mr. Storey, I'm going to ask questions |
| 11:44 | 18 | about Exhibit 12-A. |
| 11:44 | 19 | A.  Yes. |
| 11:44 | 20 | Q.  12-A is page N 20, and it's a better print |
| 11:44 | 21 | of what was part of Exhibit 12.  Can you tell me |
| 11:44 | 22 | what that is? |
| 11:45 | 23 | A.  Yes.  These are notes which Jackie |
| 11:45 | 24 | transcribed for me relating to the '870 invention, |
| 11:45 | 25 | and you can see at the top, as I've stated before, |

**TRL-MTZ 14134**          231

12:03  1      A.  Yes, because Look to Book was my shorthand
12:03  2  for the patent application.
12:03  3      MR. SCHUTZ:  Did I mark the big schematic?
12:03  4      MR. WALLACE:  Before you get to the big
12:03  5  schematic, can we take about a five-minute recess?
12:04  6      MR. SCHUTZ:  Sure.  Let me tell you what I
12:04  7  need to go through.
12:04  8      MR. WALLACE:  Sure.
12:04  9      MR. SCHUTZ:  I want to go through the rest of
12:04  10  1 through 62 just to get you to authenticate them
12:04  11  and see what they are.  And then I've got just a few
12:04  12  things that you discuss ADDemup.  And that's it.
12:04  13  Like five things and I just want you to look at
12:04  14  them, "Yeah, they're mine," type of thing.  That's
12:04  15  it.  I'd like you to go through them.
12:04  16      MR. WALLACE:  Sure.
12:04  17      THE VIDEOGRAPHER:  We are going to go off
12:04  18  record.  The time is 12:03 p.m.
12:14  19          (Recess taken.)
12:14  20                          (Carlson Exhibit 15 was
12:14  21                          marked for identification.)
12:14  22      THE VIDEOGRAPHER:  We're going back on record.
12:14  23  The time is 12:14 p.m.
12:14  24      MR. SCHUTZ:  Q.  Mr. Storey, I've handed you
12:14  25  what is marked Exhibit 15.  Can you tell us what

TRL-MTZ 14145    242

| | | |
|---|---|---|
| 12:15 | 1 | that is? |
| 12:15 | 2 | A.  Exhibit 15 is a flow chart, which I |
| 12:15 | 3 | developed. |
| 12:15 | 4 | Q.  Whose happened writing appears on the flow |
| 12:15 | 5 | chart in the boxes? |
| 12:15 | 6 | A.  It is my handwriting in the boxes. |
| 12:15 | 7 | Q.  Are there or were there drafts that you did |
| 12:15 | 8 | of either parts of this flow chart, or the whole |
| 12:15 | 9 | thing, before September 5th, 1995? |
| 12:15 | 10 | A.  I do not recall any drafts prior to |
| 12:15 | 11 | creating this flow chart. |
| 12:16 | 12 | Q.  Did you just sit down and do it out of your |
| 12:16 | 13 | head once? |
| 12:16 | 14 | A.  I sat down in one weekend and developed |
| 12:16 | 15 | this flow chart. |
| 12:16 | 16 |                        (Carlson Exhibit 16 was |
| 12:16 | 17 |                          marked for identification.) |
| 12:16 | 18 | MR. SCHUTZ:   Q.   Mr. Storey, I have now |
| 12:16 | 19 | handed you Exhibit 16, which bears the Bates number |
| 12:17 | 20 | N 39.  Can you tell me what this is?  I think, by |
| 12:17 | 21 | the way, it's exactly the same thing.  There were |
| 12:17 | 22 | just two copies produced with different Bates |
| 12:17 | 23 | numbers.  Take your time.  Everything, the |
| 12:17 | 24 | signatures, appear identical. |
| 12:17 | 25 | MR. WALLACE:   Let me suggest something, how |

