# EXHIBIT 31

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| AFFINION LOYALTY GROUP, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 04-360-JJF |
| v. ) | |
| ) | |
| ) | |
| MARITZ, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## EXPERT REPORT OF RANDY PETERSEN

### I.    INTRODUCTION AND ENGAGEMENT

I have been asked by Affinion Loyalty Group, Inc. and Affinion Net Patents, Inc.
(collectively "Affinion") to provide my expert opinions concerning: (1) the validity of certain
claims of U.S. Patent No. 5,779,870 (the "'870 patent"), U.S. Patent No. 6,009,412 (the "'412
patent") and U.S. Patent No. 6,578,012 ("'012 patent"); and (2) the role of Internet-based
incentive programs in the loyalty/frequency industry. I have been specifically asked to review
the Expert Report and Supplemental Expert Report of Bruce Bolger, dated March 10 and April
10, 2006, respectively, and the Expert Report and Supplemental Expert Report of Dr. Arthur M.
Keller of the same dates and to respond to certain of the opinions contained therein.

This report is based upon the information available at this time. If new information
becomes available or if the Court's claim construction ruling alters what I understand to be the
meaning of the patent claims, I may supplement or amend this report in light of that additional
information. I will be prepared to testify at trial as to the opinions set forth in my reports



The introductory portion of my initial expert report is incorporated herein by reference. Attached at Exhibit A hereto is a list of materials I have reviewed or relied upon in preparing my opinions herein, in addition to those identified in connection with my initial report.[1]

## II.    THE STATE OF THE ART OF FREQUENCY/LOYALTY PROGRAMS IN 1995

The introduction of the American Airlines AAdvantage program in 1981, followed closely by many of its competitors, launched the modern incentive/loyalty industry. I have followed the development of this industry closely over the years and kept abreast of the latest in innovations and developments in that industry. In 1995, none of these loyalty programs were offering redemption of points for awards through the Internet. Indeed, in 1995, on-line commerce was just beginning to gain very limited acceptance as a vehicle for making purchases (or reservations). See "Give Cyber-Ready Consumers the Once Over, *Interactive Marketing News* June 23, 1995 article (only 5 percent of remote sales were conducted through the Internet). Thus, although the use of Internet webpages to conduct various aspects of commerce may be commonplace now, it was not so in 1995.

The fact that it was not natural to think of using Internet websites to actually operate incentive or loyalty programs on-line is demonstrated by the actions of the parties in this case. Both Maritz and Trilegiant were involved in the provision of the technology for operating loyalty/incentive programs for major corporate clients in the 1990s. My review of the deposition testimony and documents in this case demonstrates that, despite the fact that these two

---

[1]    Maritz's experts cite to certain references in the introduction of their reports without referring to them again in the primary analysis of the patent claims. My review of those references does not affect my validity analysis.

companies were among the industry leaders in providing systems for operating loyalty programs, the computer system for allowing redemption of awards through the Internet was not offered by either company until at least 1998. See, e.g., TRL-MTZ38879-96 (proposal for development of Internet system in August 1998); Lister Dep. at 16-17 (first web application allowing redemption was launched in 1998); Altemueller Dep. at 37 (VAULT program developed and launched in 1999). Likewise, ClickRewards, the on-line incentive program instituted by Netcentives, which included both rewards for on-line activity and on-line redemption was not launched until 1997. Even in the airline industry, which has led the development of loyalty program technology, on-line redemption of points for awards was not widely adopted until the late 1990s. Thus, the use of Internet capabilities for the operation of incentive programs did not become widely accepted until well after the inventions at issue in this case were already made.

## III.   CLAIM CONSTRUCTION ISSUES

In my initial report, I set forth my opinions concerning the construction of certain claim terms as they related to my infringement analysis. The reports of Maritz's experts have put forward opinions concerning the construction of some additional claim terms, as well as opinions about claim terms I also discussed in my initial report.

### A.   "Immediacy"

Mr. Bolger asserts that the claims of the '412 patent require what he refers to as "immediacy effect." Mr. Bolger purports to find this limitation in the element of Claim 1 of the '412 patent that provides: "issuing said award points to an account of said user if said user qualifies for said award points, wherein said award points are redeemable by said user for an award." None of this claim language on its face contains any reference to the timing of for

3

taking those steps. Therefore, one cannot find any immediacy effect in the ordinary meaning of this claim language.[2]

I disagree with Mr. Bolger's view that the person of ordinary skill in the art would nonetheless understand this claim language to require that the issued points be immediately available for redemption. The patent specification lists multiple potential advantages of the invention, but does not include each of those advantages as elements of each and every one of the claims. See, e.g., Col. 2, lines 18-20 (an advantage of the invention is an electronic sign-up form for on-line signing up by users). In my opinion, the person of ordinary skill in the art would not conclude that the immediate award of points after purchases is part of the meaning of the claim language. The person of ordinary skill in the art would understand that the claim is focusing on the technology of the award of points by using an on-line incentive program and awarding points based on the purchase of products through an Internet webpage. It would also be recognized by the person of ordinary skill in the art that the use of such technology would permit certain aspects of those transactions to be performed more rapidly than for such systems that did not utilize Internet technology, but not that any particular timing for performing the steps was a required element of practicing the invention.

The lack of support in the claim language for the supposed "immediacy effect" as a claim element becomes clearer when one looks at the argument that the "immediacy effect" for the issuance of points as an element of Claims 10, 27 and 36 of the '412 patent. See Bolger Rep. at 27. Those claims do not contain the same language on which Maritz relies in Claim 1

---

[2]    Because I do not find any element of "immediacy" in the claims, I do not address how such an indefinite concept could be understood in the context of applying this claim to the prior art. Mr. Bolger does not specify in either of his reports how this "immediacy effect" is to be measured.

4

concerning the issuance of points. Mr. Bolger points only to the claim language "online incentive program" as somehow containing the meaning that award points must be issued to a user immediately after an on-line purchase and that those award points must be immediately redeemable by the user for an award. Nothing in the specification provides a basis for reading that limitation into the claim term "online incentive program" or into any other language of Claim 10. In addition, Maritz's accused program plainly employs and benefits from several of the advantages of the invention discussed in the specification.

B.    "On-line Incentive Program"

I disagree with at least two additional interpretations of the language used in the patent claims that are put forward by Mr. Bolger in his report. I have already discussed my understanding of what the claim term "online incentive program" would have meant to the person of ordinary skill in the art at the time of the invention. See Petersen Infringement Rep. at 5. In addition to the "immediacy effect" discussed above, Mr. Bolger's construction adds two additional elements to that language: the on-line incentive program must reward users for on-line activity and the on-line activity being rewarded must be the on-line purchase of products. The claim language of claims 10, 27 and 36 (and the claims that depend from them) does not contain any reference to purchase of products, either on-line or off-line, and, therefore the ordinary meaning of the claim language does not support Mr. Bolger's interpretation.

