# EXHIBIT 35

PART 2

27

http protocol may be used.  If several protocols and ports are supported at the
merchant site, then maintaining a secure perimeter at the merchant site becomes
more difficult.

      In one embodiment, if the remote incentive management system does

5    not receive a reply after a predetermined amount of time, the remote incentive
management system repeats the functions in blocks 520 and 530 (*e.g.*, re-signs
the encrypted RFA message and dispatches the new message to the clearinghouse
over the Internet).  In another embodiment, as shown in Figure 5, the remote
incentive management system only repeats the function in block 530 by

10   dispatching the new message to the clearinghouse over the Internet.  If the
remote incentive management system does receive a reply from the
clearinghouse, then it logs the transaction in the transaction log 320 (Figure 3)
as shown in block 550.  In one embodiment, the transaction log 320 records all
significant transactions that occur in the incentive system.  The transaction log

15   320 is a human readable text log to allow an administrator to manually review
incentive system transactions.  The entries to the transaction log 320 are signed
and encrypted so that there is no possibility that a log message will be resent,
thereby executing two value transfers for the same earning activity.

      As shown in block 560 of Figure 5, the incentive management

20   system responds to the merchant's web server software (*e.g.*, CGI program),
with a response to the RFA message.  Figure 6 is a flow diagram illustrating one
embodiment for processing RFA messages at the clearinghouse location.  As

WO 00/21008                                                    PCT/US99/23077

28

shown in block 600, the clearinghouse receives the RFA message via the

Internet. For purposes of explanation, the clearinghouse processes are executed

on the clearinghouse incentive management server 340 (Figure 3). As shown in

block 610, the clearinghouse incentive system validates the merchant's digital

5       signature on the RFA message. In general, this step includes executing an

algorithm to ascertain whether the RFA message had been forged, altered in

transit, or damaged in transit. The clearinghouse incentive system also verifies

that the RFA message was not already received (e.g., the RFA message has

already been processed). If the RFA message was previously processed, then the

10      clearinghouse incentive system confirms that value transfer has occurred.

                As shown in block 620, fraud control procedures are executed. In

one embodiment, there are two general classes of fraud control procedures: 1)

procedures derived from contractual terms between the merchant and the

clearinghouse; and 2) statistical procedures that detect abnormal transactions.

15      The contractual terms class of fraud procedures, which are dictated by the

merchant, detect violations of rules that govern the transfer of value to a

consumer. For example, the merchant may: limit the amount of value conferred

to a consumer; limit the amount of times value may be transferred to a

consumer; and limit the total value that may be transferred to a consumer.

20      These rules are mere examples, and the merchant may define any constraints for

subsequent implementation as fraud control procedures.

                The statistical fraud control procedures detect abnormal transactions,

WO 00/21008                                    PCT/US99/23077

29

and they are not merchant specific. For example, this class of fraud control procedures may detect that a single consumer is earning a significant amount of value from different merchants within a small period of time. Statistically, such an activity may identify fraud or abuse to the overall incentive system. A further

5    example of this class of fraud control procedures includes detecting value transfer from a single consumer from multiple merchants at substantially the same time.

As demonstrated in Figures 2a - 2c, the incentive system provides a real-time response to the consumer. Therefore, one important aspect of implementing fraud control procedures is the consideration of the amount of

10   processing time required to execute the fraud control procedures. In one embodiment, a balance is stricken between the amount of fraud control procedures executed during the real-time processing, and the response time associated therewith. For example, the incentive management system may balance the results obtained from executing fraud control procedures against the

15   amount of time taken to execute the procedure.

If the fraud control procedures detect fraud (e.g., abnormal behavior), then the clearinghouse incentive system generates a digitally signed and encrypted response message that indicates detection of fraud as shown in blocks 630 and 650 of Figure 6. Alternatively, if fraud is not detected, then the

20   clearinghouse incentive system executes a two phase transaction commitment to debit the merchant's account and credit the consumer's account the value specified in the RFA message, as shown in blocks 630 and 640. The

WO 00/21008                                                PCT/US99/23077

30

clearinghouse incentive system utilizes the merchant ID and the authentication

token fields of the RFA message to debit the merchant account and credit the

consumer account.  As discussed above, although the authentication phase is

executed at this time, post solution activity (*e.g.*, capture and charge back), may

5    occur to reverse the transaction.

