IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AFFINION NET PATENTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 04-360-JJF |
| | ) | |
| v. | ) | |
| | ) | **REDACTED PUBLIC VERSION** |
| MARITZ INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MARITZ'S FIRST AMENDED ANSWER TO AMENDED COMPLAINT, WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant Maritz Inc. ("Maritz"), for its First Amended Answer and Counterclaim to the Amended Complaint of Affinion Net Patents, Inc. ("ANP")[1], states as follows:

1.    Maritz admits that ANP is a Delaware corporation, that it apparently is the assignee of U.S. Pat. No. 6,009,412 ("the '412 patent"), and that Exhibit A appears to be a copy of the '412 patent. Maritz denies the remaining allegations of Paragraph 1.

2.    Maritz admits that Affinion Loyalty Group, Inc. ("ALG") is a Delaware corporation, that its principal place of business is in Richmond, Virginia, and that it operates loyalty programs that utilize the internet. As understood, Maritz denies the remaining allegations of Paragraph 2. In particular, Maritz denies that ALG is or should be a plaintiff in this litigation.

3.    Maritz admits that Maritz Inc. is a Missouri corporation with offices at 1375 North Highway Drive, Fenton, Missouri. Maritz admits that part of its business includes loyalty and incentive programs, some of which have internet-related aspects. Maritz denies the remaining allegations of Paragraph 3.

---

[1] Maritz makes this answer only as to the allegations of ANP. Affinion Loyalty Group, Inc. -- which purported to join in the filing of the Amended Complaint -- is no longer a party-plaintiff, per order of court. D.I. 148.

4.    Maritz admits that the Court has subject matter jurisdiction over ANP's patent infringement claim, but denies the remaining allegations of Paragraph 4.

5.    Maritz admits that the Court has personal jurisdiction over Maritz, but denies the remaining allegations of Paragraph 5.

6.    Maritz admits that venue is proper in this Court.

7.    Maritz admits that ANP has filed an amended complaint alleging infringement of United States Patent No. 6,009,412 (" '412 patent"). Maritz also admits that plaintiff has alleged false marking pursuant to 35 U.S.C. §292 and a violation of 15 U.S.C. §1125(a). Maritz denies that it has infringed any of the claims of the '412 patent, engaged in false marking, or violated 15 U.S.C. §1125(a) in any respect.

8.    Maritz admits the '412 patent is entitled "Fully Integrated, On Line Interactive Frequency and Award Redemption Program" and was issued by the U.S. Patent and Trademark Office on December 28, 1999. Maritz denies the remaining allegations of Paragraph 8.

9.    Maritz admits that it develops and operates loyalty and incentive programs, some of which have internet-related aspects. Maritz denies the remaining allegations of Paragraph 9.

10.    Maritz admits that the '412 patent issued on December 28, 1999 and indicated that it was assigned to Netcentives, Inc. ("Netcentives"). Maritz is without knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 10, and therefore denies them.

11.    Maritz admits that Netcentives purported to assign its rights under the '412 patent to Trilegiant Corporation. The terms of the written assignment document speak for themselves. Maritz denies the remaining allegations of Paragraph 11.

12.     Maritz admits that Trilegiant Corporation purported to assign rights under the '412 patent to Trilegiant Loyalty Solutions, Inc.  The terms of the written assignment document speak for themselves.  Maritz denies the remaining allegations of Paragraph 12.

13.     Maritz denies the allegations of Paragraph 13, inasmuch as it is unaware of a document dated October 15, 2005 involving the alleged subject matter.  Maritz further states that the terms of any assignment agreement speak for themselves.

14.     Maritz denies the allegations of Paragraph 14, inasmuch as it is unaware of a document dated October 15, 2005 involving the alleged subject matter.  Maritz further states that the terms of any license agreement speak for themselves.

15.     Maritz admits that Trilegiant Loyalty Solutions, Inc. reportedly changed its name to Affinion Loyalty Group, Inc. Maritz is without knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 15, and therefore denies them.

16.     Maritz denies the allegations of Paragraph 16.

17.     As understood, Maritz denies the allegations of Paragraph 17.

18.     Maritz admits that, on March 1, 2001, it filed U.S. Patent Application No. 09/797,189, entitled "System and Method for Implementing a Loyalty Program Incorporating On-Line and Off-Line Transactions."  Given what appears to be the intentionally ambiguous nature of plaintiff's allegations, Maritz denies the remaining allegations of Paragraph 18, as understood.

19.     Maritz admits that, in 2002, it grew concerned that Trilegiant was making false, injurious statements to customers with respect to supposed patent infringement.  Maritz denies the remaining allegations of Paragraph 19.

20.     Given what appears to be the intentionally ambiguous nature of plaintiff's allegations, Maritz denies the allegations of Paragraph 20.

21.     Given what appears to be the intentionally ambiguous nature of plaintiff's allegations, Maritz denies the allegations of Paragraph 21.

22.     Given what appears to be the intentionally ambiguous nature of plaintiff's allegations, Maritz denies the allegations of Paragraph 22.

23.     Maritz denies the allegations of Paragraph 23, and specifically denies that it falsely marked the VAULT system as "patent pending."

24.     Maritz denies the allegations of Paragraph 24, and specifically denies that it falsely marked the VAULT system as "patent pending."

