information of which [he] is aware which is material to the examination of this application under 37 C.F.R. §1.56(a)."

(b)  Mr. Storey's declaration also stated that he "qualif[ies] as an independent inventor as defined in 37 C.F.R. 1.9(c)." This section defines an independent inventor as "any inventor who (1) has not assigned, granted, conveyed, or licensed, and (2) is under no obligation under contract or law to assign, grant, convey, or license, any rights in the invention to any person who could not likewise be classified as an independent inventor if that person had made the invention, or to any concern which would not qualify as a small business concern or a nonprofit organization under this section." However, Mr. Storey was under an obligation to assign, grant, convey, or license rights in the '870 and related patents to Radisson as he was, at most, a joint inventor, not the sole inventor, of the subject matter of the Storey patents.

38.  On July 21, 1997,   REDACTED   Mr. Storey assigned the '870 patent application and related rights to Netcentives. Netcentives thus became "associated" with the prosecution of the Storey application and bound by the duty of disclosure under 37 C.F.R. §1.56(a). Netcentives quickly replaced Mr. Bach with Mr. John Stattler as the patent attorney prosecuting the '870 patent application.

39.  After assigning the patent rights,

REDACTED

Nonetheless, neither Mr. Storey, Netcentives, nor its patent counsel took any steps to correct the serious omissions that had preceded Netcentives' acquisition of patent rights from Mr. Storey.

19

40. The '870 patent issued on June 30, 1998. Five days earlier, Netcentives had filed a continuation application, which later issued as the '412 patent, claiming priority to the original '870 application. As with the earlier application, Mr. Storey's declaration was submitted, acknowledging his obligations under 37 C.F.R. §§ 1.56(a) and 1.9(c).

41. In October, 1998, Netcentives, through its patent counsel, took the highly unusual step of filing a Petition to Make Special the '412 continuation application citing, *inter alia*, the '444 (Look to Book) patent.

## REDACTED

    a. Netcentives' filing of the Petition to Make Special reflected its concern that adequate disclosure had not been made during prosecution of the by-then issued '870 patent, which (following the assignment from Mr. Storey) it had a hand in prosecuting. However, upon information and belief,[3] it recognized that the earlier non-disclosure could well be fatal to any subsequent patents claiming ultimate priority to the '870 patent application. The evidence suggests that Netcentives wished to rush the '412 application through prosecution, making a superficial disclosure of the '444 (Look to Book) patent, while avoiding the more forthcoming disclosure it feared would torpedo the patent rights which it had purchased from Mr. Storey.

    b. This intentional superficiality is demonstrated by the failure to disclose that Mr. Storey, the purported inventor of the subject matter of the '412 patent application, was a named inventor of the '444 patent. This information was of high materiality. Further, Netcentives disingenuously characterized the Radisson patent as "not disclos[ing] or suggest[ing]

---

[3] Attempts by Maritz to unveil the reasons behind this and other prosecution strategies related to the Storey patents and applications have been uniformly blocked by invocation of the attorney-client privilege. The Trilegiant/Affinion plaintiffs in this case have even blocked inquiry into conversations with which they were not involved -- but which rather involved Netcentives. This is the subject of a pending motion to compel. D.I. 137.