application.  Separate and apart from reporting the allegations of others, they also were obliged to disclose the various failures of disclosure in the earlier prosecutions, the potential inventive contributions of the Radisson employees, the potential ownership interest of Radisson, Mr. Storey's status as co-inventor of the '444 patent, the Radisson Look to Book publications, and the published 95/12175 PCT application.

56.     However, despite numerous interactions with the U.S. Patent Office during prosecution of the '012 patent application, none of these items were disclosed.  Nor were they disclosed by the Trilegiant entities, the Affinion entities, or their patent attorneys during the subsequent prosecution of the '901 patent application.

57.     On information and belief, Netcentives, Trilegiant, Storey and/or their patent attorneys intentionally failed to name other Radisson employees as inventors on the '012 patents.

58.     On information and belief, the failure of Netcentives, Trilegiant, Storey and/or their patent attorneys failure to disclose all of the inventors of the '012 patent was the result of an intent to deceive the U.S. Patent Office.

59.     The items referenced in Paragraphs 52 - 55 and 57-58 were highly material to the subject matter of the '012 patent application.  On information and belief, their non-disclosure was motivated by an intent to deceive on the part of Netcentives, the Trilegiant entities, Mr. Storey, and/or their patent attorneys.

60.

REDACTED

Attempted inquiry into this conversation by counsel for Maritz during depositions in this case was blocked on the grounds of

25

privilege, though Trilegiant/Affinion is not entitled to invoke a privilege potentially running to Netcentives.

61.     Netcentives entered bankruptcy proceedings in 2001.   In the bankruptcy, Carlson made abundantly clear in court filings that anyone purchasing the patent rights would do so subject to its claims of ownership.  Trilegiant decided to purchase the patent rights, for the sum of $2.0 Million.  It did so, despite being well-aware of the issues surrounding patent ownership, inventorship, invalidating prior art and the lack of disclosure previously made to the U.S. Patent Office.

62.     Trilegiant Loyalty Solutions ("TLS"),

# REDACTED

Trilegiant took a calculated risk by purchasing the highly suspect patent rights in an attempt to improve sagging commercial fortunes of TLS.

63.     On or about December 7, 2001, Trilegiant acquired the rights to the Storey patent rights through assignment by Netcentives.

64.

# REDACTED

65.     Like Netcentives before it, Trilegiant/TLS determined aggressively to assert the newly-obtained patents in the marketplace, with knowledge of their lack of enforceability.

---

[5] TLS was then known as Cendant Incentives.

26