# EXHIBIT 13

## EXHIBIT 13

### *CONFIDENTIAL*

## BRIEF STATEMENT OF WHAT MARITZ INTENDS TO PROVE AT TRIAL

Defendant Maritz Inc. ("Maritz") sets forth below a brief statement of what it intends to prove at trial and reserves the right to supplement this exhibit and/or the proofs offered at trial.

### I.    The Nature of the Case

This is an action alleging patent infringement, pursuant to 35 U.S.C. § 271.  Plaintiff Affinion Net Patents, Inc. ("Affinion") has asserted that Maritz infringes claims 10-17, 26-24, and 36 of U.S. Patent No. 6,009,412 ("the '412 patent").

Affinion also alleges that Maritz violated 35 U.S.C. § 292 by "us[ing] the term 'patent pending' in [Maritz's] sales presentations advertising the VAULT system to its clients."  Based on this supposed activity, Affinion further alleges that Maritz has engaged in unfair competition in violation of 15 U.S.C. § 1125(a).

Maritz has counterclaimed for a judgment that it has not infringed the '412 patent, and that the '412 patent is invalid and unenforceable.

### II.    Prosecution History of the '412 Patent

Thomas Storey is listed as the sole inventor of the '412 patent, which issued from U.S. Patent Application No. 09/105,227 ("the '227 application").  The '227 application was filed on June 25, 1998 as a continuation of U.S. Patent Application No. 08/572,017, filed December 14, 1995, which ultimately issued as U.S. Patent No. 5,774,870 ("the '870 patent") on June 30, 1998. Mr. Storey is also listed as sole inventor of the '870 patent, as well as of U.S. Patent No. 6,578,012 ("the '012 patent").  The '012 patent issued on June 10, 2003, from U.S. Patent Application No. 09/441,144 ("the '144 application), which was filed November 12, 1999, as a

1

continuation of the '227 application. The '870, '412 and '012 patents are collectively referred to below as "the Storey patents."

Mr. Storey eventually sold his patent rights to Netcentives, Inc. These rights have changed hands a number of times and now currently appear to rest with Affinion.

## III.    The Disclosure and Claims of the '412 Patent

The title of the Storey patents, like the content of the specification they share, is telling:

"FULLY INTEGRATED ON-LINE INTERACTIVE FREQUENCY AND AWARD

REDEMPTION PROGRAM." At its essence, the invention concerns a system and method for implementing an on-line frequency program that immediately awards points to users for on-line product purchases. Those points are tracked in a "frequency database" and can be redeemed on-line, immediately upon issuance, for an award from an award catalog.

Claim 10 of the '412 patent, which is exemplary of the asserted independent claims in key respects, provides: A method for redeeming incentive awards in an on-line incentive program, said method comprising the steps of:

> implementing an on-line incentive program that issues award points to users, wherein said award points are redeemable by said user for an award;
>
> implementing an Internet webpage accessible, via a computer system, to at least one user of said on-line incentive program for on-line interactive communications between said user and said Internet webpage;
>
> offering, on said Internet webpage, at least one redeemable award available to said user for exchange of said award points; and
>
> permitting said user to initiate a process to receive said at least one redeemable award for exchange of said award points issued to said user through said on-line incentive program.

Claims 27 and 36 contain the same four steps as Claim 10. Claim 27 is directed to a "computer readable medium" for carrying out these steps, while Claim 36 claims software for performing

2

them. Affinion also asserts Claims 11-17, which depend from Claim 10, and Claims 28-34, which depend from Claim 27.

## IV.    Maritz's Distinct Technology Does Not Infringe the '412 Patent

Affinion accuses two systems used by Maritz of infringing the asserted claims of the '412 patent: VAULT and AwardHQ. Both of these systems utilize database and Internet technology to manage loyalty and incentive programs. Affinion argues that Maritz infringes the '412 patent by using Internet technology in conjunction with its business model that Maritz has practiced for decades. But Maritz's VAULT and AwardHQ technologies are markedly distinct from that covered by the asserted claims.

### A.    Maritz's VAULT System Does Not Infringe the '412 Patent

#### 1.    The VAULT System Does Not Infringe Claims 10, 27, or 36

The VAULT system is a computer database system used by Maritz Loyalty Marketing to manage a wide range of consumer loyalty programs for its clients. Some programs are "equity programs" and involve points being awarded to consumers for their loyalty. Other "non-equity" programs do not involve the awarding of points in any way.

Equity programs that use the VAULT system allow consumers who have earned points in a loyalty program to redeem those points for an award. In stark contrast to the system disclosed in the '412 patent, there is a significant delay in programs using Maritz's VAULT system from when the consumer performs a point-earning activity until the points are issued for that activity and made available to the consumer for redemption. Even if the business rules of the loyalty programs did not require this delay, VAULT's system cannot provide the "immediacy effect" of the system described and claimed in the '412 patent. Instead, the VAULT system utilizes batch processing: information regarding the participant's purchasing behavior is accumulated and

3

periodically sent to Maritz as a batch file before points are added to a participant's account and made available for redemption. Therefore, the VAULT system does not issue award points to a user's account immediately upon completion of a qualifying on-line purchase, such that these points are available for immediate redemption, as is required under Maritz's proposed construction of the asserted claims.

The VAULT system does not include a website that offers products for sale or award points to participants for on-line product purchases made through the website as required by the asserted claims under Maritz's proposed construction of "on-line incentive program."[1]

There are generally three different implementations of the VAULT system with respect to processing a consumer's point earnings and making them available for redemption:

- A client of Maritz sends a batch file to Maritz indicating the number of points to be awarded. The client has already calculated how many points are to be awarded to each user based on that user's transactions. Maritz does not calculate the points to be awarded the user.

- A client of Maritz maintains the participant database with each participant's point balance. Maritz permits the participants to redeem their points for items on its website. When a participant seeks to redeem an award, Maritz checks with the client's database to verify that sufficient points are available for the redemption transaction. Maritz does not calculate the number of points to be earned nor maintain the database of points issued to participants.

