# EXHIBIT 1

REDACTED

# EXHIBIT 2

REDACTED

# EXHIBIT 3

REDACTED

# EXHIBIT 4

(C) Applications for reissues, particularly those involved in stayed litigation (37 CFR 1.176).

(D) Applications remanded by an appellate tribunal for further action.

(E) An application, once taken up for action by an examiner according to its effective filing date, should be treated as special by an examiner, art unit or Technology Center to which it may subsequently be transferred; exemplary situations include new cases transferred as the result of a telephone election and cases transferred as the result of a timely reply to any official action.

(F) Applications which appear to interfere with other applications previously considered and found to be allowable, or which will be placed in interference with an unexpired patent or patents.

(G) Applications ready for allowance, or ready for allowance except as to formal matters.

(H) Applications which are in condition for final rejection.

(I) Applications pending more than 5 years, including those which, by relation to a prior United States application, have an effective pendency of more than 5 years. See MPEP § 707.02.

(J) Reexamination proceedings, MPEP § 2261 >and § 2661<.

See also MPEP § 714.13, § 1207 and § 1309.

## 708.02 Petition To Make Special [R-3]

*37 CFR 1.102. Advancement of examination.*

(a) Applications will not be advanced out of turn for examination or for further action except as provided by this part, or upon order of the Director to expedite the business of the Office, or upon filing of a request under paragraph (b) of this section or upon filing a petition under paragraphs (c) or (d) of this section with a showing which, in the opinion of the Director, will justify so advancing it.<

(b) Applications wherein the inventions are deemed of peculiar importance to some branch of the public service and the head of some department of the Government requests immediate action for that reason, may be advanced for examination.

**>

(c) A petition to make an application special may be filed without a fee if the basis for the petition is:

(1) The applicant's age or health; or

(2) That the invention will materially:

(i) Enhance the quality of the environment;

(ii) Contribute to the development or conservation of energy resources; or

(iii) Contribute to countering terrorism.<

(d) A petition to make an application special on grounds other than those referred to in paragraph (c) of this section must be accompanied by the fee set forth in § 1.17(h).

New applications ordinarily are taken up for examination in the order of their effective United States filing dates. Certain exceptions are made by way of petitions to make special, which may be granted under the conditions set forth below.>Any statement in support of a petition to make special must be based on a good faith belief that the invention in fact qualifies for special status. See 37 CFR 1.56 and 10.18.<

### I. MANUFACTURE

An application may be made special on the ground of prospective manufacture upon the filing of a petition accompanied by the fee under 37 CFR 1.17(h) and a statement by the applicant, assignee or an attorney/agent registered to practice before the Office alleging:

(A) The possession by the prospective manufacturer of sufficient presently available capital (stating approximately the amount) and facilities (stating briefly the nature thereof) to manufacture the invention in quantity or that sufficient capital and facilities will be made available if a patent is granted;

If the prospective manufacturer is an individual, there must be a corroborating statement from some responsible party, as for example, an officer of a bank, showing that said individual has the required available capital to manufacture;

(B) That the prospective manufacturer will not manufacture, or will not increase present manufacture, unless certain that the patent will be granted;

(C) That the prospective manufacturer obligates himself, herself or itself, to manufacture the invention, in the United States or its possessions, in quantity immediately upon the allowance of claims or issuance of a patent which will protect the investment of capital and facilities; and

(D) That the applicant or assignee has made or caused to be made a careful and thorough search of the prior art, or has a good knowledge of the pertinent prior art.

Applicant must provide one copy of each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record.

## II. INFRINGEMENT

Subject to a requirement for a further showing as may be necessitated by the facts of a particular case, an application may be made special because of actual infringement (but not for prospective infringement) upon payment of the fee under 37 CFR 1.17(h) and the filing of a petition accompanied by a statement by the applicant, assignee, or an attorney/agent registered to practice before the Office alleging:

(A) That there is an infringing device or product actually on the market or method in use;

(B) That a rigid comparison of the alleged infringing device, product, or method with the claims of the application has been made, and that, in his or her opinion, some of the claims are unquestionably infringed; and

(C) That he or she has made or caused to be made a careful and thorough search of the prior art or has a good knowledge of the pertinent prior art.

Applicant must provide one copy of each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record.

Models or specimens of the infringing product or that of the application should not be submitted unless requested.

## III. APPLICANT'S HEALTH

An application may be made special upon a petition by applicant accompanied by any evidence showing that the state of health of the applicant is such that he or she might not be available to assist in the prosecution of the application if it were to run its normal course, such as a doctor's certificate or other medical certificate. No fee is required for such a petition. See 37 CFR 1.102(c).

>Personal/medical information submitted as evidence to support the petition will be available to the public if the application file and contents are available to the public pursuant to 37 CFR 1.11 or 1.14. If applicant does not wish to have this information become part of the application file record, the information must be submitted pursuant to MPEP § 724.02.<

## IV. APPLICANT'S AGE

An application may be made special upon filing a petition including any evidence showing that the applicant is 65 years of age, or more, such as a birth certificate or applicant's statement. No fee is required with such a petition. See 37 CFR 1.102(c).

>Personal/medical information submitted as evidence to support the petition will be available to the public if the application file and contents are available to the public pursuant to 37 CFR 1.11 or 1.14. If applicant does not wish to have this information become part of the application file record, the information must be submitted pursuant to MPEP § 724.02.<

## V. ENVIRONMENTAL QUALITY

The U.S. Patent and Trademark Office will accord "special" status to all patent applications for inventions which materially enhance the quality of the environment of mankind by contributing to the restoration or maintenance of the basic life-sustaining natural elements, i.e., air, water, and soil.

