# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AFFINION LOYALTY GROUP, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MARITZ INC., | ) |
| | ) |
| Defendant. | ) |

EXPERT REPORT OF BRUCE BOLGER

## 1. Background and Qualifications

I graduated from the University of California at Santa Barbara in 1975, magna cum laude, with a double major in history and French. I first entered the incentive business in 1984, when I joined Incentive Marketing magazine as the editor. I was subsequently promoted to publisher in 1990. In 1993, I left Incentive magazine to serve as show director for the New York Premium Incentive Show until 1995. At this time, I left to start Selling Communications Inc., a media, marketing and technology company specializing in the incentive marketplace. My currriculae vitae is attached to this report as Appendix 1.

I am being compensated for my time in this matter at the rate of $250 per hour. My compensation is not contingent in any way on the outcome of this case. I have not testified as an expert at any trial or deposition in the last four years.

I have authored the following publications in the last 10 years:

Associations Can Grab the Reins, Motivation Strategies, Fall 2005 edition

The Best Days Lie Ahead, Motivation Strategies, Summer Edition, 2005

**Exhibit 5**

The Science That Supports Soft Metrics, Business Performance Management, June 2005

The Promise of People Performance Management, Spring 2005

Meetings Update Reflect Our Focus on Performance, Motivation Strategies, Winter 2005.

The Great Industry Power Shift, Motivation Strategies, December 2004

Rapid Change and Vast Opportunity, Motivation Strategies, Fall 2004

Consumer and Employee Motivation: Make the Connection, Summer 2004

10 Steps to Designing an Effective Incentive Program, Employee Relations Today, Spring 2004

2004 Show Pairing Marks New Era, Motivation Strategies, Spring 2004

Principles of Results-Based Incentive Program Design, Incentive Marketing Association, 2004.

What's Ahead for Winners and Losers, Motivation Strategies, Winter 2004

New Research Gives Planners Ammunition, Corporate and Incentive Travel, January 2004

Will New Forum Raise Barriers to Entry, The Counselor, October 2003

The Cash/NonCash Dilemma, Human Resource Executive, January 2003

How to Win at Internet Publishing, Sales Marketing Network at Info-now.com, 1999

Incentive Travel Overview, Sales Marketing Network at Info-now.com, 1999

Premium Incentive Overview, Sales Marketing Network at Info-now.com, 1999

Motivating Your Middle 60%, Sales Marketing Network at Info-now.com, 1999

Promotion Guide, Sales Marketing Network at Info-now.com, 1999

A Step-by-Step Guide to a Successful Incentive Travel Program, Sales Marketing Network at Info-now.com, 1999

Creating a Successful Premium Incentive Program, Sales Marketing Network at Info-now.com, 1999

Targeted Business Development, Sales Marketing Network at Info-now.com, 1999

Going it Alone—Individual Incentive Travel, Sales Marketing Network at Info-now.com, 1999

International Incentive Solutions, Sales Marketing Network at Info-now.com, 1999

The New Marketing, Sales Marketing Network at Info-now.com, 1999

Strategic Incentive Program Design: Critical Steps to Endure an Effective Performance Improvement System, Advertising Specialty Institute, 1998

Short Escapes in France, Fodor's 1993, 1996

Short Escapes in Britain, Fodor's 1993, 1996

Short Escapes in New York, Fodor's 1993, 1996

Short Escapes in New England, Fodor's, 1996

## 2.     Opinions

I have been asked to opine on whether certain of the asserted claims of the patents in suit—U.S. Patent Nos. 5,774,870 ("the '870 patent"--claim 1); 6,009,412 ("the '412 patent"— claims 1, 10, 18, 27, 35, and 36); and 6,578,012 ("the '012 patent"--claim 1)—are anticipated, obvious, or otherwise invalid pursuant to 35 U.S.C. sections 102 and 103. I understand that claim 29 of the '870 patent has also been asserted, but I have not been asked to opine on its validity. Analyses of other claims are not made here as I understand no other claims are presently part of the case. If that changes, I am prepared to opine as to the validity of those claims.

In conducting this analysis, I have reviewed numerous materials, including the patents-in -suit and their file histories, numerous documents produced in the case, and numerous pieces of prior art, as detailed in Appendix 2.

I have also been asked to opine on whether certain information not disclosed by the patent applicants and/or their attorneys to the United States Patent and Trademark Office ("PTO") during prosecution of the patents in suit was material to patentability.

I reserve the right to modify this report and/or offer additional testimony in light of additional evidence developed in this case, additional disclosures in interrogatory answers provided by plaintiff or third parties, contrary opinions or evidence offered by any witness, or as otherwise appropriate.

3.    **Introduction**

The '870 patent was filed Dec. 14, 1995 and issued on June 30, 1998; the '412 patent is a continuation of the '870 patent and was issued Dec. 28, 1999; and the '012 patent is a continuation of the '412 patent and issued June 10, 2003.

The three patents at issue in this case are entitled "Fully Integrated On-Line Interactive Frequency and Award Redemption Program." One of ordinary skill in the art, having fully read the specification and file histories of these patents, would view the purported invention as a system for implementing and managing an online consumer incentive program. The features of this program would include an integrated platform incorporating three systems that: 1) allow the user to make purchases through an online catalog; 2) calculate, award, and track points based upon those purchases, and; 3) allow the user to access an online award catalog and redeem points for an award.

As stated by the examiner, the '870 (parent) patent was allowed because "it is the specific embodiment of the frequency database, coupled with a product catalog, from which purchase of goods may be made, and an awards catalog, from which awards maybe redeemed, that renders the invention distinct over the prior art. Several references have been cited giving specific embodiments of electronic commerce system and incentive award programs, however, none suggest or disclose combining the features of both to create the invention of the instant application." Notice of Allowance, p. 2.

4

These elements are embodied in a variety of incentive systems prevalent well before the time of the filing of the application leading to the '870 patent. The concept of a points-based award system linked to purchases has existed for over 100 years in the form of trading stamps, which are defined as "gummed stamps given by a retailer, usually for each 10 cents of purchase, to be pasted in a saver book to accumulate 1,200 or 1,500, then redeemable for premiums presented in the stamp-company catalog." (Incentives in Marketing, George Meredith and Robert Fried, National Premium Sales Executives, 1977, pp. 308 and 482.)

This concept is also embodied in the traditional coupon plan defined by Meredith et al. as "a continuous program offering a variety of premiums for coupons, labels or other tokens from one or more products (p. 482)." A Brown & Williamson promotion that began back in 1949 rewarded customers a stamp for each pack of cigarettes purchased, redeemable for merchandise in an award catalog. These prior art incentive systems incorporated available technology to most efficiently implement these customer loyalty programs. For example, the Brown & Williamson system included a "tape-produced typewriter...used to give a personal touch to 90 types of form letters, and, more recently, the company had begun using IBM Mag Card II systems..." to send out letters to customers who had redeemed their stamps over time. These letters were customized to customers "with as personal a flavor as is possible to attain" to recognize customers for their loyalty (Meredith et al., p. 299.)

Points-based award catalogs and frequency databases were common in the early 1990s. For example, the Holiday Inn Priority Club offered an awards catalog with merchandise at least as early as 1990, which enabled frequent guests to redeem points for awards at specific point levels based on their number of stays.