**TRL-MTZ 14146**          243

| 12:17 | 1 | many of these big charts do you have? |
| 12:17 | 2 | MR. SCHUTZ:   These are the only two. |
| 12:17 | 3 | MR. WALLACE:   Do you need to go down to a |
| 12:17 | 4 | bigger part of the table where you can spread them |
| 12:17 | 5 | out? |
| 12:18 | 6 | THE WITNESS:   If you would like me to go |
| 12:18 | 7 | through and compare each of these flow charts to |
| 12:18 | 8 | make sure they are exactly the same, I'd be happy to |
| 12:18 | 9 | do that. |
| 12:18 | 10 | MR. SCHUTZ:   Q.   No, I don't need you to do |
| 12:18 | 11 | that.   The flow charts will speak for themselves. |
| 12:18 | 12 | Do you remember making more than one? |
| 12:18 | 13 | A.   I do not recall making more than one flow |
| 12:18 | 14 | chart. |
| 12:18 | 15 | Q.   Did you give a copy of this flow chart to |
| 12:18 | 16 | Mr. Bach? |
| 12:18 | 17 | A.   Yes. |
| 12:18 | 18 | Q.   The written description that appears in the |
| 12:18 | 19 | '870 patent, did you provide Mr. Bach with a |
| 12:18 | 20 | narrative or write-up that he could use in drafting |
| 12:19 | 21 | the patent application? |
| 12:19 | 22 | A.   My recollection of the process is that I |
| 12:19 | 23 | developed the flow chart, which is shown here, No. |
| 12:19 | 24 | 16, and I sent the flow chart to Mr. Bach.   And then |
| 12:19 | 25 | I had at least one and I believe more than one phone |

**TRL-MTZ 14147**                    244

| | | |
|---|---|---|
| 12:19 | 1 | conversation with Mr. Bach where I went through and |
| 12:19 | 2 | described for him how the invention was meant to |
| 12:19 | 3 | work.  And I also talked to him about what made this |
| 12:20 | 4 | invention different from anything else that I was |
| 12:20 | 5 | aware of. |
| 12:20 | 6 | Q.  Did you provide any written materials to |
| 12:20 | 7 | Mr. Bach for him to use in preparing the patent |
| 12:20 | 8 | application other than this flow chart? |
| 12:20 | 9 | A.  Not that I can recall. |
| 12:20 | 10 | Q.  So the words and the description that |
| 12:20 | 11 | appear in the '870 patent were written by Mr. Bach |
| 12:20 | 12 | based on the flow chart you sent him and the |
| 12:20 | 13 | telephone conversations and the meetings you had |
| 12:20 | 14 | with him; is that correct? |
| 12:20 | 15 | MR. WALLACE:   Objection.  No foundation to |
| 12:20 | 16 | meetings. |
| 12:20 | 17 | MR. SCHUTZ:   Q.   I am sorry.  Did you have -- |
| 12:20 | 18 | thank you for that. |
| 12:20 | 19 | Did you have any face-to-face meetings with |
| 12:20 | 20 | Mr. Bach? |
| 12:20 | 21 | A.  No. |
| 12:20 | 22 | Q.  So the -- is it a fair statement, |
| 12:20 | 23 | Mr. Storey, that the patent application, the written |
| 12:21 | 24 | words in it, the specification, was written by |
| 12:21 | 25 | Mr. Bach or someone in his office based on the flow |

TRL-MTZ 14148          245

| | | |
|---|---|---|
| 12:21 | 1 | chart you sent him and the telephone conversations |
| 12:21 | 2 | that you had with him? |
| 12:21 | 3 | A. Could you repeat the question, please? |
| 12:21 | 4 | (Record read.) |
| 12:21 | 5 | THE WITNESS:   My recollection of the process |
| 12:21 | 6 | is that I sent Mr. Bach the flow chart and that I |
| 12:21 | 7 | had at least one and I believe multiple |
| 12:22 | 8 | conversations with him about the invention and the |
| 12:22 | 9 | background of the invention and how that compared to |
| 12:22 | 10 | prior inventions or commercial embodiments that I |
| 12:22 | 11 | was aware of, and that I discussed with him the |
| 12:22 | 12 | types of things that I believed were unique and not |
| 12:23 | 13 | obvious which Mr. Bach then put into the form of a |
| 12:23 | 14 | patent application which I reviewed and discussed |
| 12:23 | 15 | with Mr. Bach, and we made whatever changes we felt |
| 12:23 | 16 | needed to be made. |
| 12:23 | 17 | MR. SCHUTZ:   Q.   In these conversations that |
| 12:23 | 18 | you had with Mr. Bach, did you discuss the Look to |
| 12:23 | 19 | Book program? |
| 12:23 | 20 | A.   No, not beyond what I already mentioned |
| 12:23 | 21 | about the discussion about Look to Book. |
| 12:23 | 22 | Q.   You did, however, discuss background of the |
| 12:23 | 23 | invention including a description of related art, |
| 12:23 | 24 | correct? |
| 12:23 | 25 | A.   Yes. |