Moreover, Mr. Bolger's interpretation is not consistent with the specification of the '412 patent or the prosecution history of that patent. In the specification of the '412 patent, the inventor identifies several problems with the then-current incentive programs that he was seeking to address. See Col. 1, lines 17-59. With respect to the process of redeeming award

5

points earned in incentive programs, he specifically identifies the problem of the customer needing to physically obtain an award certificate or credit instrument and the requirement that the customer plan ahead sufficiently to allow time for that process to occur. Id. at lines 38-40, 52-55. These identified problems are specific to the process of redeeming points, regardless of how the points are earned. Therefore, the person of ordinary skill in the art would have understood that the inventor was concerned with resolving that problem in the redemption process in his invention. In Claims 10, 27 and 36, the inventor addresses that very problem through the use of an Internet webpage that permits the user to interact directly with the incentive program and initiate the redemption process directly without the need to obtain a certificate, credit instrument or other similar mechanism to obtain the award.

This interpretation is further supported by statements made on the inventor's behalf during the prosecution of the '412 patent. Although I am not a patent lawyer, I read the Petition to Make Special filed during the prosecution of the '412 patent to be distinguishing between the claims which require on-line purchase of products from the claims that do not. See, e.g., Petition to Make Special (Plaintiffs' Exhibit 217) at 2-3 (describing two distinct set of claims, one of which involves product purchase and one of which does not). That distinction, which is made repeatedly in the Petition to Make Special, would not make any sense if the claims all required on-line purchase of products. Therefore, the prosecution history is directly contrary to the position advanced by Mr. Bolger that each of the claims of the '412 patent requires on-line

product purchase.[3]

### C. "On-line"

As discussed in my opening report and addressed in more detail in Mr. Young's report, the Affinion patents define "online" to mean use of the Internet. See Young Validity Rep. at __. For the reasons set forth in Mr. Young's report, filed concurrently herewith, I disagree with the definition of "online" set forth in the opinions of Maritz's experts.

### D. "Award" or "Redeemable Award"

As discussed in my opening report, the term "award" is defined in the specification of the Affinion patents as "a product or service that can be obtained as a prize or award in exchange for award points." Mr. Bolger's report does not expressly define the term "awards," but he concludes in his validity analysis that "price discounts on later purchases" constitute an award. See Bolger Rep. at 18-19. In my opinion, the use of such discounts as an incentive to purchase would not have been understood by the person of ordinary skill in the art to constitute an "award" as that term is used in the specification of the Affinion patents. My interpretation on this point is supported by the fact that Maritz's own counsel advised Maritz that discount programs would not infringe patent claims that called for award catalogs. See MAR112752-755.

## IV. LEGAL STANDARDS

In order to render my opinions herein, I have been asked to apply certain legal standards to my analysis. I understand that a patent claim is "anticipated" only if a single piece of prior art discloses each and every element of the claimed invention. I understand that there may be an

---

[3]     Maritz's reliance on statements made by the examiner concerning the allowance of claims of the '870 patent to support this interpretation is misplaced. First, the claims of the '870 patent, in contrast to the asserted claims of the '412 patent do contain claim language relating to online purchase. Second, the examiner made plain that it was the combination of "electronic commerce systems and incentive award programs" that was novel and not

7

issue as to whether certain of the publications and patents cited in the reports of Mr. Bolger and Dr. Keller constitute prior art. For purposes of my report, I have assumed that the references cited are prior art.

I further understand that a patent claim would also be invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to one of ordinary skill to which said subject matter pertains." 35 U.S.C. § 103. In challenging the validity of a patent as obvious under section 103, I understand that Maritz may rely on multiple references, but that merely identifying each element in the prior art is insufficient, and Maritz must establish that the person of ordinary skill would have had a motivation, suggestion or teaching that would have led him to select those references and combine their teachings to make the claimed invention.

## V.    CLAIM 1 OF THE '870 PATENT IS VALID

### A.    Claim 1 of the '870 Patent is not Anticipated by the U.S. Patent No. 5,483,444 or the Look to Book Program.

Claim 1 of the '870 patent provides: A system for an incentive award program, including a computer system accessible for on-line interactive communication with users, said computer system comprising:

> A first memory area for storing a product catalog, said product catalog including product descriptions and product prices for each product available for purchase;
>
> A second memory area for storing an awards catalog, said awards catalog including an award description and award points value for each award; and,
>
> A frequency database storing account information for each

---

suggested by the prior art. See '870 patent Notice of Allowance.

8

enrolled user of said incentive award program.

I have compared the disclosure of U.S. Patent No. 5,483,444 (the "'444 patent") and the disclosure of the documents cited by Mr. Bolger concerning the operation of the Look to Book program[4] to the elements of Claim 1 of the '870 patent. My conclusion is that, whether viewed separately or combined as Mr. Bolger does, those references do not disclose each of the elements of Claim 1 of the '870 patent.[5]

Neither the '444 patent or the Look to Book documents describes a computer system accessible for "on-line interactive communication with users" as that term is defined by the '870 patent, because neither of those references discloses any use of the Internet. Instead, both of these references describe a system using a CRS system to operate an incentive program for travel agents. For that reason alone, these references do not disclose each of the elements of Claim 1 of the '870 patent.

The '444 patent does not disclose any awards catalog stored on a computer system, much less the specific attributes of the award catalog required by Claim 1 of the '870 patent. Mr. Bolger does not cite to any such disclosure in his expert report. For that additional reason, the '444 patent does not disclose all the elements of Claim 1 of the '870 patent.

The Radisson documents concerning the Look to Book Program cited by Mr. Bolger also do not disclose all the elements of Claim 1 of the '870 patent. In addition to the absence of any

---

[4] Mr. Bolger cites to the following documents concerning the Look to Book program: CC003699-708, CC004544-49, CC004558-61, CC004568-89, CC004676-77, CC004900-02, and TRL-MTZ 44088-93.

[5] My understanding is that in order to anticipate the claim of a patent the challenging party must rely on a single piece of prior art as disclosing the entire invention. Here, Mr. Bolger seems to be relying on two different references relating to Look to Book: the '444 patent and documents relating to the operation of the Look to Book program by Radisson. For purposes of my analysis, I will discuss these references separately.

on-line computer system as defined in the '870 patent, those documents do not provide any disclosure as to the use of a separate memory area for the product catalog and a separate location for storing an awards catalog, which Mr. Bolger asserts are required elements of the claim.[6]  I understand from Mr. Young's report, consistent with my own review of the documents, that a person of skill in the art would not find that these documents disclosed such separate memory areas. See Young Validity Rep. at 9.

Because neither the '444 patent and/or the Look to Book program documents disclose each and every element of Claim 1 of the '870 patent, that claim is not anticipated by either of those references.

**B.    Claim 1 of the '870 Patent Is Not Obvious in Light of Any of the Combinations of References Cited**

Mr. Bolger's obviousness analysis with respect to Claim 1 of the '870 patent appears to be based on looking at the invention and then searching for each of those elements in the prior art.  Indeed, Mr. Bolger's analysis does not specify which of the many references he lists he contends the person of ordinary skill would have combined to create the invention of Claim 1. In the absence of that specificity, I cannot know what exact combination of references Mr. Bolger is contending would have been combined by the person of ordinary skill in the art and what specific motivation to combine would apply to those specific references.