As shown in block 650, the clearinghouse incentive system generates

a response message.  Table 2 lists a number of fields for a response message

configured in accordance with one embodiment.

10                                    Table 2

| Sequence # |
| :---: |
| Merchant ID |
| Time |
| Status Code |

The clearinghouse incentive system, to generate the response message, calculates

a sequence number for the sequence # field.  The sequence number mimics the

sequence number contained in the RFA message.  The merchant ID, also

20    contained in the RFA message, uniquely identifies the corresponding merchant.

The time field inserts a date stamp, resolved to the nearest second, for the

response message.  The status code field, listed in Table 2, indicates a status for

the corresponding RFA message.  In one embodiment, the clearinghouse

incentive system generates one of four status codes.  A deposit succeeded status

31

code indicates that the value transfer transaction was committed (*e.g.*, the merchant account was debited and the consumer account was credited). A second type of status code indicates that the request for authorization has been denied due to a condition detected in the fraud control procedures. A third type

5    of status code, which also connotes a denied authorization status, indicates that there is insufficient value in the merchant's account to execute the transaction. An additional type of denied status code indicates that the consumer credential, as identified through the authentication token, is insufficient. For example, the authentication token, which identifies the consumer, may not be sufficient to

10   verify the consumer is the person or entity that the consumer purports to be.

In one embodiment, the clearinghouse incentive system records information regarding the transaction so as to compile profiles regarding transactions in the incentive program. For example, from the clearinghouse profiles, the clearinghouse may generate information identifying a type of

15   consumer that participated in one or more promotional activities sponsored by the merchant. The clearinghouse may generate profiles across all merchants to indicate the type of consumer that is attracted to particular types of promotions. With the RFA and response message information, the clearinghouse incentive system may generate numerous types of profiles.

20   Also, as shown in block 650 of Figure 6, the clearinghouse incentive system digitally signs and encrypts the response message. In one embodiment, the clearinghouse incentive system utilizes a symmetric cryptography algorithm

WO 00/21008                                              PCT/US99/23077

32

to encrypt the response message with the merchant's secret key. However, any
algorithm may be used to digitally sign and encrypt the response message.

As shown in block 660 of Figure 6, the clearinghouse incentive
system transmits the response message from the clearinghouse location to the
5    merchant location over the Internet. At the merchant location, the remote
incentive management system decrypts the response message, as well as verifies
the authenticity of the message through analysis of the digital signature as shown
in block 670. The status of the message, as indicated in the response message
status code, is recorded or logged in the transaction log 320 (Figure 3) as shown
10   in block 680. If the RFA message was generated in the asynchronous
retransmission mode (see below), then the pending status for the asynchronous
transaction is removed from the asynchronous transaction log. As shown in
block 690, the remote incentive management system delivers a message to the
consumer to indicate the status of the transaction.

15   In a preferred embodiment, the value transfer network of the
incentive system insures reliable transfer of value transactions. As discussed
above, the first call to the RFA-API 310, initiated after the consumer enters the
earning activity, ensures that the remote incentive management system (e.g.,
server) is operable. This procedure minimizes system failure by indicating to the
20   consumer, before the consumer completes the earning activity, that a failure has
occurred. Although the remote incentive management system may be operable,
a failure may occur in transmitting the RFA message from the remote incentive

WO 00/21008                                                                 PCT/US99/23077

33

management server to the clearinghouse (*e.g.*, an Internet failure). For purposes of nomenclature, the real-time response to a consumer, as described in conjunction with Figures 2a-2c, is the synchronous mode of operation. If a failure occurs in providing a real-time response to the value transfer, then the
5    remote incentive management system enters an asynchronous retransmission mode.