25.     Maritz denies the allegations of Paragraph 25, and specifically denies that it made misrepresentations related to patent status.

## CLAIM I

26.     Maritz incorporates its responses to Paragraphs 1 through 25 by reference as if fully set forth.

27.     Maritz denies the allegations of Paragraph 27.

28.     Maritz denies the allegations of Paragraph 28, and specifically denies it has committed acts of infringement.

29.     Maritz denies the allegations of Paragraph 29, and specifically denies it has committed acts of infringement.

## CLAIM II

30.     Maritz incorporates its responses to Paragraphs 1 through 29 by reference as if fully set forth.

31.     Given what appears to be the intentionally ambiguous nature of plaintiff's allegations, Maritz denies the allegations of Paragraph 31.

32.     Given what appears to be the intentionally ambiguous nature of plaintiff's allegations, Maritz denies the allegations of Paragraph 32.

33.     Given what appears to be the intentionally ambiguous nature of plaintiff's allegations, Maritz denies the allegations of Paragraph 33.

34.     Maritz denies the allegations of Paragraph 34.

## CLAIM III

35.     Maritz incorporates its responses to Paragraphs 1 through 25 and 31 through 34 by reference as if fully set forth.

36.     Given what appears to be the intentionally ambiguous nature of plaintiff's allegations, Maritz denies the allegations of Paragraph 36.

37.     Maritz denies the allegations of Paragraph 37.

38.     As understood, denied.

39.     Maritz denies the allegations of Paragraph 39, and specifically denies that it has made intentionally false statements.

40.     Maritz admits that it sometimes competes with ALG. Maritz denies the remaining allegations of Paragraph 40.

41.     Maritz denies the allegations of Paragraph 41, and specifically denies that it has made false statements.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

Maritz incorporates its Answer and the allegations of its Counterclaim by reference as if fully set forth.

A.    The Amended Complaint fails to state claims upon which relief can be granted.

B.    The claims of the '412 Patent are invalid under one or more provisions of the Patent Laws, 35 U.S.C. § 1, *et seq.*, including, but not necessarily limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112.

C.    Maritz does not infringe any valid claim of the '412 patent, and has not engaged in willful patent infringement

D.    The '412 patent is unenforceable due to inequitable conduct.

E.    The doctrine of unclean hands bars enforcement of the '412 patent.

F.    The doctrines of estoppel and/or laches bar enforcement of the '412 patent, in whole or in part.

G.    The doctrine of patent misuse bars enforcement of the '412 patent.

H.    ANP is barred from recovering damages for any activities prior to commencement of the present suit, due to a failure to comply with the marking requirements of 35 U.S.C. § 287(a).

I.    ANP's false marking claim fails, because Maritz has not marked, affixed to any article, or used in advertising in connection with any article, patent markings as contemplated by the patent statutes and interpretive case law, nor has it acted with deceptive intent.

J.    ANP has no standing to assert claims for alleged false marking in this case.

K.    ANP has no standing to assert a Lanham Act violation in this case, and the activity it challenges, even were it provable, is not cognizable under the Lanham Act.

L.    To the extent ANP purports to allege claims or recover damages on behalf of ALG, it is barred from doing so by order of court and a lack of standing.

M.    ANP lacks standing to assert patent infringement.

WHEREFORE, having fully answered, Maritz requests the Court to dismiss the Amended Complaint, declare this an exceptional case in favor of Maritz, award Maritz its attorneys' fees and costs incurred in this case, and order such other and further relief as the Court may deem just and proper.

## COUNTERCLAIM

This Counterclaim seeks declaratory judgment in favor of counterclaim-plaintiff Maritz and against counterclaim-defendant ANP. In support of this Counterclaim, Maritz states:

1.    Maritz is a corporation organized and existing under the laws of the State of Missouri, with a principal place of business in Fenton, Missouri.

2.    ANP has alleged that it is a corporation organized and existing under the laws of the State of Delaware.

3.    Paragraphs 1 through 41 of Maritz's foregoing Answer to Amended Complaint, as well as its Additional and Affirmative Defenses, are incorporated by reference herein as if fully set forth.

4.    This counterclaim arises under the Federal Declaratory Judgment Act and the patent laws of the United States of America. Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201 and Federal Rule of Civil Procedure 13. Venue is proper under 28 U.S.C. §1391.

5.    As a result of the allegations made by ANP in its Amended Complaint and statements made previously, an actual controversy exists between ANP and Maritz as to the non-infringement, invalidity, and unenforceability of the '412 patent.

**FIRST CLAIM**

**Declaratory Relief for Noninfringement of the '412 Patent**

6.    Maritz incorporates by reference the allegations of Paragraphs 1 through 5 of this Counterclaim as if fully set forth.

7.    ANP claims to be the assignee and owner of the '412 patent, entitled "Fully Integrated, On-Line Interactive Frequency and Award Redemption Program" and issued by the U.S. Patent and Trademark Office on December 28, 1999.

8.    ANP has charged Maritz with infringement and/or inducement of infringement of the '412 patent.

9.    Maritz has never infringed, directly or indirectly, the '412 patent.

**SECOND CLAIM**

**Declaratory Relief for Invalidity of the '412 Patent**

10.    Maritz incorporates by reference the allegations of Paragraphs 1 through 9 of this Counterclaim as if fully set forth.