- A client of Maritz periodically sends to Maritz a batch file of transactions for which points are to be awarded to users. Maritz then determines how many points to award each participant for the transaction and updates the participant's point account accordingly.

Under either party's proposed claim construction of the claim element, "issues award points to users," many VAULT programs do not conceivably meet this limitation.[2]

---

[1] Regardless of which proposed claim construction of "on-line incentive program" the Court adopts, the program homepage described in the '412 patent is substantially different than the web pages associated with Maritz's VAULT system.

4

On-line redemption is but one of several redemption options offered to participants. The other redemption options—via telephone, for example—do not infringe the asserted claims under either party's claim construction.

2. Maritz's VAULT System Does Not Infringe Dependent Claims 11-17 or 28-34

Because Maritz's Vault system does not infringe independent claims 10 or 27, Maritz does not infringe dependent claims 11-17 or 28-34.

Maritz's VAULT system does not infringe dependent claims 13 or 30 for the additional reason that it does not provide users with an "on-line link to an awards computer," under Maritz's proposed claim construction. Maritz's VAULT program does not establish a real-time link to a fulfillment house or product manufacturer's computer. Nor does the VAULT system establish a real-time link to Maritz's internal fulfillment system.

Numerous programs managed by Maritz through its VAULT system do not allow users to enroll in the program through an Internet webpage. Because these programs do not perform the step of permitting users to enroll in the program on-line, they cannot conceivably satisfy the additional limitation added by dependent claims 17 or 34.

**B.    The AwardHQ Website Does Not Infringe the '412 Patent**

Maritz's AwardHQ website is one tool used by Maritz in conjunction with its clients' points-based incentive programs. The AwardHQ website is a redemption vehicle for participants who wish to spend points they have earned in an incentive program. Maritz uses the AwardHQ system for a diverse array of incentive programs. For example, AwardHQ has been used with

---

[2] The programs for which Maritz does not add points to a user's account do not satisfy the "issues award points to users" limitation under either Maritz's or Affinion's proposed claim construction. The programs for which Maritz does not determine whether a user is an enrolled user or calculate the award points according to a preprogrammed formula do not satisfy the "issues award points to users" limitation under Maritz's proposed construction.

employee incentive programs, where employees earn points for certain behavior, like reaching a sales goal. AwardHQ has also been used with other types of incentive programs, such as incentive programs for distributors or other channel partners. None of the Maritz Incentives programs that use AwardHQ are frequency programs that award points to users for making purchases. Therefore, under Maritz's proposed construction of "on-line incentive program," these programs do not satisfy this claim element.

The AwardHQ website does not offer products for sale or award points to participants for on-line product purchases made through the website, as required by the asserted claims under Maritz's proposed construction of "on-line incentive program." On-line redemption is but one of several redemption options offered to participants. The other redemption options cannot conceivably satisfy the elements of the asserted claims under either party's claim construction.

Programs that offer Maritz's AwardHQ website as a redemption option do not award points immediately. Instead, there exists a delay from the time the participant performs a point-earning activity until the program issues points to participants and makes them available for redemption. Therefore, the AwardHQ system does not infringe any asserted claim under Maritz's proposed construction of the asserted claims, which requires the issuance of award points to a user's account immediately upon completion of a qualifying on-line purchase and that these points be available for immediate redemption.

Similar to the VAULT system, the AwardHQ system has various implementations with respect to processing a participant's point earnings and making them available for redemption:

- A client of Maritz sends a batch file to Maritz indicating the number of points to be awarded. The client has already calculated how many points are to be awarded to each user based on that user's transactions. Maritz does not calculate the points to be awarded the user.

6

- A client of Maritz maintains the participant database with each participant's point balance. Maritz permits the participants to redeem their points for items on its website. When a participant seeks to redeem an award, Maritz checks with the client's database to verify that sufficient points are available for the redemption transaction. Maritz does not calculate the number of points to be earned nor maintain the database of points issued to participants.

- A client of Maritz periodically sends to Maritz a batch file of transactions for which points are to be awarded to users. Maritz then determines how many points to award each participant for the transaction and updates the participant's point account accordingly.

Under either party's proposed claim construction of the claim element, "issues award

points to users" many AwardHQ implementations cannot satisfy this required claim element.[3]

Further, there can be no question that the AwardHQ website does not infringe dependent

claims 17 or 34 because no program using AwardHQ permits users to enroll in an incentive

program on-line.

## V.    If, *Arguendo*, a Finding of Infringement Is Made, Maritz's Actions Were Not Willful

Affinion cannot show, let alone by clear and convincing evidence, that Maritz acted in

disregard of the '412 patent and lacked a reasonable basis for believing it had a right to operate

its VAULT and AwardHQ systems. And there is no evidence whatsoever that Maritz

deliberately copied the ideas or design of the fully integrated on-line interactive frequency and

award redemption program which Thomas Storey purports to have invented.

At all times Maritz acted with due regard for the patent rights of others, including with

regard to the '412 patent. As with the other Storey patents, once Maritz learned of the '412

patent, it took steps to consult its outside patent counsel as to the scope of the '412 patent.

Following a thorough investigation, Maritz's outside patent counsel advised Maritz that its

---

[3] The programs for which Maritz does not add points to a user's account do not satisfy either Maritz's or Affinion's proposed claim construction. The programs for which Maritz does not determine whether a user is an enrolled user or calculate the award points according to a preprogrammed formula, do not satisfy Maritz's proposed construction.

technology was distinct from the claims of the '412 patent. Maritz also knew that its programs were materially different than those of Netcentives, which were touted as patented. Maritz formed a good-faith belief that it was not infringing the '412 patent and reasonably relied on counsel's advice and its own knowledge in continuing operation of its VAULT and AwardHQ systems.

Further, Maritz never attempted to conceal its conduct. As one notable example, when it learned that Affinion's predecessor in interest, Trilegiant, was threatening Maritz's clients with the '412 patent, Maritz contacted Trilegiant directly and informed Trilegiant that it believed it was not infringing the '412 patent and requested that Trilegiant stop threatening its clients with such accusations.