All applicants desiring to participate in this program should petition that their applications be accorded "special" status. **>The petition under 37 CFR 1.102 must state that special status is sought because the invention materially enhances the quality of the environment of mankind by contributing to the restoration or maintenance of the basic life-sustaining natural elements.< No fee is required for such a petition. See 37 CFR 1.102(c). >If the application disclosure is not clear on its face that the claimed invention materially enhances the quality of the environment by contributing to the restoration or maintenance of one of the basic life-sustaining natural elements, the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the materiality standard is met. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could materially enhance the quality of the environment. Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may enhance the quality of the environment.<

### VI. ENERGY

The U.S. Patent and Trademark Office will, on petition, accord "special" status to all patent applications for inventions which materially contribute to (A) the discovery or development of energy resources, or (B) the more efficient utilization and conservation of energy resources. Examples of inventions in category (A) would be developments in fossil fuels (natural gas, coal, and petroleum), hydrogen fuel technologies, nuclear energy, solar energy, etc. Category (B) would include inventions relating to the reduction of energy consumption in combustion systems, industrial equipment, household appliances, etc.

All applicants desiring to participate in this program should petition that their applications be accorded "special" status. **>The petition under 37 CFR 1.102 must state that special status is sought because the invention materially contributes to category (A) or (B) set forth above.< No fee is required for such a petition, 37 CFR 1.102(c).>If the application disclosure is not clear on its face that the claimed invention materially contributes to category (A) or (B), the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the materiality standard is met. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could materially contribute to category (A) or (B). Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may be directed to category (A) or (B).<

### VII. INVENTIONS RELATING TO RECOMBINANT DNA

In recent years revolutionary genetic research has been conducted involving recombinant deoxyribonucleic acid ("recombinant DNA"). Recombinant DNA research appears to have extraordinary potential benefit for mankind. It has been suggested, for example, that research in this field might lead to ways of controlling or treating cancer and hereditary defects. The technology also has possible applications in agriculture and industry. It has been likened in importance to the discovery of nuclear fission and fusion. At the same time, concern has been expressed over the safety of this type of research. The National Institutes of Health (NIH) has released guidelines for the conduct of research concerning recombinant DNA. These "Guidelines for Research Involving Recombination DNA Molecules," were published in the *Federal Register* of July 7, 1976, 41 FR 27902-27943. NIH is sponsoring experimental work to identify possible hazards and safety practices and procedures.

In view of the exceptional importance of recombinant DNA and the desirability of prompt disclosure of developments in the field, the U.S. Patent and Trademark Office will accord "special" status to patent applications relating to safety of research in the field of recombinant DNA. Upon appropriate petition and payment of the fee under 37 CFR 1.17(h), the Office will make special patent applications for inventions relating to safety of research in the field of recombinant DNA. Petitions for special status should be accompanied by statements under 37 CFR 1.102 by the applicant, assignee, or statements by an attorney/agent registered to practice before the Office explaining the relationship of the invention to safety of research in the field of recombinant DNA research. The fee set forth under 37 CFR 1.17(h) must also be paid.

### VIII. SPECIAL EXAMINING PROCEDURE FOR CERTAIN NEW APPLICATIONS — ACCELERATED EXAMINATION

A new application (one which has not received any examination by the examiner) may be granted special status provided that applicant (and this term includes applicant's attorney or agent) complies with each of the following items:

(A) Submits a petition to make special accompanied by the fee set forth in 37 CFR 1.17(h);

(B) Presents all claims directed to a single invention, or if the Office determines that all the claims presented are not obviously directed to a single invention, will make an election without traverse as a prerequisite to the grant of special status.

The election may be made by applicant at the time of filing the petition for special status. Should applicant fail to include an election with the original papers or petition and the Office determines that a requirement should be made, the established telephone restriction practice will be followed.

If otherwise proper, examination on the merits will proceed on claims drawn to the elected invention.

If applicant refuses to make an election without traverse, the application will not be further examined at that time. The petition will be denied on the ground that the claims are not directed to a single invention, and the application will await action in its regular turn.

Divisional applications directed to the nonelected inventions will not automatically be given special status based on papers filed with the petition in the parent application. Each such application must meet on its own all requirements for the new special status;

(C) Submits a statement(s) that a pre-examination search was made, listing the field of search by class and subclass, publication, Chemical Abstracts, foreign patents, etc. The pre-examination search must be directed to the invention as claimed in the application for which special status is requested. A search made by a foreign patent office satisfies this requirement if the claims in the corresponding foreign application are of the same or similar scope to the claims in the U.S. application for which special status is requested;

(D) Submits one copy each of the references deemed most closely related to the subject matter encompassed by the claims if said references are not already of record; and

(E) Submits a detailed discussion of the references, which discussion points out, with the particularity required by 37 CFR 1.111 (b) and (c), how the claimed subject matter is patentable over the references.

In those instances where the request for this special status does not meet all the prerequisites set forth above, applicant will be notified and the defects in the request will be stated. The application will remain in the status of a new application awaiting action in its regular turn. In those instances where a request is defective in one or more respects, applicant will be given *one* opportunity to perfect the request in a renewed petition to make special. If perfected, the request will then be granted. If not perfected in the first renewed petition, any additional renewed petitions to make special may or may not be considered at the discretion of the Technology Center (TC) Special Program Examiner.

Once a request has been granted, prosecution will proceed according to the procedure set forth below; there is no provision for "withdrawal" from this special status.

The special examining procedure of VIII (accelerated examination) involves the following procedures:

(A) The new application, having been granted special status as a result of compliance with the requirements set out above will be taken up by the examiner before all other categories of applications except those clearly in condition for allowance and those with set time limits, such as examiner's answers, etc., and will be given a complete first action which will include *all* essential matters of merit as to all claims. The examiner's search will be restricted to the *subject matter encompassed by the claims*. A first action rejection will set a 3-month shortened period for reply.

(B) During the 3-month period for reply, applicant is encouraged to arrange for an interview with the examiner in order to resolve, with finality, as many issues as possible. In order to afford the examiner time for reflective consideration before the interview, applicant or his or her representative should cause to be placed in the hands of the examiner at least one working day prior to the interview, a copy (clearly denoted as such) of the amendment that he or she proposes to file in response to the examiner's action. Such a paper will not become a part of the file, but will form a basis for discussion at the interview.