Upon the advent of online services in the late 1980s and early 1990s, businesses began to move commerce operations onto online systems. This was evident in the area of e-commerce at least as early as 1990, with an online shopping service offered by Prodigy (Despite Prodigy's Shortcomings, You Can Still Reap Big Bonuses, PC Computing, vol., no. 9, p. 290, Sept. 1990). This was shortly followed by similar online shopping services offered by other proprietary networks such as AOL, Genie, and CompuServe. (U.S. News & World Report, January 24, 1994).

By 1994, a growing number of organizations were offering online shopping malls and catalogs, typically via World Wide Web services (Mall Hopping on the Internet, Network World, Oct. 10, 1994). By November of that year, some 21,700 commercial storefronts were officially registered on the Internet (Businessweek, p. 81, Nov. 14, 1994.) "In fact," the article added, "when it comes to almost anything but video on demand—electronic shopping, banking, publishing, information services—the Internet looks like the medium of choice."

As businesses moved their sales online, it was natural for incentive programs to follow. First, incentives were needed to attract customers (Power Vision and LA Online Share a Common Goal: Let Your Fingers do the Shopping, Computer Shopper, Feb. 1993, vol. 13, no. 2, p. 783.) Once the customers came, the companies had to retain them. Thus, companies began offering rewards to customers for making online purchases. (Online Shopping is Moving Out of the Gray and Into the Black, Computer Shopper, Oct. 1994, vol. 14, No. 10, p. 64.) It was anticipated that online Frequent Buyer programs, particularly those operated over the Internet, would become part of the commercial mainstream. (Is It Time for Web Surfers to Fill Out Frequent Browser Point Applications?, Adweek, November 1995.). Indeed, as corporations moved online, they brought their tried-and-true frequency programs to the internet. For example,

when Hilton Hotels launched its "Hilton Internet Concierge"—which allowed guests to "make reservations directly through their PCs" it brought its Hilton HHonors® loyalty program online as well. Welcome to HiltonNet! New Hilton Internet Concierge Rolls Out the "Virtual" Red Carpet, PR Newswire; August 21, 1995.

By early 1994, companies were testing online merchandise award catalogs in which people could view merchandise and place orders online. It was also obvious that online technology could facilitate the systems that supported incentive award catalogs, points tracking, and redemption. (Incentive, Feb. 1994, p. 23.) Before the filing of the '870 patent, companies, including defendant Maritz Inc., had developed and/or contemplated programs that included online redemption of award points. See MAR 113138-113142 (describing an "online catalog of Maritz merchandise … for immediate orders" as a redemption option), MAR 113133-113137, 108176-108182; U.S. Patent No. 5,794,210 (filed December 11, 1995) (disclosing a system in which "digital cash" is awarded in real time for on-line behavior and is immediately available for redemption online).

Moving the classic bricks and mortar frequent buyer program to the internet was an obvious development that was triggered by the emergence of viable electronic commerce platforms in the early 1990's. As recognized by the Canadian patent office in rejecting a related application: "There is nothing new about points-based incentive programs in themselves…Nor is there anything new about assembling networks of computers so as to quickly and efficiently communicate data between them…This leaves as the discovery at the heart of this application the realization that by harnessing the abilities of the Internet, certain efficiencies can be gained in the administration of a points incentive program (page 2, line 17 to page 3, line 17.) The incentive award plan itself has not changed (and, even if it had, those details would be left to the

7

professional skill of the marketing people designing it), it is now simply specifying the use of online communications instead of telephones and mail, web pages instead of paper catalogs, databases instead of paper records, and the use of software to automate a known incentive plan management method." Use of this technology would have been obvious to one of ordinary skill in the art at the time the '870 patent was filed.

4.     **Analysis**

    A.     **Legal Standards**

When conducting an invalidity analysis, it is my understanding that an issued patent carries with it a presumption of validity. Thus, one challenging the validity of that patent must present clear and convincing evidence of invalidity.

        1.     **Anticipation.**

It is my understanding that anticipation requires the presence of each and every element of the claimed invention in a single prior art disclosure. To be anticipatory, the reference must qualify as prior art under Section 102 of the Patent Act. The reference must also enable one of ordinary skill in the art to make, construct, and/or practice the claimed invention.

        2.     **Obviousness**

Title 35 U.S.C. Section 103 states that a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to one of ordinary skill to which said subject matter pertains." As opposed to anticipation, multiple references may be considered when analyzing whether an invention was obvious. When considering multiple references, there must have been a motivation to combine the teaching of those references.

Several secondary considerations may also relevant when determining whether a claimed invention would have been obvious of one of ordinary skill in the art at the time of the invention: 1) scope and content of the prior art; 2) differences between the prior art and the claims at issue; 3) level of ordinary skill in the art, and 4) secondary considerations, such as commercial success, copying, licenses, long felt need, praise and skepticism, prior failure of others, and unexpected results. These factors will be discussed in further detail below.

### 3.    Materiality

It is my understanding that there is more than one standard for determining whether a piece of prior art is material to patentability. One such standard, the "reasonable examiner" standard, dictates that a piece of art is material if a reasonable examiner would have considered such prior art important in deciding whether to allow the application. The second standard established by the PTO states that:

> [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application and,

> 1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

> 2) It refutes, or is inconsistent with, a position the application takes in: (i) [o]pposing an argument of unpatentability relied on by the Office or (ii) [a]sserting an argument of patentability."

37 C.F.R. Section 1.56.

### 4.    Claim Interpretation

It is my understanding that terms are given their ordinary and customary meaning as viewed by one of ordinary skill in the art at the time of the invention, in light of the specification and file history. Further, a patentee can act as his or her own lexicographer and define any term used in any claim. In conducting my analysis, I gave the claim language its ordinary and

9

customary meaning as understood by one of ordinary skill in the art having read the claim and the specification.

It is my understanding that the plaintiff in this matter, Affinion Loyalty Group, Inc., has not provided its positions regarding claim interpretation. Thus, which claim limitations will be disputed by the parties is left to speculation. Accordingly, I reserve the right to supplement or modify this report based on claim interpretations or other positions advanced by Affinion or rulings of the Court on matters of claim interpretation.

### 5.    The Level of Ordinary Skill in the Art

It is my opinion that one of ordinary skill in the art would be someone with approximately one to two years experience designing, selling, and/or implementing incentive programs.

## 5.    Claim 1 of the '870 Patent is Invalid as Anticipated and/or Obvious

Claim 1 provides: A system for an incentive award program, including a computer system accessible for on-line interactive communication with users, said computer system comprising:

> A first memory area for storing product catalog, said product catalog including product descriptions and product prices for each product available for purchase;
>
> A second memory area for storing an awards catalog, said awards catalog including an award description and award points value for each award; and,
>
> A frequency database storing account information for each enrolled user of said incentive award program.

It is my opinion that one of ordinary skill in the art would have understood the term "online," as used in this claim and throughout the other patents-in-suit, to mean a computer network allowing users to exchange information on a real-time basis. The term "online" was not

limited to the Internet, but included other proprietary networks, such as America Online, Prodigy, and Compuserve, as well as private commercial networks, such as Apollo and Sabre.

This definition is supported by the specification of the patents at issue. For instance, the Detailed Description of the Preferred Embodiment describes "access via an on-line provider such as AOL, CompuServe," as well as "direct access to the internet, such as via Netscape." Based on this language, it is apparent that the terms "on-line" and "Internet" were not viewed as interchangeable by the applicant.

### A. Radisson's Look to Book Program Anticipates Claim 1

One of ordinary skill in the art would understand the term "First Memory area" to mean a location for storing a product catalog, and the term "Second Memory area" to mean a separate location for storing an awards catalog—as opposed to a single memory area that stores both the products-for-sale catalog and the awards catalog.