TRL-MTZ 14149          246

EXHIBIT 17

"ADDenUM" FLowCHART

ON-LINE FREQUENCY AwARDS PROGRAM

9/5/95

EXHIBIT 18

UNITED STATES DISCTRICT COURT

NORTHERN DISCTRICT OF CALIFORNIA

NETCENTIVES, INC., ET AL.,



              PLAINTIFF,

VS.                                    NO. 00-2637

CARLSON COMPANIES, INC., ET AL.

              DEFENDANTs.

_____/

DEPOSITION OF

JOSEPH BACH

FRIDAY, MAY 11TH, 2001

NOTICING ATTORNEY: RONALD J. SCHUTZ, ESQ.

REPORTED BY:  NICHOLE M. RODICH, RPR, CSR NO. 11604

G O L D E N   G A T E   R E P O R T E R S

35 Mitchell Boulevard, Suite 8
San Rafael, CA 94903-2010
(415) 491-4611 * 1-800-442-4611
FAX (415) 491-4635

email:  Ggr@depos.com   web:  http://www.depos.com

G O L D E N   G A T E   R E P O R T E R S

35 MITCHELL BOULEVARD, #8
SAN RAFAEL, CA 94903
(415) 491-4611 * 1-800-442-4611
FAX (415) 491-4635

MAY 20th, 2001

TO:   JOSEPH BACH
      17460 LAKE VIEW DR.
      MORGAN HILL, CA
      95037

RE:   NETCENTIVES VS CARLSON COMPANIES


DEAR MR. BACH:

PLEASE BE ADVISED THAT VOLUME I OF THE TRANSCRIPT
OF YOUR DEPOSITION TAKEN ON MAY 11TH, 2001,
IN THE ABOVE-ENTITLED MATTER HAS BEEN COMPLETED AND IS
NOW READY FOR YOUR SIGNATURE BY APPOINTMENT IN OUR
SAN RAFAEL OFFICE.


IN THE EVENT YOU HAVE NOT REVIEWED YOUR DEPOSITION
WITHIN 30 DAYS, [CCP 2025(Q)(1)], THE ORIGINAL
TRANSCRIPT WILL BE SEALED PURSUANT TO CCP 2025(S)(1),
AND THEREAFTER MAILED TO THE NOTICING ATTORNEY.


                    YOURS VERY TRULY,

                    *Nichole M. Rodich*

                    NICHOLE M. RODICH, CSR, RPR


CC:   ALL COUNSEL
      ORIGINAL


GOLDEN GATE REPORTERS    1-800-442-4611

**TRL-MTZ 12307**

1    BE IT REMEMBERED THAT PURSUANT TO NOTICE OF
TAKING DEPOSITION, AND ON FRIDAY, MAY 11TH 2001,
2    COMMENCING AT THE HOUR OF 8:40 A.M., THEREOF, AT THE
OFFICE OF CROSBY, HEAFEY, ROACH & MAY,
3    TWO EMBARCADERO CENTER, SAN FRANCISCO, CA
BY NICHOLE M. RODICH, A CERTIFIED SHORTHAND REPORTER,
4    THERE PERSONALLY APPEARED,

5              JOSEPH BACH

6    CALLED AS A WITNESS BY THE DEFENDANTS, WHO, BEING
BY ME FIRST DULY SWORN, WAS THEREUPON EXAMINED AND
7    QUESTIONED aS HEREINAFTER SET FORTH.