---

[6]     It is also unclear from the documents cited by Mr. Bolger when certain documents were created and, therefore, whether they are even prior art.  For purposes of my analysis I will assume that these documents do constitute prior art.

As an initial matter, even though Mr. Bolger cites many references in an effort to come up with each element of the invention of Claim 1 of the '870 patent, no combination of those references would disclose each and every element of that claim. None of the references discloses an on-line computer system containing the second memory area for an awards catalog. Both of the references cited by Mr. Bolger (Look to Book program documents and Judy Quinn, "The Interactive Revolution," *Incentive*, February 1994 ("the Quinn article")) disclose only the display of award catalogs on the CRS system or private computer networks, not the use of the Internet for such catalogs. Because the '870 patent defines on-line as through the Internet, all of the possible combinations of references cited by Mr. Bolger would still be lacking the use of an awards catalog accessible through the Internet.

Nothing in the references cited by Mr. Bolger would have given the person of ordinary skill in the art a motivation to combine the elements of a computer system accessible for on-line interactive communication with users, a memory area with a product catalog, a second memory area with an award catalog, and a frequency database. Indeed several of the references cited by Mr. Bolger actually would discourage a person of ordinary skill in the art from combining the elements into the invention of the '870 patent. For example, U.S. Patent No. 5,025,372 ("the '372 patent") discloses the use of a credit instrument in the provision of incentive award programs in an effort to avoid the burden of having to use a catalog of awards. See Col.4, lines 7-col. 6, line 55 (describing advantages of operating an incentive program that does not rely on an awards catalog). A person of ordinary skill in the art would therefore understand the '372 patent to be discouraging the use of on-line award catalogs in the administration of incentive award programs and certainly would not have been motivated to combine the disclosure of that

11

reference with an awards catalog. Another article cited by Mr. Bolger, "A Shopping Spree in Cyberspace" by Laurie Petersen in *Catalog Age*, September 1, 1995 (the "*Catalog Age* article") mentions a frequent buyer club for an Internet mall (which does not include an awards catalog or on-line redemption), but describes in great detail the difficulties that were experienced in using the Internet as a method of conducting a relatively simple consumer transaction. The person of ordinary skill on reviewing such an article would, if anything, have been dissuaded by that author's account from viewing the use of the Internet as a viable route for operating an incentive program.

Likewise, the article by Anne Stuart in *CIO*, August 1995 (the "*CIO* article") describing Radisson's use of information technology refers to the use of the Internet as a way for consumers to book rooms, but also refers separately to the success of the non-Internet systems used by Radisson, such as Pierre and Harmony, and the Look to Book system. The person of ordinary skill in the art readings such an article would not have seen anything suggesting that the Look to Book program should be moved to the Internet or suggesting the implementation of consumer incentive programs through the Internet. Taken as a whole, the articles and patents that Mr. Bolger asserts would have provided a motivation to combine the elements found in the various references cited simply would not have done so.

C.    Claim 1 of the '870 Patent is Not Invalid Under § 102(f).

My understanding of the position set forth in Mr. Bolger's report is that he asserts that Mr. Storey was joined by others in inventing the invention of Claim 1 of the '870 patent. Mr. Bolger does not cite any evidence to suggest that anyone other than Mr. Storey invented the claimed invention or had any involvement at all in making the invention. Indeed, as I understand

the testimony, the invention was made well after Mr. Storey had left his employment at Radisson. See Storey Dep. at 12-13, 195-98 (left Radisson for Doubletree in 1994; invention made in spring/summer 1995). The sole basis for this argument appears to be the assertion that the Look to Book program is the same as the invention of the '870 patent. For the reasons stated above, there are significant distinctions between the disclosures of either of the Look to Book references and the claimed invention. Therefore, the logic of the argument is flawed.[7]

## VI.     CLAIMS 1, 10-17, 18, 27-34, 35 AND 36 OF THE '412 PATENT ARE VALID.

Mr. Bolger's initial expert report addresses only the validity of Claims 1, 10, 18, 27, 35 and 36 of the '412 patent. He has recently submitted a Supplemental Expert Report that addresses the validity of the dependent Claims 11-17 and 28-34. I address herein the opinions expressed in both of those reports concerning the validity of those patent claims.

### A.     The '887 Patent Does Not Anticipate Claims 1, 18 or 35 of the '412 Patent.

Claim 1 of the '412 patent provides:  A method for implementing an on-line incentive program, said method comprising the steps of:

> Providing an Internet webpage accessible to at least one user, via a computer system, for on-line interactive communications between said user and said Internet webpage;
>
> Offering on said Internet webpage, at least one product for sale to said user. Determining whether said user qualifies for one or more award points based on said user's response to purchase said at least one product;
>
> Calculating said award points according to a preprogrammed formula if said user qualifies for said award points, and
>
> Issuing said award points to an account of said user if said user qualifies for said

---

[7]      Dr. Keller makes a similar argument with respect to the inventorship of Claim 10 of the '412 patent.  Since neither of Maritz's experts assert that Claim 10 of the '412 patent is anticipated by the '444 patent, there is even less support for such an argument with respect to that patent claim.

award points, wherein said award points are redeemable by said user for an award.

Claim 18 claims "a computer readable medium comprising a plurality of instructions, which when executed by a computer causes a computer to perform" the same steps as in Claim 1. Claim 35 claims "a computer system for implementing an on-line incentive program, said computer system comprising" software to perform the same.

Mr. Bolger asserts that, under the claim construction proposed by Affinion, Claim 1 of the '412 patent is anticipated by U.S. Patent No. 5,710,887 ("the '887 patent"). The focus of the '887 patent is on the technology of bringing shopping functions to the Internet. It describes in great detail the ways in which a system should be designed to facilitate the operation of electronic storefronts. The issue of incentive programs is discussed only very briefly in the patent specification and is not mentioned in either the abstract, the summary of the invention or the claims. Although the '887 patent does mention the use of incentives, the '887 patent uses the term "incentive" to encompass sales or discounts on merchandise and does not contemplate what would traditionally be viewed as a customer loyalty/frequency program. See '887 patent, col. 7, lines 19-24. Therefore, it is my opinion that the person of ordinary skill in the art would not view the '887 patent as being a reference in the field of loyalty/frequency programs.

I have been asked to compare the limitations of Claim 1 of the '412 patent to the disclosures of the '887 patent. Based on that comparison, I conclude that the '887 patent does not anticipate Claims 1 or 18 of the '412 patent because it does not disclose each and every element of that claim.

14

1.    The '887 Patent does not disclose an "On-line Incentive Program"

Mr. Bolger's analysis of Claim 1 of the '412 patent ignores the opening section of the claim. In the case of Claim 1 of the '412 patent, it is necessary to look at that language to understand the claim in its entirety. Indeed, Maritz's lawyers apparently understood the importance of that language in its non-infringement opinions. See SP00410-435 at SP00419 ("we interpret the implementing an on-line incentive program preamble language to be a limitation of Claim 1"). Therefore, in my view, the analysis must start with the issue of whether the '887 patent discloses the implementation of an on-line incentive program.