In general, when operating in the asynchronous retransmission mode, the remote incentive management system generates RFA messages on its own initiative. In one embodiment, value transfers, which are not successfully
10   executed due to a failure in the value transfer network, are signed, encrypted, and logged in an asynchronous transaction log. For this embodiment, RFA messages logged in the asynchronous transaction log are signed and encrypted to prevent the unauthorized tampering of RFA messages. Periodically, the remote incentive management server 315 initiates transfer of an RFA message on its own
15   initiative. For example, if the failure in the value network is attributable to the Internet, then the remote incentive management system resends the RFA message periodically. In one embodiment, when operating in the asynchronous retransmission mode, if a large amount of value is transferred to the consumer, then the incentive management system sends an e-mail message to the consumer
20   to verify that value has been awarded to the consumer. As discussed above in conjunction with Figure 2c, if a network failure does occur, the consumer is notified that value will be transferred pending compliance with the incentive

34

program conditions. If an asynchronous retransmission mode attempt is successful, such that the remote incentive management system receives a response message with a success status code, then the asynchronous retransmission mode transaction is removed from the asynchronous
5    retransmission mode log.

        If after several attempts the value transfer is unsuccessful, then the merchant notifies the clearinghouse of the value transfer via alternative means (*e.g.*, means other than message transmission over the Internet). This notification, via alternative means, insures reliability of the value transfer.
10   Under this condition, the remote incentive management system may log the transactions to a permanent storage medium. Through use of the permanent storage medium, the transactions may be transferred to the clearinghouse, including physically transferring the permanent storage medium to the clearinghouse. Accordingly, the incentive system of the present invention
15   ensures reliable service to deposit value in a consumers account.

        In one embodiment, to further ensure reliability of the value transfer network, the remote incentive management system and the clearinghouse incentive system periodically execute "ping" transactions. For this embodiment, the remote incentive management system periodically sends a message, to
20   execute the ping transaction, that tests the communications link between remote incentive management system and the clearinghouse incentive system. At a minimum, the information, associated with a ping transaction, is signed and

WO 00/21008

PCT/US99/23077

35

encrypted, and includes a time stamp to identify when the message was sent. However, the message may include any parameter. If successful, the remote incentive management system receives a signed and encrypted response from the clearinghouse incentive system, which also includes a time stamp to indicate

5    when the response was sent. Similarly, the response may include any parameter. Also, the clearinghouse incentive system may initiate the ping transaction.

The remote incentive management system, residing at the merchant's location, may be administered remotely. In general, any number of functions, pertaining to the remote incentive management system, may be remotely

10   administered. For example, remote administration may include functions: to read the transaction log, to update software for the remote incentive management system, to shut down one or more incentive programs, to update the IP address, to change the frequency of the ping operation, etc. In one embodiment, the remote incentive management system is administered from the clearinghouse,

15   through use of software running on a server at the clearinghouse.

Figure 7 illustrates one embodiment of a remote incentive management system implemented at the merchant's location. The merchant web server 300 is shown coupled to the incentive management system 400, which in one embodiment, comprises a separate server. As discussed above, the remote

20   incentive management system may be implemented on a single server. In one embodiment, the merchant's implementation on the merchant web server 300 includes a CGI program, designated as box 700 on Figure 7. However, the

WO 00/21008                                          PCT/US99/23077

36

functionality for the merchant's web server 300 may be implemented using
NSAPI, ISAPI, and other similar server side scripting techniques. The double
line, which terminates in an arrow, signifies that the CGI program 700 runs on
the merchant web server 300. In general, the CGI program 700 includes three

5      basic functions. First, the CGI program 700 defines all parameters associated
with the earning activity, including verification of completion of the earning
activity. The CGI program, as a second function listed in block 700, calls the
remote incentive management routines for a request for authorization (RFA) to
transfer value to a consumer. As shown in Figure 3, in one embodiment, the

10     merchant web server software calls the RFA-API 310, shown in Figure 7 in box
310. As discussed above, the RFA-API 310 is a hook into the software of the
remote incentive management system 400. As a third basic function, the CGI
program 700 displays responses/results to the consumer (see Figures 2a, 2b, and
2c). The arrow, which couples the web server 300 to the remote incentive

15     management system 400, may be a network connection over a local area network
(LAN).

       For this embodiment, the merchant fully implements the promotion
functionality on the merchant web server 300. This implementation permits the
merchant to maintain a customized web site while implementing the incentive

20     program. If a merchant, prior to implementing the incentive program, has
functionality on a web page to support electronic commerce, then the merchant
need only modify the web site to include the promotional aspects, such as the

WO 00/21008                                                      PCT/US99/23077

37

addition of promotional pages. Accordingly, the merchant has full control and flexibility to implement the functionality to support the earning activity.