11.    Each claim of the '412 patent is invalid under the provisions of 35 U.S.C. §§ 101, 102, 103, and/or 112, or otherwise.

## ALLEGATIONS COMMON TO THE REMAINING CLAIMS

12.     Maritz incorporates by reference the allegations of Paragraphs 1 through 11 of this Counterclaim as if fully set forth.

13.     Prosecution of the Storey patents is permeated with material non-disclosures, including especially suppression of matters related to proper inventorship, patented ownership, related prior art, and litigation proceedings involving these interrelated subjects. The abundant evidence of continuous misconduct before the U.S. Patent Office, centered around a core set of common issues, and which has an immediate and necessary relation to the claims of the '412 patent, warrants a finding that the '412 patent is unenforceable on each of the independent bases of (a) inequitable conduct, (b) unclean hands, and (c) patent misuse

14.     Thomas Storey is listed as the sole inventor of the '412 patent, which was filed on June 25, 1998. The '412 patent is a continuation of application No. 08/572,017, filed December 14, 1995, which ultimately issued as U.S. Pat. No. 5,774,870 ("the '870 patent") on June 30, 1998. Mr. Storey is also listed as sole inventor of the '870 patent, as well as of U.S. Pat. No. 6,578,012 ("the '012 patent"), a continuation of the '412 application. The '012 patent application was filed November 12, 1999, and issued June 10, 2003. The '870, '412 and '012 patents are sometimes collectively referred to below as "the Storey patents."

15.     Mr. Storey was also shown as the sole inventor on U.S. application No. 10/420,901, which was filed on April 23, 2003 and ultimately abandoned on February 24, 2006 ("the '901 application"). The '901 application was a continuation of the '012 patent application. He is also shown as sole inventor on U.S. application Nos. 11/331,139 and 11/331,265 (the "'139" and "265" applications, respectively), filed on January 13, 2006, each claiming priority to the '901 application.

16.    Mr. Storey is also listed as one of five inventors on U. S. Patent No. 5,483,444, entitled "System for Awarding Credits to Persons Who Book Travel-Related Reservations" ("the '444 patent"), which issued January 9, 1996. Mr. Storey testified that

**REDACTED**

17.    At most, Mr. Storey's role in conceiving this program was ancillary to that of other named inventors. For instance,

**REDACTED**

18.    Mr. Storey began working for Radisson Hotels in approximately August 1989 and left Radisson in August 1994. Mr. Storey's responsibilities included overseeing Radisson's incentive program operations.

19.    Mr. Storey has acknowledged that the Look to Book program used a computer to book travel related reservations. According to Mr. Storey,

**REDACTED**

20.    The Look to Book program operated by awarding points to travel agents who booked Radisson hotel rooms. These agents were able to access Radisson's Central Reservation

System ("CRS") from their own computers online through the Global Distribution System ("GDS"). The GDS was a network that, in essence, grew out of the airline computer reservation system in use at the time. Radisson was connected to the GDS through its Pierre network, which in turn allowed users to access the CRS. Upon enrollment, Pierre would assign an identification number to the agent. Radisson's computer system also created a master file of all agents enrolled in the program. This master file also contained the agent's contact information, as well as the number of points earned by each agent.

      a.    To enroll in the Look to Book program, a travel agent would enter his or her name in the Special Information ("SI") field. The travel agent could submit a reservation request and, if available, Radisson would send the agent a response indicating the reservation had been made and the number of incentive points the agent earned for the reservation. These "pending points" became redeemable after an amount of time set in the Look to Book program. "Redeemable points" accumulated by travel agents using Look to Book were redeemable for incentives, such as prizes or merchandise. Every time an enrolled agent made a reservation, the agent would receive information regarding how many points they received for that booking and the total number of redeemable points in his/her account. When making the reservation, the travel agent could enter the customer's credit card number to guarantee the reservation.

      b.    Enrolled agents were also provided with a printed awards catalogue. Agents could also access an online catalogue through the GDS. The online catalogue provided travel agents with a description of the available awards and the number of "redeemable points" needed for each award.

      c.    The Look to Book program bore close similarity to the subject matter of the Storey patents: it (a) was a frequent buyer program (b) where on-line purchasing behavior

11

was rewarded (c) by the immediate issuance of points that were redeemable for awards, (d) with use of a frequency database to track program activity, and (e) award levels and prizes which were viewable on-line.

      d.

## REDACTED

"Fully Integrated On-Line Interactive Frequency and Award Redemption Program." The advertising materials ·

## REDACTED

"Radisson and Visa Introduce First Frequency Program for Travel Agents." This brochure described the Look to Book program as being "on-line. Paperless. And easy to use!" Further, this brochure instructed travel agents that they could "enroll right at [their] terminal," "earn points for each booking," and "[s]pend these points on name-brand merchandise."

      21.    Mr. Storey publicly disclosed the Look to Book program at an American Society of Travel Agents conference in September 1992.

      22.    Among the early Look to Book publications were a brochure and an 8-minute video distributed by Radisson's sales representatives to prospective clients in November 1992.

## REDACTED

      23.    Mr. Storey oversaw several media blitzes designed to raise the awareness of thousands of persons within the travel industry with respect to the Look to Book program.

      24.