## VI.    The Claims of the '412 Patent Are Invalid

The U.S. patent system is premised on the notion that a patent should issue only to the first person to invent. The presumed invention date for the '412 patent is its effective filing date—which can be no earlier than December 14, 1995. Should the Court accept Affinion's claim construction, and determine that the asserted claims cover a system and method substantially different from that disclosed in the written description and figures of the '412 patent, the effective filing date for the asserted claims can be no earlier than June 25, 1998—the date the disclosure of such a system was added to the application, as originally filed. Prior to this addition on June 25, 1998, the disclosure did not adequately describe the non-integrated on-line redemption system set forth in Affinion's proposed claim construction as required by 35 U.S.C. § 112. Under 35 U.S.C. § 120, the asserted claims are not entitled to the benefit of the earlier-

filed application describing a fully integrated on-line interactive frequency and award redemption program.[4]

Affinion bears the heavy burden to establish an invention date prior to that of any cited prior art reference to avoid the invalidating disclosures therein. Affinion has presented no documentary or testimonial proof sufficient to carry this heavy burden. The uncorroborated, self-serving testimony of Mr. Storey cannot meet this burden.

### A.    The Claims of the '412 Patent Are Anticipated by the '887 Patent and the Broadvision System Under 35 U.S.C. §102(e) and (g)

The same frequency program disclosed and claimed in the '412 patent was first invented and disclosed in U.S. Patent No. 5,710,887 ("the '887 patent"). The inventors of the '887 patent ("the Broadvision inventors") conceived of the system disclosed in the '887 patent, along with numerous features not expressly disclosed therein, long before December 14, 1995.

> 1.    The Subject Matter of the '412 Patent Was Described In a Patent Granted on an Application for Patent by Another Filed in the United States Before the Filing of the '412 Patent

The '887 patent was filed on August 29, 1995, issued on January 20, 1998, and was assigned to Broadvision. *Id.* Because the '887 patent has an earlier effective date than the '412 patent, it is statutory prior art under Section 102(e). The system disclosed by the '887 patent is an "electronic mall comprising a collection of suppliers of items such as goods or services, such as electronic stores." Col. 6, ll. 5-8; Figure 1.

The '887 patent further discloses a computer system and method for electronic commerce that operates an "in-store incentive [that] is a frequent buyer points program." Col. 27, ll. 60-66. This "incentive takes the form of points issued to a customer's frequent buyer account" which

---

[4] The discussion that follows concerns prior art that invalidates the '412 patent under either an August 29, 1995 or June 25, 1998 priority date. There is substantial additional art which invalidates the '412 patent if the latter is deemed the priority date.

the customer can later redeem at various levels for goods or services available through the system. *Id*. Inherent in any system that allows customers to *redeem* points is a process for allowing the user to *initiate* such a redemption. This is particularly true when one considers that the user can redeem points *through the e-commerce system* disclosed by the '887 patent. *See e.g.* col. 27, ll. 61-67

The '887 patent also discloses a program webpage which permits users to interact with the incentive program on-line. The '887 patent is directed to "[a] system for facilitating commercial transactions, between a plurality of customers and at least one supplier of items over a computer driven network capable of providing communications between the supplier and at least one customer site associated with each customer." Abstract. The '887 patent further discloses that one method of providing such communications is through Internet web pages. Col. 12, ll. 1-9, Fig. 2. The program's "In-store Processing System," which includes "the Sales Representative Program Object, Product Database, Pricing Engine, Tax Engine, Shipping Cost Engine, Payment Handler Interface, External Payment Handler, Order Fulfillment Subsystem, and Order Fulfillment Legacy System," communicates with the Customer Contact System described above. Col. 12, ll. 10-21. The '887 patent further discloses a "computer readable medium" and "software" for performing the above discussed actions. *See* Title, col. 5, ll. 57 - 60, col. 9, ll. 26 - 49, col. 23, l. 59 - 67; Fig. 2.

In summary, the '887 patent discloses an electronic commerce system that can be implemented through interactive webpages wherein users are awarded points for making purchases through the system. Users can then initiate a process to receive an award in exchange for those points. Every feature of the asserted independent claims is disclosed by the '887 patent.

10

2.     The Broadvision System Anticipates the '412 Patent

The Broadvision system, which ultimately resulted in the '887 patent, was conceived and reduced to practice before the '412 patent's effective filing date. At least as early as late 1994, Broadvision had conceived of a consumer-based points program that was similar to then-existing consumer-based frequency programs. The Broadvision inventors conceived that their "frequent buyer program" would incentivize consumers by awarding them points for making purchases through Broadvision's on-line system. Users would have had the ability to redeem those points over the Internet at various levels for merchandise or services. The inventors of the Broadvision system also conceived that the system would be implemented on the Internet and use web pages that could be accessed by consumers and provide interactive communications with users of the system.

The Broadvision inventors further conceived of operating the Broadvision system in a way that would allow users to redeem frequent buyer points through the system. By the end of 1994, the inventors conceived that the Broadvision system would enable users to redeem their points over the Internet for a product or service offered by any of the merchants participating in the system. The Broadvision inventors conceived of at least two separate ways of redeeming points: (1) a separate awards catalog; or (2) allowing users to redeem points for products or services offered for sale in the electronic stores.

At least as early as March 21, 1995, Broadvision began advertising its consumer purchasing and incentive system. Broadvision's advertising materials disclosed the system's ability to interact with customers, the ability to support incentive and loyalty programs such as coupons, quantity cards, and frequent-buyer points programs. Broadvision reduced this Internet-based system to practice by mid-1995 and, as discussed above, filed the application which led to

11

the issuance of the '887 patent on August 29, 1995. Every feature of the asserted claims were conceived of and reduced to practice by the Broadvision inventors before the effective filing date of the '412 patent.