(C) Subsequent to the interview, or responsive to the examiner's first action if no interview was had, applicant will file the "record" reply. The reply at this stage, to be proper, must be restricted to the rejections, objections, and requirements made. Any amendment which would require broadening the search field will be treated as an improper reply.

(D) The examiner will, within 1 month from the date of receipt of applicant's formal reply, take up the application for final disposition. This disposition will constitute either a final action which terminates with the setting of a 3-month period for reply, or a notice of allowance. The examiner's reply to any amendment submitted after final rejection should be prompt and by way of form PTOL-303, by passing the application to issue, or by an examiner's answer should applicant choose to file an appeal brief at this time. The use of these forms is not intended to open the door to further prosecution. Of course, where relatively minor issues

or deficiencies might be easily resolved, the examiner may use the telephone to inform the applicant of such.

(E) A personal interview after a final Office action will not be permitted unless requested by the examiner. However, telephonic interviews will be permitted where appropriate for the purpose of correcting any minor outstanding matters.

After allowance, these applications are given top priority for printing. See MPEP § 1309.

## IX. SPECIAL STATUS FOR PATENT APPLICATIONS RELATING TO SUPERCONDUCTIVITY

In accordance with the President's mandate directing the U.S. Patent and Trademark Office to accelerate the processing of patent applications and adjudication of disputes involving superconductivity technologies when requested by the applicant to do so, the U.S. Patent and Trademark Office will, on request, accord "special" status to all patent applications for inventions involving superconductivity materials. Examples of such inventions would include those directed to superconductive materials themselves as well as to their manufacture and application. In order that the U.S. Patent and Trademark Office may implement this procedure, we invite all applicants desiring to participate in this program to request that their applications be accorded "special" status. Such requests should be accompanied by a statement under 37 CFR 1.102 that the invention involves superconductive materials. No fee is required.

## X. INVENTIONS RELATING TO HIV/AIDS AND CANCER

In view of the importance of developing treatments and cures for HIV/AIDS and cancer and the desirability of prompt disclosure of advances made in these fields, the U.S. Patent and Trademark Office will accord "special" status to patent applications relating to HIV/AIDS and cancer.

Applicants who desire that an application relating to HIV/AIDS or cancer be made special should file a petition and the fee under 37 CFR 1.17(h) requesting the U.S. Patent and Trademark Office to make the application special. The petition for special status should be accompanied by a statement explaining how the invention contributes to the diagnosis, treatment or prevention of HIV/AIDS or cancer.

## XI. INVENTIONS FOR COUNTERING TERRORISM

In view of the importance of developing technologies for countering terrorism and the desirability of prompt disclosure of advances made in these fields, the U.S. Patent and Trademark Office will accord "special" status to patent applications **>for inventions which materially contribute to countering terrorism<.

International terrorism as defined in 18 U.S.C. 2331 includes "activities that - (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; [and] (B) appear to be intended - (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by assassination or kidnapping..." The types of technology for countering terrorism could include, but are not limited to, systems for detecting/identifying explosives, aircraft sensors/security systems, and vehicular barricades/disabling systems.

**>All applicants desiring to participate in this program should petition that their applications be accorded special status. The petition under 37 CFR 1.102 must state that special status is sought because the invention materially contributes to countering terrorism. No fee is required for such a petition. See 37 CFR 1.102(c). If the application disclosure is not clear on its face that the claimed invention is materially directed to countering terrorism, the petition must be accompanied by a statement under 37 CFR 1.102 by the applicant, assignee, or an attorney/agent registered to practice before the Office explaining how the invention materiality contributes to countering terrorism. The materiality standard does not permit an applicant to speculate as to how a hypothetical end-user might specially apply the invention in a manner that could counter terrorism. Nor does such standard permit an applicant to enjoy the benefit of advanced examination merely because some minor aspect of the claimed invention may be directed to countering terrorism.<

### XII. SPECIAL STATUS FOR APPLICATIONS RELATING TO BIOTECHNOLOGY FILED BY APPLICANTS WHO ARE SMALL ENTITIES

Applicants who are small entities may request that their biotechnology applications be granted "special" status. Applicant must file a petition with the petition fee under 37 CFR 1.17(h) requesting the special status and must:

(A) state that small entity status has been established or include a statement establishing small entity status;

(B) state that the subject of the patent application is a major asset of the small entity; and

(C) state that the development of the technology will be significantly impaired if examination of the patent application is delayed, including an explanation of the basis for making the statement.

#### FORMAL REQUIREMENTS OF PETITION TO MAKE SPECIAL

Any petition to make special should:

(A) be in writing; and

(B) identify the application by application number and filing date.

#### HANDLING OF PETITIONS TO MAKE SPECIAL

Applications which have been made special will be advanced out of turn for examination and will continue to be treated as special throughout the entire prosecution in the Office.

Each petition to make special, regardless of the ground upon which the petition is based and the nature of the decision, is made of record in the application file, together with the decision thereon. The part of the Office that rules on a petition is responsible for properly entering that petition and the resulting decision in the file record. The petition, with any attached papers and supporting affidavits, will be given a single paper number and so entered in the "Contents" of the file. The decision will be accorded a separate paper number and similarly entered. To ensure entries in the "Contents" in proper order, the technical support staff in the TC will make certain that all papers prior to a petition have been entered and/or listed in the application file before forwarding it for consideration of the petition. Note MPEP § 1002.02(s). For Image File Wrapper (IFW) processing, see IFW Manual.

Petitions to make special are decided by the Special Program Examiner of the TC to which the application is assigned.

## 708.03 Examiner Tenders Resignation [R-2]

Whenever an examiner tenders his or her resignation, the supervisory patent examiner should see that the remaining time as far as possible is used in winding up the old complicated cases or those with involved records and getting as many of his or her amended cases as possible ready for final disposition.