It is my opinion that claim 1 of the '870 patent is anticipated by Radisson's "Look to Book" program, which is the commercial embodiment of U.S. Patent No. 5,483,444 (the '444 patent--priority date Oct. 26, 1993). This program was directed to an online system for awarding credits to persons who book travel-related reservations[1] and discloses every element of Claim 1 of the '870 patent.

> "A first memory area for storing product catalog, said product catalog including product descriptions and product prices for each product available for purchase"

The "Look to Book" program offered travel agents a catalog of products for sale available in the "Travel Reservations Network" (col. 3, line 13-col. 4, line 13). Travel agents were provided with rate information and sell capabilities directly from Radisson's *Pierre* reservation system. (CC 004546 et seq.).

---

[1] The commercial embodiment of the '444 patent is the "Look to Book" travel agent incentives program developed by Radisson Hotels International (col. 3, lines 7-11.)

"A second memory area for storing an awards, said awards catalog including an award description and award points value for each award"

Travel agents enrolled in the "Look to Book" program were provided with paper and electronic versions of a catalog containing awards the travel agents could receive by redeeming their earned points. (CC 004568-4583; TRL-MTZ 44088-93). The electronic award catalog contained award descriptions and point values required for redemption. (TRL-MRZ 44088-93).

"A frequency database storing account information for each enrolled user of said incentive award program"

The "Look to Book" program also utilized a frequency database for storing and managing award accounts that included a method of calculating and issuing credits based on purchases (col. 4, line through col. 5, line 16). Travel agents could enroll on-line simply by including their name in the "SI" field when making their first Radisson reservation. (CC 004545). Thereafter, the agent could enter that same information in the "SI" field when making reservations and the "Look to Book" program would automatically calculate and award points to the agent's account. This allowed enrolled travel agents to "focus on [their] clients while [Radisson] track[ed] your points" (TRL-MTZ 44088; CC 004561).

It is my opinion that the "Look to Book" program discloses the subject matter of Claim 1 of the '870 patent in sufficient detail to enable one of ordinary skill in the art to make and use the claimed system without undue experimentation.

## B. Claim 1 Would Have Been Obvious to One of Ordinary Skill in the Art

Even if the "Look to Book" program were not anticipatory, it is my opinion that the subject matter of Claim 1 would have been obvious to one of ordinary skill in the art. As discussed above in the introduction, and, as recognized by the examiner in the notice of allowance, the concepts of e-commerce (online product catalogs) and consumer incentive

programs (frequency database and award catalogs) were not new in 1995. These three elements are disclosed in numerous prior art references, each of which are in the e-commerce and/or incentive program fields of art.

For example, a memory area for storing an online product catalog containing product descriptions and prices is found in the following references: (1) the "Look to Book" program— see, for example, CC 004546, TRL-MTZ 44088-93, '444 patent col. 3, lines 32 to 49; (2) U.S. Patent No. 5,592,378 patent ("the '378 patent")—see, for example, col. 2, line 37-col. 3, line 19; col. 14, lines 1-6; (3) U.S. Patent No. 5,710,887 patent—see, for example, col. 3, lines 18-26; col. 7, lines 7-16; col. 10, line 56-col. 11, line 3; (4) U.S. Patent No. 5,724,424 patent ("The '424 patent")—see, for example, col. 3, lines 13-25; col. 4, lines 53-56.

As discussed above in the introduction, award catalogs have been known in the incentive business since the advent of trading stamps over 100 years ago. Storing these catalogs in a computer memory area would have been obvious to one of ordinary skill in the art. In fact, the following references show award catalogs stored in a computer memory area: (1) The "Look to Book" program —see for example, TRL-MTZ 44088-44092; (2) Incentive, Feb. 1994, p. 23 ("the Quinn Article"), discussing "a merchandise catalog where users can view images of items and place orders online."

Frequency databases that store customer information and point balances have also been known in the incentive business for decades. Such databases are specifically disclosed in: (1) U.S. Patent No. 5,025,372 – see for example col. 1, l. 10 – col. 6, l. 55; (2) the "Look to Book" program—see, for example, TRL-MRZ 44089-93, CC 004545, CC 004561, '444 patent col. 4, line 15-col. 6, line 17; (3) '887 patent—see, for example, col. 3, lines 25-29; col. 7, lines 7-53; col. 27, line 60-col. 28, line 10.

It is my opinion that one of ordinary skill in the art would have been motivated to combine these well known concepts. In order to operate any type of purchase-based incentive program, these functions go hand-in-hand: it is necessary to have a means for people to make purchases; a means to track points or credits earned based on those purchases, and a means of offering awards that can be obtained with those points or credits. These three functions have been combined since the earliest days of the trading stamps. As discussed above, as new technology developed, the means of performing these functions evolved accordingly.

Additionally, the motivation to combine these functions can be found in numerous other prior art references, including:

1) A November 1995 Adweek article on Frequent Buyer Programs, in which Michael Schrage wrote, "Every enterprise that offers loyalty programs is well-positioned to bring them to the Net."

2) An article discussing the "Look to Book" program in the August 1995 edition of CIO magazine, which stated: "Radisson recently began offering similarly convenient online booking directly to potential guests" through an Internet Web page.

3) A September 1995 Cyberspace Malls promotion offering users a product directory from which they could purchase products and participate in a frequent buyer club wherein each dollar spent on the site earned one point that could be redeemed for gifts (Catalog Age, Sept. 1, 1995, p. 80.) Cyberspace Malls Inc. filed a trademark application related to this system on March 23, 1995. The claimed first use in commerce was the same day. See U.S. Trademark Application No. 74650191.

4) An article in the Nov. 28, 1995 edition of Newsbytes discussing Prodigy's Internet shopping mall and its ability to track a shopper's history and enabling "Prodigy and its participating retail partners to develop special sales incentive programs and electronic coupons."

5) The '378 patent (filing date Aug. 19, 1994) describing an online computerized order entry system and method operating over a TCP/IP (Transmission Control Protocol/Internet Protocol) network combined with incentive promotions. Specifically, the '378 patent discloses a product catalog storing products and descriptions of those products (cols. 2 and 3, Summary of the Invention; col. 5, lines 1-26; col. 14, lines 26-47, and Figures 2, 18, and 19). This patent further discloses the use of incentives, including "product-to-product cross sell, free gifts, dollar or percentage off a line item, the order, the shipping or the handling coupons, a gift, a coupon, a discount, a payment type discount, a shipment service level discount, and shipping and handling discount" (col. 20, lines 7-19).

6) The '887 patent (filing date Aug. 29, 1995) disclosing an online computer system and method for electronic commerce combined with the use of coupons and "Frequent Buyer Incentives" (col. 27, line 60 to col. 28, line 17.) It also discloses the use of a frequency database in connection with operating a frequent buyer promotion (col. 3, line 25-29; col. 4, lines 49-51; col. 7, lines 17-22; col. 9, line 62-col. 10, line 2; col. 27, line 60 to col. 28, line 17). Information stored in this database includes name, address, methods available to the participant for payment, and points issue in frequent buyer programs. *Id.*

7) U.S. Patent No. 5,794,210 ("the '210 patent" – filed December 11, 1995) discloses a system for rewarding participants with "digital cash" for reviewing online advertisements sent via e-mail. (Abstract, col. 10, ll. 9 – 57). Participants could then redeem their "digital cash" for "positively priced information," such as music, magazines, and newspaper articles. *Id.*

15

It is therefore my opinion that the subject matter of Claim 1 of the '870 patent would have been obvious to one of ordinary skill in the art in light of any combination of the disclosures of the references discussed above.