8

9    APPEARANCES:

10        WILEY, REIN & FIELDING,
1776 K STREET, N.W.  WASHINGTON D.C.
11    20006. JAMES H. WALLACE, JR., ESQ. AND
GREGORY R. LYONS, ESQ., APPEARED
12    AS COUNSEL ON BEHALF OF THE PLAINTIFFS.

13

14        ROBINS, KAPLAN, MILLER & CIRESI, LLP,
2800 LASALLE PLAZA, 800 LASALLE AVE., MINNEAPOLIS, MN
15    55402. RONALD J. SCHUTZ, ESQ., APPEARED
AS COUNSEL ON BEHALF OF THE DEFENDANTS.

16

17

18

19

20                    --oOo--

21

22

23

24

25

                                                2

GOLDEN GATE REPORTERS    1-800-442-4611

**TRL-MTZ 12308**

37:51AM  1    that right?

2    A    That's correct.

3    Q    At my firm we call those time sheets.  Is that what

4    you called them there?

9:37:57AM  5    A    I don't know what they call them there.  I kept --

6    Q    You kept time records?

7    A    Time records.

8    Q    And did you keep them by writing them in hand?

9    A    Yes, I did.

9:38:08AM  10    Q    What did you do with the time records after you

11    filled them out?

12    A    We had a computer system.  At the end of the day we

13    enter the time that was written.

14    Q    Mr. Storey was a client that came to Sughrue

9:38:30AM  15    through your efforts, correct?

16    A    I did not say he came to Sughrue.

17    Q    I'm sorry.  I don't mean physically came.  But

18    Mr. Storey is -- he became a client of Sughrue through

19    your efforts, correct?

9:38:46AM  20    A    Mr. Storey never became a client of Sughrue.

21    Q    He did not?

22    A    He did not.

23    Q    Did Mr. Storey ever become your client?

24    A    Yes, he did.

39:00AM  25    Q    So you prosecuted this patent application for

33

| | | |
|---|---|---|
| 39:05AM | 1 | Mr. Storey not as part of your employment at Sughrue; is |
| | 2 | that correct? |
| | 3 | A    That's correct. |
| | 4 | Q    You moonlighted for this one? |
| 9:39:14AM | 5 | A    That is correct. |
| | 6 | Q    Did you ever do that at any other time while you |
| | 7 | were employed at Sughrue? |
| | 8 | A    Yes, I did. |
| | 9 | Q    How many times? |
| 9:39:21AM | 10 | A    I do not recall the exact number, but Alexa Lenkin |
| | 11 | is another example. |
| | 12 | Q    Did Sughrue have a policy on its associates |
| | 13 | moonlighting? |
| | 14 | A    There was no formal policy. |
| 9:39:49AM | 15 | Q    Did either of your mentors know you were drafting |
| | 16 | patent applications on the side for other people? |
| | 17 | A    I do not believe so. |
| | 18 | Q    Why didn't you tell them? |
| | 19 | A    I've discussed the matter with a partner, Allan |
| 9:40:07AM | 20 | Kaspear, and I was assured there is no issue there. |
| | 21 | Q    Allan Kaspear.  How do you spell that? |
| | 22 | A    K-a-s-p-e-a-r. |
| | 23 | Q    Is he still employed at Sughrue? |
| | 24 | A    Yes, he is. |
| 40:24AM | 25 | Q    At the time you had this discussion with him, what |