As discussed in my opening report and above, an on-line incentive program in the '412 patent, requires a program webpage which permits users to interact with the incentive program on-line. The '887 patent discloses a webpage through which a user can shop, which may be analogous to the "product homepage" described in the '412 patent specification. See '412 patent, col. 3, lines 13-22. The '887 patent does not disclose any program homepage to implement an on-line incentive program and no webpage which permits the users of an incentive program to interact with that program. Therefore, the '887 patent does not disclose the implementation of an on-line incentive program.

2.    The '887 Patent does not expressly or inherently disclose the elements of determining whether a customer qualifies for award points or calculating award points according to a preprogrammed formula.

As Mr. Bolger recognizes, the '887 patent does not describe the claim elements of either determining whether a customer qualifies for award points based on said user's response to purchase said at least one product or calculating award points according to a preprogrammed formula. Mr. Bolger asserts (without significant explication) that such elements are "inherent"

15

in the frequent buyer program disclosure of the '887 patent. I disagree. The sketchy disclosure

in the '887 patent does not provide any guidance to the person of ordinary skill in the art as to

how the program decides to award points to a user's account or provide any information as to

how those points are calculated. The program as described in the '887 patent would not have

disclosed these elements of Claims 1 and 18 to the person of ordinary skill in the art.

The person of ordinary skill in art would understand that nothing the '887 patent

disclosure requires that the points be awarded based on said user's response to purchase a

particular product, or any product for that matter. The '887 patent describes the frequent buyer

program as being a type of "in-store incentive." See Col. 27, lines 61-65. The "in-store

incentives" described elsewhere in the specification of the '887 patent include incentives based

on simple presence in the electronic "store" or coupons which may be obtained from multiple

sources, including shopping at other sites. See '887 patent at col. 20, lines 43-46; col. 23, lines

4-12. Therefore, a person of ordinary skill in the art would understand that, although an award

of points based on the decision to purchase a product bought through the website offering

products for sale is one possible way of implementing the program described in the '887 patent,

it is not necessary that the award of points be based on such purchases.

Mr. Bolger also asserts that it is inherent in the sketchy disclosure of the '887 patent that

the points are calculated "according to a preprogrammed formula if said user qualifies for said

award points." The '887 patent does not disclose anything about how the points are calculated

and certainly does not provide that they are calculated by the computer system according to a

preprogrammed formula. The person of ordinary skill in the art would understand that the

computer system could calculate the points according to a preprogrammed formula, but there is

no necessity that it be calculated that way based on the limited disclosure of the '887 patent.

### 3. The '887 Patent does not disclose award points that are redeemable by said user for an award.

The '887 patent does not disclose any redemption of points to obtain an award as required by Claims 1 and 18. The sole benefit for purchasers in the incentive system described by the '887 Patent is a discount that is calculated automatically after a customer has placed certain items in his cart. See '887 patent, Fig. 13 and col. 24, line 65 - col. 15, line 5. The disclosure relating to "Frequent Buyer Incentives" describes discounts as the only incentive being provided. See id. at col. 27, line 59 – col. 28, line 17. As discussed above, such a price discount at the time of a future purchase from the retailer is not an "award" as that term is used in the '412 patent. Therefore, the '887 patent does not disclose this element of Claim 1 of the '412 patent.

### B. Claims 1 and 18 of the '412 Patent Were Not Rendered Obvious By Any of the Combinations of References Cited

Maritz's experts advance multiple possible combinations of references that they assert would render Claims 1 and 18 obvious to the person of ordinary skill in the art, each of which I analyze below.

#### 1. The '887 patent

As discussed above, "immediacy" is not an element of Claim 1 of the '412 patent. Therefore, whether or not the person of ordinary skill in the art would or would not find the immediate award of points for on-line purchases obvious in light of the '887 patent is not relevant to the analysis of whether the '887 patent invalidates Claim1 of the '412 patent. For the reasons set forth above, with respect to the anticipation argument, the '887 patent would

17

also not have rendered the invention of Claim 1 of the '412 patent obvious.

### 2. The '887 Patent and U.S. Patent No. 5,794,210 ("the '210 patent")

As with the argument above concerning obviousness in light of the '887 patent alone, the issue of whether the '210 patent would have rendered the immediate award of points for on-line purchase obvious is not relevant to the analysis of the validity of Claim 1 of the '412 patent.

These two references are from such different fields and take such different approaches to the provision of incentives that the person of ordinary skill in the art would not have been motivated to combine them. Nothing in Mr. Bolger's report points to any indication in either of those pieces or prior art that the disclosures should be combined with others such as the other reference.

Moreover, even if one were to make this combination, the claimed invention would not have been obvious to the person of ordinary skill in the art. Neither of these pieces of prior art teaches the person of ordinary skill in the art a method or system for providing awards to the purchasers of products through an Internet webpage. Nor does the '210 patent provide any disclosure concerning providing points based on product purchases according to a pre-programmed formula. Therefore, this combination of references would not have rendered the invention of Claim 1 of the '412 patent obvious.

### 3. The Look to Book Program/ '444 Patent

The Look to Book program would not have rendered Claim 1 of the '412 patent obvious.

First, as Mr. Bolger concedes, the Look to Book program does not disclose the use of an Internet webpage for any of the functions of the program. Indeed, the specification of the '444 patent teaches away from the use of new technologies to implement the program:

18

> A key to making the present invention commercially viable involves
> determining how to implement the invention. Since most travel agents work
> through reservation systems (described below) that are already established,
> implementing such a system involves determining how to interact with the
> existing reservation system. Col. 3, lines 1-6. (emphases added).

The '444 patent also would not have suggested the use of the Internet to operate the Look

to Book program because the entire focus of that patent was on the awards to travel agents, all

of whom were already electronically reachable through the CRS system. Therefore, there

would be no reason to look for a different mechanism to bring an incentive program to that

group. Indeed, even after Radisson began moving some reservations operations to the Internet,

Look to Book itself remained a function on the CRS systems. See *CIO* article. Because the

'444 patent praises the success of the Look to Book program, see '444 patent, Col. 3, lines 6-29,

the person of ordinary skill in the art at the time of the invention would not have believed that a

need to a new (and largely untested) technology was warranted. Indeed, because the travel

agents were all reachable through the CRS system and regularly used that system to engage in

the precise activity by travel agents that Look to Book sought to encourage. Look to Book

actually teaches away from using the Internet for providing awards.[8]

Second, the Look to Book program does not disclose the element of rewarding the

purchaser of the product from an Internet webpage for their response to purchase that product.

In fact, the Look to Book program suggests just the opposite by focusing on the rewards for the

intermediaries rather than the actual purchasers of the product as the persons to receive awards.

---

8       The '444 patent refers to the possible use of other known technologies for the receipt of information by the
award system, such as a modem or kiosk, but does not mention the Internet or suggest that non-CRS systems would

Therefore, the person of ordinary skill in the art would not have looked to the '444 patent as particularly useful source for thinking about operation of a loyalty program for rewarding on-line product purchases.