Consumer Private Label Currency Redemption:

5          Referring again to Figure 3, one embodiment for a consumer private label currency redemption system is illustrated. The consumer, which gains access to the Internet via the consumers Internet Service Provider 330, locates a clearinghouse Internet site. This connection is illustrated by the "Z" shaped lines and corresponding arrows on Figure 3. In one embodiment, the

10         clearinghouse web site is supported by the clearinghouse incentive management server 340. Alternatively, a separate server, dedicated to the redemption process, may be implemented. The clearinghouse incentive management server 340 has access to the consumer account 335, as indicated by the line coupling the server 340 with the consumers account 335.

15         In general, the process of redemption involves a consumer that requests the transformation of the private label currency value into some other form of value. Figure 8 is a flow diagram illustrating one embodiment for consumer private label currency redemption. As shown in block 800, the consumer contacts the clearinghouse web site that supports the private label

20         currency redemption. The redemption process may be implemented on one or more web pages on the clearinghouse web site. A consumer, prior to redeeming any value, must authenticate himself or herself by effectively binding the

38

consumer's network identity, used to earn the value, to the consumer's social identity. As shown in block 810, the consumer authenticates himself or herself to the clearinghouse incentive system. In one embodiment, to authenticate themselves, consumers submit a digital identification as well as a password if the

5    consumer has an account with the clearinghouse. If the consumer does not have an account, then the consumer must open a consumer account. In one embodiment, the authentication step is the same information used to generate the authentication token in the RFA message (Table 1).

In general, to open an account, the consumer supplies information

10   to the clearinghouse. The type and amount of information supplied varies depending upon how risk is allocated for the incentive program. In one embodiment, at a minimum, the consumer supplies, to the clearinghouse, his/her name and e-mail address. Thereafter, the clearinghouse sends an e-mail to the consumer requesting additional information. In response to this e-mail, the

15   consumer supplies, to fully activate an account: history of participation in a merchant's earning activities, an identification (ID) to uniquely identify the consumer, and/or a digital certificate. In one embodiment, the digital certificate conforms to a digital certificate as defined by the standard x509.3.

As shown in blocks 810 and 870, if the consumer is not

20   authenticated, then the consumer receives notice that the authentication has failed. If the authentication is successful, then the clearinghouse incentive system displays account information, for the corresponding consumer, as well as a

39

redemption catalog as shown in blocks 810 and 820. In general, the account information includes the amount of value or private label currency earned by the consumer. For example, the account information may indicate the number of points awarded to the consumer.

5          The redemption catalog lists the goods and services available to the consumer for redemption of value. The services and goods may include frequent flyer miles, cash, credit, or any other goods and/or services. The redemption catalog may include, in addition to the list of goods and/or services, the amount of value required to redeem various goods and/or services. The redemption

10        catalog may also indicate a relative correspondence of value between the redemption catalog and the consumers earned value. For example, the consumer may redeem, for each point earned, one frequent flyer mile.

          As shown in block 830 of Figure 8, to redeem value, a consumer chooses a redemption item from the redemption catalog. In general, this step

15        involves some way for the consumer to transform value from the private label currency system into a good and/or a service. As shown in block 840 of Figure 8, the clearinghouse incentive system executes fraud control procedures. In general, the fraud control procedures insure that the consumer meets some statistical criteria prior to execution of the redemption process. For example, in

20        one embodiment, more stringent fraud control procedures may be executed where the consumer attempts to redeem a large amount of value. If fraud is detected (*e.g.*, the consumer does not meet the statistical criteria), then the consumer

WO 00/21008                                        PCT/US99/23077

40

receives notice that value will not be redeemed as shown in blocks 850 and 870.
Alternatively, if fraud is not detected, then the incentive system debits the
consumer account, and begins the supplier fulfillment process as shown in block
860.

5        In general, supplier fulfillment involves initiating the process to
deliver the redemption good and/or service. For example, if the redemption item
is frequent flyer miles, then the clearinghouse executes the necessary steps to
deliver the redeemed value to the supplier, an airline. In turn, the supplier
actually confers the redeemed value. For the frequent flyer miles award program
10      example, the supplier, an airline, awards the frequent flyer miles to the
consumer.