## REDACTED

**REDACTED**

c.     Thus, while a Radisson employee, Mr. Storey learned that Radisson

. He also learned that Radisson

**REDACTED**

d.    In 1993, Prodigy provided not only the EAASY SABRE service to its users, but also provided internet access. Access to the internet through Prodigy was described as a                **REDACTED**

The '444 patent was later described by Netcentives (with whom Mr. Storey was then consulting) in the Petition to Make Special filed during prosecution of the '412 patent application (discussed further below) as "not disclos[ing] or suggest[ing] an on-line incentive system that offers products for sale on an Internet web page."[2] However, the referenced Radisson memoranda disclosed to Mr. Storey               **REDACTED**

e.    Additionally, Radisson began offering hotel reservations over the internet in 1995.

25.    Thus, Radisson employees besides Mr. Storey contributed to the conception of any invention(s) reflected in the Storey patents (including the '412 patent), a fact well-known to Mr. Storey but never disclosed to the U.S. Patent Office during the prosecution of those patents, or during the later '901 patent application. Nor were serious litigation allegations concerning inventorship (referenced further below) ever disclosed to the Patent Office during the referenced patent prosecutions. The '901 application was pending before the Patent Office during much of the current litigation. Significantly, Mr. Storey has been a paid consultant to the plaintiff during and with respect to this litigation.

---

[2] On June 21, 2000, Radisson filed United States Application No. 09/598,586 ("the '586 application"). The '586 application is a continuation of, and claims priority to, U.S. Pat. App. No. 08/892,563, which is a continuation of U.S. Pat. Appp. No. 08/439,626, which is a continuation of U.S. Pat. App. No. 08/385,381, which issued as the '444 patent. Contrary to Netcentives' characterization of the Radisson patent in its Petition to Make Special, the '586 application claims a "computerized on-line incentive system for awarding points to a user conducting an on-line purchase."

14

26.    As a Radisson employee, Mr. Storey had an acknowledged duty to assign ownership of any patentable subject matter conceived during his employment at Radisson to that company. However, Mr. Storey has never acted to assign any interest in the subject matter of the Storey patents to Radisson,    **REDACTED**

Serious litigation allegations concerning ownership (referenced further below) were never disclosed to the U.S. Patent Office during any of the above-referenced patent prosecutions.

27.    On or about May 26, 1994, Radisson filed Patent Cooperation Treaty Application No. WO 95/12175 ("the PCT Application"). The PCT Application has the same specification as the '444 patent. The PCT Application was published on May 4, 1995, over seven months before Mr. Storey filed the '870 patent application.

28.    After leaving Radisson in August 1994, Mr. Storey took a position with Doubletree Hotels. A short time later,    **REDACTED**

**REDACTED**

29.                                                                                    bore striking similarities to Radisson's Look to Book program, i.e., the program with which Mr. Storey previously had been involved, along with several other Radisson employees.

30.    **REDACTED**    Jacqueline Miller
                                                    was not named a co-inventor on the '870 patent application that followed. Indeed, in purporting to

**REDACTED**

15

31.    Jacqueline Miller contacted a patent attorney -- Joseph Bach -- recommended by a friend to handle the '870 patent application.  At the time, Mr. Bach was with the Sughrue Mion, PLLC law firm,    **REDACTED**

32.

**REDACTED**

Mr. Storey was aware of the Look to Book program and the '444 patent application (on which he was a co-inventor, and with respect to which he had signed an inventor's oath).  Nonetheless, neither the Look to Book program, the '444 patent application, nor the '444 patent itself (which issued shortly after the '870 patent application was filed), nor the 95/12175 PCT Application were disclosed to the U.S. Patent Office during the '870 patent prosecution.  And only incomplete disclosure was made to the Patent Office during prosecution of the '412 patent application, as discussed below.

33.    **REDACTED**

U.S. Patent No. 4,750,119 ("the Cohen patent"), titled "Purchasing System With Rebate Feature."  The Cohen patent had issued on June 7, 1988.

a.

**REDACTED**

16

**REDACTED**

b.      The Cohen patent further teaches "a computer program, utilized in combination with a purchasing or transactional system, which allows subscriber-purchasers to buy goods and services and obtain future guaranteed rebates based upon the cost of that purchase" to "motivate the purchaser to patronize vendors who are associated with the purchasing system."

c.      **REDACTED**   Mr. Storey affirmatively elected to suppress the Cohen patent during prosecution of the '870 patent application.  Nor was the Cohen patent disclosed during prosecution of the '412 patent application.

d.      In an apparent attempt to undo the effects of the previous non disclosure of the Cohen patent, on December 2, 1999, Netcentive's patent counsel Philip Albert disclosed it to the U.S. Patent Office during the prosecution of the '012 patent.  To date, no explanation has been offered as to why the Cohen patent was deemed by the applicant to be material to the later-filed '012 patent but not to the '870 and/or '412 patent applications.  In fact, it clearly was material to all.

e.      Indeed, the Cohen patent was disclosed to the U.S. Patent Office by Radisson during its prosecution of the '444 (Look to Book) patent application, on which Mr. Storey was a named co-inventor.  However, Mr. Storey determined not to disclose it during the prosecution of the first two of his own patent applications.