            3.     Maritz Conceived of On-Line Redemption Before the Effective Filing Date of the '412 Patent

Prior to the effective filing date of the '412 patent, Maritz had conceived of a program in which users could redeem their points on-line for awards. In 1995, Maritz employees conceived of the Goldmail program, which awarded points to users for viewing ads that were sent to the user's e-mail account, visiting sponsor websites, completing surveys, and other related activities. Users enrolled over the Internet and could view an award catalog on an Internet webpage. Users could also interact with the system via an Internet webpage. Though users could only redeem their points by calling a 1-800 number when Goldmail was first launched, Maritz's employees had conceived of providing on-line redemption prior to the effective filing date of the '412 patent. Such a method of redemption was later offered by Maritz.

## B.    The Claims of the '412 Patent Are Invalid Under 35 U.S.C. § 103 Because They Are Obvious Over the Prior Art

The '412 patent claims must clearly distinguish from the prior art or be declared invalid. Many of the references asserted as prior art by Maritz here were never disclosed to or considered by the examiner during prosecution of the '412 patent, and the asserted prior art is individually and collectively far more pertinent than the references of which the examiner was aware. When the asserted art is compared to the invention as a whole claimed in the '412 patent, the subject matter of all of the '412 patent claims would have been obvious to a person of ordinary skill in the art of incentive programs (35 U.S.C § 103).

What was within the knowledge of persons skilled in the art as of the effective filing date of the '412 patent is shown by the subject matter offered for sale, in public use, and/or described in patents and printed publications. Some of that available art has been described above, and will not be repeated here. Were any of that art deemed deficient because it lacked a clear description of some element in the asserted claims of the '412 patent, that art would and could be combined with other art relied on by Maritz. All of Maritz's art is directed to incentive programs and thus is from the same field of endeavor as the '412 patent.

Maritz will illustrate this obviousness with reference to prior art not previously discussed in detail, it being understood that the earlier discussed art could also be combined to render the '412 patent obvious.

### 1.    The State of the Art

The Patent Office has indicated that, because e-commerce systems and incentive programs were both known in the art, it was the specific combination of: (1) an on-line product catalog; (2) a frequency database; and (3) an on-line award catalog that was patentable over the prior art. This combination, however, would have obvious to one of ordinary skill in the art based upon their knowledge and/or numerous prior art references. The '412 patent is directed to an on-line incentive program that awards points to users for making on-line purchases through the system. Essentially, the '412 patent discloses a system that moved traditional frequency programs from the bricks and mortar and paper catalog world to the Internet. Such a move would have been obvious to one of ordinary skill. In fact, several prior art system had already made that move.

The concept of a points-based award system linked to purchases has existed for over 100 years. Over those 100 years, prior incentive systems have always incorporated available

13

technology to most efficiently implement the programs. Points-based award catalogs and frequency databases have been known in the industry since at least the early 1990s. Upon the advent of online services in the late 1980s and early 1990s, businesses began to move commerce operations onto online systems. This was evident in the area of e-commerce at least as early as 1990 with the advent of online shopping services. By 1994, numerous organizations were offering online shopping malls and catalogs, typically via World Wide Web services. As businesses moved their sales online, frequency programs were fast to follow. By early 1994, companies were testing online merchandise award catalogs in which people could view merchandise and place orders online.

Moving the classic bricks and mortar frequent buyer program to the internet was an obvious development that was triggered by the emergence of viable electronic commerce platforms in the early 1990's. As recognized by the Canadian patent office in rejecting a related application: "There is nothing new about points-based incentive programs in themselves...Nor is there anything new about assembling networks of computers so as to quickly and efficiently communicate data between them...This leaves as the discovery at the heart of this application the realization that by harnessing the abilities of the Internet, certain efficiencies can be gained in the administration of a points incentive program .... The incentive award plan itself has not changed (and, even if it had, those details would be left to the professional skill of the marketing people designing it), it is now simply specifying the use of online communications instead of telephones and mail, web pages instead of paper catalogs, databases instead of paper records, and the use of software to automate a known incentive plan management method." Use of this technology would have been obvious to one of ordinary skill in the art at the time the '412 patent was filed.

      2.    The Chelliah Patent

14

As discussed above, the Chelliah patent anticipates claims 10, 27, and 36 of the '412 patent. If any of the elements of claims 10, 27, and 36 are found to not be expressly disclosed by the Chelliah patent, such elements would have been obvious to one of ordinary skill in the art. The elements of dependent claims 11-17 and 28-34 add nothing more to claims 10 and 27 than features that were common to any incentive program in 1995. These additional features were disclosed by analogous prior art references and one of ordinary skill in the art would have been motivated to combine these references with the disclosure of the Chelliah patent. Accordingly, these claims also would have been obvious to one of ordinary skill in the art based on the teachings of the Chelliah patent.

3.    The Look to Book Program and the '444 Patent

In late 1992, Radisson Hotels International launched its Look to Book program, which Mr. Storey has described as the commercial embodiment of U.S. Patent No. 5,483,444 ("the '444 patent") but which had relevant features even beyond those disclosed in the '444 patent. The Look to Book program was a frequency program that immediately awarded points to travel agents for booking Radisson hotel rooms on-line. Travel agents could enroll in the Look to Book program on-line. The Look to Book program tracked individual travel agent's point balances in a frequency database and those travel agents could check their frequency account balance every time they made a reservation. When a redemption was made, the Look to Book system checked the travel agent's frequency account to ensure the agent had sufficient points for the requested item and, if enough points were available, decremented those points from the account.

Travel agents were also provided with a paper and on-line awards catalog which contained the awards available in exchange for earned points. The electronic catalog contained

15

award descriptions and point values required for redemption. Users could initiate a process to redeem their points by calling a toll free number that was listed in the on-line catalog. Travel agents were provided with additional information about the Look to Book program on-line.

If the Look to Book program was deemed in itself insufficient to render the '412 patent obvious, it, in combination with any of the other incentive program art discussed by Maritz would clearly do so.[5]

### 4.    The Goldhaber Patent

U.S. Patent No. 5,794,210 ("the Goldhaber patent") was filed before the effective filing date of the '412 patent and is directed to an incentive program in which users are awarded points, or CyberCoins, for viewing on-line advertisements. Those points are awarded in real-time and can be redeemed on-line for various awards, such as magazines. Users were also able to access and review their award account, including the number of points earned, and enroll on-line. When a redemption occurred, the system subtracted the redeemed points from the user's account. If the Goldhaber patent was deemed in itself insufficient to render the '412 patent obvious, it, in combination with any of the other incentive program art discussed by Maritz, would clearly do so.