If the examiner has considerable experience in his or her particular art, it is also advantageous to the Office if he or she indicates (in pencil) in the file wrappers of application in his or her docket, the field of search or other pertinent data that he or she considers appropriate. >For Image File Wrapper (IFW) processing, see IFW Manual.<

## 709 Suspension of Action [R-3]

*37 CFR 1.103. Suspension of action by the Office.*

(a) *Suspension for cause.* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph for good and sufficient cause. The Office will not suspend action if a reply by applicant to an Office action is outstanding. Any petition for suspension of action under this paragraph must specify a period of suspension not exceeding six months. Any petition for suspension of action under this paragraph must also include:

(1) A showing of good and sufficient cause for suspension of action; and

**>

(2) The fee set forth in § 1.17(g), unless such cause is the fault of the Office.<

(b) *Limited suspension of action in a continued prosecution application (CPA) filed under § 1.53(d).* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph in a continued prosecution application filed under § 1.53(d) for a period not exceeding three months. Any request for suspension of action under this paragraph must be filed with the request for an application filed under § 1.53(d), specify the period of suspension, and include the processing fee set forth in § 1.17(i).

(c) *Limited suspension of action after a request for continued application (RCE) under § 1.114.* On request of the applicant, the Office may grant a suspension of action by the Office under this paragraph after the filing of a request for continued examina-

# EXHIBIT 5

(2) Activities will be initiated before dusk;

(3) Construction noises must be kept constant (i.e., not interrupted by periods of quiet in excess of 30 minutes) while pinnipeds are present;

(4) If activities cease for longer than 30 minutes and pinnipeds are in the area, start-up of activities will include a gradual increase in noise levels;

(5) A NMFS-approved marine mammal observer will visually monitor the pinnipeds on the beach adjacent to the harbor and on rocks for any flushing or other behaviors as a result of Boeing's activities (see Monitoring); and

(6) To the extent possible, the *Delta Mariner* and accompanying vessels will enter the harbor only when the tide is too high for harbor seals to haul-out on the rocks. The vessel will reduce speed 1.5 to 2 knots (2.8–3.7 km/hr) once the vessel is within 3 mi (4.83 km) of the harbor. The vessel will enter the harbor stern first, approaching the wharf and mooring dolphins at less than 0.75 knot (1.4 km/hr).

**Monitoring**

As part of its 2002 application, Boeing provided a proposed monitoring plan for assessing impacts to harbor seals from the activities at south VAFB harbor and for determining when mitigation measures should be employed. NMFS proposes the same plan for this IHA.

A NMFS-approved and VAFB-designated biologically trained observer will monitor the area for pinnipeds during all harbor activities. During nighttime activities, the harbor area will be illuminated, and the monitor will use a night vision scope. Monitoring activities will consist of:

(1) Conducting baseline observation of pinnipeds in the project area prior to initiating project activities;

(2) Conducting and recording observations on pinnipeds in the vicinity of the harbor for the duration of the activity occurring when tides are low enough for pinnipeds to haul out (2 ft, 0.61 m, or less); and

(3) Conducting post-construction observations of pinniped haul-outs in the project area to determine whether animals disturbed by the project activities return to the haul-out.

Monitoring results from previous years of these activities have been reviewed and incorporated into the analysis of potential effects in this document, as well as the take estimates.

**Reporting**

Boeing will notify NMFS 2 weeks prior to initiation of each activity. After each activity is completed, Boeing will provide a report to NMFS within 90 days. This report will provide dates and locations of specific activities, details of seal behavioral observations, and estimates of the amount and nature of all takes of seals by harassment or in other ways. In addition, the report will include information on the weather, the tidal state, the horizontal visibility, and the composition (species, gender, and age class) and locations of haul-out group(s). In the unanticipated event that any marine mammal is injured or killed as a result of these activities, Boeing or its designee shall report the incident to NMFS immediately.

**Endangered Species Act**

This action will not affect species listed under the Endangered Species Act (ESA) that are under the jurisdiction of NMFS. VAFB formally consulted with U.S. Fish and Wildlife Service (FWS) in 1998 on the possible take of southern sea otters during Boeing's harbor activities at south VAFB. A Biological Opinion was issued in August 2001, which concluded that the proposed activities were not likely to jeopardize the continued existence of the southern sea otter. The activities covered by this IHA are analyzed in that Biological Opinion, and this IHA does not modify the action in a manner that was not previously analyzed.

**National Environmental Policy Act**

In 2001, the USAF prepared an Environmental Assessment (EA) for Harbor Activities Associated with the Delta IV Program at Vandenberg Air Force Base. In 2005, NMFS prepared an EA supplementing the information contained in the USAF EA and issued a Finding of No Significant Impact (FONSI) on the issuance of an IHA for Boeing's harbor activities in accordance with section 6.01 of the National Oceanic and Atmospheric Administration Administrative Order (NAO) 216–6 (Environmental Review Procedures for Implementing the National Environmental Policy Act, May 20, 1999). The proposed activity is within the scope of NMFS'2005 EA and FONSI.

**Conclusions**

NMFS has issued an IHA to Boeing for harbor activities related to the Delta IV/EELV to take place at south VAFB over a 1-year period, contingent upon adherence to the previously mentioned mitigation, monitoring, and reporting requirements. NMFS has determined that the impact of harbor activities related to the Delta IV/EELV at VAFB (transport vessel operations, cargo movement activities, harbor maintenance dredging, and kelp habitat mitigation) will result in the Level B Harassment of small numbers of Pacific harbor seals, California sea lions, and northern elephant seals. The effects of Boeing's harbor activities are expected to be in the form of short-term and localized behavioral changes and no take by injury or death is anticipated or authorized. NMFS has further determined that these takes will have a negligible impact on the affected marine mammal species and stocks and will not have an unmitigable adverse impact on the availability of such marine mammal species and stocks for subsistence uses.

**Authorization**

NMFS has issued an IHA to take marine mammals, by Level B harassment, incidental to conducting harbor activities at VAFB to Boeing for a 1-year period, provided the mitigation, monitoring, and reporting requirements are undertaken.

Dated: June 19, 2006.