> ### C. The Applicant Failed to Disclose the Correct Inventorship of the Patent to the PTO and the Patent is Therefore Invalid Under Section 102(f)

It is my understanding that one is not entitled to a patent if "he did not himself invent the subject matter sought to be patented." It is my opinion that the sole named inventor of the '870 patent did not invent the subject matter of claim 1 himself.

As discussed above, it is my opinion that the "Look to Book" program anticipates Claim 1 of the '870 patent. The sole named inventor of the '870 patent, Mr. Thomas Storey, is also listed as an inventor of the '444 patent, the commercial embodiment of which is the "Look to Book" program. The '444 patent also lists four other individuals, Mr. Scott Heintzman, Ms. Barbara Monsoon, Mr. Steven Medina, and Mr. Gregory Malark, as inventors. Because the subject matter of the '444 patent and Claim 1 of the '870 patent are identical, it is my opinion that the '870 patent is invalid pursuant to 35 U.S.C. Section 102(f) for failure to name all of the correct inventors.

### 6. The '412 patent

### A. Claims 1, 18, and 35

Claim 1 of the '412 patent provides: A method for implementing an on-line incentive program, said method comprising the steps of:

> providing an Internet webpage accessible to at least one user, via a computer system, for on-line interactive communications between said user and said Internet webpage;
>
> offering, on said Internet webpage, at least one product for sale to said user,

determining whether said user qualifies for one or more award points based on said user's response to purchase said at least one product;

calculating said award points according to a preprogrammed formula if said user qualifies for said award points, and

issuing said award points to an account of said user if said user qualifies for said award points, wherein said award points are redeemable by said user for an award.

### 1. Plaintiff's Apparent Claim Construction Would Render Claim 1 Anticipated by the '887 Patent

It is my opinion that, if plaintiff's apparent claim construction is adopted by the Court, Claim 1 of the '412 patent would be anticipated by the '887 patent. As discussed above, the '887 patent discloses a computer system and method for an electronic commerce system supporting a points-based frequent buyer program. The '887 patent discloses each and every element of Claim 1 of the '412 patent.

"providing an Internet webpage accessible to at least one user, via a computer system, for on-line interactive communications between said user and said Internet webpage"

The system disclosed in the '887 patent provides an Internet webpage that is accessible by a customer using a World Wide Web browser application and allows the customer to interact with the system via a TCP/IP connection. See, for example, fig. 2 (Customer Contact System); col. 12, lines 1-28. A customer can enter the "electronic mall" disclosed in the '887 patent via this "user interface" and interact with the system. See, for example, Fig. 1, col. 6, ll. 26 – 57.

"offering, on said Internet webpage, at least one product for sale to said user"

Customers visiting the '887 patent's "electronic storefront" via the "user interface" may purchase products offered sale through the Customer Contact System (col. 3, lines 19-26; col. 6, l. 4 – col. 7, l. 63, col. 10, line 56- col. 11, line 3; col. 12, ll. 1 – 28, 34 – 42).

"determining whether said user qualifies for one or more award points based on said user's response to purchase said at least one product"

The '887 patent also discloses a point-based frequent buyer program based on purchases made through the system (col. 27, line 60-col. 28, line 17). According to these programs, points are issued to a customer's frequent buyer account rather than instantaneous price discounts. *Id.* Users may redeem these points at various levels to receive awards. Inherent in such a program is a method for determining whether the customer qualifies for award points based on his or her purchase. Otherwise, there would be no process by which the user could accumulate points in his or her frequent buyer account.

"calculating said award points according to a preprogrammed formula if said user qualifies for said award points"

As stated above, the points based frequent buyer program disclosed in the '887 patent issues points to a user's frequent buyer account. Inherent in such a program is a method by which those award points are calculated following the user's purchase.

"issuing said award points to an account of said user if said user qualifies for said award points, wherein said award points are redeemable by said user for an award"

One of ordinary skill in the art, having read the specification and file history of the '412 patent, would understand that this claim limitation requires that points be issued to the user's account immediately upon completion of the user's purchase transaction. In the specification, the applicant specifically distinguished the '412 patent from the prior art that allowed processing time before awarding points:

> However, while such programs may enhance the selection of prizes, there is still the problem of obtaining the credit instrument for redeeming the awarded points. In addition, the enrollee must allow for processing time before the bonus points are recorded and made available as redeemable credit. Thus, the immediacy effect of the reward is lacking in these conventional incentive programs. Col. 1, ll. 51 – 59.

> Another advantage of the subject invention is that it awards bonus points immediately upon purchase of a (*sic*) merchandise. Col. 2, ll. 3 – 5.

One of ordinary skill in the art would also read this claim limitation as requiring that the issued points be immediately available for redemption. Again, the applicant repeatedly stated that this was an important element of the invention:

> The present invention is further advantageous in that it provides bonus points which are immediately made available for redemption.

> Another advantage of the present invention is that it allows the customer to select a prize immediately upon award of the bonus points.

> A further advantage of the present invention is that it allows a customer to order a prize and redeem the awards points towards the ordered prize immediately upon the award of the bonus points, thus enhancing the immediacy effect of the reward program.

Col. 2, ll. 6 – 17. Accordingly, this claim requires that points be immediately issued and available for redemption upon completion of a qualifying transaction through the claimed Internet webpage ("the immediacy effect").

It appears that plaintiff will argue that this claim does not require the immediacy effect and thus covers any system awarding points that are redeemable for an award. Under this interpretation, which I believe to be incorrect, the '887 patent would anticipate Claim 1. As discussed above, the system of the '887 patent issues points to a user's frequent buyer account based on purchases made by the user from the electronic store front. Col. 27, line 60-col. 28, line 17. The user is then able to redeem those points at various levels to obtain actual price discounts on later purchases. Accordingly, if this claim element is construed not to require that the points be awarded immediately and be immediately available for redemption, the '887 patent discloses every element of Claim 1.

Further, were plaintiff's apparent (albeit incorrect) claim construction to apply and hence Claim 1 be anticipated by the '887 patent, it is my opinion that the '887 patent discloses the

subject matter of Claim 1 of the '412 patent in sufficient detail to enable one of ordinary skill in the art to make and use the claimed system without undue experimentation.

**2. Claim 1 Would Have Been Obvious to One of Ordinary Skill in the Art**

Regardless of which interpretation is adopted, it is my opinion that the subject matter of Claim 1 would have been obvious to one of ordinary skill in the art.

a.    The '887 Patent

As discussed above, the '887 patent discloses every element of Claim 1, as properly interpreted, except the immediacy effect. But this immediacy effect would have been obvious to one of ordinary skill in the art based on the disclosures contained in the '887 patent.

According to the '887 patent, once a customer selects a product to purchase through the Internet webpage, the system arranges for immediate payment. First, the system queries the customer for a payment method, such as the type of credit card (i.e. Visa) to be used. The system then obtains the information necessary to perform a credit check of the user, including name, address, amount of the transaction, etc. After obtaining this information, the system connects to a "Payment Handler," which authorizes the transaction through an external payment network, such as VISAnet. Col. 12, ll. 34 – 65.