34

GOLDEN GATE REPORTERS   1-800-442-4611

TRL-MTZ 12340

| | | |
|---|---|---|
| :44:29AM | 1 | client.  There's no relationship yet as I understand it. |
| | 2 | I don't think that's privileged. |
| | 3 | MR. WALLACE:  Was he your client at the time of the |
| | 4 | conversation, Mr. Bach? |
| 9:44:38AM | 5 | THE WITNESS:  No. |
| | 6 | MR. WALLACE:  Okay. |
| | 7 | By MR. SCHUTZ: |
| | 8 | Q    Go ahead. |
| | 9 | A    Let me correct myself:  For all the clients I was |
| 9:45:00AM | 10 | working doing work outside of Sughrue, I always offer |
| | 11 | them to be a client of Sughrue. |
| | 12 | Q    Did you do so during the initial contact with them? |
| | 13 | A    Generally, yes. |
| | 14 | Q    Did any of them decide they wanted to be clients of |
| 9:45:17AM | 15 | Sughrue? |
| | 16 | A    No. |
| | 17 | Q    Do you know why? |
| | 18 | A    Yes. |
| | 19 | Q    Why? |
| 9:45:19AM | 20 | A    Sughrue requires an expensive retaining fee which |
| | 21 | many of these clients can't afford. |
| | 22 | Q    You were cheaper, right? |
| | 23 | A    I did not have overhead. |
| | 24 | Q    If you prosecuted an application out of your home |
| :45:44AM | 25 | versus prosecuting the same application out of your |

38

TRL-MTZ 12344

45:47AM  1  office at Sughrue, it would be cheaper to do it out of

2  your home, correct?

3  A    Yes.

4  Q    And you told -- probably told that to Mr. Storey;

9:46:00AM  5  is that correct?

6  A    I do not recall, but likely.

7  Q    Did you give Mr. Storey an estimate as to how much

8  it would cost to prosecute this application?

9  A    I do not recall.

9:46:24AM  10  Q    For the work that you did out of your home, in

11  general did you keep time records?

12  A    No, I did not.

13  Q    How did you determine what to charge a client for

14  the work you did for them out of your home?

9:46:43AM  15  A    It was agreed upon before they became a client.

16  Q    Did you do the patent prosecution work out of your

17  home on a fixed-fee basis?

18  A    That's correct.

19  Q    Do you recall what the fixed fee was for

9:46:56AM  20  Mr. Storey?

21  A    I do not recall.

22  Q    Did you ever send him a bill?

23  A    I don't recall, but I must have.

24  Q    Did he pay it?

·47:13AM  25  A    I do not recall any problems with him with payments

39

GOLDEN GATE REPORTERS    1-800-442-4611

TRL-MTZ 12345

EXHIBIT 19

**BENEFITS**



## PriorityPlus® Status — For Our Most Frequent Guests

Priority Club members who stay at Holiday Inn hotels or Crowne Plaza hotels and resorts 50 or more qualifying nights during the year achieve PriorityPlus® status. PriorityPlus members earn additional benefits — including a 10% Bonus on base points (or frequent flyer miles/credits) for every qualifying night. Throughout the year, PriorityPlus members may be offered added perks like an automatic upgrade to Crowne Plaza Club Level (when available), or a one car class upgrade when renting a mid or full-size car from one of our car rental partners. Monitor your progress toward PriorityPlus status by checking your activity statement.

## How to Collect Points . . . and Awards!

The Priority Club program makes it easy for members to build and redeem points. You don't have to worry about keeping track — we'll do the tracking and send you an activity statement after each quarter you stay at Holiday Inn hotels or Crowne Plaza hotels and resorts.

**It's easy to collect:**

▲ Simply give your Priority Club number (or airline frequent flyer number) when you make your reservation and stay at a qualifying rate. Present your Priority Club card upon check-in.

Receive one point or equivalent frequent flyer miles/credits for each U.S. dollar spent on qualifying nights at all Holiday Inn Worldwide hotels. Collect 25 points per night or equivalent airline miles/credits per qualifying stay at Holiday Inn Express hotels.

▲ Even when you can't stay at Holiday Inn hotels, you'll have the opportunity to receive points from other travel-related companies. Look in your Priority Club activity statements for more information on these point-earning opportunities.

**It's easy to order:**

▲ Simply check your point balance, select your award and place your order in the way that's easiest for you.

— Call toll-free 1-800-272-9273 . . .

OR

— Fax the completed order form attached in this catalog to 1-800-PCLUB-FAX (725-8232) . . .

OR

— Mail your order form in the envelope provided. Allow 48 to 72 hours for processing and 10 to 14 days for delivery.

MAR114807

3