Third, to the extent that Claim 1 requires immediacy as claimed by Mr. Bolger, '444 patent and is directly at odds with that immediacy requirement. Because the Look to Book program is offering points based on the booking of reservations, the program contemplates a significant waiting period, based on either time or a subsequent event or both. See '444 patent Col. 5, lines 17-44. Thus, the person of ordinary skill in the art would understand the disclosure of the '444 patent, including its discussion of the success of the Look to Book program incorporating a substantial waiting period, to teach away from any need for immediacy in the availability of points.

### 4. The '887 patent and the "Look to Book" Program

Even if one combines those two references, the combination does not contain all the limitations of Claim 1 of the '412 patent.

The person of ordinary skill in the art would not have been motivated to combine the '887 patent and the Look to Book program. The '887 patent relates to the technology for putting stores onto websites as part of the development of Internet-based commerce. In contrast, the Look to Book program does not mention the Internet, or shopping through the Internet at all. Nothing in those references themselves would have led the person of ordinary skill in the art to

---

be desirable or preferable.

have combined them.[9]

Nor do any of the other prior art references that Mr. Bolger cites provide a motivation to combine the Look to Book program documents or with the '887 patent. The *Catalog Age* article would not have motivated the person of ordinary skill in the art to move consumer focused incentive programs to the Internet. Indeed, as discussed above, the *Catalog Age* article would likely have discouraged such movement, as it reflected the continuing difficulties in consumer access and use of the Internet in commercial transactions. As discussed above, the Quinn article did not discuss Internet-based award catalogs and, therefore, would not have provided a motivation to combine the '887 patent and the Look to Book program.

     5.      The '887 Patent, "Look to Book" Program, and the '210 Patent

For the reasons already discussed above, these three references would not render obvious the '412 patent claims. The addition of the '210 patent would not add anything to the combination of the '887 patent and the '210 patent discussed above.

There would be even less motivation to combine these three references. As discussed above, the '210 patent does not fall within the scope of the frequency/loyalty field. The idea of compensating the public directly for reviewing ads over the Internet was very new (and ultimately not very successful) at the time of the invention. The person of ordinary skill in the art would not have viewed that patent as relating to the use of awards to incentivize consumers relating to on-line purchase of products.

     C.      The '887 Patent Does Not Anticipate Claims 10, 27 or 36 of the '412 Patent.

---

[9]     The reference to AOL and other proprietary networks in the '887 patent would not have provided such a motivation, for the reasons set forth in Mr. Young's validity report at 11.

Claim 10 provides:

A method for redeeming incentive awards in an on-line incentive program, said method comprising the steps of:

Implementing an on-line incentive program that issues award points to users, wherein said award points are redeemable by said user for an award;

Implementing an Internet webpage accessible, via a computer system, to at least one user of said on-line incentive program for on-line interactive communications between said user and said Internet webpage;

Offering on said Internet webpage, at least one redeemable award available to said user for exchange of said award points, and

Permitting said user to initiate a process to receive said at least one redeemable award for exchange of said award points issued to said user through said on-line incentive program.

Claim 27 provides:

A computer readable medium comprising a plurality of instructions, which when executed by a computer, causes the computer to perform the steps of:

Implementing an on-line incentive program that issues award points to users, wherein said award points are redeemable by said user for an award;

Implementing an Internet webpage accessible, via a computer system, to at least one user of said on-line incentive program for on-line interactive communications between said user and said Internet webpage;

Offering on said Internet webpage, at least one redeemable award available to said user for exchange of said award points, and

Permitting said user to initiate a process to receive said at least one redeemable award for exchange of said award points issued to said user through said on-line incentive program.

Claim 36 provides:

22

> A computer system for implementing an on-line incentive
> program, said computer system comprising software for offering,
> on an Internet webpage, at least one redeemable award available to
> said user for exchange of at least one award point, and for
> permitting said user to initiate a process to receive at least one
> redeemable award for exchange of said award points, said award
> points being issued from said on-line incentive program, and said
> Internet webpage being accessible to said user for on-line
> interactive communications between said user and said Internet
> webpage.

The '887 patent disclosure does not disclose each of the elements of Claims 10, 27 or 36 of the '412 patent for at least two reasons.

First, as discussed above at 14-15, the '887 Patent does not disclose implementing an "on-line incentive program." The '887 Patent does not disclose a program webpage (or any mechanism for that matter) whereby a user can interact on-line with the incentive program. Therefore, for all the reasons addressed above, the '887 patent does not disclose an on-line incentive program.

Second, as discussed above at 16-17, the '887 patent does not disclose points that are redeemable for an award or any "redeemable award". The offer of discounts on items that the user is going to purchase is not an "award" as that term is used in the specification of the '412 patent. Maritz's experts incorrectly suggest that the '887 patent discloses a mechanism by which users could obtain "free products." See Keller Rep. at 14. The '887 patent does not describe the specifics of the program but refers to what is available consistently as "price discounts." See '887 patent, col. 27, lines 66-67; see also Bolger Supp. Rep. at 5. The use of price discounts as incentives would not indicate to the person of ordinary skill in the art that free products would be available. Because the '887 patent does not involve the offer of redeemable awards, it does not

23

disclose any of the claim elements that require a "redeemable award."

Because the '887 patent fails to disclose at least these two elements of Claims 10, 27 and 36, those claims are not anticipated.

### D. Maritz Did Not "Develop the Idea of an On-line Award Catalog and On-line Redemption" Prior to the Invention

My review of the documents and testimony concerning Maritz's Goldmail System indicates that Maritz did not develop the idea of an on-line award catalog and on-line redemption prior to the invention.[10]

First, the sole source for Mr. Bolger's view that Maritz was discussing on-line redemption is MAR11340 and 113117, dated October 18, 1995. That document on its face does not refer to on-line redemption, but only to an on-line catalog. Less than 10 days later, on October 27, 1995, the fulfillment process was described more clearly: "Customers order items via 800 number to Maritz Customer Service." See MAR 108177. Mr. Steinkamp, Maritz's designated witness on its Goldmail system testified that, when it was launched in June 1996, Goldmail used an on-line catalog but used phone, mail and e-mail for redemptions, not on-line redemption. See Steinkamp Dep. 18-19. Moreover, as reflected in MAR 109946 and confirmed by Mr. Steinkamp's testimony at 24-25, the description of the proposed program as of December 14, 1995, specified that Maritz was developing the Goldmail system using an on-line catalog with telephone redemption. Therefore, the best interpretation of MAR11340 is that it refers to the use of an on-line catalog but not on-line redemption.

Second, Mr. Steinkamp testified that he had no knowledge of any work done on

---

[10] It is unclear from the Maritz expert reports whether and, if so, on what basis, Maritz contends that these Goldmail documents would constitute prior art or would render any patent claims invalid.

Goldmail prior to October 18, 1995. My review of Mr. Storey's testimony indicates that he invented the invention claimed in the '412 patent before October 18, 1995. See Storey Dep. at 195-98. Therefore, there does not appear to be any evidence that any alleged invention relating to Goldmail was prior to the invention by Mr. Storey.