        In the final step of the on-line redemption process, the consumer
receives notice of the updated account information as shown in block 870. The
updated account information includes the new total of value or private label
15      currency held by the consumer. For example, if the consumer, prior to
redemption, had 2,000 points, and redeemed 1,000 points for a redemption item,
then the incentive system displays the balance of 1,000 points as the updated
account information.

        As discussed above, consumers, to participate in an earning activity
20      as well as redeem value, authenticate themselves. In general, a consumer
authentication refers to the binding of a net identification to a social identification
for a consumer. An authentication requirement raises the barrier of entry to a

WO 00/21008                                                    PCT/US99/23077

41

consumer to start earning value through an earning activity. It is desirable to

lower the entry barrier to entice consumers to perform earning activity to earn

value. However, if the consumer authentication requirement is minimal, then the

system is susceptible to fraud and abuse. For example, a "Robin Hood" attacker

5    may attempt to drain all value from a merchant, even though the Robin Hood

attacker has no intent to redeem the value. A "Doppleganger" attacker attempts

to appear as many people, and the attacker seeks to gain an excessive amount of

value. Thus, for the preferred embodiment, a balance is drawn between the

competing interests of having a low authentication barrier to entice consumers to

10   earn value verse having a high authentication barrier to prevent fraud and abuse

of an incentive program.

In one embodiment, a first time consumer authentication process

creates clearinghouse members by generating a consumer account with the

clearinghouse (*e.g.*, account information exists for the consumer in the consumer

15   account database 335 (Figure 3)). The first time consumer authentication is a

one time only process. After completion of the first time consumer

authentication process, the consumer performs a "normal" authentication, prior

to entering an earning activity, whereby a consumer provides a UID-password

or a public key certificate (*e.g.*, the authentication token).

20   In one embodiment, the incentive system supports deferred

authentication. In general, deferred authentication permits a consumer to enter

an earning activity prior to the first time authentication. For this scenario, the

WO 00/21008                                      PCT/US99/23077

42

consumer value earned during the earning activity is deposited into an inactive
account. One rationale to implement a deferred authentication system is that
once consumers earn value, they will be more motivated to perform the more
rigorous first authentication procedure. For purposes of nomenclature, the
5    inactive account is referred to as a "pending transaction pool."

In allowing deferred authentication, value is held in the pending
transaction pool until the consumer performs the first authentication. Thus, value
is only redeemable after the value has been transferred from the inactive account
to a consumer account (e.g., after the first authentication). In a preferred
10   embodiment, the value held in the pending transaction pool expires after a
predetermined amount of time, such as two weeks. Value held in the pending
transaction pool may expire for any number of reasons. The consumer, who
completed the earning activity prior to the first consumer authentication, has
forgot to perform the first authentication, and therefore the value has expired
15   unintentionally. Value in the pending transaction pool may also expire from an
attempted security breach, or an attempted denial of service attack.

The use of the pending transaction pool presents an additional issue
of billing between the clearinghouse and the merchant. In one embodiment, the
merchant is billed (e.g., value is debited from the merchant account) when value
20   enters an inactive account. In a second embodiment, the merchant account is
debited only when the consumer performs the first authentication, and the value
is transferred to a specific consumer account. In a third embodiment, a

WO 00/21008                                                    PCT/US99/23077

43

combination of the first two embodiments is implemented, such that a portion of the value is debited from the merchant's account when the value enters an inactive account, and if the value is transferred to a specific consumer account, then the remaining portion of value is debited from the merchant account.

5

Computer System:

Figure 9 illustrates a high level block diagram of a general purpose computer system in which the servers of the inventive system of the present invention may be implemented. A computer system 1000 contains a processor

10    unit 1005, main memory 1010, and an interconnect bus 1025. The processor unit 1005 may contain a single microprocessor, or may contain a plurality of microprocessors for configuring the computer system 1000 as a multi-processor system. The main memory 1010 stores, in part, instructions and data for execution by the processor unit 1005. If the incentive system of the present

15    invention is wholly or partially implemented in software, the main memory 1010 stores the executable code when in operation. The main memory 1010 may include banks of dynamic random access memory (DRAM) as well as high-speed cache memory.