34.     In his April, 2001 deposition, Mr. Storey contended that

**REDACTED**

**REDACTED**

Mr. Bach has testified that                                                                    Moreover,

co-pending applications involving the same inventor are of particular interest to the U.S. Patent

Office, since under such circumstances an interference proceeding may need to be invoked.

MPEP 2001.06(b).          **REDACTED**

35.    Mr. Storey's          **REDACTED**          for the additional reason

that thousands of travel agents and other persons had become intimately familiar with the

workings of the Look to Book program since its introduction in 1992.

**REDACTED**          the Look to Book program had been in the

public domain since at least 1992 through a variety of media.

36.    Moreover, the '444 patent itself issued a few weeks after filing of the '870 patent

application, further undermining the notion that Mr. Storey had a legitimate belief that he needed

to keep the '444 patent application and/or Look to Book program confidential.   Nor did Mr.

Storey advise Mr. Bach of the published PCT Application.

37.    The application leading to the '870 patent was filed on December 14, 1995.   As

noted, Thomas Storey was listed as the sole inventor.   None of the other Radisson inventors nor

Jacqueline Miller were listed as co-inventors.   None of the Look to Book program, '444 patent

application, PCT Application, or Cohen reference were brought to the U.S. Patent Office's

attention, at the time of filing or later.   Nor was the '444 patent, which issued only three weeks

after the '870 patent application was filed.

(a)    As the purported inventor of the '870 patent, Mr. Storey executed a

declaration filed with the U.S. Patent Office in which he "acknowledge[d] [his] duty to disclose

18

information of which [he] is aware which is material to the examination of this application under 37 C.F.R. §1.56(a)."

(b)     Mr. Storey's declaration also stated that he "qualif[ies] as an independent inventor as defined in 37 C.F.R. 1.9(c)." This section defines an independent inventor as "any inventor who (1) has not assigned, granted, conveyed, or licensed, and (2) is under no obligation under contract or law to assign, grant, convey, or license, any rights in the invention to any person who could not likewise be classified as an independent inventor if that person had made the invention, or to any concern which would not qualify as a small business concern or a nonprofit organization under this section." However, Mr. Storey was under an obligation to assign, grant, convey, or license rights in the '870 and related patents to Radisson as he was, at most, a joint inventor, not the sole inventor, of the subject matter of the Storey patents.

38.     On July 21, 1997,     **REDACTED**     Mr. Storey assigned the '870 patent application and related rights to Netcentives. Netcentives thus became "associated" with the prosecution of the Storey application and bound by the duty of disclosure under 37 C.F.R. §1.56(a). Netcentives quickly replaced Mr. Bach with Mr. John Stattler as the patent attorney prosecuting the '870 patent application.

39.     After assigning the patent rights,

**REDACTED**

Nonetheless, neither Mr. Storey, Netcentives, nor its patent counsel took any steps to correct the serious omissions that had preceded Netcentives' acquisition of patent rights from Mr. Storey.

40.    The '870 patent issued on June 30, 1998.  Five days earlier, Netcentives had filed a continuation application, which later issued as the '412 patent, claiming priority to the original '870 application.  As with the earlier application, Mr. Storey's declaration was submitted, acknowledging his obligations under 37 C.F.R. §§ 1.56(a) and 1.9(c).

41.    In October, 1998, Netcentives, through its patent counsel, took the highly unusual step of filing a Petition to Make Special the '412 continuation application citing, *inter alia*, the '444 (Look to Book) patent.

## REDACTED

a.    Netcentives' filing of the Petition to Make Special reflected its concern that adequate disclosure had not been made during prosecution of the by-then issued '870 patent, which (following the assignment from Mr. Storey) it had a hand in prosecuting.  However, upon information and belief,[3] it recognized that the earlier non-disclosure could well be fatal to any subsequent patents claiming ultimate priority to the '870 patent application.  The evidence suggests that Netcentives wished to rush the '412 application through prosecution, making a superficial disclosure of the '444 (Look to Book) patent, while avoiding the more forthcoming disclosure it feared would torpedo the patent rights which it had purchased from Mr. Storey.

b.    This intentional superficiality is demonstrated by the failure to disclose that Mr. Storey, the purported inventor of the subject matter of the '412 patent application, was a named inventor of the '444 patent.  This information was of high materiality.  Further, Netcentives disingenuously characterized the Radisson patent as "not disclos[ing] or suggest[ing]

---

[3] Attempts by Maritz to unveil the reasons behind this and other prosecution strategies related to the Storey patents and applications have been uniformly blocked by invocation of the attorney-client privilege.  The Trilegiant/Affinion plaintiffs in this case have even blocked inquiry into conversations with which they were not involved -- but which rather involved Netcentives.  This is the subject of a pending motion to compel.  D.I. 137.

an on-line incentive system that offers products for sale on an Internet web page." Netcentives also failed to disclose any of the materials concerning the Look to Book commercial embodiment, including, for example, the ability to view awards and award redemption levels on-line. The '412 patent ultimately issued on December 21, 1999, without any indication that the Examiner was aware of Mr. Storey's status as co-inventor of the '444 patent.