### 5.    The Quinn Article

In a February 1994 article in Incentives Magazine, Judy Quinn discussed how emerging technologies, including the Internet, could be used to manage and operate consumer incentive programs. ("the Quinn article"). Among those emerging technologies was an on-line, interactive award catalogue being tested by Maritz. That award catalog allowed users to view images of offered awards and place orders online. Affinion has attempted to distinguish this article on the

---

[5] Maritz will also prove that the '412 patent is invalid because it was derived from the work of others, *i.e.*, the inventors of the '444 patent and Look to Book program.

16

basis that it discusses on-line award catalogs rather than Internet based catalogs. As recognized by the Patent Office, however, it would have been obvious to one of skill in the art at the time to implement such catalogs on the Internet. Thus, if the Quinn article was deemed in itself insufficient to render the '412 patent obvious, it, in combination with any of the other incentive program art discussed by Maritz, would do so.

### 6.    The Petersen Article

Yet another example of an Internet based program in which users were awarded points for making on-line purchases was described in the September 1, 1995 edition of Catalog Age ("the Petersen Article"). That article described Cyberspace Mall's on-line frequent buyer program, where users were awarded one point for every dollar they spent in the program's on-line mall. The article also discussed the ability to redeem those points for gifts through the system's website using on-line order forms. If the Petersen article were to be deemed in itself insufficient to render the '412 patent obvious, it, in combination with any of the other incentive program art discussed by Maritz would clearly do so.

Numerous other analogous pieces of art in the electronic commerce and incentive industries, which were previously produced by Maritz and appear on Maritz's exhibit list, would have motivated one to develop the subject matter of the '412 patent. Any of these other references, in combination with those discussed above, would have rendered the subject matter of the '412 patent obvious to one of ordinary skill in the art.

### 7.    The Secondary Considerations Confirm the Obviousness of the '412 Patent's Subject Matter

The '412 patent subject matter has not achieved a significant degree of commercial success. To the contrary, Netcentives, who was the original owner of the '412 patent, and attempted to commercially exploit the patented subject matter, was forced to file for bankruptcy

17

in 2000. Further, several companies who obtained licenses from Netcentives to practice the '412 patent also were forced into bankruptcy. Trilegiant Corporation, the owner of the patent for several years, did not practice the claimed invention. Its subsidiary (and then licensee) Trilegiant Loyalty Solutions has long suffered financially, and whatever success it has achieved is attributable largely to promotional efforts and the menacing of others in the industry with the '412 and other Storey patents. The '412 patent has now been sold to Affinion Net Patents, which does not practice the claimed invention.

There was no long-felt need for the invention disclosed in the '412 patent. To the contrary, as discussed above, numerous individuals and companies developed the concept of rewarding consumers for on-line purchases and allowing those consumers to redeem their points on-line. Further, these prior inventions also show that others had not tried and failed to develop the invention disclosed in the '412 patent. Instead, it was merely the development of Internet technology that enabled the subject matter of the '412 patent.

There is no evidence that anyone has copied the invention disclosed in the '412 patent. As discussed above, numerous other programs that utilized on-line redemption had been developed prior to the issuance of the '412 patent.

While there have been a number of licenses taken under the '412 patent, there is no evidence that these licenses were sought after because of the merits of the claimed invention. To the contrary, virtually all of these licenses were obtained under threat of litigation. Others were obtained at an extremely low cost. For example, upon acquiring the '412 patent out of the Netcentives bankruptcy, Trilegiant granted a fully paid-up license to industry giant Carlson and its customers ... for free.

### C. The '412 Patent Is Invalid Under 35 U.S.C. §102(f) For Failing to Name the Correct Inventors

In addition to being listed as the sole inventor of the '412 patent, Mr. Storey is also one of five named inventors of the '444 patent, which is described in detail above. Because the subject matter of the '444 patent is virtually identical to that of the '412 patent, it is plain that the other named inventors of the '444 patent also contributed to the conception of the alleged invention disclosed in the '412 patent. It is also clear from the evidence that Jacqueline Miller, Mr. Storey's wife, contributed to the conception and reduction to practice of the '412 patent and should have been named as an inventor.

Affinion attempts to distinguish the Look to Book program because it did not utilize the Internet as of the date the '412 patent was filed. But while Mr. Storey was still employed by Radisson, other Radisson employees disclosed to him that the Look to Book system could be implemented on the Internet, on obvious fact in any event.

### D.    Dependent Claims 12, 13, 29, and 30 Are Invalid and Indefinite Under 35 U.S.C. § 112

Claims 12, 13, 29, and 30 of the '412 patent are indefinite and therefore invalid under 35 U.S.C. § 112, second paragraph. One of ordinary skill in the art cannot determine the scope of claims 12, 13, 29, and 30 due to the ambiguities present in these claims.

Claims 12, 13, 29, and 30 are all dependent claims. Dependent claims must reference a previous claim and they must be construed to incorporate by reference all the limitations of the referenced claims.

Claim 12 incorporates all of the limitations from claim 10 and purports to provide additional limitations to the step of "redeeming a particular award for said users." Claim 10 contains no such step. Instead, claim 11 contains the step of "redeeming a particular award for said user." One of ordinary skill in the art would not be able to discern the scope of claim 12 due

19

to this ambiguity.  Even if one of ordinary skill in the art presumed that the drafter intended

claim 12 to depend from claim 11 rather than claim 10, the claim would remain ambiguous to

one of ordinary skill in the art for the reasons discussed below with respect to claim 29.

Claim 13 incorporates all of the limitations of claims 10 and 12 and provides additional

steps to the method described above in those claims.  Because claim 13 depends from claim 12,

it incorporates the ambiguity discussed above for claim 12.  Because of this, claim 13 is invalid

as indefinite because one of ordinary skill in the art would be unable to discern the scope of

claim 13.