**James H. Lecky,**

*Director, Office of Protected Resources, National Marine Fisheries Service.*

[FR Doc. E6–10044 Filed 6–23–06; 8:45 am]

BILLING CODE 3510–22–S

---

**DEPARTMENT OF COMMERCE**

**Patent and Trademark Office**

**[Docket No.: PTO–P–2006–0014]**

## Changes to Practice for Petitions in Patent Applications To Make Special and for Accelerated Examination

**AGENCY:** United States Patent and Trademark Office, Commerce.

**ACTION:** Notice.

**SUMMARY:** The United States Patent and Trademark Office (USPTO) has established procedures under which the examination of a patent application may be accelerated. Under one of these procedures, the USPTO will advance an application out of turn for examination if the applicant files a grantable petition to make special under the accelerated examination program. The USPTO is revising its procedures for applications made special under the accelerated examination program with the goal of completing examination within twelve months of the filing date of the application. The USPTO is similarly revising the procedures for other petitions to make special, except those based on applicant's health or age or the recently announced Patent Prosecution Highway (PPH) pilot program between the USPTO and the Japan Patent Office.

**DATES:** *Effective Date:* The change in practice in this notice applies to

petitions to make special filed on or after August 25, 2006.

**FOR FURTHER INFORMATION CONTACT:** Pinchus Laufer, Detailee, Office of Patent Legal Administration, Office of the Deputy Commissioner for Patent Examination Policy, by telephone at (571) 272–7726, or by facsimile at (571) 273–7726. Comments concerning petition to make special practice may be sent by electronic mail message over the Internet addressed to *MPEPFeedback@uspto.gov*, or submitted by mail addressed to: Mail Stop Comments—Patents, Commissioner for Patents, P.O. Box 1450, Alexandria, VA, 22313–1450.

Any inquiries concerning electronic filing of the application should be directed to the Electronic Business Center (EBC) at (866) 217–9197. Any inquiries concerning a specific petition to make special should be directed to the appropriate Technology Center Special Program Examiner.

**SUPPLEMENTARY INFORMATION:** New patent applications are normally taken up for examination in the order of their United States filing date. The USPTO has a procedure for requesting accelerated examination under which an application will be advanced out of turn for examination if the applicant files a petition to make special with the appropriate showing. *See* 37 CFR 1.102 and *Manual of Patent Examining Procedure* § 708.02 (VIII) (8th ed. 2001) (Rev. 3, August 2005) (MPEP). The USPTO is revising its procedures for applications made special under the accelerated examination program with the goal of completing examination within twelve months of the filing date of the application. *See* Part VIII (subsection The Twelve-Month Goal) for more information.

The USPTO is similarly revising the procedures for other petitions to make special, except those based on applicant's health or age or the PPH pilot program. Specifically, other petitions to make special (*i.e.*, petitions based on: manufacture, infringement, environmental quality, energy, recombinant DNA, superconductivity materials, HIV/AIDS and cancer, countering terrorism, and biotechnology applications filed by small entities (*see* MPEP § 708.02)) will be processed and examined using the revised procedure for accelerated examination. Thus, all petitions to make special, except those based on applicant's health or age or the PPH pilot program, will be required to comply with the requirements of petitions to make special under the accelerated examination program that are set forth in this notice.

Any petition to make special, other than those based on applicant's health or age or the PPH pilot program, filed on or after the effective date must meet the requirements set forth in this notice. Applications filed before the effective date will not be eligible for the revised accelerated examination program. Until the effective date, applicant may file a petition to make special in an application filed before the effective date by complying with the previous guidelines and requirements in MPEP § 708.02 (I–II, and V–XII). A petition to make special filed after the effective date will only be granted if it is based upon applicant's health or age or is under the PPH pilot program, or if it complies with the requirements set forth in this notice. See Part VIII, for more information on eligibility.

*Part I. Requirements for Petitions to Make Special under Accelerated Examination:* A new application may be granted accelerated examination status under the following conditions:

(1) The application must be filed with a petition to make special under the accelerated examination program accompanied by either the fee set forth in 37 CFR 1.17(h) or a statement that the claimed subject matter is directed to environmental quality, energy, or countering terrorism. *See* 37 CFR 1.102(c)(2). Applicant should use form PTO/SB/28 for filing the petition.

(2) The application must be a non-reissue utility or design application filed under 35 U.S.C. 111(a).

(3) The application, petition, and required fees must be filed electronically using the USPTO's electronic filing system (EFS), or EFS-Web. If the USPTO's EFS and EFS-Web are not available to the public during the normal business hours for these systems at the time of filing the application, applicant may file the application, other papers and fees by mail accompanied by a statement that EFS and EFS-Web were not available during the normal business hours, but the final disposition of the application may occur later than twelve months from the filing of the application. *See* Part VIII (subsection The Twelve-Month Goal) for more information.

(4) At the time of filing, the application must be complete under 37 CFR 1.51 and in condition for examination. For example, the application must be filed together with the basic filing fee, search fee, examination fee, and application size fee (if applicable), and an executed oath or declaration under 37 CFR 1.63. *See* Part VIII (subsection Conditions for Examination) for more information.

(5) The application must contain three or fewer independent claims and twenty or fewer total claims. The application must also not contain any multiple dependent claims. By filing a petition to make special under the accelerated examination program the applicant is agreeing not to separately argue the patentability of any dependent claim during any appeal in the application. Specifically, the applicant is agreeing that the dependent claims will be grouped together with and not argued separately from the independent claim from which they depend in any appeal brief filed in the application (37 CFR 41.37(c)(1)(vii)). The petition must include a statement that applicant will agree not to separately argue the patentability of any dependent claim during any appeal in the application. See form PTO/SB/28.

(6) The claims must be directed to a single invention. If the USPTO determines that all the claims presented are not directed to a single invention, applicant must make an election without traverse in a telephonic interview. The petition must include a statement that applicant will agree to make an election without traverse in a telephonic interview. See form PTO/SB/28.