It would have been obvious to one of ordinary skill in the art to award points to the user's frequent buyer program immediately upon authorization of the credit transaction as required by Claim 1 of the '412 patent. Once the sponsoring company has received payment, there would be no reason to delay the issuance of points to the user's account. In fact, in Figure 5, the incentive program used by the '887 patent is directly linked to both the electronic storefront and the "payment handler." Immediately issuing the points to the user's frequency account would be known by one of ordinary skill in the art to increase the motivational effect of the program due to

20

the impact instant gratification has on the user. In other words, it was known throughout the incentives industry that the faster the user receives the award, the more motivational the incentive program would be. Using this knowledge, and the teachings of the '887 patent, it is my opinion that Claim 1 of the '412 patent would have been obvious to one of ordinary skill in the art.

b.    The '887 Patent and U.S. Patent No. 5,794,210

The '887 patent, as discussed thoroughly above, discloses every element of Claim 1, as properly construed, except the immediacy effect. U.S. Patent No. 5,794,210 ("the '210 patent" filed December 11, 1995[2]) discloses a system by which users are awarded "digital cash," in the form of "cyber coins," for viewing advertisements over the Internet. Known as "attention brokerage," this system provides consumers with an incentive, or "digital cash," to review advertising materials offered by participating merchants. See col. 10, ll. 39 – 57. This digital cash can be delivered over a computer network, such as the Internet, to the user's personal computer. See claim 26, col. 23, ll. 52 – 54. In addition, this delivery can be effectuated in "real time," or immediately upon the user's review of the advertisement, and can then be redeemed by the user for "positively priced information," such as music, magazines, or newspaper articles. See Claim 29, col. 10, ll. 9 – 38.

It is my opinion that one of ordinary skill in the art would have been motivated to combine the teachings of these two pieces of prior art. This motivation can be found in the experience of one of ordinary skill in the art and from the specific teachings of the art. Both references disclose e-commerce systems using incentives to influence the user's behavior.

c.    The "Look to Book" Program / The '444 Patent

---

[2] The inventor of the '210 patent, Mr. Nat Goldhaber, filed a trademark application related to the system disclosed in the '210 patent on February 19, 1993. See Application Serial No. 74/360345, MAR108745-108755; MAR 108243-108263.

The "Look to Book" program and '444 patent are described thoroughly above with reference to Claim 1 of the '870 patent. There are only two elements of Claim 1 of the '412 patent not specifically disclosed by this program: (1) offering a product for sale through an Internet Web page; and (2) points being immediately available for redemption upon completing an online transaction. However, implementing these features in light of the "Look to Book" program and the '444 patent would have been obvious to one of ordinary skill in the art.

Though it does not utilize an Internet webpage, the Look to Book program does disclose offering travel products for sale through an online system using a computer-based display by which the travel agent can access the system (TRL-MTZ 44088-89.) One of ordinary skill in the art at the time would have known that the Internet would provide a more convenient and accessible platform for managing an online incentive program such as "Look to Book" than would proprietary networks. Thus, it would have been obvious to one of ordinary skill in the art use the technological features of the Internet in implementing a program such as "Look to Book."

The Look to Book program also awarded points to the travel agent's frequency account immediately after the agent made a reservation. Col. 4, l. 16 – col. 5, l. 44. But these points were not available for redemption until after the guest completed the reservation (i.e. stayed in the hotel and paid for the room). Col. 5, ll. 34 – 44. One of ordinary skill in the art would realize the purpose of this delay period to be to ensure that points could not be redeemed before the sponsoring merchant received payment for the reservation. One of ordinary skill in the art would have known that, if the program was structured such that payment was received immediately upon the user's making of the reservation, there would be no reason to provide a delay period before the user's earned points could be redeemed. By eliminating the delay period,

22

the points would be immediately available for redemption. It is therefore my opinion one of ordinary skill in the art, using his or her own knowledge and the teachings of the "Look to Book" program, would have found the subject matter of Claim 1 obvious.

        d.    <u>The '887 patent and the "Look to Book" Program</u>

Both of these systems are described in thorough detail above. One of ordinary skill in the art, using the Internet, points based frequent buyer program, and credit card authorization teachings of the '887 patent and the online frequent buyer program of the "Look to Book" program would have found the subject matter of Claim 1 obvious.

One of ordinary skill in the art would have been motivated to combine the teachings of these two references. Specifically, both references relate to e-commerce systems in which users earn and accumulate points that are redeemable for an award in a frequent buyer program. The '887 patent also speaks to combining proprietary networks, such as AOL and Compuserve, with Internet based commerce. '887 patent, col. 7, ll. 57 – 63 ("For example, existing commercial services having proprietary electronic storefronts (e.g. Amerca Online or Compuserve's home shopping forums) will probably want to continue to use those storefronts even if they become networked into a broader electronic commerce architecture provided by this invention").

Additionally, the motivation to move consumer-based incentive programs from a proprietary online network (or paper for that matter) to the Internet was specifically disclosed in numerous references, including:

1) The '887 patent itself, which, as discussed above, discloses the sale of products over an Internet Web page in combination with a frequent-buyer program and the desire to incorporate existing proprietary networks into the system.

2) A September 1995 Cyberspace Malls Internet promotion offering users an online product directory from which they could purchase products and participate in a frequent buyer club wherein each dollar spent on the site earned one point that could be redeemed for gifts (Catalog Age, Sept. 1, 1995, p. 80.; Cyberspace Malls TM Registration).

3) The Quinn Article, discussing the use of online award catalogs.

It is therefore my opinion that one of ordinary skill in the art would have been motivated to combine the teachings of the '887 patent and the "Look to Book" program and that this combination renders the subject matter of Claim 1 of the '412 patent obvious.

e.     The '887 Patent, "Look to Book" program, and the '210 Patent

The combination of the '887 patent and the Look to Book program is discussed directly above. The '210 patent, as discussed above, discloses the ability to immediately issue "digital cash" to the user's account upon the user viewing an advertisement on an Internet page. The user can then redeem this "digital cash" for "positively priced information," such as magazines, newspaper articles, or music.

The combination of these three pieces of art would have rendered the subject matter of Claim 1 of the '412 patent obvious to one of ordinary skill in the art. One of ordinary skill in the art would have been motivated to combine these references for the reasons discussed above.

By adding the immediacy effect taught by the '210 patent to the e-commerce and frequent buyer program teachings of the '887 patent and the "Look to Book" program, one of ordinary skill in the art would have known such programs could issue points immediately and allow immediate redemption. Accordingly, the subject matter of Claim 1 of the '412 patent would have been obvious to one of ordinary skill in the art and is therefore invalid.

Claim 18 has all of the same limitations as Claim 1, except that Claim 18 is a system claim, whereas Claim 1 is a method claim. Claim 35 also contains the same limitations as Claim 1 except that it refers to the software for performing the steps of the method of Claim 1. Each of the prior art patents discussed above include computer systems and software for managing their methods. Accordingly, it is my opinion that Claims 18 and 35 are also invalid for the reasons discussed above.

**B.**     **Claims 10, 27, and 36**

Claim 10 provides: A method for redeeming incentive awards in an on-line incentive program, said method comprising the steps of:

> implementing an on-line incentive program that issues award points to users, wherein said award points are redeemable by said user for an award;
>
> implementing an Internet webpage accessible, via a computer system, to a least one user of said on-line incentive program for on-line interactive communications between said user and said Internet webpage;
>
> offering, on said Internet webpage, at least one redeemable award available to said user for exchange of said award points, and
>
> permitting said user to initiate a process to receive said at least one redeemable award for exchange of said award points issued to said user through said on-line incentive program.