### E. Claims 10, 27 and 36 of the '412 Patent Would Not Have Been Obvious.

I have examined all of the various combinations of references that the Maritz experts rely on as a basis for their opinion of obviousness. For the reasons set forth in Section IV, B above, as well as those set forth below, I conclude that none of those combinations would have rendered Claims 10, 27 and 36 of the '412 patent obvious.

#### 1. The '444 Patent and '887 Patent

Neither of these references discloses the on-line redemption of points for awards. The '444 patent does not disclose either an on-line awards catalog or on-line redemption. And, as Mr. Bolger concedes, no form of the Look to Book program discloses on-line redemption of points for awards. See Bolger Rep. at 29 ("redemption did not occur online"). As discussed above, the '887 patent lacks several elements, including in particular the redemption of points for "awards." Thus, even were one to combine these two references, one would still not have had all the elements of the invention of Claims 10, 27 or 36 of the '412 patent.

Moreover, the person of ordinary skill in the art would not have had any motivation to combine these two references. The '444 patent does not mention the Internet or electronic commerce and does not involve the use of discounts or other consumer-oriented rewards as it is expressly targeting the travel agent. The '887 patent, in contrast, focuses almost entirely on the technology for developing a store for use in Internet-based commerce and makes only a scant

25

reference to any form of incentives and no mention at all of a traditional points-based loyalty program. Thus, as discussed above with respect to Claim 1 of the '412 patent, there would have been no motivation to combine these two references.

## 2.    Quinn Article and Look to Book program or the '887 patent

As an initial matter, Mr. Bolger's reliance on the Quinn article as representing an "online awards catalog" is based on a misinterpretation of the Quinn article. The Quinn article relates to Maritz's incentives programs, not its loyalty programs. Although it uses the term "online" to describe the catalogs being tested by Maritz, the description indicates that the catalog is being made available only on a private network of the client's computers, not on the Internet. I believe this interpretation is confirmed by the testimony of Maritz's witnesses concerning the timing of Maritz's introduction of an Internet based awards catalog for its incentives program. Maritz's designated witness on its incentive program website testified that the first use of an Internet-based awards catalog for Maritz's incentives program was not until 1998. See Lister Dep. at 16-17, 20-21. It is thus extremely unlikely that the system being "tested" in 1994 was the same one not put into use until at least 1998. Therefore, I do not view the Quinn article as adding any significant disclosure to the disclosure of the Look to Book program documents, which include the disclosure of some sort of an awards catalog displayed in a private computer network. Therefore, the same analysis as to the combination of the '887 patent with the Look to Book patent would apply to the combination with the Quinn article.

Finally, the person of ordinary skill in the art would not have been motivated to combine the Quinn article with either the '887 patent or the Look to Book program. Mr. Bolger states that the person of ordinary skill in the art would have been motivated to combine the teachings of

each because all of these references "relate to incentive programs, and specifically loyalty based frequent buyer programs." See Bolger Rep. at 30. That is an inaccurate description of the nature of these three references. The Look to Book program is not properly described as a "frequent buyer program" but is instead an incentive program for partners in the distribution channel. Likewise, the Quinn article is referring to Maritz's incentives programs, which are not frequent buyer programs at all. In contrast, the '887 patent is not what the person of ordinary skill in the art would think of as a loyalty based frequent buyer program because it uses only a form of discounting, not any sort of reward structure that was associated with standard loyalty programs, such as those described in the specification of the '412 patent.

### 3. Look to Book Program

Dr. Keller assets (for the first time in his Supplemental Report) that the Look to Book program alone renders Claim 10 obvious. He concedes that the Look to Book program does not disclose an Internet webpage, but asserts, without providing any basis for believing it is so, that one of ordinary skill in the art would have known how to operate an incentive program through an Internet webpage and "would have been motivated to do so." With respect to the limitation requiring that the system permit the user to initiate the redemption of points for the award through the webpage, Dr. Keller asserts that it would have been obvious to use the CRS system to arrange for travel awarded through the program. That assertion is belied by the fact that the Look to Book program itself was not operated that way and did not permit travel agents to redeem travel awards through the CRS system.

27

### F. Dependent Claims 11-17 and 28-34 Would Not Have Been Obvious

The asserted dependent claims, Claims 11-17 and 28-34 of the '412 patent, add

limitations relating to the specific operation of the on-line incentive program claimed in Claims

10 and 27. Mr. Bolger points to various pieces of prior art as containing one element or another

of the asserted claims and asserts that the person of ordinary skill in the art would have thought it

obvious to add those features to the other prior art. In fact, none of these reference combinations

takes into account the fact that none of these features had been used in conjunction with the

operation of an on-line incentive program through a webpage. It would not have been obvious to

a person of ordinary skill in the art to take features that had traditionally been performed offline

and put them into the Internet setting. All of the arguments made above with respect to the

validity of the independent claims apply as well to the asserted dependent claims and are

incorporated into the analysis of the dependent claims by reference. I have also reviewed the

opinions of Maritz's experts concerning the validity of these dependent claims and address the

additional limitations added by those claims below.

#### 1. Claims 11 and 28

Claims 11 and 28 add to the limitations of Claims 10 and 27 the elements of (1)

"accessing an account of said user"; (2) "redeeming a particular award for said user based on

said points issued to said user if said user has earned sufficient points to qualify for said

particular award; and (3) subtracting said points from said account of said user." Mr. Bolger and

Dr. Keller assert that these claims are obvious in light of the references identified with respect to

Claims 10 and 27 in combination with a series of additional references.

Mr. Bolger asserts that the steps of Claims 11 and 18 "will necessarily be performed" in

the frequent buyer points program referred to in the '887 patent. See Bolger Supp. Rep. at 13. He also asserts that the additional steps of Claims 11 and 18 would necessarily be performed in the operation of the Maritz system referred to in the Quinn article. In addition to the other problems with the supposed disclosures of the '887 patent and the Quinn article, neither of those articles actually describes anything about the way that the process of redeeming points is actually conducted. Therefore, it does not follow, as Maritz's experts suggest, that any disclosure of redemption inherently discloses these specific limitations. Indeed, the prior art cited by Maritz's experts contains at least one example of a program which permits users to create a negative balance. See U.S. Patent No. 5,689,100 (the "'100 patent") at Col. 8, lines 49-65.

It is also my opinion that Claims 11 and 28 are not rendered obvious by any of the other combinations of references put forward by Mr. Bolger and Dr. Keller. The '210 patent does not discuss a points account for awards but instead describes accounts containing digital cash that can be used to purchase information. The other two references relied on by Mr. Bolger deal only with incentive programs that are not operated through interaction with any Internet webpage. The '100 patent describes a debit card program, which permits users to obtain good or services by redeeming points at retailers. U.S. Patent No. 5,806,045 ("the '045 patent") describes the use of a "smart card" for use at merchants to obtain goods or services.

Mr. Bolger does not provide any basis on which he asserts that a person of ordinary skill in the art would be motivated to combine any of these references with any of the references that he asserts contain the elements of the independent claims from which Claims 11 and 28 depend. As addressed below, the broad brush assertions Mr. Bolger makes concerning motivations to

29

combine these references do not withstand scrutiny.