The computer system 1000 further includes a mass storage device

20    1020, peripheral device(s) 1030, portable storage medium drive(s) 1040, input control device(s) 1070, a graphics subsystem 1050, and an output display 1060. For purposes of simplicity, all components in the computer system 1000 are

WO 00/21008                                                PCT/US99/23077

44

shown in Figure 9 as being connected via the bus 1025. However, the computer

system 1000 may be connected through one or more data transport means. For

example, the processor unit 1005 and the main memory 1010 may be connected

via a local microprocessor bus, and the mass storage device 1020, peripheral

5      device(s) 1030, portable storage medium drive(s) 1040, graphics subsystem 1050

may be connected via one or more input/output (I/O) busses. The mass storage

device 1020, which may be implemented with a magnetic disk drive or an optical

disk drive, is a non-volatile storage device for storing data and instructions for

use by the processor unit 1005. In the software embodiment, the mass storage

10     device 1020 stores the incentive system software for loading to the main memory

1010.

        The portable storage medium drive 1040 operates in conjunction

with a portable non-volatile storage medium, such as a floppy disk or a compact

disc read only memory (CD-ROM), to input and output data and code to and

15     from the computer system 1000. In one embodiment, the incentive software is

stored on such a portable medium, and is input to the computer system 1000 via

the portable storage medium drive 1040. The peripheral device(s) 1030 may

include any type of computer support device, such as an input/output (I/O)

interface, to add additional functionality to the computer system 1000. For

20     example, the peripheral device(s) 1030 may include a network interface card for

interfacing the computer system 1000 to a network.

        The input control device(s) 1070 provide a portion of the user

WO 00/21008                                                PCT/US99/23077

45

interface for a user of the computer system 1000. The input control device(s) 1070 may include an alphanumeric keypad for inputting alphanumeric and other key information, a cursor control device, such as a mouse, a trackball, stylus, or cursor direction keys. In order to display textual and graphical information, the

5     computer system 1000 contains the graphics subsystem 1050 and the output display 1060. The output display 1060 may include a cathode ray tube (CRT) display or liquid crystal display (LCD). The graphics subsystem 1050 receives textual and graphical information, and processes the information for output to the output display 1060. The components contained in the computer system 1000 are

10    those typically found in general purpose computer systems, and in fact, these components are intended to represent a broad category of such computer components that are well known in the art.

        The incentive system may be implemented in hardware, software, or both. For the software implementation, the incentive management system is

15    software that includes a plurality of computer executable instructions for implementation on a general purpose computer system (e.g., one or more servers). Prior to loading into a general purpose computer system, the incentive system software may reside as encoded information on a computer readable medium, such as a magnetic floppy disk, magnetic tape, and compact disc read

20    only memory (CD - ROM). In one hardware implementation, the incentive system may comprise a dedicated processor including processor instructions for performing the functions described herein. Circuits may also be developed to

46

perform the functions described herein. The transaction log, customer account and merchant account may be implemented as databases stored in memory for use by the incentive system software running on a server.

5        Although the present invention has been described in terms of specific exemplary embodiments, it will be appreciated that various modifications and alterations might be made by those skilled in the art without departing from the spirit and scope of the invention.

WO 00/21008

PCT/US99/23077

47

## CLAIMS

What is claimed is:

1      1.      A method for implementing an on-line incentive system, said method

2      comprising the step of:

3           providing, at a merchant's web site, a means for a consumer to enter an

4      earning activity to earn value from said merchant; and

5           transferring value from said merchant to said consumer for participation in

6      said earning activity, if said consumer qualifies, without re-directing said

7      consumer away from said merchant's web site, whereby said consumer's focus

8      of activity remains at said merchant's web site.


1      2.      The method as set forth in claim 1, wherein the step of transferring

2      value comprises the step of providing, at a merchant's web site, a means for

3      determining whether said consumer qualifies to earn value by defining parameters

4      that determine said earning activity, wherein said consumer remains at said

5      merchant's web site to earn value from said merchant.


1      3.      The method as set forth in claim 1, further comprising the step of

2      requesting authorization to a clearinghouse site to transfer value from said

3      merchant to said consumer.