42.    Mr. Philip Albert was also retained by Netcentives to assist in prosecution of the Storey patent applications.    **REDACTED**

and ultimately replaced Mr. Stattler as counsel of record for the completion of the '412 patent prosecution and commencement of the '012 patent prosecution.

a.    **REDACTED**    Netcentives was cognizant of the earlier non-disclosures (during the '870 patent prosecution) on the patent rights it had purchased, Mr. Albert

**REDACTED**

b.    However, neither Mr. Albert, Mr. Stattler, or anyone else affiliated with Netcentives took steps to advise the U.S. Patent Office during prosecution of the '412 patent application that (a) Mr. Storey was a co-inventor on the '444 patent along with several others, (b) the Look to Book program itself had been a publicly known prior art program since no later than 1992 or (c) during the prior prosecution of the '870 patent application, the U.S. Patent Office had not been advised of these facts, or of the existence of the '444 patent application, the issuance of the '444 patent, or of the published 95/12175 PCT application.

43.     Further, Netcentives did not disclose the Cohen patent to the U.S. Patent Office at any time during the prosecution of the '412 patent. The Cohen patent was not disclosed to the Patent Office until the later prosecution of the '012 patent.

44.     The '444 patent application, the issued '444 patent, the published 95/12175 PCT application, the Radisson Look to Book publications, the co-inventor status of the other Radisson employees, Radisson's potential ownership of the subject matter of the '870 patent, and the Cohen patent were all highly material to the patentability of the '870 patent.

45.     On information and belief, the failure by Mr. Storey, Netcentives, and/or their patent attorneys to disclose the foregoing items during the prosecution of the '870 patent was motivated by an intent to deceive the U.S. Patent Office.

46.     Mr. Storey's status as co-inventor of the '444 patent, the co-inventor status of the other Radisson employees, Radisson's potential ownership of the subject matter of the '870 patent, the published 95/12175 PCT application, Radisson's Look to Book publications, the Cohen patent and the prior failures to disclose were all highly material to the patentability of the '412 patent.

47.     On information and belief, the failure of Mr. Storey, Netcentives, and/or their patent attorneys to disclose the foregoing items during the prosecution of the '412 patent was motivated by an intent to deceive the U.S. Patent Office.

48.     On information and belief, Mr. Storey, Netcentives, and/or their patent attorneys intentionally failed to name other Radisson employees as inventors on the '870 and '412 patents.

49.     On information and belief, the failure of Mr. Storey, Netcentives, and/or their patent attorneys to name all of the inventors of the '870 and '412 patents was motivated by an intent to deceive the U.S. Patent Office.

22

50.    During and after engaging in the foregoing prosecution strategy, Netcentives,

Trilegiant entities, and now the Affinion entities have aggressively used the Storey patents in the

marketplace,                    **REDACTED**                    becoming involved in

several lawsuits.

51.    Substantial litigation activities based on the '412 and/or '870 patents -- which

have the same specification as the '012 patent --arose during the 1999-2001 time frame.  These

included the following:

      a.    Complaint For Declaratory and Injunctive Relief filed in the United States
District Court for the Northern District of California by Mypoints.com, Inc. against
Netcentives on or about March 19, 1999, alleging invalidity of the '870 patent.

      b.    Complaint for Declaratory Judgment filed in the United States District
Court for the District of Massachusetts by The Sperry and Hutchinson Company, Inc.
against Netcentives on or about February 17, 2000, seeking a declaration that the '870
and '412 patents were invalid.

      c.    Complaint filed in the United States District Court for the Northern
District of California by Netcentives against S&H and Webmiles.com Corp. on or about
February 28, 2000, alleging infringement of the '870 and '412 patents.

      d.    Complaint filed in the United States District Court for the Northern
District of California by Netcentives against Massmedium.com, Inc., TelAmerica Media
Inc., Smart Net Corp., and Pointsurf.com, Inc. on or about March 21, 2000 alleging
infringement of the '870 and '412 patents.

      e.    Complaint filed in the United States District Court for the Northern
District of California by Netcentives against Beenz.com, Inc., Carlson Companies Inc.,
Passpoints, Inc., Freeride.com, LLC, and Stario, Inc. on or about July 21, 2000, alleging
infringement of the '870 and '412 patents.

      f.    Complaint filed in the United States District Court for the District of
Minnesota by Radisson Hotels International, Inc., *et al.* against Netcentives on or about
July 28, 2000, alleging invalidity, unenforceability, and incorrect inventorship of the '870
and '412 patents.

      g.    Complaint for Declaratory Judgment filed in the United States District
Court for the Northern District of California by S&H against Netcentives on or about
February 23, 2001, alleging the '870 patent was invalid and unenforceable based upon

Netcentive's and Mr. Storey's failure to disclose the '444 patent and/or its commercial embodiments to the U.S. Patent Office during the prosecution of the '870 patent.

52.    During the pendency of those cases, the parties adverse to Netcentives collectively made allegations concerning invalidity and/or unenforceability of the '412 and/or '870 patents; conducted element by element analyses in support of invalidity allegations; identified and asserted substantial material prior art; and challenged inventorship and ownership of the patents.[4]

53.    Notably, Carlson, one of the litigants, specifically contended that the subject matter of the '870 and the '412 patents was conceived by Radisson employees, and as such those patents and related patent rights were owned by Carlson.  Very substantial discovery was taken on these issues, including the production of documents and taking of numerous depositions.  This inventorship dispute was never disclosed to the U.S. Patent Office during the prosecution of any of the Storey patents.