Claim 29 incorporates all the limitations of claim 28, which in turn incorporates all of the

limitations of claim 27.  Claim 28, from which claim 29 depends, reads as follows:

> 28.    The computer readable medium as set forth in claim 27, wherein the step
> of permitting said user to initiate a process to receive a redeemable award
> comprises the steps of:
>
> accessing an account of said user;
>
> *redeeming a particular award for said user based on said points issued to
> said user if said user has earned sufficient points to qualify for said
> particular award*; and
>
> subtracting said points from said account of said user.

One of ordinary skill in the art would understand claim 28 to provide further details about

how the software for implementing an on-line incentive program permits a user to redeem his or

her points for an award.  The '412 patent describes these steps relating to the "REDEEM

routine" at 9:51–10:11 and Figure 4 (500, 510, 515, 520, and 530).[6]  Based on the plain meaning

of the above-italicized language of claim 28 and the corresponding description in the

---

[6] Figure 4 constitutes "a flow chart showing the award redemption part of the program."  '412
patent 2:49-51.

specification, one of ordinary skill in the art would have understood this limitation to mean checking the balance in a user's account to ensure there are sufficient points available to redeem a particular award.

One of ordinary skill in the art would also understand the steps of claim 28 to necessarily occur sequentially: (1) First, the user's account—which is stored in the FREQUENCY DATABASE 515—is accessed; (2) Next, the user's account balance is checked to determine if he or she has sufficient points to cover the selected award; and (3) Finally, the user's account balance is decremented by the point value of the award redeemed.

Claim 29 purports to further modify the second step of claim 28, the step of checking the user's point account balance:

> 29.    The computer readable medium as set forth in claim 28, wherein the step of redeeming a particular award for said user comprises the steps of:
>
> displaying, via said Internet webpage, a catalog of awards redeemable with said award points of said on-line incentive system; and
>
> accepting a selection by said user that indicates an award from said catalog.

One of ordinary skill in the art would understand the step of "displaying, via said Internet webpage, a catalog of awards..." to mean displaying one or more redeemable awards to the user on a webpage. The specification describes such a webpage as the "AWARD CATALOGUE HOME PAGE 400." '412 patent, Figure 4, 8:8–21. And one of ordinary skill in the art would understand "accepting a selection by said user..." to mean permitting users to select awards from the award catalog. Neither of these steps relate to checking a user's account balance to authorize an award redemption transaction, much less further limit the scope of that step as claim 29 purports to do. One of ordinary skill in the art would find this claim ambiguous and would be unable to discern the scope of claim 29.

21

Claim 30 incorporates all of the limitations of claims 27, 28, and 29 and provides additional steps to the method described in those claims. Because claim 30 depends from claim 29, it incorporates the ambiguity discussed above for claim 29. For the reasons discussed above, claim 30 is invalid as indefinite because one of ordinary skill in the art would be unable to discern the scope of claim 30.

## VII.    The '412 Patent is Unenforceable Due to the Inequitable Conduct of the Applicants and Their Attorneys by Failing to Disclose Highly Material Information to the Patent Office

Patent applicants owe a duty of candor to the PTO during the prosecution of an application. As such, applicants must sign a formal oath or declaration obligating them to disclose any material information of which they are aware to the PTO. If it is shown that an applicant or his/her attorney intentionally failed to disclose important information of which they were aware, any resulting patent must be held unenforceable due to that inequitable conduct. Though the applicant disclosed some information to the PTO during the prosecution of the Storey patents, those disclosures were woefully inadequate and lacked the most important information known to the applicant. Mr. Storey, his representatives and successors in interest plainly committed inequitable conduct in this case as they engaged in a willful, calculated pattern of conduct designed to withhold material information and mislead the Patent Office.

### A.    Inequitable Conduct During Prosecution of the '870 Patent Has 'Infected' the '412 Patent

In addition to being named as the sole inventor of the Storey patents, Mr. Storey is also listed as one of five inventors on U. S. Patent No. 5,483,444, entitled "System for Awarding Credits to Persons Who Book Travel-Related Reservations" ("the '444 patent"), which issued January 9, 1996 and was assigned to Radisson Hotels. Radisson also filed a Patent Cooperation Treaty Application No. WO 95/12175 ("the PCT Application"). The PCT Application has the

22

same specification as the '444 patent and published on May 4, 1995, over seven months before Mr. Storey filed the '870 patent application.

The commercial embodiment of the '444 patent was the "Look to Book" program, though the program contained additional salient aspects.    As discussed above, the Look to Book program operated by immediately awarding points to travel agents who booked Radisson hotel rooms on-line and tracking those points in a frequency database.  Travel agents could then review a paper or on-line award catalog and redeem their points for awards.  Agents could also enroll on-line and view their point balances on-line every time they made a reservation.

The Look to Book program, as Mr. Storey was keenly aware, had been in the public domain since 1992.  In fact, Mr. Storey was responsible for the advertising launch of the Look to Book program in 1992.  The advertising materials sent out at Mr. Storey's direction instructed travel agents that they could "enroll right at [their] terminal," "earn points for each booking," and "[s]pend these points on name-brand merchandise."  Mr. Storey even described the Look to Book program as "the first on-line interactive frequency program for travel agents," which bears striking similarity to the title of the Storey patents, "Fully Integrated On-Line Interactive Frequency and Award Redemption Program."  Despite the numerous and highly relevant similarities between the Look to Book program (and, consequently, the '444 patent), Mr. Storey chose not to disclose it to the PTO during the prosecution of the '870 patent.

Mr. Storey also withheld from the PTO the fact that he was not the sole inventor of the '870 patent. As discussed above, other Radisson employees and Jacqueline Miller contributed to the conception and reduction to practice of the '870 patent.  Again, despite knowing he was not the sole inventor, Mr. Storey chose not to disclose this highly material information to the PTO.

Had the Look to Book program, '444 patent, the PCT application, or the correct inventorship been disclosed to the PTO by Mr. Storey or Netcentives, the examiner undoubtedly would have rejected the claims of the '870 patent. As the examiner of the '870 patent observed, the only patentable feature of the '870 patent was its combination of an on-line product catalog, frequency database, and on-line award catalog. The Look to Book program also combined these features, albeit over three years before the '870 patent was filed.