(7) The applicant must be willing to have an interview (including an interview before a first Office action) to discuss the prior art and any potential rejections or objections with the intention of clarifying and possibly resolving all issues with respect to patentability at that time. The petition must include a statement that applicant will agree to have such an interview when requested by the examiner. See form PTO/SB/28.

(8) At the time of filing, applicant must provide a statement that a preexamination search was conducted, including an identification of the field of search by United States class and subclass and the date of the search, where applicable, and for database searches, the search logic or chemical structure or sequence used as a query, the name of the file or files searched and the database service, and the date of the search.

(A) This preexamination search must involve U.S. patents and patent application publications, foreign patent documents, and non-patent literature, unless the applicant can justify with reasonable certainty that no references more pertinent than those already identified are likely to be found in the eliminated source and includes such a justification with this statement.

(B) This preexamination search must be directed to the claimed invention and

encompass all of the features of the claims, giving the claims the broadest reasonable interpretation.

(C) The preexamination search must also encompass the disclosed features that may be claimed. An amendment to the claims (including any new claim) that is not encompassed by the preexamination search or an updated accelerated examination support document (*see* item 9) will be treated as not fully responsive and will not be entered. *See* Part IV (Reply by Applicant) for more information.

(D) A search report from a foreign patent office will not satisfy this preexamination search requirement unless the search report satisfies the requirements set forth in this notice for a preexamination search.

(E) Any statement in support of a petition to make special must be based on a good faith belief that the preexamination search was conducted in compliance with these requirements. *See* 37 CFR 1.56 and 10.18.

(9) At the time of filing, applicant must provide in support of the petition an accelerated examination support document.

(A) An accelerated examination support document must include an information disclosure statement (IDS) in compliance with 37 CFR 1.98 citing each reference deemed most closely related to the subject matter of each of the claims.

(B) For each reference cited, the accelerated examination support document must include an identification of all the limitations in the claims that are disclosed by the reference specifying where the limitation is disclosed in the cited reference.

(C) The accelerated examination support document must include a detailed explanation of how each of the claims are patentable over the references cited with the particularity required by 37 CFR 1.111(b) and (c).

(D) The accelerated examination support document must include a concise statement of the utility of the invention as defined in each of the independent claims (unless the application is a design application).

(E) The accelerated examination support document must include a showing of where each limitation of the claims finds support under the first paragraph of 35 U.S.C. 112 in the written description of the specification. If applicable, the showing must also identify: (1) Each means- (or step-) plus-function claim element that invokes consideration under 35 U.S.C. 112, ¶ 6; and (2) the structure, material, or acts in the specification that correspond to each means- (or step-) plus-function claim element that invokes consideration under 35 U.S.C. 112, ¶ 6. If the application claims the benefit of one or more applications under title 35, United States Code, the showing must also include where each limitation of the claims finds support under the first paragraph of 35 U.S.C. 112 in each such application in which such support exists.

(F) The accelerated examination support document must identify any cited references that may be disqualified as prior art under 35 U.S.C. 103(c) as amended by the Cooperative Research and Technology Enhancement (CREATE) Act (Pub. L. 108–453, 118 Stat. 3596 (2004)).

*Part II. Decision on Petition To Make Special:* Applicant will be notified of the decision by the deciding official. If the application and/or petition does not meet all the prerequisites set forth in this notice for the application to be granted special status (including a determination that the search is deemed to be insufficient), the applicant will be notified of the defects and the application will remain in the status of a new application awaiting action in its regular turn. In those instances in which the petition or accelerated examination support document is defective in one or more requirements, applicant will be given a single opportunity to perfect the petition or accelerated examination support document within a time period of one month (no extensions under 37 CFR 1.136(a)). This opportunity to perfect a petition does not apply to applications that are not in condition for examination on filing. *See* Part VIII (subsection Condition for Examination). If the document is satisfactorily corrected in a timely manner, the petition will then be granted, but the final disposition of the application may occur later than twelve months from the filing date of the application. Once a petition has been granted, prosecution will proceed according to the procedure set forth below.

*Part III. The Initial Action on the Application by the Examiner:* Once the application is granted special status, the application will be docketed and taken up for action expeditiously (*e.g.*, within two weeks of the granting of special status). If it is determined that all the claims presented are not directed to a single invention, the telephone restriction practice set forth in MPEP § 812.01 will be followed. Applicant must make an election without traverse during the telephonic interview. If applicant refuses to make an election without traverse, or the examiner cannot reach the applicant after a reasonable effort, the examiner will treat the first claimed invention (the invention of claim 1) as constructively elected without traverse for examination. Continuing applications (*e.g.*, a divisional application directed to the non-elected inventions) will not automatically be given special status based on papers filed with the petition in the parent application. Each continuing application must on its own meet all requirements for special status.

If the USPTO determines that a possible rejection or other issue must be addressed, the examiner will telephone the applicant to discuss the issue and any possible amendment or submission to resolve such issue. The USPTO will not issue an Office action (other than a notice of allowance) unless either: (1) An interview was conducted but did not result in the application being placed in condition for allowance; or (2) there is a determination that an interview is unlikely to result in the application being placed in condition for allowance. Furthermore, prior to the mailing of any Office action rejecting the claims, the USPTO will conduct a conference to review the rejections set forth in the Office action.

If an Office action other than a notice of allowance or a final Office action is mailed, the Office action will set a shortened statutory period of one-month or thirty-days, whichever is longer. No extensions of this shortened statutory period under 37 CFR 1.136(a) will be permitted. Failure to timely file a reply will result in abandonment of the application. *See* Parts V and VI for more information on post-allowance and after-final procedures.

*Part IV. Reply by Applicant:* A reply to an Office action must be limited to the rejections, objections, and requirements made. Any amendment that attempts to: (1) Add claims which would result in more than three independent claims, or more than twenty total claims, pending in the application; (2) present claims not encompassed by the preexamination search (*see* item 8 of Part I) or an updated accelerated examination support document (*see* next paragraph); or (3) present claims that are directed to a nonelected invention or an invention other than previously claimed in the application, will be treated as not fully responsive and will not be entered. *See* Part VIII (subsection Reply Not Fully responsive) for more information.