One of ordinary skill in the art at the time of the invention would have understood the language "implementing an online incentive program" to mean implementing a program which rewards users for on-line activity. In the context of the '412 patent, the specification makes plain that this online activity can only be the online purchase of products. In other words, the "incentivized" behavior is the online purchase of products.

This understanding finds support in the claim language itself. According to the claim, the online incentive program "issues award points to users, wherein said award points are

redeemable by said user for an award." One of ordinary skill in the art would read this language as requiring that these award points be issued in response to some online behavior. In light of the specification, it is clear that this behavior is the online purchase of products.

For example, the patent is titled "Fully Integrated On-Line Interactive Frequency and Award Redemption Program." The specification repeatedly refers to an online catalog and product home page through which consumers may purchase goods. The specification also makes clear that the claimed incentive program is designed to induce loyalty with respect to purchases through the online system. *See, e.g.,* Abstract, col. 2, lines 4-6; fig. 1; fig. 2; fig. 3; col. 3, line 13-col. 5, line 58.) In fact, the specification does not refer to any other behavior to be 'incentivized' other than purchases made through the online catalog.

This construction finds further support in the prosecution history of the patents-in-suit. As the examiner of the '870 stated in the Notice of Allowance:

> it is the specific embodiment of the frequency database, coupled with a product catalog, from which purchase of goods may be made, and an awards catalog, from which awards maybe redeemed, that renders the invention distinct over the prior art. Several references have been cited giving specific embodiments of electronic commerce system and incentive award programs, however, none suggest or disclose combining the features of both to create the invention of the instant application.

'870 patent, Notice of Allowance, p. 2. Further, in the Notice of Allowance for the '012 patent, the examiner stated that an online awards catalog was present in the art, citing the Quinn article, but that there was no motivation to combine that teaching with references disclosing an online product catalog. '012 patent Notice of Allowance, p. 2. Thus, according to the examiner, online redemption alone was known in the art before the filing date of the patents-in-suit and the only reason these claims were allowed was the specific combination of such an awards catalog with a product catalog and frequency database. Knowing this, and having read the specification, one of

ordinary skill in the art would understand the claim element "implementing an online incentive program" as requiring the online purchase of goods by the user.

It is also my opinion that, as discussed in more detail above, one of ordinary skill in the art would also understand that the "online incentive program" must immediately issue award points to a user upon completion of an online purchase, and that those award points must be immediately redeemable by the user for an award (the "immediacy effect").

### 1. Under Plaintiff's Apparent Claim Construction, The '887 Patent Would Anticipate Claim 10

It is my opinion that the '887 patent would anticipate plaintiff's apparent construction of Claim 10 of the '412 patent in that, as discussed above, it utilizes Internet Web pages; implements an online incentive program awarding points for the online purchase of products; and offers awards in exchange for those award points. The only additional requirement of Claim 10 is that the user must be able to "initiate a process to receive said at least one redeemable award for exchange of said award points issued to said user through said on-line incentive program." This feature is disclosed in the '887 patent in that it discloses online redemption where "customers may redeem points at various levels to obtain actual price discounts" for future in-store purchases (col. 37, line 60-col. 28, line 18.)

Again, it appears that plaintiff will argue this claim does not require the immediacy effect. This contention is addressed above and will not be repeated here. Under such a claim construction argument, the '887 patent would be anticipatory because every element of the claim is found in the '887 patent. However, if, as I believe to be the case, the immediacy effect is required, Claim 10 of the '412 patent would not be anticipated by the '887 patent.

It also appears that plaintiff will argue that the claim term "implementing an online incentive program" does not require the online purchase of products. Instead, it will apparently

27

contend that Claim 10 requires only online redemption. Under such an interpretation, Claim 10 would be anticipated by the '887 patent. As discussed above, the '887 patent discloses every element of this claim (including the issuance and redemption of points, even under plaintiff's apparent interpretation) including the online purchase of products. Removing this step would still render the claim anticipated by the '887 patent.

### 2. Maritz Developed the Idea of an Online Award Catalog and Online Redemption Before the Effective Filing Date of the '412 Patent

As evidenced by the Quinn article, Maritz was testing an online award catalog at least as early as February 1994 ("*Interactive award catalogs ... Maritz is testing a merchandise catalog where users can view images of items and place orders online*"). By October 1995, Maritz was developing its "GoldMail" program. See MAR 113139-113142; MAR 113133-113137; MAR 108176-108182; MAR 108745-108755).

> "implementing an online incentive program that issues award points to users, wherein said award points are redeemable by said user for an award"

The Goldmail program was an "online incentive program," as per plaintiff's expected argument that this claim requires only online redemption. The Goldmail program is also an "online incentive program" according to my interpretation of that claim language in that it rewarded users for reading advertisements online (i.e. the activity being "incentivized" was occurring online). See MAR 113139-113142; MAR 113133-113137; MAR 108176-108182; MAR 108745-108755

Pursuant to this program, users were sent e-mail advertisements and were awarded incentives for reading the advertisement. *Id.* These incentives included award credits issued to the user's account. MAR 113136, MAR 113140, MAR 113141. Thus, the program issued award points to the user's account, said credits being redeemable for an award.

28

"implementing an Internet webpage, via a computer system, to at least one user of said online incentive program for online interactive communications between said user and said Internet webpage"

The Goldmail program also used an Internet webpage that was accessible by the user for interactive, online communication. Users of the Goldmail program could enroll over a World Wide Webpage via the Internet (MAR 113135, 113139) and could click on hyperlinks enclosed in e-mailed advertisements that were "hotlinks" to the webpages of particpating merchants.

"offering, on said Internet webpage, at least one redeemable award available to said user for exchange of said award points" and "permitting said user to initiate a process to receive said atleast one redeemable award for exchange of said award points issued to said user though said online incentive program."

Goldmail participants were provided with an incentive, such as award credits, for every advertisement they read. One method by which Maritz contemplated users redeeming these incentives was through "[a]n online catalog of Maritz merchandise … for immediate orders." MAR 113140, MAR 113117, MAR 113140. Thus, the Goldmail system offered awards online for the exchange of award credits and permitted the user to initiate a process for exchanging those points through an online catalog. Based on these documents, it is clear that Maritz developed the idea of online redemption before the patents-in-suit were filed.

### 3.    Claim 10 Would Have Been Obvious to One of Ordinary Skill in the Art

Even if Claim 10 is not anticipated by the '887 patent, it would have been obvious to one of ordinary skill in the art at the time of the effective filing date of the '412 patent.

#### a.    The "Look to Book" Program and the '887 Patent

As discussed above, the '444 patent and '887 disclose online incentive programs that award points to a user's account that may be redeemed for awards. Though redemption did not occur online, the '444 patent utilized an online catalog that users could view. TRL-MTZ 44088-93. The '887 patent did offer customers the ability to "redeem points at various levels to obtain

29

actual price discounts" in subsequent Internet shopping sessions, though not through a separate online awards catalog. Col. 27, ll. 60 – 67.

As discussed above, one of ordinary skill in the art would have been motivated to combine the teachings of these two references. One of ordinary skill in the art, using these teachings, would have found the subject matter of Claim 10 obvious.

      b.    The Quinn Article and the "Look to Book" program or the '887 Patent

The disclosures contained in the "Look to Book" program and the '887 patent are discussed at length above. The specific concept of online redemption through online award catalogs was also known in the industry before the time of filing. In the Quinn article, the author highlighted that online merchandise award catalogs "where users can view images of items and place orders online" were being tested in the incentive industry at least as early as February 1994.