### 2.    Claims 12 and 29

Claims 12 and 29 add to the limitations of Claims 11 and 27 the elements of (1) "displaying, via said Internet webpage, a catalog of awards redeemable with said award points of said on-line incentive system; and (2) accepting a selection by said user that indicates an award from said catalog.[11]

The '887 patent fails to disclose a catalog of awards. Instead, the disclosure of the '887 patent discloses only the offering of discounts on products purchased from a product catalog. The person of ordinary skill in the art would understand the '412 patent to require that the award catalog be something other than the product catalog listing items for sale. Indeed, Maritz's counsel agreed with this interpretation in his non-infringement opinions on which Maritz relied. See MAR112481-82.

As discussed above, the Goldmail program, did not disclose on-line redemption of points and, therefore, even if that program were combined with other references (not specifically identified by Mr. Bolger), on-line redemption would still be missing from the combination. Therefore, that reference combined with the other references cited would not render the invention of Claims 12 and 29 obvious.

Likewise, the Look to Book program did not disclose either an awards catalog available through an Internet webpage or a system that could accept the selection of a user from that Internet webpage of an award. Therefore, that reference combined with the other references

---

[11]    I understand that Mr. Bolger argues that Claims 12 and 13 are invalid because they do not correctly designate the claims from which they depend. For purposes of my opinion, I have been asked to assume that Claim 12 depends from Claim 11, rather than Claim 10.

cited would not render the invention of Claims 12 and 29 obvious.

The Quinn article also does not disclose either an awards catalog available through an Internet webpage or a system that could accept the selection of a user from that Internet webpage of an award. Mr. Young has also reviewed the disclosure of the Quinn article and determined that the article does not indicate that the use of online in that article refers to use of the Internet. See Young Validity Rep. at 13.

Finally, even if any of these references in combination would provide each of the elements of Claims 12 and 29, as discussed in more detail below, there is no motivation to combine these references.[12]

###    3.    Claims 14 and 31

Claims 14 and 31 add to the limitations of Claims 10 and 27 the limitation of "permitting a user to review an awards catalog from said Internet webpage that comprises awards redeemable for said award points."

Other than the Goldmail documents, none of the references cited by Maritz's experts discloses use of an Internet webpage from which said award catalog is displayed. As discussed above in detail both the Look to Book Program and the Quinn article are addressing only the use of award catalogs on private computer systems. The Expressnet press release does not disclose either an awards catalog or the review of an awards catalog from an Internet webpage and the Hilton press release does not disclose anything about the review of an award catalog from an Internet webpage. Therefore, the combination of any of the cited references with those

---

[12]    Dr. Keller also asserts that claims 12. 13. 29 and 30 are indefinite. I disagree with his analysis. The person of ordinary skill in the art would be able to easily understand the scope of those claims.

references would be lacking the element of an awards catalog that the user can review from an Internet webpage.

The Goldmail documents disclose only a vague intention to use an on-line catalog, the details of which are unclear. Moreover, as discussed above, there was no discussion in those documents of on-line redemption.[13]

Finally, as set forth below in more detail, neither of Maritz's experts has provided a basis for concluding that the person of ordinary skill in the art would have been motivated to combine these references with any other particular references.

### 4. Claims 15 and 32

Claims 15 and 32 adds to the limitations of Claim 10 and 27 the limitation of "permitting a user to review an account from said Internet webpage for said user, wherein said account reflects an amount of said award points credited to said user."

None of the references cited would have, in combination with other references, rendered the invention of Claims 15 and 32 obvious. As discussed above, two of the references cited (the Look to Book program/'444 patent and the Quinn article) do not disclose the limitation because, as explained above, they do not disclose use of an Internet webpage at all. Likewise, the American Express press release does not refer to the use of an Internet webpage, but only to use of AOL's proprietary computer network. See "Expressnet from American Express Debut on America Online" (January 30, 1995 press release) (Expressnet available exclusively on AOL). Therefore, none of those references can be said to disclose the element of permitting a user to

---

[13]     Maritz's use of the Goldmail documents in this manner raises the question of on what basis Maritz contends these documents could possibly constitute any category of prior art recognized by § 102. Neither of Maritz's experts addresses this point in their reports.

32

review an account from such Internet webpage. Therefore, the only references to which Mr. Bolger cites that use Internet webpages and make some reference to checking user accounts are the two advertisement-reading programs (the Goldmail documents and the '210 patent) and the Hilton press release. Maritz's experts do not explain any basis on which one could conclude that the person of ordinary skill in the art would have been motivated to combine these enumerated references with any reference or references that is claimed to disclose the other elements of the asserted claim.

### 5. Claims 16 and 33

Claims 16 and 33 add to the limitations of Claim 10 and 27 the limitation of "permitting a user to preview information about said on-line incentive program from said Internet webpage."

Most of the prior art references that Mr. Bolger asserts contain this limitation do not disclose the use of an Internet webpage at all and, therefore, cannot be said to disclose offering a user the ability to preview information "from said Internet webpage." As discussed above, the '444 patent, the Look to Book program documents, the Quinn article and the American Express press release do not describe use of an Internet webpage at all.

Moreover, the person of ordinary skill in the art would not have been motivated to combine any of the remaining references with the '887 patent and, therefore, those combinations do not render these claims obvious.

### 6. Claims 17 and 34

Claims 17 and 34 adds to the limitations of Claims 10 and 27 the limitation of "permitting a user to apply for membership to said on-line incentive program from said Internet webpage."

Several of the references cited by Mr. Bolger as disclosing this element do not do so because they do not include an Internet webpage at all. Neither the '444 patent/documents concerning the Look to Book program nor the American Express Press Release discloses use of an Internet webpage, and therefore, would not have provided the claimed element to a combination. The '210 patent and Goldmail program documents do have some limited disclosures relating to permitting a participant in their programs for rewarding the readers of advertisements sent to them to apply to participate through the website. Nonetheless, those disclosures would not render these claims obvious to the person of ordinary skill in the art because there would be no motivation to combine these references with any of the prior art Maritz relies upon to make its argument that the independent claims were obvious.

### G.     Motivation to Combine

Mr. Bolger does not provide any specific analysis of the motivation to combine the prior art that he pieces together to make his obviousness analyses for any of the dependent claims. Instead, he presents only an omnibus view that the person of ordinary skill would be generally motivated to combine the various pieces of prior art cited. Because of this undifferentiated approach to the motivation to combine references, it is impossible to know what exactly Maritz contends would have motivated the person of ordinary skill in the art to combine any particular set of references. Should Mr. Bolger at some point provide more detail as to motivation to combine any particular sets of references, I will respond to those more detailed assertions if necessary.[14]

---

[14]      Dr. Keller's Supplemental report provides even more conclusory statements of the alleged motivation to combine. I address Mr. Bolger's assertions specifically but all of the opinions herein are equally applicable to Dr. Keller's even more general analysis. Should Dr. Keller offer more detail, I will respond to his assertions as well.