1      4.      The method as set forth in claim 1, further comprising the steps of:

WO 00/21008                                    PCT/US99/23077

48

2      executing the step of providing a means for a consumer to enter an earning

3      activity and a step of providing a means for determining whether said consumer

4      qualifies to earn value on a merchant's web server; and

5      executing a step of requesting authorization to a clearinghouse site to

6      transfer value from said merchant to said consumer on a server distinct from said

7      merchant's web server.

1      5.    The method as set forth in claim 1, wherein the step of providing a

2      means for a consumer to earn value through an earning activity comprises the

3      step of providing a means for a consumer to lend attention in a manner pre-

4      defined by said merchant.

1      6.    The method as set forth in claim 1, wherein the step of providing a

2      means for a consumer to earn value through an earning activity comprises the

3      step of providing a means for a consumer to send information requested by said

4      merchant.

1      7.    The method as set forth in claim 1, wherein the step of providing a

2      means for a consumer to earn value through an earning activity comprises the

3      step of providing a means for a consumer to conduct an activity in a manner pre-

4      defined by said merchant.

WO 00/21008                                    PCT/US99/23077

49

1    8.    The method as set forth in claim 1, wherein the step of providing a

2    means for a consumer to earn value through an earning activity comprises the

3    step of providing a means for a consumer to purchase merchandise offered by the

4    merchant.


1    9.    A method for transferring value, conferred by a merchant, to a

2    consumer, said method comprising the steps of:

3        generating, at said merchant's location, a request to authorize a value

4    transfer from a merchant account for said merchant to said consumer;

5        dispatching said request from the merchant site to a clearinghouse site;

6        authorizing, at said clearinghouse site, said value transfer from said

7    merchant account for said merchant to said consumer;

8        generating, at said clearinghouse site, a response message that indicates a

9    status for said authorization; and

10        generating a response to said consumer that indicates said status of said

11    authorization request.


1    10.    The method as set forth in claim 9, further comprising the steps of:

2        depositing said value into an account for said consumer; and

3        debiting said value in said merchant's account.

WO 00/21008                                    PCT/US99/23077

50

1       11.    The method as set forth in claim 9, further comprising the step of

2    re-sending said request message if a failure occurs in transmission between said

3    merchant site and said clearinghouse site.

1       12.    The method as set forth in claim 9, further comprising the step of

2    logging said value transfer transaction at said merchant location.

1       13.    The method as set forth in claim 12, wherein the step of logging said

2    value transfer transaction comprises the step of logging said value transfer

3    transaction as human readable text.

1       14.    The method as set forth in claim 12, wherein the step of logging said

2    value transfer transaction further comprises the step of digitally signing and

3    encrypting said value transfer transaction.

1       15.    The method as set forth in claim 9, wherein the step of generating

2    a request to authorize comprises the step of encrypting said request message

3    utilizing a private key cryptographic algorithm.

1       16.    The method as set forth in claim 9, further comprising the steps of:

2    providing a means, for said merchant, to capture said value transfer; and

3    providing a means, for said merchant, to execute a charge back against said

51

4       value transfer.


1       17.    The method as set forth in claim 9, wherein the step of authorizing

2       said value transfer comprises the step of executing fraud control procedures to

3       detect consumer attempting to defraud said incentive system.


1       18.    The method as set forth in claim 9, wherein the step of authorizing

2       said value transfer comprises the step of authorizing said value transfer for

3       consumers not yet authenticated with said incentive system.


1       19.    The method as set forth in claim 18, further comprising the step of

2       transferring said value into an inactive account pending authentication by said

3       consumer.


1       20.    A method for implementing an incentive system, said method

2       comprising the steps of:

3              providing, at a merchant site, a means for a consumer to earn value,

4       conferred by said merchant, through an earning activity;

5              transferring, from said merchant to said clearinghouse, said value conferred

6       in the form of a general private label currency; and

7              providing, at said clearinghouse, a means for said consumer to redeem said

8       private label currency value for goods and services.