54.    The material prior art variously disclosed to Netcentives during the above-referenced lawsuits included U.S. Patent Nos. 5,448,471, 5,638,457, 5,592,560, 5,710,887 (the Chelliah patent), 5,991,736, 5,956,695, 5,937,391, 5,915,244, 5,999,914, 5,970,469, 5,983,196, 5,809,144, 5,878,141 and PCT Patent Nos. 93/12489 and 95/12175.

55.    During the prosecution of the '012 patent, Netcentives, Trilegiant Corporation ("Trilegiant"), Storey, and their patent attorneys had an affirmative duty to disclose to the U.S. Patent Office any material information of which they became aware during the litigation, including questions of inventorship and ownership, prior art, allegations of inequitable conduct, and allegations of invalidity, all of which involved the subject matter of the then-pending

---

[4] A detailed recitation of the allegations challenging the Storey patents, and the specific failures to disclose them to the Patent Office, is set forth at Pars. 67 through 117 of Maritz's Amended Answer and Counterclaim, filed September 15, 2005, and incorporated here by reference.  D.I. 61.

application. Separate and apart from reporting the allegations of others, they also were obliged to disclose the various failures of disclosure in the earlier prosecutions, the potential inventive contributions of the Radisson employees, the potential ownership interest of Radisson, Mr. Storey's status as co-inventor of the '444 patent, the Radisson Look to Book publications, and the published 95/12175 PCT application.

56.     However, despite numerous interactions with the U.S. Patent Office during prosecution of the '012 patent application, none of these items were disclosed.  Nor were they disclosed by the Trilegiant entities, the Affinion entities, or their patent attorneys during the subsequent prosecution of the '901 patent application.

57.     On information and belief, Netcentives, Trilegiant, Storey and/or their patent attorneys intentionally failed to name other Radisson employees as inventors on the '012 patent.

58.     On information and belief, the failure of Netcentives, Trilegiant, Storey and/or their patent attorneys failure to disclose all of the inventors of the '012 patent was the result of an intent to deceive the U.S. Patent Office.

59.     The items referenced in Paragraphs 52 - 55 and 57-58 were highly material to the subject matter of the '012 patent application.  On information and belief, their non-disclosure was motivated by an intent to deceive on the part of Netcentives, the Trilegiant entities, Mr. Storey, and/or their patent attorneys.

60.

# REDACTED

Attempted inquiry into this conversation by counsel for Maritz during depositions in this case was blocked on the grounds of

privilege, though Trilegiant/Affinion is not entitled to invoke a privilege potentially running to Netcentives.

61.     Netcentives entered bankruptcy proceedings in 2001.  In the bankruptcy, Carlson made abundantly clear in court filings that anyone purchasing the patent rights would do so subject to its claims of ownership.  Trilegiant decided to purchase the patent rights, for the sum of $2.0 Million.  It did so, despite being well-aware of the issues surrounding patent ownership, inventorship, invalidating prior art and the lack of disclosure previously made to the U.S. Patent Office.

62.     Trilegiant Loyalty Solutions ("TLS"),

# REDACTED

Trilegiant took a calculated risk by purchasing the highly suspect patent rights in an attempt to improve sagging commercial fortunes of TLS.

63.     On or about December 7, 2001, Trilegiant acquired the Storey patent rights through assignment by Netcentives.

64.

# REDACTED

65.     Like Netcentives before it, Trilegiant/TLS determined aggressively to assert the newly-obtained patents in the marketplace, with knowledge of their lack of enforceability.

---

[5]  TLS was then known as Cendant Incentives.

66.     Prior to and after obtaining the blemished patent rights (consisting of the '870 patent, the '412 patent, the '012 patent application, and related rights), Trilegiant/TLS engaged in :

Upon information and belief,      REDACTED

Maritz's attempt to discover the substance of these conversations during this case have uniformly been blocked on the grounds of privilege, despite that privilege does not protect communications in furtherance of commission of a fraud.

67.     Commencing immediately upon purchase by Trilegiant of the Storey patent rights out of the Netcentives bankruptcy proceeding, responsibility for the (a) patent prosecution, (b) and (c) litigation has been assumed by a single law firm.

# REDACTED

Thus, there has been a continuance of Netcentives' earlier pattern of brandishing patents known to be unenforceable and invalid throughout the industry, while simultaneously continuing to withhold from the U.S. Patent Office material information about inventorship disputes during the prosecution of patent applications ultimately claiming priority back to the original Storey patent application.

68.     MPEP §2001.06(c), provides in pertinent part that:

Where the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom *must be brought to the attention of the U.S.P.T.O.* Examples of such material information include evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of fraud, inequitable conduct, and violation of duty of disclosure ... [and] any assertion that is made during litigation which is contradictory to assertions made to the examiner. (Emphasis added).

27

69.     Trilegiant, through its counsel, prosecuted the '901 application through an appeal before the Board of Patent Appeals and Interferences, which ruled in its favor in February, 2006. Despite this apparent success, ANP expressly abandoned the patent application. The circumstances suggest that this action was taken because of the allegations and proof advanced by Maritz in this litigation concerning the continuous course of conduct suppressing inventorship, and related issues, throughout the prosecution of the Storey patents. Upon information and belief, recognizing that the intentional suppression of information during the fourth ('901) application likely cast it in the same dim light as the preceding three patents, ANP opted to abandon the allowed case and instead file continuation applications through which it could attempt belatedly to obtain patent rights based on more forthcoming disclosure ... albeit over ten years after the first Storey patent application was filed.