Affinion has attempted to distinguish the Look to Book program from the '870 patent by arguing that the Look to Book program did not utilize the Internet or webpages. But Mr. Storey also failed to disclose to the PTO that other Radisson employees disclosed the concept of operating the Look to Book program over the Internet while Mr. Storey was still a Radisson employee. Thus, not only did Mr. Storey fail to disclose the other inventors of the '870 patent to the PTO, he also owed a Radisson a duty to assign it the '870 patent. Mr. Storey could have, and should have, disclosed this information to the PTO. Instead, he intentionally withheld all of this highly material information from the examiner while selectively providing only scant, far less relevant disclosures. This inequitable conduct, which was not cured during prosecution of the '412 patent, directly relates to the equity Affinion seeks in this case – enforcement of the '412 patent – and thus renders the '412 patent unenforceable.

Additionally, neither Netcentives nor Mr. Storey disclosed U.S. Patent No. 4,750,119 ("the Cohen patent") to the PTO during prosecution of the '412 (or '870) patents. The Cohen patent issued on June 7, 1988 and discloses, *inter alia*, "a computer program, utilized in combination with a purchasing or transactional system, which allows subscriber-purchasers to buy goods and services and obtain future guaranteed rebates based upon the cost of that

24

purchase." It is indisputable that Mr. Storey knew of this reference and its high level of similarity to the alleged invention of the '412 patent.

## B.    Additional Inequitable Conduct Occurred During Prosecution of the '412 Patent

In order to cure the inequitable conduct in which they engaged in during the prosecution of the '870 patent, Mr. Storey and Netcentives would have had to expressly advise the PTO of the existence of the misrepresentation, stating specifically wherein it resides, advise the PTO what the actual facts were, and establish the patentability of the claimed subject matter based on the factually accurate record. Instead, they chose to take the highly unusual step of filing a Petition to Make Special in an effort to expedite the prosecution of the '412 patent while making a superficial and misleading disclosure of the '444 patent. They also intentionally chose to continue withholding the details of the Look to Book program -- including its immediate award of points and on-line award catalog -- and chose to continue withholding the correct inventorship of the '412 patent.

Netcentives was painfully aware of the need to disclose the Look to Book program, the '444 patent, and past failures of disclosure, but plainly strategized not do so in forthcoming fashion for fear of rendering the entire patent estate unenforceable.[7] It also did not disclose invalidity allegations regarding the '870 patent made by Mypoints.com in litigation that occurred while the '412 patent application was pending. Had complete disclosure been made to the PTO during prosecution of the '412 patent, the examiner would have rejected the claims asserted in this case. The inequitable conduct committed during prosecution of the '412 patent, separate and apart from the infecting inequitable conduct committed during the prosecution of the '870 patent,

---

[7] An attorney involved in prosecuting the '870 and '412 patents for Netcentives, John Stattler, acknowledged that the PTO would be particularly interested in applications relating to similar subject matter in which the same inventor is named. *See also* MPEP § 2004 at No. 9.

25

renders this patent unenforceable. *See also* the discussion that follows, which is incorporated here by reference. The allegations of Maritz's counterclaim are also incorporated here and in the sections that follow.

## VIII.  The '412 Patent is Unenforceable Due To Unclean Hands

In furtherance of the course of conduct noted above, those prosecuting the application that led to third Storey patent, the '012 patent, and a later related application, flagrantly suppressed substantial material information related to litigation involving the Storey patent estate. That litigation, involving Netcentives and numerous other companies, saw allegations of unenforceability, invalidity, and infringement made by the several companies accused of infringement. The inventorship question, Radisson's claim of ownership, and attendant considerations of fraud and invalidity were front and center in the litigation amphitheater. The highly material Chelliah reference (discussed above) and other prior art was brought to Netcentives' attention as well.

Trilegiant Corp. bought the Storey patent rights out of Netcentives' bankruptcy proceeding with full knowledge of Radisson's claim of right in the estate. It had access to the litigation files of Netcentives, replete as they were with the highly material information referenced above.[8] Yet Trilegiant and its outside counsel affirmatively chose to suppress this information in ongoing dealings with the PTO with respect to Storey patent applications.[9]

---

[8]  MPEP provisions and substantial case law emphasize the extreme materiality of litigation coming to bear on pending patent applications, and the particular significance of questions of inventorship.

[9] The information was suppressed throughout history of prosecuting Application No. 10/420,901, including while the current litigation was pending and the history of suppression was laid out in Maritz's pleadings. As a final touch of inequitable conduct, after prosecuting this application through a favorable decision by the PTO's appeals board, it was abandoned without disclosure

26

Simultaneously, they chose to wield them aggressively throughout the industry in an effort to shore up Trilegiant's sagging financial fortunes.

Trilegiant Loyalty chose to institute this case, asserting each of the '870, '412 and '012 patents against Maritz. When Maritz did not succumb to its wishes, but instead constructed a persuasive case of inequitable conduct, Trilegiant/Affinion effectively admitted that the first and third[10] Storey patents were obtained by fraud by amending the complaint so as to only assert the '412 patent. Maritz incurred substantial expense in defending against the '870 and '012 patents while they were still being asserted. Affinion apparently has not ruled out asserting those patents against Maritz yet again, as evidenced by the wording of the covenants not to sue it has executed. And Affinion apparently still intends to assert the '870 and '012 patents against the trade. Indeed, the licenses it has granted include those within their sweep, and they have been brandished repeatedly against numerous companies.

As discussed above, the '412 patent has its own set of very real enforceability issues through which Affinion is attempting to navigate. In the end, however, those are part of an overall course of conduct designed to hide the dirty little secrets of the Storey patent estate from the Patent Office. The conduct, continuing as it has through prosecution of this litigation, renders the '412 patent unenforceable as a matter of unclean hands.