For any amendment to the claims (including any new claim) that is not encompassed by the accelerated examination support document in Part I, item 9, applicant is required to provide an updated accelerated examination

support document that encompasses the amended or new claims at the time of filing the amendment. Failure to provide such updated accelerated examination support document at the time of filing the amendment will cause the amendment to be treated as not fully responsive and not to be entered. *See* Part VIII (subsection Reply Not Fully Responsive) for more information. Any IDS filed with an updated accelerated examination support document must also comply with the requirements of 37 CFR 1.97 and 1.98.

Any reply or other papers must be filed electronically via EFS-Web so that the papers will be expeditiously processed and considered. If the papers are not filed electronically via EFS-Web, or the reply is not fully responsive, the final disposition of the application may occur later than twelve months from the filing of the application.

*Part V. Post-Allowance Processing:* The mailing of a notice of allowance is the final disposition for purposes of the twelve-month goal for the program. In response to a notice of allowance, applicant must pay the issue fee within three months from the date of mailing of the Notice of Allowance and Fee(s) Due (form PTOL–85) to avoid abandonment of the application. In order for the application to be expeditiously issued as a patent, the applicant must also: (1) Pay the issue fee (and any outstanding fees due) within one month from the mailing date of the form PTOL–85; and (2) not file any post-allowance papers that are not required by the USPTO (*e.g.*, an amendment under 37 CFR 1.312 that was not requested by the USPTO).

*Part VI. After-Final and Appeal Procedures:* The mailing of a final Office action or the filing of a notice of appeal, whichever is earlier, is the final disposition for purposes of the twelve-month goal for the program. Prior to the mailing of a final Office action, the USPTO will conduct a conference to review the rejections set forth in the final Office action (*i.e.*, the type of conference conducted in an application on appeal when the applicant requests a pre-appeal brief conference). In order for the application to be expeditiously forwarded to the Board of Patent Appeals and Interferences (BPAI) for a decision, applicant must: (1) Promptly file the notice of appeal, appeal brief, and appeal fees; and (2) not request a pre-appeal brief conference. A pre-appeal brief conference would not be of value in an application under a final Office action because the examiner will have already conducted such a conference prior to mailing the final Office action. During the appeal process, the application will be treated in accordance with the normal appeal procedures. The USPTO will continue to treat the application special under the accelerated examination program after the decision by the BPAI.

Any after-final amendment, affidavit, or other evidence filed under 37 CFR 1.116 or 41.33 must also meet the requirements set forth in Part IV (Reply by Applicant). If applicant files a request for continued examination (RCE) under 37 CFR 1.114 with a submission and fee, the submission must meet the reply requirements under 37 CFR 1.111 (*see* 37 CFR 1.114(c)) and the requirements set forth in Part IV (Reply by Applicant). The filing of the RCE is a final disposition for purposes of the twelve-month goal for the program. The application will retain its special status and remain in the accelerated examination program. Thus, the examiner will continue to examine the application in accordance with the procedures set forth in Part III and any subsequent replies filed by applicant must meet the requirements of Part IV. The goal of the program will then be to reach a final disposition of the application within twelve months from the filing of the RCE.

*Part VII. Proceedings Outside the Normal Examination Process:* If an application becomes involved in proceedings outside the normal examination process (*e.g.*, a secrecy order, national security review, interference, or petitions under 37 CFR 1.181–1.183), the USPTO will treat the application special under the accelerated examination program before and after such proceedings. During those proceedings, however, the application will not be accelerated. For example, during an interference proceeding, the application will be treated in accordance with the normal interference procedures and will not be treated under the accelerated examination program. Once any one of these proceedings is completed, the USPTO will process the application expeditiously under the accelerated examination program until it reaches final disposition, but that may occur later than twelve months from the filing of the application.

*Part VIII. More Information:*

*Eligibility:* Any non-reissue utility or design application filed under 35 U.S.C. 111(a) on or after the effective date of this program is eligible for the revised accelerated examination program. The following types of filings are not eligible for this revised accelerated examination program: Plant applications, reissue applications, applications entering the national stage from an international application after compliance with 35 U.S.C. 371, reexamination proceedings, RCEs under 37 CFR 1.114 (unless the application was previously granted special status under the program), and petitions to make special based on applicant's health or age or under the PPH pilot program. Rather than participating in this revised accelerated examination program, applicants for a design patent may participate in the expedited examination program by filing a request in compliance with the guidelines set forth in MPEP § 1504.30. *See* 37 CFR 1.155.

*Form:* Applicant should use form PTO/SB/28 for filing a petition to make special, other than those based on applicant's health or age or the PPH pilot program. The form is available on EFS-Web and on the USPTO's Internet Web site at *http://www.uspto.gov/web/forms/index.html*.

*Conditions for Examination:* The application must be in condition for examination at the time of filing. This means the application must include the following:

(A) Basic filing fee, search fee, and examination fee, under 37 CFR 1.16 (*see* MPEP section 607(I)),

(B) Application size fee under 37 CFR 1.16(s) (if the specification and drawings exceed 100 sheets of paper) (*see* MPEP section 607(II));

(C) An executed oath or declaration in compliance with 37 CFR 1.63;

(D) A specification (in compliance with 37 CFR 1.52) containing a description (37 CFR 1.71) and claims in compliance with 37 CFR 1.75;

(E) A title and an abstract in compliance with 37 CFR 1.72;

(F) Drawings in compliance with 37 CFR 1.84;

(G) Electronic submissions of sequence listings in compliance with 37 CFR 1.821(c) or (e), large tables, or computer listings in compliance with 37 CFR 1.96, submitted via the USPTO's electronic filing system (EFS) in ASCII text as part of an associated file (if applicable);

(H) Foreign priority claim under 35 U.S.C. 119(a)–(d) identified in the executed oath or declaration or an application data sheet (if applicable);

(I) Domestic benefit claims under 35 U.S.C. 119(e), 120, 121, or 365(c) in compliance with 37 CFR 1.78 (*e.g.*, the specific reference to the prior application must be submitted in the first sentence(s) of the specification or in an application data sheet, and for any benefit claim to a non-English language provisional application, the application must include a statement that: (a) An English language translation, and (b) a statement that the translation is

accurate, have been filed in the provisional application) (if applicable);

(J) English language translation under 37 CFR 1.52(d), a statement that the translation is accurate, and the processing fee under 37 CFR 1.17(i) (if the specification is in a non-English language);

(K) No preliminary amendments present on the filing date of the application; and

(L) No petition under 37 CFR 1.47 for a non-signing inventor.