Because all of these references relate to incentive programs, and specifically loyalty based frequent buyer programs, one of ordinary skill in this art clearly would have been motivated to combine the teachings of each. Based on the combination of the Quinn article and the "Look to Book" program or the '887 patent, one of ordinary skill in the art would have found the subject matter of Claim 10 obvious.

Claim 27 has the same limitations as Claim 10, except that Claim 27 refers to a computer readable medium for performing the steps of Claim 10. Claim 36 also contains the same limitations as Claim 1 except that it refers a computer system for performing the steps of the method of Claim 10. Each of the references discussed above include computer systems and software for managing their methods. Accordingly, it is my opinion that Claims 27 and 36 are also invalid for the reasons discussed above

**7.    The '012 Patent**

Claim 1 provides: system for an incentive award program, including a computer system

accessible for on-line interactive communication with users, said computer system comprising;

a microprocessor comprising:

a first memory area for storing a product catalog, said product catalog including product
descriptions and product prices for each product available for purchase;

a second memory area for storing an awards catalog, said awards catalog including an
award description and award points value for each award; and

a frequency database storing account information for each enrolled user of said incentive
award program; and

a display for browsing at least one of said product catalog and said awards catalog.

This claim adds only two limitations to Claim 1 of the '870 patent: 1) a microprocessor,

and 2) a display for browsing the product catalog and the awards catalog.[3] The term

"microprocessor" appears no where in the specification of the '012 patent. It is my

understanding that another expert is opining on the meaning of this claim term and its impact on

the validity of this claim.

Because of the similarities between Claim 1 of the '870 patent and Claim 1 of the '012

patent, the examiner rejected Claim 1 of the '012 patent for double-patenting over the '870 patent.

The applicant filed a terminal disclaimer, after which the examiner allowed the claims to issue.

As the examiner stated in the Notice of Allowance, the addition of these elements in Claim 1

differed from Claim 1 of the '870 patent "only in adding an obvious limitation to a means/display

for browsing the product catalog/database." '870 Patent Notice of Allowance, page 2.

Not only would addition of a display have been obvious in light of the '870 patent, it also

would have been obvious to one of ordinary skill in the art using common knowledge of the

---

[3] The remaining limitations to this claim are identical to Claim 1 of the '870 patent; thus, the analysis above is
equally applicable to this claim.

industry. A display would be required in order for a user to view a product catalog online or to review the awards catalog online.

Use of a display allowing a user to view a product catalog or awards catalog is also found in numerous pieces of prior art. For example, the '378 patent discloses the use of pages by which a user can view a product catalog (col. 14, line 22-60; fig. 19). The '887 patent also teaches such a display (col. 3, lines 5-17). Radisson's "Look to Book" program provided users with a display for reviewing a product catalog (TRL-MTZ 44088-44092). Quinn also discloses an online award catalog "where users can view images of items and place orders online" (Incentive, Feb. 1994, p. 23.)

Every limitation of this claim is found in these analogous pieces of prior art. As discussed above, one of ordinary skill in the art one would have been motivated to combine these teachings. Accordingly, this claim is invalid as obvious.

8.    **Secondary Considerations**

It is my understanding that certain "secondary considerations" may be considered in assessing obviousness. The party seeking to rely on such considerations must establish a "nexus" between the evidence and the merits of the claimed invention.

One secondary consideration is commercial success, that is, success that is due to the claimed features of the invention, as opposed to factors such as advertising and marketing. Though it appears that substantial points have been issued and redeemed with respect to methods and systems of Netcentives and Trilegiant Loyalty, it is not clear that this commercial activity is necessarily related to the patented aspects as opposed to sales or marketing efforts. I am further aware that Netcentives entered bankruptcy and had its assets liquidated despite ownership of the rights of the patents-in-suit and licenses thereunder.

Another secondary consideration potentially relevant to obviousness is copying of the patented system. I am unaware of any evidence of copying, on the part of Maritz or any other entity.

I also understand that the existence of licenses may, with a proper nexus, be relevant to obviousness. There have been a number of licenses taken under the patents. Out of the Netcentives bankruptcy, the patents were conveyed to Trilegiant Corp., which granted a fully paid-up license to Carlson and its customers for free. I am unaware of any showing that licenses were agreed to because of an actual belief in any of the patents' validity or enforceability, or in the belief that the licensee's activity was actually covered by any claims of the patents. It would appear that licensees could have been as readily motivated by a desire to avoid costly litigation, to obtain licenses for a relatively inexpensive cost, or for some other subjective reason.

Other secondary considerations include long-felt need, that is, an industry need that remains unmet for years; prior failure of others; and unexpected results. In my view there was nothing unexpected in putting long-utilized incentive programs into an online environment. This was not a situation where the industry was experiencing difficulty applying on-line technology to the existing incentive programs of the day, or where others failed in the attempt to do the same.

Considered collectively, the secondary considerations do not work to overcome my opinions concerning obviousness.

9.    **Materiality**

   A.    **The "Look to Book" program.**

It is my understanding that the "Look to Book" program was first made public in the U.S. in September 1992 (Radisson Hotels International Press Release, "Radisson Hotels International and Visa USA Unveil World's First On-Line Frequency Program for Travel Agents," Sept. 22,

1992.) The inventors of the "Look to Book" program, including Mr. Storey (the sole-named inventor of the patents at issue), filed an application with the PTO on Oct. 26, 1993, which issued as the '444 patent on Jan. 9, 1996. They also filed an international application under the Patent Cooperation Treaty ("PCT") on May 26, 1994. That application was published on May 4, 1995, over 8 ½ months before the application that issued as the '870 patent was filed and over three years before it issued. Despite being publicly available for several years and disclosed in the U.S. and P.C.T applications, the "Look to Book" program was never disclosed to the P.T.O during the prosecution of the '870 patent.

It is my opinion that the "Look to Book" program and the PCT application that was published on May 4, 1995 were highly material to the patentability of the '870 patent. As discussed above, the "Look to Book" program anticipates Claim 1 of '870 patent and thus establishes a prima facie case of unpatentability. As also discussed above, these references render other asserted claims obvious, alone and in combination with other highly relevant pieces of prior art. And Storey's failure to name his Radisson co-inventors provides a further ground for invalidating the patents-in-suit. At a minimum, a reasonable examiner would have found these references important in deciding whether to allow the claims of the patents-in-suit.

### B.    The Chelliah patent.

The Chelliah patent was filed Aug. 29, 1995 and issued on Jan. 20, 1998. The '012 patent was filed Nov. 11, 1999, and issued June 10, 2003. It is my understanding that the Chelliah patent was disclosed to Netcentives at least as early as June 28, 2000, during litigation between Netcentives and numerous other parties. Despite being made aware of the Chelliah patent, neither Netcentives nor Trilegiant disclosed this piece of art to the PTO during prosecution of the '012 patent.

It is my opinion that the Chelliah patent was highly material to the patentability of the '012 patent. As discussed above, Chelliah discloses a system by which users can earn frequent buyer points for purchases made over the Internet as well as a display allowing users to browse a product catalog. The Chelliah patent, in combination with other art before the examiner, such as the '444 patent, establishes a prima facie case of unpatentability of Claim 1 of the '012 patent. It is also highly material to the '870 and '412 patents such that, if the applicant was aware of Chelliah during the prosecution of either of those patents, it should have been disclosed to the PTO. Clearly, a reasonable examiner would have found it important in allowing the claims of each of these patents.