Mr. Bolger asserts that the motivation to combine arises from the "nature of the problem addressed" by the '412 patent, which he describes as "how to increase consumer frequency and loyalty to a business' e-commerce website." I do not agree with that description of the problem addressed by the '412 patent. The specification of the '412 patent describes a series of problems with the prevailing methods for operating loyalty/frequency programs at that time. One specific problem identified with those programs is that "the customer generally needs to plan ahead in sufficient time to order and receive the award certificate" or "the problem of obtaining the credit instrument for redeeming the awarded points." See Col. 1, lines 38-40, 52-55. Another problem identified in the specification of the '412 patent was the time lag between the customer taking the action being incentivized and the award of points, such as the situation when a person books a flight but does not receive points until after actually taking the flight. See Col. 1, lines 22-24. The specification does not discuss the needs of businesses in e-commerce, but instead focuses on improvements to the operation of frequency and award redemption programs. Moreover, I do not see how, even if one accepted the characterization of the problem made by Mr. Bolger, it would motivate the person of ordinary skill in the art to combine the many references that Mr. Bolger relies on which are not related to the operation of e-commerce websites.

Mr. Bolger incorrectly asserts that all of the prior art references included in his report are within the same *field* as the '412 patent, but then identifies two separate and distinct fields: frequency and award redemption programs and on-line purchasing systems. Dr. Keller does essentially the same thing by referring to the "field of on-line electronic commerce systems and/or frequency and award programs. See Keller Supp. Rep. at 29. In fact, the prior art references are not all in a single field at all. The '887 patent, for example, makes only a very

35

brief, cursory reference to incentive programs and would not be viewed by a person of ordinary skill in the art of frequency and award redemption programs as a reference within that field. In contrast, the '444 patent would be considered a reference in the field of frequency and award redemption programs but would not be viewed as being in the field of Internet commerce. Therefore, it is simply inaccurate to suggest that all of the prior art cited by Mr. Bolger is in the same field.

Mr. Bolger incorrectly asserts that the person of ordinary skill in the art would have been motivated to combine references from these two disparate fields because of the "evolution" of technology and/or because of references that generally refer to technology and incentive programs. This view of the motivation of the person of ordinary skill in the art ignores the limitations of the Internet technology in 1995 and the extremely limited use of that technology in loyalty/frequency programs by that time. See *Interactive Marketing News*, June 1995. As explained above, it was not known in 1995 to what extent the Internet would become useful in mainstream commerce and other technologies, including use of exclusive proprietary computer systems, CRS systems, and improved automated telephone systems, were the focus of the thinking on technology in the loyalty/incentives industry, as is reflected in the very articles cited by Mr. Bolger. See, e.g., Quinn article, '444 Patent.

Finally, Mr. Bolger's reliance on the discussion in the '444 patent describing the commercial success of Radisson's Look to Book program as a motivation to combine the references he relies on is misplaced. The '444 patent makes no reference at all to using an Internet webpage, to use of on-line award catalogs, or to many of the other elements of the claims of the '412 patent, as discussed in detail above. Indeed, the '444 patent might be read to

36

discourage the use of the claimed invention of the '412 patent in that it suggests that tremendous commercial success can be gained through use of a frequency program that does not include use of the Internet. As discussed above, the '444 patent specification emphasizes the importance of adapting the program to the current CRS technology and does not even mention the Internet. Therefore, the person of ordinary skill in the art would not have viewed the '444 patent as providing a motivation to combine it with any Internet-related references.

Because there is no motivation for the person of ordinary skill in the art to combine the numerous references cited by Maritz, those references do not render the invention of the asserted claims of the '412 patent obvious.

## VII. SECONDARY INDICIA

Mr. Bolger makes several arguments concerning secondary indicia of non-obviousness with which I disagree. First, it is plain that the inventions of the asserted claims have been of great commercial success in the industry and have been widely, if not universally, adopted in the consumer loyalty industry. To suggest that the invention of on-line redemption in frequency/loyalty programs has not been a commercial success is simply incorrect. Maritz's head of sales testified that redemption of awards through the website is a requirement of Requests for Proposal and was part of the state-of-the-art internet technologies that Maritz referred to in its submissions to clients. See Sigman Dep. at 28-29, 45. Mr. Sigman further testified that all of the major Maritz Loyalty customers have the availability of redemption through a website as part of their program. Id. at 29. The Netcentives bankruptcy cannot fairly be attributed to the technology contained in the Storey patents, but was part of the general collapse of Internet-oriented companies that had grown during the dot.com boom.

37

Mr. Bolger's discussion of the licensing of these patents ignores the substantial licenses entered into both by Netcentives and Trilegiant under the Storey patents. These licenses, which have been produced in this litigation, include licenses to Yahoo, American Express, E-Bay, and Orbitz, among others.

## VIII. MATERIALITY OF THE '887 PATENT IN THE PROSECUTION OF THE '012 PATENT AND THE '444 PATENT AND LOOK TO BOOK DOCUMENTS IN THE PROSECUTION OF THE '870 PATENT

I understand that information is material to patentability when it "is not cumulative to information already of record or being made of record in the application" and it "establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim" or "refutes or is inconsistent with" a position the applicant takes.

As noted above, the '887 patent does not disclose an on-line award catalog and separate product catalog. As each of the claims of the '012 patent requires a separate product catalog and award catalog, the '887 patent is not close prior art to the claims of that patent. The elements of the claims of the '012 patent that are disclosed in the '887 patent are also disclosed in art that was before the Patent Office during that prosecution, including the '210 patent and the '444 patent. Indeed, Dr. Keller relies on the '887 patent only for the "display" element of Claim 1 of the '012 patent. Therefore, in my opinion, disclosure of the '887 patent would not have affected the reasonable examiner's analysis of the '012 patent claims.

For the reasons discussed above, neither the '444 patent nor the Look to Book documents anticipate or, in combination with other prior art, render obvious any of the claims of the '412 or '870 patents. In my opinion, neither of those references would have been considered material to the prosecution of those patents.

38

## CONCLUSION

For the reasons set forth herein, it is my opinion and belief that the asserted claims

(Claims 10-17, 27-35 and 36) of the '412 patent are not rendered invalid by any of the references

cited by Maritz's experts. It is also my opinion and belief that neither Claim 1 of the '870 patent

or Claim 1 of the '012 patent or Claims 1 and 18 of the '412 patent are rendered invalid by any of

the references cited by Maritz's experts.

_____
Randy Petersen

## Exhibit A

Information Considered

Expert Report of Bruce Bolger (March 10, 2005) and all references cited therein.

Supplemental Expert Report of Bruce Bolger (April 10, 2006) and all references cited therein.

Expert Report of Arthur Keller (March 10, 2006) and all references cited therein.

Expert Report of Arthur Keller (April 10, 2006) and all references cited therein.

Transcripts for the deposition of:

> Thomas Storey
> Ronald Steinkamp, and exhibits thereto
> Tom Bushold

License Agreements between Trilegiant and:

> EBay
> Orbitz
> Choice Hotels

TRL-MTZ38879-96; SP00410-35; MAR11248-82