WO 00/21008    PCT/US99/23077

1 / 9

# FIG. 1



WO 00/21008

2 / 9

PCT/US99/23077

## FIG. 2A



## FIG. 2B



## FIG. 2C



WO 00/21008

3  /  9

PCT/US99/23077



FIG. 3

WO 00/21008    4 / 9    PCT/US99/23077



FIG. 4

WO 00/21008          5  /  9          PCT/US99/23077

# FIG. 5



WO 00/21008    6 / 9    PCT/US99/23077



FIG. 6

FIG. 7



WO 00/21008    8 / 9    PCT/US99/23077

# FIG. 8





FIG. 9

# INTERNATIONAL SEARCH REPORT

| | |
|---|---|
| | Intern  al Application No<br>PCT/US 99/23077 |

**A. CLASSIFICATION OF SUBJECT MATTER**

IPC 7    G06F17/60

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)

IPC 7    G06F    G07F

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category * | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | GB 2 315 351 A (FUJITSU LTD)<br>28 January 1998 (1998-01-28) | 1,2,6-8 |
| Y | page 3, line 9 – line 24 | 9,10,<br>12-15,20 |
| | page 6, line 7 – line 16<br>page 9, line 23 –page 10, line 25<br>page 14, line 7 – line 12<br>page 15, line 25 –page 16, line 11<br>page 18, line 22 –page 19, line 12<br>page 28, line 19 – line 20<br>page 30, line 15 –page 31, line 23 | |
| A | page 39, line 3 – line 11 | 4,5,16,<br>18,19 |
| | ---- | |
| | –/-- | |

| | | | | |
|---|---|---|---|---|
| [X] | Further documents are listed in the continuation of box C. | | [X] | Patent family members are listed in annex. |

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 25 January 2000 | 16/02/2000 |

| Name and mailing address of the ISA<br>European Patent Office, P.B. 5818 Patentlaan 2<br>NL - 2280 HV Rijswijk<br>Tel. (+31–70) 340–2040, Tx. 31 651 epo nl,<br>Fax: (+31–70) 340-3016 | Authorized officer<br><br>Wolles, B |
|---|---|

Form PCT/ISA/210 (second sheet) (July 1992)

1

INTERNATIONAL SEARCH REPORT

Intern al Application No

PCT/US 99/23077

C.(Continuation) DOCUMENTS CONSIDERED TO BE RELEVANT

| Category * | Citation of document, with indication,where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | WO 97 22058 A (STOREY THOMAS W)<br>19 June 1997 (1997-06-19) | 1,2,5-8 |
| Y | page 2, line 25 -page 3, line 28 | 9,14,15,<br>18-20 |
| | page 10, line 21 - line 25<br>page 11, paragraph 3<br>claims 1,2,8-10,15,17,18 | |
| A | --- | 4,12,13 |
| Y | WO 96 29668 A (MARITZ INC)<br>26 September 1996 (1996-09-26) | 9,10,12,<br>13,18-20 |
| A | page 2, line 15 -page 5, line 8<br>page 6, line 2 - line 25<br>page 14, line 26 - line 31<br>page 15, line 13 - line 15<br>claims 1-4,15<br>figure 1 | 16,17 |
| Y | --- | |
| | BRUCE SCHNEIER: "Applied Cryptography"<br>1996 , JOHN WILEY & SONS , NEW YORK<br>XP002128601  238530<br>page 461 -page 502 | 14,15 |
| | ----- | |

1

Form PCT/ISA/210 (continuation of second sheet) (July 1992)

# INTERNATIONAL SEARCH REPORT

Information on patent family members

| | | Intern: al Application No |
|---|---|---|
| | | PCT/US 99/23077 |

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| GB 2315351 | A | 28-01-1998 | JP<br>US | 10078989 A<br>5937391 A | 24-03-1998<br>10-08-1999 |
| WO 9722058 | A | 19-06-1997 | US<br>EP | 5774870 A<br>0867006 A | 30-06-1998<br>30-09-1998 |
| WO 9629668 | A | 26-09-1996 | AU<br>AU<br>BR<br>CA<br>EP<br>JP<br>US | 691109 B<br>5316196 A<br>9607787 A<br>2215969 A<br>0815524 A<br>11502647 T<br>5956695 A | 07-05-1998<br>08-10-1996<br>07-07-1998<br>26-09-1996<br>07-01-1998<br>02-03-1999<br>21-09-1999 |

Form PCT/ISA/210 (patent family annex) (July 1992)