70.     In the pending continuation applications, Affinion and its outside counsel finally disclosed to the U.S. Patent Office some of previously-withheld litigation documents and key prior art references.

71.     Never during the prosecution of any of the Storey patent applications has the applicant advised the U.S. Patent Office of the previous material non-disclosures, alerted it that further examination may be required, or explained the patentability of the claimed subject matter in light of the previously withheld information. Neither Afffinion nor Trilegiant has disclaimed any of the Storey patents affected by the material non-disclosures.

72.     In numerous instances since acquiring the Storey patent rights, the Trilegiant entities and now ANP have asserted one or more of the '412, '870 and '012 patents against, **REDACTED** various companies, despite the knowledge that the patents were inequitably obtained.

73.    The foregoing circumstances, and Trilegiant and ANP's decision(s) to assert the '412 patent (and previously the '870 and '012 patents) against Maritz, warrant declaration of an exceptional case in Maritz's favor and against plaintiff.

### THIRD CLAIM

#### Declaratory Relief for Unenforceability
#### of the '412 Patent

74.    Maritz incorporates by reference the allegations of Paragraphs 1 through 73 of this Counterclaim as if fully set forth.

75.    The '412 patent is unenforceable as a result of the inequitable conduct committed by Mr. Storey, Netcentives, and/or one or more of their patent attorneys, and on account of the ongoing course of inequitable conduct that has pervaded the Storey patents, including but not limited to during prosecution of the '412 patent application.

### FOURTH CLAIM

#### Declaratory Relief for Unclean Hands

76.    Maritz incorporates by reference the allegations of Paragraphs 1 through 75 of this Counterclaim as if fully set forth.

77.    ANP is barred from asserting the '412 patent against Maritz on account of the unclean hands of it and others, which has pervaded the Storey patents, including but not limited to during prosecution of the '412 patent application.

### FIFTH CLAIM

#### Declaration of Patent Misuse

78.    Maritz  incorporates by reference the allegations of Paragraphs 1 through 77 of this Counterclaim as if fully set forth.

79.    On information and belief, ANP knew that the '412 patent was unenforceable due to inequitable conduct when it filed the Amended Complaint.  On information and belief, ANP knew the '412 patent was invalid when it filed the Amended Complaint.

80.    Moreover, on information and belief, Trilegiant knew the '870, '412, and '012 patents were unenforceable due inequitable conduct when it commenced the present suit. Further, on information and belief, Trilegiant knew the referenced patents were invalid when it commenced the present suit.

81.    The various attempts to enforce the '412 patent with knowledge of its unenforceability and/or invalidity constitutes patent misuse, rendering that patent unenforceable.

WHEREFORE, Maritz respectfully requests that judgment be entered in its favor on its counterclaims and against ANP:

A.    Declaring that Maritz is not now and has never infringed the '412 patent;

B.    Declaring that the '412 patent is invalid under the provisions of 35 U.S.C. §§ 101, 102, 103, and/or 112, or otherwise;

C.    Declaring that the '412 patent is unenforceable on the grounds of inequitable conduct;

D.    Declaring that ANP is barred from asserting the '412 patent on account of unclean hands;

E.    Declaring that the '412 patent is unenforceable on the grounds of patent misuse;

F.    Finding this to be an exceptional case, and awarding Maritz its attorneys' fees, costs, and such other relief as the Court deems appropriate.

Respectfully submitted,

CONNOLLY BOVE LODGE & HUTZ

July 19, 2006

**Redacted Version
Filed 7/31/06**

By: _Patricia S Rogowski_
Rudolf E. Hutz (#484)
Patricia Smink Rogowski (#2632)
The Nemours Building
1007 Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

J. Bennett Clark
David W. Harlan
Jennifer E. Hoekel
Marc W. Vander Tuig
SENNIGER POWERS
One Metropolitan Square, 16th Floor
St. Louis, MO 63102
(314) 231-5400

Attorneys for Maritz Inc.

31

**CERTIFICATE OF SERVICE**

  I, hereby certify that on **July 19, 2006**, I electronically filed **MARITZ'S FIRST AMENDED ANSWER TO AMENDED COMPLAINT, WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIM** with the Court Clerk using CM/ECF which will send notification of such filing(s) to Jack B. Blumenfeld and Maryellen Noreika.

  I hereby further certify that on July 19, 2006, I have also served this document on the attorneys of record at the following addresses as indicated:

| **Via Hand Delivery** | **Via Federal Express** |
|---|---|
| Jack B. Blumenfeld | Steven Lieberman |
| Maryellen Noreika | Sharon L. Davis |
| Morris, Nichols, Arsht & Tunnell LLP | Rothwell, Figg, Ernst & Manbeck, P.C. |
| 1201 N. Market Street | 1425 K Street, N.W. |
| P.O. Box 1347 | Suite 800 |
| Wilmington, DE 19899-11347 | Washington, D.C. 20005 |

**Redacted Version**
**Filed 7/31/06**

*Patricia S Rogowski*
Patricia Smink Rogowski (#2632)