## IX.    The '412 Patent is Unenforceable Due to Patent Misuse

ever having made been. Very belated disclosures made in newly-filed and now-pending applications constitute admissions of materiality and past non-disclosure.

[10] As part of this artifice, plaintiff refused to produce for deposition the attorney who prosecuted the '012 patent and '901 patent application. This attorney was a member of the same firm which orchestrated the post-bankruptcy assertion of rights and suppression of material information from the PTO and which, for that matter, is orchestrating this litigation. By blocking discovery of the prosecuting attorney and zealously invoking the attorney-client privilege, Trilegiant/Affinion and their counsel have walled themselves off from offering a purported explanation for the challenged conduct.

27

After inequitably acquiring the '870 and '412 patents, and knowing that these patents (a) did not name the correct inventors, (b) should have been assigned to Radisson, and (c) were invalid, Netcentives, the Trilegiant entities, and now Affinion have aggressively asserted these patents in the marketplace. During the resulting litigation, numerous parties raised allegations of inequitable conduct and invalidity. Some of those invalidity contentions were based on highly material art that was disclosed during that litigation but had not been before the PTO during prosecution of the '870 or '412 patents. While these cases were pending in various courts across the country, Netcentives was prosecuting the '012 patent. Netcentives intentionally chose not to disclose any of those allegations to the PTO during the prosecution of the '012 patent despite its absolute duty to do so as reflected in the Manual of Patent Examination and Procedure.

Of particular relevance were allegations raised by Carlson Companies, Radisson's parent company, after it was sued by Netcentives for infringement of the '870 and '412 patents. During that litigation, Carlson informed Netcentives that the '870 and '412 patents failed to disclose all of their inventors and that Radisson was the proper owner of those patents. Carlson also made clear during Netcentive's bankruptcy proceedings that any purchaser of the '870 and '412 patents, as well as the application which later issued as the '012 patent, was purchasing those rights subject to Radisson's ownership thereof. Trilegiant Corp. was aware of Carlson's statements of ownership when it purchased Netcentive's patent rights for approximately $2 million dollars.

free license. In

REDACTED

28

The continued enforcement of these inequitably obtained patents constitutes patent misuse and renders the '412 patent unenforceable on this separate basis.[11]

## X.    If, *Arguendo*, Infringement Were Found, and the '412 Patent Were Not Found Invalid or Unenforceable, Affinion Is Not Entitled to Recover For Any Alleged Damages Accruing Prior To the Filing of this Suit

Affinion is not entitled to damages for any time period prior to the filing of this lawsuit, for failure to satisfy the requirements of 35 U.S.C. § 287. Affinion will not dispute that it and its predecessors failed to mark websites through which any patented products operate. Nor will Affinion offer any facts to show substantially consistent and continuous marking by it, its predecessors or licensees that would entitle Affinion to the benefits of 35 U.S.C. § 287.

In the absence of compliance with the marking requirements of section 287, Affinion is not entitled to any pre-suit damages unless it can demonstrate actual notice to Maritz of the '412 patent and of Maritz's alleged infringement of it.

## XI.    If, *Arguendo*, Infringment Were Found, and The '412 Patent Were Not Found Invalid Or Unenforceable, Affinion is Not Entitled To Recover Any Alleged Lost Profit Damages

Affinion will not be able to prove any recoverable lost profits in this case. Affinion is barred from seeking lost profit damages for any time period prior to January 29, 2004, because Affinion's assignor, Trilegiant Corporation, which owned the patent-in-suit prior to January 29, 2004, did not sell the patented product or a product competitive with the alleged infringing product. Thus, it could not (and did not) have lost sales as a result of the alleged infringement. Further, Affinion concedes that it will not seek lost profits damages for the period October 17, 2005, and after.

---

[11] Plaintiff's claims are also barred, in whole or in part, by the doctrines of equitable estoppel and laches, on the part of plaintiff and/or its predecessors-in-interest.

29

The only time period for which Affinion can even request lost profits is the period between January 29, 2004 and October 16, 2005. For this period, however, Affinion cannot demonstrate that but for the activities of Maritz, Trilegiant Loyalty Solutions would have made these sales. The programs for which Affinion seeks lost profits either (1) did not include award points, or (2) Maritz did not issue the award points to users as required by the asserted claims, or (3) the program or client has an established history with Maritz prior to Affinion's predecessor's acquisition of the '412 patent. For these reasons Affinion is not entitled to any lost profits damages.

## XII.    Reasonable Royalty

If *arguendo* Affinion were entitled to damages, these should be solely in the form of a reasonable royalty. A reasonable royalty in this case, based on the factors in *Georgia Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116 (S.D.N.Y. 1970), should be in the range of 1.75 to 7.0 percent. Maritz's expert, Gregory Bell, will testify that a hypothetical negotiation between Maritz and Affinion in December 1999 would have resulted in reasonable royalty rate of 3.7 percent.

This royalty rate should be applied to a revenue basis that includes only revenue from online redemptions. The applicable royalty basis would be, at most, $59.1 million for 2000 to mid-2005. This includes $8.6 million for Maritz Loyalty programs and $50.5 million for Maritz Incentives. Applying the 3.7 percent royalty rate to online redemption revenues of $59.1 million yields a damages total of $2,171,259.

## XIII.    Maritz  Did Not Violate 35 U.S.C. § 292 or The Lanham Act

Affinion alleges that Maritz falsely marked some unidentified sales presentations with "patent pending." Maritz, however, did not mark, or affix to any article, patent markings as

30

contemplated by the patent statutes and Affinion can not prove otherwise. Further, even if Maritz had marked any sales presentations as Affinion alleges, which it did not, Affinion cannot prove that Maritz did so with deceptive intent.

Affinion further claims that any allegedly improper marking of Maritz sales presentations caused Affinion to suffer "substantial injury, loss and damage" and that it should be permitted to recover damages pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq*. Affinion, however, has not, and cannot, produce any evidence that Maritz mismarked any advertising materials or any injury, loss or damage suffered by Affinion from such alleged mismarking. Further, Affinion cannot show that Maritz acted in bad faith. These claims should not be submitted to the jury.

31