Furthermore, if the application is a design application, the application must also comply with the requirements set forth in 37 CFR 1.151–1.154.

Applicant should also provide a suggested classification, by class and subclass, for the application on the transmittal letter, petition, or an application data sheet as set forth in 37 CFR 1.76(b)(3) so that the application can be expeditiously processed.

The petition to make special will be dismissed if the application omits an item or includes a paper that causes the Office of Initial Patent Examination (OIPE) to mail a notice during the formality review (*e.g.*, a notice of incomplete application, notice to file missing parts, notice to file corrected application papers, notice of omitted items, or notice of informal application). The opportunity to perfect a petition (Part II) does not apply to applications that are not in condition for examination on filing.

*Reply Not Fully Responsive:* If a reply to a non-final Office action is not fully responsive, but a *bona fide* attempt to advance the application to final action, the examiner may provide one month or thirty-days, whichever is longer, for applicant to supply the omission or a fully responsive reply. No extensions of this time period under 37 CFR 1.136(a) will be permitted. Failure to timely file the omission or a fully responsive reply will result in abandonment of the application. If the reply is not a *bona fide* attempt or it is a reply to a final Office action, no additional time period will be given. The time period set forth in the previous Office action will continue to run.

*Withdrawal From Accelerated Examination:* There is no provision for "withdrawal" from special status under the accelerated examination program. An applicant may abandon the application that has been granted special status under the accelerated examination program in favor of a continuing application, and the continuing application will not be given special status under the accelerated examination program unless the continuing application is filed with a petition to make special under the accelerated examination program. The filing of an RCE under 37 CFR 1.114, however, will not result in an application being withdrawn from special status under the accelerated examination program.

*The Twelve-Month Goal:* The objective of the accelerated examination program is to complete the examination of an application within twelve months from the filing date of the application. The twelve-month goal is successfully achieved when one of the following final dispositions occurs: (1) The mailing of a notice of allowance; (2) the mailing of a final Office action; (3) the filing of an RCE; or (4) the abandonment of the application. The final disposition of an application, however, may occur later than the twelve-month timeframe in certain situations (*e.g.*, an IDS citing new prior art after the mailing of a first Office action). *See* Part VII for more information on other events that may cause examination to extend beyond this twelve-month time frame. In any event, however, this twelve-month timeframe is simply a goal. Any failure to meet the twelve-month goal or other issues relating to this twelve-month goal are neither petitionable nor appealable matters.

*Paperwork Reduction Act:* This notice involves information collection requirements which are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). The collection of information involved in this notice has been reviewed and previously approved by OMB under OMB control number 0651–0031. The Office has submitted a Change Worksheet to OMB for review of form PTO/SB/28 Petition to Make Special Under the Accelerated Examination.

Notwithstanding any other provision of law, no person is required to respond to nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a currently valid OMB control number.

Section 708.02 of the *Manual of Patent Examining Procedure* will be revised in due course to reflect this change in practice.

Dated: June 20, 2006.

**Jon W. Dudas,**

*Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. E6–10022 Filed 6–23–06; 8:45 am]

BILLING CODE 3510–16–P

## COMMITTEE FOR THE IMPLEMENTATION OF TEXTILE AGREEMENTS

## Designation under the Textile and Apparel Commercial Availability Provisions of the United States Caribbean Basin Trade Partnership Act (CBTPA)

June 21, 2006.

**AGENCY:** The Committee for the Implementation of Textile Agreements (CITA)

**ACTION:** Designation.

**EFFECTIVE DATE:** June 26, 2006.

**SUMMARY:** The Committee for the Implementation of Textile Agreements (CITA) has determined that certain 100 percent cotton, yarn-dyed, 3- or 4-thread twill weave, flannel fabrics, of combed, ring spun single yarns, of the specifications detailed below, classified in subheading 5208.43.0000 of the Harmonized Tariff Schedule of the United States (HTSUS), for use in products in Categories 340, 341, and 350, cannot be supplied by the domestic industry in commercial quantities in a timely manner. The CITA hereby designates products in Categories 340, 341, and 350 that are both cut and sewn or otherwise assembled in one or more eligible CBTPA beneficiary countries from such fabrics, as eligible for quota free and duty free treatment under the textile and apparel commercial availability provisions of the CBTPA and eligible under HTSUS subheading 9820.11.27 to enter free of quota and duties, provided that all other fabrics in the referenced apparel articles are wholly formed in the United States from yarns wholly formed in the United States.

**FOR FURTHER INFORMATION CONTACT:** Maria K. Dybczak, Office of Textiles and Apparel, U.S. Department of Commerce, (202) 482 3400.

**SUPPLEMENTARY INFORMATION:**

Authority: Section 213(b)(2)(A)(v)(II) of CBERA, as added by Section 211(a) of the CBTPA; Presidential Proclamation 7351 of October 2, 2000; Section 6 of Executive Order No. 13191 of January 17, 2001.

### BACKGROUND:

The commercial availability provision of the CBTPA provides for duty free and quota free treatment for apparel articles that are both cut (or knit to shape) and sewn or otherwise assembled in one or more beneficiary CBTPA country from fabric or yarn that is not formed in the United States if it has been determined that such yarns or fabrics cannot be supplied by the domestic industry in commercial quantities in a timely

# EXHIBIT 6

**REDACTED**