Bruce Bolger
March 10, 2006

APPENDIX 1

# Bruce Bolger
## 14 Cedar Street
## Hastings on Hudson NY 10706

**1995 to Present**
**President, Selling Communications Inc.,** Irvington, N.Y., SCI is an integrated media, marketing, and technology company specializing in the incentive and promotion business.

**1993 to 1995**
**Director, Premium Incentive Show,** a division of VNU Media in New York. This is the second largest show in the incentive field.

**1984-1992**
**Editor/Publisher, Incentive Magazine,** a division of Bill Communications (now VNU). This is one of the leading publications in the incentive field.

**1978-1983**
**Publisher, Airport Press, JAJ Publishing, Pelham, N.Y.** A monthly publication covering the airline industry.

**1977-1978**
**Advertising Sales Executive, Village Voice, New York. N.Y.** A weekly newspaper covering New York City politics and lifestyle.

**1975-1976**
**Production Editor, Plastics Engineering Magazine, Society of Plastics Engineers,** Greenwich, Conn. A trade magazine covering the plastics industry.

**Industry-Related Experience/Awards**
- **President, SITE Research Foundation,** 1990-2000; research committee advisor, 2000 to present. The SITE Foundation conducts research on motivation in business.
- **Executive Director, Forum for People Performance Management and Measurement at Northwestern University,** 2002-2006. The Forum conducts research on motivation and engagement in business.
- **Named Certified Incentive Professional** by the Association of Incentive Marketing, Naperville, Ill., in 2005.
- **Named Man of the Year** by the Association of Incentive Marketing in 2004.

**APPENDIX 2**

1.  Patent No. 5,774,870 and file history
2.  File history for US Patent Appl. No. 10/420,901
3.  Patent No. 6,009,412 and file history
4.  Patent No. 6,578,012 B1 and file history
5.  Prosecution History of Canadian Application No. 2,240,424
6.  Belsie, Laurent, "On-line Shoppers; Electronic Merchants May Track Your Habits," *Christian Science Monitor* (pre-1997 Fulltext), Sept. 12, 1995
7.  Burton Patent No. 5,025,372
8.  *Business Week online*, "Cyberspace," McGraw-Hill 1991-2005
9.  Cameron Patent No. 5,592,378
10. Chelliah patent -- US Patent No. 5,710,887
11. Cyberspace malls trademark applications
12. Dearth, Jeffrey and King, Arnold, "Negotiating the Internet," *InformationWeek*, 1/9/95 Issue 509, p. 70
13. Newsbytes, "'Desktop Channel' allows Online Purchases of PC Products," The Gale Group 2/7/94.
14. "E-banking: NYNEX & Chase unveil prototype interactive payment system; companies join forces to speed development of electronic commerce," 9/25/95, The Gale Group.
15. Ellison, Carol article -- "Despite Prodigy's shortcomings, you can still reap big bonuses," 9/90 The Gale Group.
16. Gaffin, Adam article -- "Mall-hopping on the Internet," Network World 10/10/95
17. Gifford patent -- US Patent No. 5,724,424
18. Goldhaber Patent No. 5,794,210
19. Heath, Thomas article– "High Tech Hotels," *Information Week*, 4/17/95 Issue 523.
20. Heintzeman PCT WO 95/12175
21. Heintzeman Patent No. 5,483,444
22. Hill Patent No. 5,528,490
23. Hill Patent No. 5,761,649
24. Hill Patent No. 6,029,142
25. Holiday Inn Priority Club Awards Catalog
26. Iacovou, Charalambos article -- "Electronic data interchange and small organizations: Adoption and impact of technology," University of Minnesota, MIS Research Center, Dec. 1995; ProQuest Information and Learning Company
27. *Incentive* Magazine, February 1994, "The Incentive Industry Gets Smart"
28. *Information Week*, "Online Shopping Spree, 1/30/95.
29. *Interactive Age*, "How top Web Malls Stack up *Shopping* the Net," 7/17/95.

30. Kolhatkar, Sheelah article Web article – "Teleway Inc's 800-Flowers online flower-ordering service is a growing success," The Gale Group, 3/95.

31. Liebs, Scott , "Single Male Seeks Power Mac for Good Time," *NetGuide,* 5/95, Vol. 2 Issue 5.

32. Look to Book 1994 Merchandise Awards

33. MAR 108176-108182

34. MAR 108196-108235

35. MAR 108243-108263; MAR 108745-108755

36. MAR 113133-113142

37. Marley, Brian article, "NCEX launches the Desktop Channel, an interactive, online shipping network for pc products," *Business Wire* Jan. 31, 1994

38. Marsh, Barbara article -- "Peapod's On-Line Grocery Service Checks Out Success -- Customers Shop Electronic Aisles; Finicky Workers Sack the Goods," Dow Jones & Company, Inc., June 30, 1994.

39. McCarthy Patent No. 5,287,268

40. McKenna, Patrick article -- "Prodigy Building Virtual Mall on Internet," The Gale Group, 11/28/95.

41. Meredith, George, *Incentives in Marketing,* National Premium Sales Executives Education Fund 1977.

42. O'Brien, Jim article – "PowerVision and LA Online share a common goal: let your fingers do the shopping," The Gale Group.

43. O'Brien, Jim article -- "Online shopping is moving out of the gray and into the black," The Gale Group.

44. Pearson, Stewart article– "Relationship management: Generating business in the diverse," Whurr Publications Limited 1994.

45. Peterson, Laurie article -- "A Shopping Spree in Cyberspace," *Catalog Age,* September 1, 1995

46. Phillips Media Group's Interactive Marketing News, "Web Site Directories Lure More Traffic, Advertising Marketers Tap Tide for Consumer Research Data, Sales Lead," ProQuest Information and Learning Company, 5/26/95.

47. Phillips Media Group's Interactive Marketing News, "ESHOP Eases Fears About Shopping Online," ProQuest Information and Learning Company, 11/24/95.

48. "Prodigy Made Easy, 2d Edition

49. Quinn, Judy article -- "The Interactive Revolution"

50. Radisson's Look to Book documents

51. Roach Patent No. 5,310,997

52. Roach Patent 5,434,394

53. Robinson Patent No. 5,734,838

54. Rodriguez, Karen, "Andersen's Net Strategy," *Interactive Age,* 7/17/95 Vol. 2,, Issue 19.

55. Schrage, Michael article -- "Is it time for Web surfers to fill out Frequent Browser Point Applications?"

56. Schultz Patent No. 5,056,019
57. Stuart, Anne article – CIO magazine article re Look to Book program
58. Verity, John W., "Ready or Not, the Electronic Mall is Coming," The McGraw-Hill Companies Inc. 1991-2005.
59. Verity, J.W. article – "The Internet – How it will change the way you do business," *Business Week,* Nov. 14, 1994.
60. Verity, J. W. article -- "The Internet," The McGraw-Hill Companies Inc. 1991-2005.
61. Welcome to Hiltonnet!
62. Wiener, Leonard article -- "A Shopping Trip, by Computer"
59. License Agreements between Netcentives and:
    AOL
    Beenz.com
    Customer Loyalty Network
    eBay
    Enhancement Services Corporation
    Freeride.com
    MassMedium.com
    MyPoints.com
    Rewards2K.com
    Sperry and Hutchison
    WebMiles.com
    Yahoo! Inc.
    Trilegiant