IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AFFINION LOYALTY GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 04-360-JJF |
| | ) | |
| v. | ) | |
| | ) | |
| MARITZ INC., | ) | |
| | ) | |
| Defendant. | ) | |

# EXPERT REPORT OF ARTHUR M. KELLER, PH.D.



## 1. INTRODUCTION AND BACKGROUND

I have been retained by defendant Maritz Inc. ("Maritz") as an expert. In my capacity as an expert, I was asked to offer my opinion on the validity of Claims 10 through 17, 27 through 34, and 36 of U.S. Patent No. 6,009,412 ("the '412 Patent"). If additional claims are asserted, I reserve the right to opine on the validity of those additional claims as well. I am being compensated at a rate of $450/hour for research and $600/hour for testimony. My compensation is not contingent in any way on the outcome of this case.

A list of the materials I considered is attached as Appendix 1.

## 2. QUALIFICATIONS

In 1977, I received a BS *summa cum laude* from Brooklyn College (CUNY) in Mathematics and in Computer and Information Science, with honors in both majors. I received my MS in 1979 and my PhD in 1985, both in Computer Science from the Stanford University. My dissertation was on updating relational databases through views. I have authored over 70 publications, including scientific articles related to databases, programming, distributed systems, and computerized typesetting. I wrote one textbook (translated into Spanish, French, Italian, and Japanese) and its instructors' manual on computer programming. I wrote several book chapters on database management and electronic commerce. My Curriculum Vitae is attached to this report as Appendix 2.

For about thirty-four years, I have been involved in the field of computer systems, for twenty-eight years, I have been involved in the field of database systems, and for about twelve years I have been involved in the field of electronic commerce. In this regard, I have worked in both commercial and academic settings. Since 2001, I have served as Lecturer, Researcher and

Visiting Associate Professor of Computer Science at the University of California at Santa Cruz, where I have taught undergraduate and graduate courses in database management and in systems analysis and design. I am also managing partner of Minerva Consulting, where I advise a variety of companies in the fields of databases, electronic commerce, and distributed systems. Previously, I was a Senior Research Scientist of Computer Science at Stanford University for approximately 12 years. At Stanford, I was responsible for managing research groups on various aspects of database management and electronic commerce as well as teaching courses on database management. The projects I managed at Stanford include the Penguin project on object interfaces to relational databases, the Paradata project on parallel databases, and the Fauve project on distributed databases, and I was also project manager at Stanford for CommerceNet on electronic commerce catalog integration. I also collaborated with the Tsimmis project on heterogeneous database integration.

Based on my experience with the Penguin project, I served as Chief Technical Advisor and a member of the Board of Directors of Persistence Software prior to its IPO in June 1999. I provided technical advice to Persistence Software towards the development of their products, including their first product, a database access system for C++ that cached data from relational databases. Based on my work on electronic commerce, I was co-founder of Mergent Systems, which was acquired by Commerce One in January 2000. Mergent Systems integrated electronic catalogs from multiple companies through the use of database integration technology.

In the last 4 years, I have testified as an expert witness in the following cases: MercExchange v. eBay, et al., for the defense; Business Objects vs. Microstrategy, for the defense; Trilogy Software, Inc., and Trilogy Development Group, Inc. v. Selectica, Inc., and

counterclaims, for the defendant and counterclaimant; Microstrategy v. Business Objects, for the

plaintiff; and Hyperion v. OutlookSoft, for the defense of counterclaim.

## 3. LEVEL OF ORDINARY SKILL

I was asked to give an opinion as to the educational and vocational qualifications of one

of ordinary skill in the art taught by Claim 10–17, 27–34, and 36 of the '412 Patent at the time of

the invention. The '412 Patent relates to the field of electronic commerce systems and

interactive frequency and award redemption programs.

In the 1995 timeframe, a hypothetical person of ordinary skill in the art to whom aspects

of the subject claims are addressed would have had a range of knowledge roughly equivalent to

that of a person holding the degree of Bachelor of Science in Electrical Engineering, Computer

Science, or Computer Engineering with knowledge of business and database systems. In

reaching this opinion as to the qualifications of the hypothetical person of ordinary skill in the

art, I have considered the types of problems encountered in the art, the prior art solutions to those

problems, the rapidity with which innovations are made, the sophistication of the technology,

and the educational level of active workers in the field.

## 4. LEGAL STANDARDS

In formulating my opinions and conclusions in this case, I have been provided with an

understanding of the principles of United States patent law as they relate to claim interpretation

and invalidity.

I am informed that, according to basic principles of patent law, a validity determination is

a two-step process. First, the claim language must be construed to determine its scope and

meaning. Second, the construed claim must be compared to the alleged prior art to determine whether the claim is valid.

In performing my analysis of the proper interpretation to be given to the claims of the '412 Patent, it is my understanding that terms are to be given their plain and ordinary meaning, in light of the specification and file history, as viewed by one of ordinary skill in the art at the time the application was filed. In addition, a person of ordinary skill in the art has knowledge beyond what is written in the specification. This knowledge may be used to understand the meaning of claim terms. I further understand that a patentee can act as his own lexicographer and define any claim term in the specification or file history.

I am informed that under United States patent law, each claim of the '412 Patent is presumed valid and each such claim may be invalidated only by clear and convincing evidence. As explained herein, my analysis of the validity of the '412 Patent will be undertaken from the perspective of what would have been known or understood by one of ordinary skill in the art relevant to the '412 Patent in the 1995 time frame when the inventor of the '412 Patent conceived of and reduced the claimed inventions to practice. Thus, whether Claims 10–17, 27– 34, and/or 36 of the '412 Patent are anticipated, obvious, or rendered invalid by virtue of indefiniteness is determined based on an understanding of a person of ordinary skill in the relevant art.

Furthermore, it is my understanding that, in order to anticipate a patent claim under 35 U.S.C. § 102, a single asserted prior art reference must disclose each and every element of the claimed invention, either explicitly or inherently to a person of ordinary skill in the art. Also, I understand that, for a reference to be an anticipating reference, it must describe the claimed subject matter with sufficient clarity to establish that the subject matter existed and that its

- 4 -

existence was recognized by a person of ordinary skill in the field of the invention. Lastly, the disclosure contained in the piece of art must provide sufficient detail as to allow one of ordinary skill in the art to practice the claimed invention.

I am also informed and understand that even though a prior art reference does not fully anticipate a claim of a patent, a claim may, nonetheless, be rendered obvious to one of ordinary skill in the art if the differences between the subject matter set forth in the patent claim and the prior art are such that the subject matter of the claim as a whole would have been obvious at the time the claimed invention was made. In addition, it is my understanding that obviousness is a determination of law based on various underlying determinations of fact. In particular, these underlying factual determinations include (1) the scope and content of the prior art; (2) the level of ordinary skill in the art at the time the claimed invention was made; (3) the differences between the claimed invention and the prior art; and (4) the extent of any proffered objective indicia of nonobviousness. I understand that the objective indicia that may be considered in such an analysis include commercial success of the patented invention (including evidence of industry recognition or rewards), whether the invention fills a long-felt but unresolved need in the field, the failure of others to arrive at the claimed invention, evidence of copying, unexpected results, and initial skepticism in the field, among others.

To ascertain the scope and content of the prior art, it is necessary to first examine the field of the inventor's endeavor and the particular problem with which the inventor was involved at the time the invention was made. It is also my understanding that in order to render a patent claim invalid as being obvious from a combination of references, there must be some evidence within the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination in such a way that would produce the patented invention. In addition, it is my

understanding that in order to find a patent claim invalid for obviousness, there must be a finding that each element in each limitation of each patent claim is disclosed or taught by the asserted combination of prior art references or somewhere else in the relevant prior art.

In addition, it is my understanding that for a claim to be valid under the definiteness requirement of 35 U.S.C. § 112, it must "particularly point out and distinctly claim the subject matter the applicant regards as his invention." A claim is invalid as indefinite if it does not reasonably apprise those skilled in the art of its scope, such that competitors cannot accurately determine the "metes and bounds" of the patentee's claimed property right.

## 5. INVALIDITY DUE TO INDEFINITENESS OF CLAIMS 12–13 AND 29–30 OF THE '412 PATENT

Claims 12, 13, 29, and 30 of the '412 Patent are indefinite and therefore invalid under 35 U.S.C. § 112, second paragraph.

Despite a thorough attempt to understand the meaning and scope of Claims 12, 13, 29, and 30, I am unable to resolve the ambiguities present in these claims and find them indefinite. It is my opinion that Claims 12, 13, 29, and 30 are invalid for failing to reasonably apprise one of ordinary skill in the art of their scope.

Claims 12, 13, 29, and 30 are all dependent claims. I understand that a patent can include two types of claims, independent and dependent, under the patent laws. Dependent claims must reference a previous claim and they must be construed to incorporate by reference all the limitations of the referenced claims.

Claim 12 incorporates all of the limitations from Claim 10 and purports to provide additional limitations to the step of "redeeming a particular award for said users." Claim 10 contains no such step. Instead, Claim 11 contains the step of "redeeming a particular award for

- 6 -

said user." One of ordinary skill in the art would not be able to discern the scope of Claim 12

due to this ambiguity. Even if one of ordinary skill in the art presumed that the drafter intended

Claim 12 to depend from Claim 11 rather than Claim 10, the claim would remain ambiguous to

one of ordinary skill in the art for the reasons discussed below with respect to Claim 29.

Claim 13 incorporates all of the limitations of Claims 10 and 12 and provides additional

steps to the method described above in those claims. Because Claim 13 depends from Claim 12,

it incorporates the ambiguity discussed above for Claim 12. For the reasons discussed above, it is

my opinion that Claim 13 is invalid as indefinite because one of ordinary skill in the art would be

unable to discern the scope of Claim 13.

Claim 29 incorporates all the limitations of Claim 28, which in turn incorporates all of the

limitations of Claim 27. Claim 28, from which Claim 29 depends, reads as follows:

> 28. The computer readable medium as set forth in claim 27, wherein the step of
> permitting said user to initiate a process to receive a redeemable award comprises
> the steps of:
> accessing an account of said user;
> *redeeming a particular award for said user based on said points issued to said
> user if said user has earned sufficient points to qualify for said particular
> award*; and
> subtracting said points from said account of said user.
> (emphasis added)

One of ordinary skill in the art would understand Claim 28 to provide further details

about how the software for implementing an on-line incentive program permits a user to redeem

his or her points for an award. The '412 Patent describes these steps relating to the "REDEEM

routine" at 9:51–10:11 and Figure 4 (500, 510, 515, 520, and 530).[1]  Based on the plain meaning

of the above-italicized language of Claim 28 and the corresponding description in the

specification, one of ordinary skill in the art would have understood this limitation to mean

---

[1] Figure 4 constitutes "a flow chart showing the award redemption part of the program." '412
Patent 2:49-51.

- 7 -

checking the balance in a user's account to ensure there are sufficient points available to redeem a particular award.

One of ordinary skill in the art would also understand the steps of Claim 28 to necessarily occur sequentially: (1) First, the user's account—which is stored in the FREQUENCY DATABASE 515—is accessed; (2) Next, the user's account balance is checked to determine if he or she has sufficient points to cover the selected award; and (3) Finally, the user's account balance is decremented by the point value of the award redeemed.

Claim 29 purports to further modify the second step of Claim 28, the step of checking the user's point account balance:

> 29. The computer readable medium as set forth in claim 28, wherein the step of redeeming a particular award for said user comprises the steps of:
> displaying, via said Internet webpage, a catalog of awards redeemable with said award points of said on-line incentive system; and
> accepting a selection by said user that indicates an award from said catalog.

One of ordinary skill in the art would understand the step of "displaying, via said Internet webpage, a catalog of awards..." to mean displaying one or more redeemable awards to the user on a webpage. The specification describes such a webpage as the "AWARD CATALOGUE HOME PAGE 400." '412 Patent, Figure 4, 8:8–21. And one of ordinary skill in the art would understand "accepting a selection by said user..." to mean permitting users to select awards from the award catalog. Neither of these steps relate to checking a user's account balance to authorize an award redemption transaction, much less further limit the scope of that step as Claim 29 purports to do. One of ordinary skill in the art would find this claim ambiguous and would be unable to discern the scope of Claim 29. It is my opinion that Claim 29 is invalid as indefinite.

Claim 30 incorporates all of the limitations of Claims 27, 28, and 29 and provides additional steps to the method described in those claims. Because Claim 30 depends from Claim

- 8 -

29, it incorporates the ambiguity discussed above for Claim 29. For the reasons discussed above, it is my opinion that Claim 30 is invalid as indefinite because one of ordinary skill in the art would be unable to discern the scope of Claim 30.

## 6. INVALIDITY DUE TO OBVIOUSNESS OF CLAIMS 10–17, 27–34 AND 36 OF THE '412 PATENT

Examiner Donald L. Champagne allowed the claims of the '012 Patent in an office action dated 30 November 2002. The examiner stated "the allowed claims differ materially from corresponding claims in Storey (US pat 5,774,870) only in adding the obvious limitation to a means/display for browsing the product catalog/database." '012 Patent File History, Notice of Allowability, 30 November 2002, Page 2. The '870 Patent was clearly granted only because the claims required both product and award catalogs—*i.e.*, combining a frequent buyer program with an electronic commerce system. '870 Patent File History, Notice of Allowability, December 2, 1997, Pages 2–3. The examiner of the '012 Patent further states, "Quinn teaches an online award catalog..." and "The closest non-patent prior art is Quinn, which fails to teach or suggest an online product catalog. That is taught by Peterson, but the combination is not suggested by the prior art."

There are several motivations to combine the Peterson and Quinn articles. The Peterson article itself states, "Before checking out, I learn that it's possible to join the Cyberspace Malls frequent-buyer club; each dollar spent earns one point that I'll be able to use for gifts that aren't yet shown on the site. Within two months, the area promises, it will be possible to tick off shopping selections and have them transfer to an order form. For now, a user must manually record each one and transfer it to the form."

In addition, Chelliah, et al., (US Patent 5,710,887) filed August 29, 1995 ("the '887

Patent") teaches to combine frequent buyer programs with e-commerce systems. For example,

the system described in the '887 Patent includes a system for incentives, as shown in Figures 5,

7, 10, and 12, and 7:17–23, among others. In particular, the '887 Patent states, "Likewise, the

Incentives Subsystem is a marketing module which allows stores to establish discount programs

such as in-store sales, coupon-based discounts, frequent buyer programs, and quantity discount

cards." '887 Patent 7:19–23. The frequent buyer incentives are further described at 27:60–28:10.

Furthermore, Daly, et al., (US Patent 5,878,141) filed August 25, 1995 ("the '141

Patent") states, "The pricing system might also use information in the subscriber database for

features such as coupons or frequent buyer programs." '141 Patent 10:47–49.

Schrage observed that "frequent browser points" can be earned for online behavior,

namely spending time viewing web content online, in an article published November 1995.

Thus, one of ordinary skill in the art in 1995 would have understood how to combine

electronic catalogs with online incentive systems, and would have been motivated to do so.

## 6.1. Electronic Catalogs and Award Catalogs

It is my opinion one of ordinary skill in the art at the time the parent patent application

was filed could have easily implemented an online interactive award catalog using existing e-

commerce tools. One of ordinary skill in the art would have implemented an award catalog in

the similar manner as one would implement an electronic catalog. The list of awards would be

displayed and searched in the same manner as an electronic catalog displays and allows searches

for products for sale. The primary difference between an electronic catalog and an award catalog

is that an electronic catalog must interface with a complex payment infrastructure in order to

process credit card transactions, while an award catalog uses the much simpler local database

listing the award balance for each user. As understood by the examiner and as described below,

prior art known at the time the parent patent was filed described in sufficient detail how to build

an electronic catalog. It is my opinion that one of ordinary skill in the art who was creating an

online awards catalog would have known how to use the techniques for electronic catalogs and

would have been motivated to do so.

## 7. INVALIDITY DUE TO ANTICIPATION OR OBVIOUSNESS OF THE '412 PATENT

Claim 10 of the '412 Patent states:

10.     A method for redeeming incentive awards in an on-line incentive program, said
        method comprising the steps of:
        implementing an on-line incentive program that issues award points to users,
                wherein said award points are redeemable by said user for an award;
        implementing an Internet webpage accessible, via a computer system, to at least
                one user of said on-line incentive program for on-line interactive
                communications between said user and said Internet webpage;
        offering, on said Internet webpage, at least one redeemable award available to
                said user for exchange of said award points; and
        permitting said user to initiate a process to receive said at least one redeemable
                award for exchange of said award points issued to said user through said
                on-line incentive program.

The step of "implementing an on-line incentive program that issues award points to

users" is understood by one of ordinary skill in the art as requiring issuing points to users for

making purchases from an online product catalog.

In the Notice of Allowability, the examiner of the '412 Patent stated "claim 40 [in the

application (which became Claim 10)] is similar to patented claim 17 [of the '870 Patent]." '412

File History, Notice of Allowability, May 10, 1999, Page 3. The examiner also stated, "Claims

31, 32, 37–41, 44, 48, 54–58, 61, 65, and 66 are rejected under the judicially created doctrine of

obviousness-type double patenting as being unpatentable over claims 17 and 24–27 of U.S.

Patent 5,774,870. Although the conflicting claims are not identical, they are not patentably distinct from each other because they are obvious variations of each other." Ibid., Page 2.

The examiner of the '870 Patent stated, "It is the specific embodiment of the frequency database, coupled with a product catalog, from which purchases of goods may be made, and an awards catalog, from which awards may[ ]be redeemed, that renders the invention distinct over the prior art. Several references have been cited giving specific embodiments of electronic commerce systems and incentive award programs, however, none suggest or disclose combining the features of both to create the invention of the instant application. For this reason the claim is allowed."

The examiners of the '870 Patent and '012 Patent both understood that it was the combination of a product catalog and awards catalog as part of the on-line incentive program that made the otherwise obvious invention patentable.

Thus it is clear that the examiner understood that the on-line incentive program described and claimed in the '412 Patent issues award points to users as a result of making purchases from an online catalog.

This understanding is also dictated by the disclosure of the '412 Patent's specification. '412 Patent Fig. 1, Fig. 2, Fig. 3, 3:13–5:58. For example, the Summary of the Invention of the '412 Patent is consistent with this understanding:

> SUMMARY OF THE INVENTION
> In view of the above, the present invention is advantageous in that it provides an on-line, interactive incentive program which is fully integrated.
> The disclosed invention is also advantageous in that it provides an on-line access to product information, product purchases using an on-line electronic order form, award catalogs, and award redemption using an on-line electronic redemption forms [sic].
> Another advantage of the subject invention is that it awards bonus points immediately upon purchase of a merchandise [sic].
> The present invention is further advantageous in that it provides bonus points which are immediately made available for redemption.

- 12 -

Another advantage of the present invention is that it allows the customer to select a prize immediately upon the award of the bonus points.

A further advantage of the present invention is that it allows a customer to order a prize and redeem the awarded points towards the ordered prize immediately upon the award of the bonus points, thus enhancing the immediacy effect of the reward program.

Yet another advantage of the present invention is that it provides an electronic sign-up form for on-line signing up by users.

The above and other advantages are provided by the disclosed invention which includes provisions for access over the internet. Upon gaining of an access [sic], the customer is able to browse through a merchandize catalog, an award catalog, view the bonus points available for redemption in the customer's award bonus account, and get information about the products for purchase, the program, and the customer's account. The program also enables the customer to order merchandize [sic] on-line, order prizes on-line and redeem awarded points on-line. Accordingly, the selection of available prizes is expanded by the merchants who join the program, and the bonus award is made instantly redeemable.

'412 Patent 1:60–2:32.

No mention is made anywhere in the specification of the '412 Patent of any manner of earning points other than through the online purchase of products or gift certificates.

It is also my opinion that one of ordinary skill in the art would understand the asserted claims of the '412 Patent to require the award points to be issued immediately following the online purchase, such that the customer's award account is updated in real time. Thus, the award points are immediately available for redemption. '412 Patent 1:51–59, 2:3–5, 2:6–17, and 2:30–32. Indeed, in the discussion of Related Art, the '412 Patent distinguishes itself from prior art by complaining, "Thus, the immediacy effect of the reward is lacking in these conventional incentive programs." '412 Patent 1:57–59.

### 7.1. Chelliah ('887 Patent)

It is my opinion that Claim 10 of the '412 Patent is anticipated by the '887 Patent under certain claim constructions.

implementing an on-line incentive program that issues award points to users, wherein said award points are redeemable by said user for an award

- 13 -

Customers visiting the '887 Patent's "electronic storefront" via the "user interface" may purchase products through the Customer Contact System ('887 Patent 3:19–26, 6:4–7:63, 10:56–11:3, 12:1–28, 12:34–42) and participate in a frequent buyers program ('887 Patent 7:19–23, among others). If this claim is interpreted (in my view incorrectly) not to require immediate redemption after earning points, then clearly this claim element is disclosed by the '887 Patent.

> implementing an Internet webpage accessible, via a computer system, to at least one user of said on-line incentive program for on-line interactive communications between said user and said Internet webpage

The system disclosed in the '887 Patent allows a customer to interact with the system via access to an Internet webpage. '887 Patent, Figure 2, 12:1–28, among others. Through this user interface, a customer can purchase products at the "electronic mall" disclosed in the '887 Patent. '887 Patent, Figure 1, 6:26–57, among others.

> offering, on said Internet webpage, at least one redeemable award available to said user for exchange of said award points

Customers visiting the '887 Patent's "electronic storefront" via the "user interface" may purchase products offered for sale through the Customer Contact System '887 Patent, 3:19–26, 6:4–7:63, 10:56–11:3, 12:1–28, 12:34–42. The customer may use points from a frequent buyer program to obtain discounted or free products. '887 Patent 27:60–28:17.

> permitting said user to initiate a process to receive said at least one redeemable award for exchange of said award points issued to said user through said on-line incentive program

The customer may use points from a frequent buyer program to obtain discounted or free products. '887 Patent 27:60–28:17.

## 7.2. Chelliah ('887 Patent) and Goldhaber ('210 Patent)

The '887 Patent, as discussed above, discloses every element of Claim 10, except possibly the immediacy effect—i.e. the real time awarding of points. Goldhaber (U.S. Patent

5,794,210 filed December 11, 1995) ("the '210 Patent") discloses a system which awards users "digital cash," or "cyber coins," for viewing advertisements over the Internet. Known as "attention brokerage," this system incentivizes consumers to review advertising materials offered by participating merchants. '210 Patent 10:39–57. This incentive, or "digital cash" is delivered to the user's personal computer via the Internet or other computer network. '210 Patent, Claim 26, 23:52–54. In addition, "the compensation…is made available to the user in real time." '210 Patent Claim 29, also 10:9–38.

Because both references disclose incentivizing a consumer's online behavior, one of ordinary skill in the art would have been motivated to combine the teachings of the '887 Patent and the '210 Patent.

### 7.3. Heintzeman ('444 Patent); "Look To Book"

It is my opinion that Claim 10 of the '412 Patent is rendered obvious by Radisson's "Look to Book" program, which is the commercial embodiment of Heintzeman, et al. (U.S. Patent 5,483,444) filed February 7, 1995 with priority date October 26, 1993 ("the '444 Patent").

> implementing an on-line incentive program that issues award points to users, wherein said award points are redeemable by said user for an award

The "Look to Book" program offered travel agents a catalog of products for sale in the "Travel Reservations Network" '444 Patent 3:13–4:13. Travel agents were provided with rate information and sell capabilities directly from Radisson's *Pierre* reservation system. CC 004546 *ff.* Travel agents were awarded points for booking reservations online with Radisson. However, the points are pending to the travel agent until the guest completes the stay for the booking for which the points are awarded. TRL-MTZ 44089. Thus, in the event that immediate redemption

after earning is not required, this claim element is disclosed by the '444 Patent and "Look to Book" system.

> implementing an Internet webpage accessible, via a computer system, to at least one user of said on-line incentive program for on-line interactive communications between said user and said Internet webpage

Travel agents enrolled in the "Look to Book" program were provided with paper and electronic versions of a catalog containing awards the travel agents could receive by redeeming their earned points. CC 004568–4583, TRL-MTZ 44088–93. The electronic award catalog contained award descriptions and point values required for redemption. TRL-MTZ 44088–93. Although the interface between the reservation system and the travel agent was a networked computer reservation system rather than an Internet webpage, it is my opinion that one of ordinary skill in the art would have known how to provide the claimed Internet webpage and would have been motivated to do so.

> offering, on said Internet webpage, at least one redeemable award available to said user for exchange of said award points

The electronic award catalog contained award descriptions and point values required for redemption. TRL-MTZ 44088–93. It is my opinion that one of ordinary skill in the art would have known how to display the claimed redeemable award on the claimed Internet webpage and would have been motivated to do so.

> permitting said user to initiate a process to receive said at least one redeemable award for exchange of said award points issued to said user through said on-line incentive program

The '444 Patent classifies credits as pending credits and redeemable credits. Since the "Look to Book" system was for a travel reservation system, it would have been obvious to one of ordinary skill in the art to use the system itself to arrange for travel that was awarded through the system, such as the free hotel night. TRL-MTZ 44090.

- 16 -

### 7.4. Quinn and "Look to Book" or '887 Patent

The systems of the "Look to Book" and '887 Patent disclose awarding points to users for online purchases. And redeeming award points online from online award catalogs was known by one of ordinary skill in the art since at least February 1994. The Quinn article disclosed online merchandise award catalogs "where users can view images of items and place orders online" were being tested in the incentive industry at least as early as February 1994.

Because all of these references relate to frequent buyer programs and award point redemption, one of ordinary skill in this art clearly would have been motivated to combine the teachings of each. Based on the combination of the Quinn article and the "Look to Book" program or the '887 Patent, one of ordinary skill in the art would have found the subject matter of Claim 10 obvious.

### 7.5. Incorrect Inventorship of Claim 10 of '412 Patent

It is my understanding that a person is not entitled to a patent if "he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f). Thomas Storey applied for, and received, '412 Patent as a sole inventor. Thomas Storey was listed as a co-inventor with his Radisson colleagues on the '444 Patent. Because it is my opinion that the '444 Patent claims subject matter that is nearly identical to the subject matter of Claim 10 of the '412 Patent, it is also my opinion that the '444 Patent is invalid under 35 U.S.C. 102(f) for failing to name the correct inventors.

### 7.6. Maritz Itself Developed the Idea of Online Award Catalogs Before December 14, 1995.

Quinn in February 1994 stated that Maritz was testing an awards catalog where "users can view images of items and place orders online." Quinn, p. 23 MAR28746.

- 17 -

The GoldMail program was being developed by October 1995. The GoldMail program involved awarding participants for desired online behavior by loading points to their GoldMail accounts. This online behavior included reading advertisements, visiting a website, and making purchases at a website. See MAR 108139–108145. These points could then been redeemed for merchandise displayed in an online award catalog. See MAR 113139–113142, MAR 113133–113137, MAR 108176–108182. If Claim 10 is interpreted not to require that the points be earned online, then clearly this claim element is disclosed by the GoldMail program. If this claim is interpreted not to require immediate redemption after earning points, then clearly this claim element is disclosed by the GoldMail program.

> implementing an online incentive program that issues award points to users, wherein said award points are redeemable by said user for an award

The GoldMail program was an "online incentive program." See MAR 113139–113142, MAR 113133–113137, MAR 108176–108182. One implementation of the GoldMail program, the "online commerce" offer, awarded points for online product purchases. MAR 108144.

The GoldMail program involved issuing award credits issued to the user's account, which were redeemable for an award. MAR 113136, MAR 113140, MAR 113141.

> implementing an Internet webpage, via a computer system, to at least one user of said online incentive program for online interactive communications between said user and said Internet webpage"

The GoldMail program had an Internet webpage that was accessible by the user for interactive, online communication. Users of the GoldMail program could enroll online via this webpage (MAR 113135, 113139) and could click on hyperlinks enclosed in e-mailed advertisements to the web pages of participating merchants.

> offering, on said Internet webpage, at least one redeemable award available to said user for exchange of said award points

GoldMail participants were provided with an incentive, such as award credits, for every advertisement they read. One way participants could redeem these credits was through "[a]n online catalog of Maritz merchandise...for immediate orders." MAR 113140.

> permitting said user to initiate a process to receive said at least one redeemable award for exchange of said award points issued to said user though said online incentive program

GoldMail participants could order awards through the online catalog of Maritz merchandise. MAR 113140.

Thus, the GoldMail system offered awards online for the exchange of award credits and permitted the user to initiate a process for exchanging those points through an online catalog. In my opinion, Maritz developed the idea of online redemption before the application leading to the '412 Patent was filed.

## 7.7. Claim 11 of '412 Patent

Claim 11 of the '412 Patent states:

11.    The method as set forth in claim 10, wherein the step of permitting said user to initiate a process to receive a redeemable award comprises the steps of: accessing an account of said user; redeeming a particular award for said user based on said points issued to said user if said user has earned sufficient points to qualify for said particular award; and subtracting said points from said account of said user.

The '887 Patent discloses the additional elements of Claim 11. The '887 Patent includes a "customer information database [that] stores information relating to the customer." '887 Abstract, among others. The customer may redeem frequent buyer points to obtain reduced price or free items. '887 Patent 27:60–28:17. It would have been obvious to one of ordinary skill in the art that sufficient points must be required and that the points are subtracted from the account.

Quinn also discloses users placing orders for award items online. Quinn, p. 23 MAR28746. One of ordinary skill in the art reading this article in 1994 would have known that the steps of accessing the user's account, allowing a user to redeem an award if he or she had sufficient points, and subtracting the redeemed points from the user's account would have necessarily been performed by the interactive award catalog described by Quinn.

The '444 Patent and "Look to Book" system disclose the additional elements of Claim 11. The "Look to Book" system maintains user accounts, allows the redemption of awards if the user has sufficient points, and subtracts the points used from the user's account. TRL-MTZ 44089 *ff*.

The '210 Patent describes allowing a user to redeem "digital cash" earned for certain on-line behavior for "positively priced information." This transaction involves debiting the user's account or "digital cash repository" balance.'210 Patent 10:9–38, 10:58–11:7.

Other prior art references disclose these steps as well. See U.S. Patent No. 5,689,100 ("the '100 Patent"), Fig. 2 (228), Fig. 3 (236), 5:26–31, 6:61–66, 8:35–37, 8:43–45; U.S. Patent No. 5,806,045 ("the '045 Patent), 1:22–67, 2:50–65, 7:14–29, 12:38–13:33, Fig. 2, Fig. 4b.

It is my opinion that the above references render Claim 11 obvious.

## 7.8. Claim 12 of '412 Patent

Claim 12 of the '412 Patent states:

12.    The method as set forth in claim 10, wherein the step of redeeming a particular award for said user comprises the steps of:
displaying, via said Internet webpage, a catalog of awards redeemable with said award points of said on-line incentive system; and
accepting a selection by said user that indicates an award from said catalog.

Section 5 discussed why Claim 12 is indefinite. However, even if the claim had been drafted in a way that added the limitations without the indefiniteness problem discussed above, the claim would still invalid in light of the prior art.

The '887 Patent renders obvious Claim 12. It would have been obvious to one of ordinary skill in the art to display the products that can be redeemed for points in the same manner as is disclosed for displaying products available for purchase. The process for selecting a free or reduced price award is similar to the process of selecting a product for purchase.

The '444 Patent and "Look to Book" system renders obvious Claim 12. The '444 Patent and "Look to Book" system displays a catalog of awards. TRL-MTZ 44089–44093. As discussed above, it would have been obvious to one of ordinary skill in the art for this list of awards to be displayed on a webpage and for the system to accept selections for an award for travel.

As discussed above, Maritz developed the idea of online redemption via an online award catalog before the effective filing date of the '412 Patent. (MAR113133–113137, MAR113139–113142, MAR108176–108182, MAR108196, MAR108210–108211, MAR108217-108220).

One of ordinary skill in the art would understand Quinn to necessarily disclose the additional steps of Claim 12. Quinn, p. 23 MAR28746.

It is my opinion that the above references render Claim 12 obvious.

### 7.9. Claim 13 of '412 Patent

Claim 13 of the '412 Patent states:

13.    The method as set forth in claim 12, further comprising the steps of:
       providing said user with an on-line redeeming form comprising entries that
           specify an award for redeeming said award points; and
       establishing an on-line link to an award computer; and

> sending, via said on-line link, entries of said on-line redeeming form to said
> award computer.

Section 5 discussed why Claim 13 is indefinite. However, even if the claim had been drafted in a way that added the limitations without the indefiniteness problem discussed above, the claim would still invalid in light of the prior art.

The specification of the '412 describes the "on-line redeeming form" referenced in Claim 13. See SUMMARY OF THE INVENTION: "[t]he disclosed invention is also advantageous in that is provides...award redemption using an on-line electronic redemption forms [sic]." '412 Patent 1:65–2:2), 9:62–10:2, Fig. 4 (REDEEM Step 500). One of ordinary skill in the art would consider the "on-line redeeming form" or "REDEEM 500" to be functionally equivalent to the "ORDER FORM 130" described by the specification as the mechanism for purchasing products online. '412 Patent 4:60–63, 5:12–20, Fig. 2 (130).

The specification also describes "establishing an on-line link to an award computer" and "sending, via said on-line link, entries of said on-line redeeming form to said award computer":

"The program then electronically places an award redeeming order with the fulfillment house and updates the user's award account." '412 Patent Abstract.
"A link is then established to the fulfillment house or directly to the product manufacturer and an award order is communicated, 530." '412 Patent 10:9–11.

One of ordinary skill in the art would understand these that additional limitations require immediately placing an order with a fulfillment house or product manufacturer's computer system via a real-time connection. One of ordinary skill in the art would recognize that the technology required to implement an on-line link to an "award computer" is identical to that required for placing orders with manufacturers for non-award transactions. '412 Patent 5:33–37, Fig. 2 ("ORDER FORM 160").

- 22 -

On-line order forms were a well known mechanism for communicating orders from a consumer to an electronic commerce system before December 14, 1995. For example, this feature is found in the following references:

- U.S. Patent No. 5,592,378 8:30–22:14, Figures 8–36.

- U.S. Patent No. 5,724,424 5:18–6:49, Figures 3, 4, 6, and 7.

- The Interactive Marketing News article of June 23, 1995 included in the filed history of the '870 Patent describes known on-line shopping capabilities: "Like catalogs, online stores deliver on-demand product info and hope to spur immediate buying decisions. Instead of mailing back an insert or phoning, online shoppers can pull up electronic order forms—which may have been automatically filled out as they browsed items—and execute their purchases." Give Cyber-Ready Consumers the Once Over—Computer-Savvy Home-Shopping Segments May Drive Online Sales, Offer Marketing Clues, Interactive Marketing News, June 23, 1995.

- The Catalog Age article dated September 1, 1995 also shows online order forms were being used before December, 1995: "Had I wished to order, Tilley provides an online order form. You can fill it out completely with credit card and order info and submit it online." A shopping spree in Cyberspace, Catalog Age, September 1, 1995.

An on-line order form is a necessary feature for any on-line transaction, including an award redemption transaction. One of ordinary skill in the art would have known to use the established on-line ordering capabilities available in other electronic commerce applications to implement an on-line award catalog. It is my opinion that this feature is either inherent in the prior art on-line award catalogs discussed above or would have been an obvious feature of an on-line award catalog.

- 23 -

Establishing an on-line link to a manufacturer or other fulfillment facility was well known by those of ordinary skill in the art before December 14, 1995. For example, this feature can be found in the '887 Patent at 3:57–65, 11:50–60, 12:66–13:10, 17:22–30, Claim 5 (29:57–59).

It would have been obvious to one of ordinary skill in the art to apply these known on-line capabilities to implement an on-line consumer loyalty program for placing both product purchase transactions and award fulfillment transactions through an on-line link with manufacturers or other fulfillment facilities.

One of ordinary skill in the art seeking to implement an on-line awards catalog would have followed the approach of on-line sales catalogs, as implemented in known e-commerce systems. It is my opinion that the only difference between an on-line purchase transaction and an on-line point redemption transaction is the currency involved, and that the product presentation and order placement systems would be identical. It is my opinion that one of ordinary skill in the art would have been motivated to combine the teachings of the above references to implement an award redemption transaction.

It is my opinion that the above references render Claim 13 obvious.

## 7.10.    Claim 14 of '412 Patent

Claim 14 of the '412 Patent states:

14.    The method as set forth in claim 10, further comprising the step of permitting a user to review an awards catalog from said Internet webpage that comprises awards redeemable for said award points.

The '887 Patent discloses the additional elements of Claim 14. The '887 Patent includes a catalog of products for sale, and discloses that some of those products can be offered to a participant in a frequent buyer program for free or at a reduced cost in exchange for frequent

- 24 -

buyer points. It is my opinion that one of ordinary skill in the art would understand that the

process for displaying an award catalog is based on the process for displaying a catalog of goods

for sale, which is spelled out in detail in the '887 Patent.

The '444 Patent and "Look to Book" system disclose the additional elements of Claim

14. The '444 Patent and "Look to Book" system displays a page with awards. TRL-MTZ

44089. As discussed above, it would have been obvious to one of ordinary skill in the art for the

list of awards to be displayed as an awards catalog accessible from a webpage.

Quinn also discloses this step. Quinn, p. 23 MAR28746. And Maritz's GoldMail

program involved displaying awards in an online catalog. See MAR 113133–113137, 113139–

113142, 108176–108182, 108196, 108210–108211, 108217–108220.

It is my opinion that the above references render Claim 14 obvious.

### 7.11.  Claim 15 of '412 Patent

Claim 15 of the '412 Patent states:

15.  The method as set forth in claim 10, further comprising the step of permitting a
     user to review an account from said Internet webpage for said user, wherein said
     account reflects an amount of said award points credited to said user.

Maritz's GoldMail Program discloses this step. MAR108177.

Radisson's "Look to Book" Program discloses this step. TRL-MTZ 44088, CC 003701,

CC 004676. The '444 Patent discloses this step. '444 Patent 5:4–8, 6:20–21, Fig. 8 (108), Claim

40. As discussed above, it would have been obvious to one of ordinary skill in the art for this

information to be available from the Internet.

Quinn discloses this step. Quinn, p. 23 MAR28746.

The '210 Patent discloses this step. '210 Patent 19:4–18, Fig. 7, Fig. 13.

- 25 -

The American Express ExpressNet discloses this step. "American Express today announced the launch of ExpressNet from American Express, its first electronic interactive service, currently available only on America Online." "EXPRESSNET FROM AMERICAN EXPRESS DEBUT ON AMERICA ONLINE" January 30, 1995 press release, TRL-MTZ 08853. "ExpressNet from American Express offers other special benefits and services for American Express Cardmembers, including the ability to:

- Enroll in rewards programs, such as Membership Miles, or check the status of existing Membership Miles accounts." TRL-MTZ 08854.

The HiltonNet press release discloses this step. "Within the next few weeks, HHonors Program members will have the option of checking their HHonors account information via HiltonNet." Welcome to HiltonNet! New Hilton Internet Concierge Rolls Out the "Virtual" Red Carpet, PC Newswire, August 21, 1995.

It is my opinion that the above references render Claim 15 obvious.

### 7.12. Claim 16 of '412 Patent

Claim 16 of the '412 Patent states:

16.    The method as set forth in claim 10, further comprising the step of permitting a user to preview information about said on-line incentive program from said Internet webpage.

Maritz's GoldMail Program discloses this step. MAR108196–108197, MAR108199.

The '444 Patent and "Look to Book" system discloses the additional elements of Claim 16. The "Look to Book" system displays a page with information about the awards program awards. TRL-MTZ 44088 *ff.* As discussed above, it would have been obvious to one of ordinary skill in the art for this information to be available from the Internet.

Quinn discloses this step. Quinn, p. 23 MAR28746.

The American Express ExpressNet discloses this step. "American Express today announced the launch of ExpressNet from American Express, its first electronic interactive service, currently available only on America Online." "EXPRESSNET FROM AMERICAN EXPRESS DEBUT ON AMERICA ONLINE" January 30, 1995 press release, TRL-MTZ 08853. "ExpressNet from American Express offers other special benefits and services for American Express Cardmembers, including the ability to:

- Enroll in rewards programs, such as Membership Miles, or check the status of existing Membership Miles accounts." TRL-MTZ 08854.

It is my opinion that the above references render Claim 16 obvious.

### 7.13.    Claim 17 of '412 Patent

Claim 17 of the '412 Patent states:

17.    The method as set forth in claim 10, further comprising the step of permitting a user to apply for membership to said on-line incentive program from said Internet webpage.

Maritz's GoldMail Program allows users to enroll on-line. MAR113135, MAR113139, MAR108177, MAR108180, MAR108196, MAR108200–108207.

The "Look to Book" system supports enrollment of the travel agent online. TRL-MTZ 44088, CC 004585, CC 004545, CC 004676. As discussed above, it would have been obvious to one of ordinary skill in the art for this enrollment to be available from an Internet webpage.

The '210 Patent describes on-line enrollment. '210 Patent 12:38–14:10.

The American Express ExpressNet discloses this step. "American Express today announced the launch of ExpressNet from American Express, its first electronic interactive service, currently available only on America Online." "EXPRESSNET FROM AMERICAN EXPRESS DEBUT ON AMERICA ONLINE" January 30, 1995 press release, TRL-MTZ

08853. "ExpressNet from American Express offers other special benefits and services for American Express Cardmembers, including the ability to:

- Enroll in rewards programs, such as Membership Miles, or check the status of existing Membership Miles accounts." TRL-MTZ 08854.

It is my opinion that the above references render Claim 17 obvious.

### 7.14.    Claims 27–34 of '412 Patent

Claims 27 through 34 of the '412 Patent are comparable to Claims 10 through 17, respectively, of the '412 Patent. The difference is that Claims 10–17 are "method" claims, while Claims 27–34 are for "computer readable medium comprising a plurality of instructions, which when executed by a computer, causes the computer to perform the steps" of the corresponding Claims 10–17, respectively.

It is my opinion that one of ordinary skill in the art would understand that the systems of the '887 Patent, the '444 Patent, '210 Patent, the "Look to Book" program, and the other references discussed above would necessarily be programmed on computer readable medium comprising a plurality of instructions, which when executed by a computer, causes the computer to perform the steps of the Claims 10–17 as described above. The same arguments regarding the invalidity of Claims 10–17 also apply to Claims 27–34, because Claims 10–17 includes all the elements of Claims 27–34. It is therefore my opinion that Claims 27–34 are invalid for the same reasons addressed above for Claims 10–17.

### 7.15.    Claim 36 of '412 Patent

Claim 36 of the '412 Patent is for a "computer system" implementing the "method" of Claim 10. It is my opinion that one of ordinary skill in the art would understand that the systems

- 28 -

of the '887 Patent, the '444 Patent, the "Look to Book" program, and the other references discussed above would necessarily be computer systems comprising software. The same arguments regarding the invalidity of Claim 10 also apply to Claim 36, because Claim 10 includes all the elements of Claim 36. It is therefore my opinion that Claim 36 is invalid for the same reasons addressed above for Claim 10.

### 7.16.    Motivation to Combine References

It is my opinion that one of ordinary skill in the art as of the date the parent patent application was filed would have been motivated to combine the references discussed above. All of the references relate to the field of online electronic commerce systems and/or frequency and award programs. These references are pertinent to the problem the patent aimed to address, and logically would have committed themselves to the attention of one skilled in the art who was faced with this problem.

### 7.17.    Secondary Considerations

It is my understanding that certain "secondary considerations" are considered in assessing obviousness. To be relevant, there must be some "nexus" between the evidence and the merits of the claimed invention.

One secondary consideration is commercial success. The "nexus" requirement dictates that the success be due to the claimed features of the invention, as opposed to factors such as advertising and marketing. It is not apparent that any commercial activity by Netcentives or Trilegiant is related to the aspects of Claims 10–17, 27–34, and 36 as opposed to other aspects or sales and marketing efforts. I have been informed by counsel that Netcentives entered bankruptcy, wherein its assets were liquidated despite owning the '412 Patent.

- 29 -

Another potentially relevant secondary consideration is copying of the patented system. I am not aware of any evidence of copying, by Maritz or any other entity.

The existence of licenses may also be relevant to obviousness. Again, the nexus requirement applies. I have been informed by counsel that there have been a number of licenses taken under the '412 Patent. After the Netcentives bankruptcy, the patents were conveyed to Trilegiant Corp., which granted a fully paid-up license to Choice Hotels and to Carlson Marketing and its customers at no cost. I am unaware of any showing that licenses were agreed to based on the method of Claims 10–17, 27–34, and 36 or a belief in the validity of Claims 10–17, 27–34, and 36, or in the belief that the licensee's activity was actually covered by these claims of the '412 Patent. Instead, the licensees could well have been motivated by a desire to avoid litigation, or for some other reason.

Other secondary considerations include long-felt, but unresolved need; prior failure of others; and unexpected results. It is my opinion that there was nothing surprising or unexpected in the method or computer readable medium set forth in Claims 10–17, 27–34, and 36 of the '412 Patent. To my knowledge, no person of ordinary skill in the art had failed to perform the method of Claims 10–17 or computer readable medium of Claims 27–34, and 36.

None of the secondary considerations change my opinion that the subject matter of Claims 10–17, 27–34, and 36 would have been obvious to one of ordinary skill in the art at the time the patent application leading to the '412 Patent was filed.

## 8. TRIAL EXHIBITS

I may rely on visual aids and demonstrative exhibits that demonstrate the bases of my opinions. Examples of these visual aids and demonstrative exhibits may include, for example, claim charts, patent drawings, excerpts from patent specifications, file histories, interrogatory

- 30 -

responses, deposition testimony and deposition exhibits, as well as optical components, charts, diagrams, videos and animated or computer-generated video.

Other than as referred to in this report, I have not yet prepared any exhibits for use at trial as a summary or support for the opinions expressed in this report, but I expect to do so in accordance with the Court's scheduling orders.

## 9. SUPPLEMENTATION OF OPINIONS

I expect to testify regarding the matters set forth in this declaration, if asked about these matters by the Court or the parties' attorneys.

I understand that discovery is ongoing in this case. I therefore reserve the right to adjust or supplement my opinions after I have had the opportunity to review deposition testimony or in light of additional documents or arguments that may be brought to my attention. I also reserve the right to adjust or supplement my analysis in light of any critique of my report or alternative opinions advanced by or on behalf of plaintiff.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. This declaration was executed in Palo Alto, California on April 10,

2006.

ARTHUR M. KELLER, PH.D.

- 32 -

## APPENDIX 1

1. Patent No. 5,774,870 and file history
2. File history for US Patent Appl. No. 10/420,901
3. Patent No. 6,009,412 and file history
4. Patent No. 6,578,012 B1 and file history
5. Prosecution History of Canadian Application No. 2,240,424
6. Belsie, Laurent, "On-line Shoppers: Electronic Merchants May Track Your Habits," *Christian Science Monitor* (pre-1997 Fulltext), Sept. 12, 1995
7. U.S. Patent No. 5,025,372
8. *Business Week online,* "Cyberspace," McGraw-Hill 1991-2005
9. U.S. Patent No. 5,592,378
10. U.S. Patent No. 5,710,887
11. Cyberspace malls trademark applications
12. Dearth, Jeffrey and King, Arnold, "Negotiating the Internet," *InformationWeek*, 1/9/95 Issue 509, p. 70
13. Newsbytes, "'Desktop Channel' allows Online Purchases of PC Products," The Gale Group 2/7/94.
14. "E-banking: NYNEX & Chase unveil prototype interactive payment system; companies join forces to speed development of electronic commerce," 9/25/95, The Gale Group.
15. Ellison, Carol, "Despite Prodigy's shortcomings, you can still reap big bonuses," 9/90 The Gale Group.
16. Gaffin, Adam, "Mall-hopping on the Internet," Network World 10/10/95
17. U.S. Patent No. 5,724,424
18. U.S. Patent No. 5,794,210
19. Heath, Thomas, "High Tech Hotels," *Information Week*, 4/17/95 Issue 523.
20. Heintzeman PCT WO 95/12175
21. U.S. Patent No. 5,483,444
22. U.S. Patent No. 5,528,490
23. U.S. Patent No. 5,761,649
24. U.S. Patent No. 6,029,142
25. MAR114095–114162 (Holiday Inn Priority Club Awards Catalog)
26. Iacovou, Charalambos, "Electronic data interchange and small organizations: Adoption and impact of technology," University of Minnesota, MIS Research Center, Dec. 1995, ProQuest Information and Learning Company.
27. *Information Week,* "Online Shopping Spree, 1/30/95.
28. *Interactive Age,* "How top Web Malls Stack up *Shopping* the Net," 7/17/95.
29. Kolhatkar, Sheelah, "Teleway Inc's 800-Flowers online flower-ordering service is a growing success," The Gale Group, 3/95.
30. Liebs, Scott, "Single Male Seeks Power Mac for Good Time," *NetGuide,* 5/95, Vol. 2 Issue 5.
31. Look to Book 1994 Merchandise Awards
32. MAR 108176–108182
33. MAR 108196–108235

34.    MAR 108243–108263, MAR 108745–108755

35.    MAR 113133–113142

36.    Marley, Brian, "NCEX launches the Desktop Channel, an interactive, online shipping network for pc products," *Business Wire* Jan. 31, 1994

37.    Marsh, Barbara, "Peapod's On-Line Grocery Service Checks Out Success — Customers Shop Electronic Aisles; Finicky Workers Sack the Goods," Dow Jones & Company, Inc., June 30, 1994.

38.    U.S. Patent No. 5,287,268

39.    McKenna, Patrick, "Prodigy Building Virtual Mall on Internet," The Gale Group, 11/28/95.

40.    Meredith, George, *Incentives in Marketing,* National Premium Sales Executives Education Fund 1977.

41.    O'Brien, Jim, "PowerVision and LA Online share a common goal: let your fingers do the shopping," The Gale Group.

42.    O'Brien, Jim, "Online shopping is moving out of the gray and into the black," The Gale Group.

43.    Pearson, Stewart, "Relationship management: Generating business in the diverse," Whurr Publications Limited 1994.

44.    Peterson, Laurie, "A Shopping Spree in Cyberspace," *Catalog Age*, September 1, 1995

45.    Phillips Media Group's Interactive Marketing News, "Web Site Directories Lure More Traffic, Advertising Marketers Tap Tide for Consumer Research Data, Sales Lead," ProQuest Information and Learning Company, 5/26/95.

46.    Phillips Media Group's Interactive Marketing News, "ESHOP Eases Fears About Shopping Online," ProQuest Information and Learning Company, 11/24/95.

47.    Prodigy Made Easy, 2d Edition

48.    Quinn, Judy, "The Interactive Revolution — How do you get consumers to respond to your promotions?  Through new high-tech routes on the emerging information superhighway," *Incentive*, February 1994

49.    Radisson's Look to Book documents

50.    U.S. Patent No. 5,310,997

51.    U.S. Patent No. 5,434,394

52.    U.S. Patent No. 5,734,838

53.    Rodriguez, Karen, "Andersen's Net Strategy," *Interactive Age*, 7/17/95 Vol. 2, Issue 19.

54.    Schrage, Michael, "Is it time for Web surfers to fill out Frequent Browser Point Applications?," Adweek, Nov. 27, 1995.

55.    U.S. Patent No. 5,056,019

56.    Stuart, Anne, CIO magazine article re Look to Book program

57.    Verity, John W., "Ready or Not, the Electronic Mall is Coming," *BusinessWeek,* Nov. 14, 1994.

58.    Verity, J.W., "The Internet – How it will change the way you do business," *BusinessWeek,* Nov. 14, 1994.

59.    Verity, J. W. , "The Internet," *BusinessWeek,* Nov. 14, 1994.

60.    Welcome to Hiltonnet!  New Hilton Internet Concierge Rolls Out the "virtual" Red Carpet,  PR Newswire, August 21, 1995.

61. Wiener, Leonard, "A Shopping Trip, by Computer"
62. License Agreements between Netcentives and:
    AOL
    Beenz.com
    Customer Loyalty Network
    eBay
    Enhancement Services Corporation
    Freeride.com
    MassMedium.com
    MyPoints.com
    Rewards2K.com
    Sperry and Hutchison
    WebMiles.com
    Yahoo! Inc.
    Trilegiant
63. MAR108139–108145
64. Look to Book Documents: CC004584–4589, 4568–4583, 4544–4549,
    4558–4561, 4900–4902, TRL-MTZ 44088–44093, R 025380–25389,
    007800–007801, 006525–6527
65. U.S. Patent No. 5,689,100
66. U.S. Patent No. 5,806,045
67. MAR114765–114912
68. TRL-MTZ 08853–8855
69. TRL-MTZ 08890
70. MAR108132–108137

- 35 -

**APPENDIX 2**

March 8, 2006

## Arthur M. Keller

Minerva Consulting
3881 Corina Way
Palo Alto, CA 94303-4507
tel +1(650)424-0202
fax +1(650)424-0424
email arthur@kellers.org

### Research Interests:

Electronic commerce, databases, fighting spam, voting, entrepreneurship.

### Education:

Brooklyn College (City University of New York).
BS, *summa cum laude*, (2/77) with departmental honors in both majors Mathematics
and in Computer and Information Science.

Stanford University.
MS (6/79) in Computer Science.
PhD (2/85) in Computer Science.
Thesis topic: Updating Relational Databases Through Views.

### Professional Experience:

| | |
|---|---|
| 2003 to present | University of California at Santa Cruz, Information Systems and Technology Management. Lecturer and Research Associate. |
| 2001 to 2003 | University of California at Santa Cruz, Department of Computer Science. Visiting Associate Professor. |
| 1999 to present | Minerva Consulting, Palo Alto, CA. Managing Partner and co-Founder. Clients include Propel Software (Technical Advisory Board), Virtual Giveaway.com (Advisor), Serus (Advisor), Broader Minds (Founding Advisor and Board Member). |
| 2000 to present | Globallinx Network, Inc., Mountain View, CA. Interim CEO, Board Member, angel investor, and co-Founder. |
| 1998 to 2003 | Target Mining Corp. (previously buyermail.com and ccRewards.com), Los Altos, CA. Chief Technical Advisor, Board Member, angel investor, and co-Founder. |
| 1987 to 1999 | Stanford University, Computer Science Department. Senior Research Scientist (1992 to 1999), Research Scientist (1991 to 1992), Research Associate (1989 to 1991), Visiting Assistant Professor (1987 to 1989). |
| 1991 to 1999 | Persistence Software, San Mateo, CA. Chief Technical Advisor (1992 to 1999), member of Board of Directors (1994 to 1997), |

|              | member of Board of Advisors (1992 to 1994), Technical Advisor (1991 to 1992). (IPO, June 1999.) |
|--------------|-------------------------------------------------------------------------------------------------|
| 1996 to 1998 | Epistemics (now called Mergent Systems), Palo Alto, CA. Co-Founder, Chief Financial Officer, Chief Operating Officer, and Board Member. (Acquired by Commerce One, January 2000.) |
| 1989 to 1993 | Advanced Decision Systems, Mountain View, CA. Senior Computer Scientist. |
| 1985 to 1989 | University of Texas at Austin, Department of Computer Sciences. Assistant Professor (1985 to 1988). Adjunct Assistant Professor (1988 to 1989). |
| 1977 to 1985 | Stanford University, Computer Science Department. Research Associate (1985). Research Assistant (1977 to 1985). Acting Assistant Chairman (with rank of Predoctoral Research Affiliate) (1982). Instructor (1979, 1980, 1981). |
| 1981         | IBM, San Jose Research Laboratory, San Jose, CA. Academic Associate. |
| 1980         | IBM, Thomas J. Watson Research Center, Yorktown Heights, NY. Summer Research Assistant. |
| 1977         | Brooklyn College (CUNY), Computer and Information Science Department, Brooklyn, NY. Instructor, "Computers and Society." |
| 1974 to 1977 | Brooklyn College (CUNY), Computer Center, Brooklyn, NY. Systems Analyst. |

**Courses Taught:**

| Winter 2005 | Systems Analysis and Design, University of California at Santa Cruz. |
|-------------|---------------------------------------------------------------------|
| Winter 2004 | Systems Analysis and Design, University of California at Santa Cruz. |
| Spring 2003 | Systems Analysis and Design, University of California at Santa Cruz. |
| Spring 2003 | Database Management, University of California at Santa Cruz. |
| Fall 2002   | Relational Database Management (graduate course), University of California at Santa Cruz. |
| Spring 2002 | Relational Database Management (graduate course), University of California at Santa Cruz. |
| Winter 2002 | Database Management, University of California at Santa Cruz. |
| Fall 2001   | Database Management, University of California at Santa Cruz. |

2

| | |
|---|---|
| January 1998 | Infomaster, for Epistemics at PanCanadian Petroleum, Calgary, Alberta, Canada. |
| Summer 1997 | Internet Payment: Technologies and Systems (co-organizing instructor), Western Institute for Computer Science. |
| Summer 1997 | Internet Commerce for Business (co-organizing instructor), Western Institute for Computer Science. |
| Summer 1997 | Internet Security (co-organizing instructor), Western Institute for Computer Science. |
| Summer 1996 | Object Data Management (organizing instructor), Western Institute for Computer Science. |
| Summer 1996 | Electronic Commerce on the Internet (organizing instructor), Western Institute for Computer Science. |
| Summer 1996 | Internet Security (organizing instructor), Western Institute for Computer Science. |
| Summer 1995 | Object Data Management (organizing instructor), Western Institute for Computer Science. |
| Summer 1995 | Internet Security (organizing instructor), Western Institute for Computer Science. |
| Summer 1994 | Object Data Management (organizing instructor), Western Institute for Computer Science. |
| Spring 1994 | Introduction to Databases, Universidad Blas Pascal, Córdoba, Argentina. |
| Spring 1994 | Distributed Databases, Universidad Blas Pascal, Córdoba, Argentina. |
| Fall 1993 | Introduction to Databases, Stanford University. |
| Summer 1993 | Object Data Management Laboratory (organizing instructor), Western Institute for Computer Science. |
| Summer 1993 | Object Data Management (organizing instructor), Western Institute for Computer Science. |
| Winter 1993 | File and Database Systems (Graduate Course), Stanford University, co-taught with Hector Garcia-Molina. |
| Fall 1992 | Introduction to Databases, Stanford University. |
| Summer 1992 | Object Data Management (organizing instructor), Western Institute for Computer Science. |
| Spring 1992 | Distributed Databases (Advanced Graduate Course), Helsinki University of Technology. |

3

| Spring 1992 | Introduction to Databases, Helsinki University of Technology. |
| Winter 1992 | File and Database Systems (Graduate Course), Stanford University. |
| Fall 1991 | Introduction to Databases, Stanford University. |
| Summer 1991 | Distributed Databases (Advanced Graduate Course), Stanford University. |
| Summer 1991 | Databases in Modern System Architectures (organizer), Western Institute for Computer Science. |
| Fall 1990 | Introduction to Databases, Stanford University. |
| Fall 1989 | Introduction to Databases, Stanford University. |
| Fall 1988 | Introduction to Databases, Stanford University. |
| Spring 1987 | Data Management, Univ. of Texas at Austin. |
| Fall 1986 | Database Management (Graduate Course), Univ. of Texas at Austin. |
| Spring 1986 | Database Interfaces (Advanced Graduate Course), Univ. of Texas at Austin. |
| Fall 1985 | Data Management, Univ. of Texas at Austin. |
| Summer 1985 | An Intensive Introduction to TeX, TeX Users Group. |
| Summer 1984 | An Intensive Introduction to TeX, TeX Users Group. |
| Winter 1981 | Introduction to Computing, Stanford University. |
| Winter 1980 | Introduction to Computing, Stanford University. |
| Summer 1979 | Introduction to Computing, Stanford University. |
| Spring 1977 | Computers and Society, Brooklyn College. |

**Honors:**

Who's Who in America, Millennium Edition (2000); Profesor Extraordinario Visitante, Universidad Blas Pascal, Córdoba, Argentina (1994); Best Student Paper, IEEE Computer Data Engineering Conference (1984); George Forsythe Memorial Award for Excellence in Student Teaching, Stanford University Computer Science Dept. (1981-82); President, Brooklyn College Chapter, Pi Mu Epsilon (1976-77); Top score at Brooklyn College on Putnam Exam (1976); Institutional Member Nominee by Brooklyn College to American Mathematical Society (1976).

**Scholarships:**

| 1973 to 1977 | New York State Regents Scholarship. |
| 1977 to 1980 | National Science Foundation Graduate Fellowship. |

4

**Professional Societies:**

Association for Computing Machinery, Institute for Electrical and Electronics Engineers, IEEE Computer Society Technical Committee on Database Engineering, TEX Users Group, Sigma Xi, Mathematical Association of America, American Mathematical Society (Institutional Member Nominee), Open Voting Consortium (Vice President and Chief Operating Officer and Chief Financial Officer, 2003–2005; Secretary, 2005–present), Voting Systems Performance Review (Chair, Executive Committee, 2005–present).

**Committee Memberships and Assignments:**

Tuition Task Force, Brooklyn College, 1976–77;
Visitors Committee, Computer Science Dept., Stanford Univ., 1977–78;
Student Advisor, Computer Science Dept., Stanford Univ., 1978–85;
Odd Jobs Chairman, Computer Science Dept., Stanford Univ., 1979–80;
Prancing Pony Cooperative (runs a computerized vending machine), Financial Manager, Computer Science Dept., Stanford Univ., 1980–85;
Computer Facilities Committee, Computer Science Dept., Stanford Univ., 1978–79, 1981–83;
Curriculum Committee, Computer Science Dept., Stanford Univ., 1982–83;
Systems Qualifying Exam Committee, Computer Science Dept., Stanford Univ., 1983;
LOTS Computer Facility Liaison, Stanford Univ., 1983–84;
Honor Code Commission, chairman 1984–85, Stanford Univ., 1983–85;
Prospective Student Committee, Computer Science Dept., Stanford Univ., 1983–84;
Finance Committee, TEX Users Group, 1983–85;
Committee of Fifteen, Stanford Univ., 1984–85;
Office Assignments, Computer Science Dept., Stanford Univ., 1982–83, 1984–85;
Publisher, *California YumYum*, a restaurant guide of the Prancing Pony, 1984–85;
Question Submission, Computer Science Graduate Record Exam, Educational Testing Service, 1984;
Program Committee, Int. Conf. on Data Engineering, IEEE Computer Society, February 5–7, 1986;
International Coordinator, and Steering Committee, TEX Users Group, 1985–1987;
Undergraduate Studies, Computer Sciences Dept., University of Texas at Austin, 1985–86;
Colloquia, Computer Sciences Dept., University of Texas at Austin, 1985–86;
Undergraduate Appeals, Computer Sciences Dept., University of Texas at Austin, 1985–86;
Program Committee, Int. Conf. on Data Engineering, IEEE Computer Society, February 3–5, 1987;
Vice Chair, IEEE Computer Society Technical Committee on Data Base Engineering, 1986–1987;
Colloquia, Chairman, Computer Sciences Dept., University of Texas at Austin, 1986–87;
Communications Officer, Chai Society, Congregation Beth Am, 1987–89;
Undergraduate Major Committee, Computer Science Dept., Stanford University, 1987–93;

Masters Degree Committee, Computer Science Dept., Stanford University, 1987–93;
Doctoral Degree Committee, Computer Science Dept., Stanford University, 1987–90;
Chair, Administrative Computing Committee, Computer Science Dept., Stanford
University, 1987–89;

Chair, Polya DBMS Committee, Computer Science Dept., Stanford University, 1987–88;
Databases and Knowledge Bases PhD Qualifying Exam Committee, Computer Science
Dept., Stanford University, 1987–88;

Program Committee, Int. Conf. on Data Engineering, IEEE Computer Society, February
7–9, 1989;

Computer Science DBMS Committee, Computer Science Dept., Stanford University,
1988–89;

Chair, Databases and Knowledge Bases PhD Qualifying Exam Committee, Computer
Science Dept., Stanford University, 1988–90;

Computer Science Comprehensive Exam Committee, Computer Science Dept., Stanford
University, 1988–92;

Secretary, Community Singles Shabbat Service, Northern California Jewish Federation,
1988–89;

Program Committee, Int. Conf. on Very Large Data Bases, August 22–25, 1989;
Vice President—Publicity, Chai Society, Congregation Beth Am, 1989–90;

Coordinator of Publicity, Community Singles Shabbat Service, Northern California
Jewish Federation, 1989–90;

National Science Foundation, Scientific Review Panel Member, 1993;

Stanford Computer Forum, Forum Workshops Subcommittee, 1995–1996, Advisory
Committee, 1996–99, Student Advisor Mentor Program Coordinator, 1996–98;

Computer Science Dept. Web Presence committee, 1996–98;

Cong. Kol Emeth, member of Board of Directors, Chair of Publicity Committee, 1996–
2000;

Program Committee, Int. Workshop on Advanced Transaction Models and Architec-
tures, Goa, India, August 31–September 2, 1996;

Program Committee, Int. Conference on Information and Knowledge Management,
Rockville, MD, November 12–16, 1996;

Direct Appeal Chair, Ohlone PTA, Palo Alto, CA, 2001–2002;

Site Council, Ohlone Elementary School, Palo Alto, CA, 2001–2003;

Student Directory Chair and Email Moderator, Ohlone Elementary School, Palo Alto,
CA, 2001–present;

Vice President, Operations and Finance, Founder and Board Member, Open Voting
Consortium, 2003–2005;

District Student Directory Committee, Palo Alto Unified School District, Palo Alto, CA,
2004;

Parent Association Liaison to Development, The Girls' Middle School, Mountain View,
CA, 2004–2005;;

Secretary and Board Member, Open Voting Consortium, 2005–present;

Founder and Chair, Nominating Committee, VSPR, 2005;

Board Member, The Girls' Middle School, Mountain View, CA, 2005–present;

Chair, Executive Committee, VSPR, 2005–present;
Board Liaison to Executive Committee, The Girls' Middle School, Mountain View, CA, 2005–present;
Founder and President, Adobe Meadow Neighborhood Association, Palo Alto, CA, 2005–present.

**Publications:**

**Books:**

*A First Course in Computer Programming Using PASCAL*, McGraw-Hill, New York, June 1982, xiii+306pp. Also, International Student Edition, 1985.

*Un premier cours de programmation en Pascal*, McGraw-Hill Éditeurs, Montréal, Québec, Canada, Summer 1985, French translation of *A First Course in Computer Programming Using PASCAL* by Jacques Beaudry, Claude Goutier, and Francine Ouellette, xii+367pp.

*Instructor's Manual for A First Course in Computer Programming Using PASCAL*, McGraw-Hill, New York, January 1984, viii+216pp.

*Programmare in PASCAL*, Zanichelli, Bologna, Italy, October 1983, Italian translation of *A First Course in Computer Programming Using PASCAL* by Giovanni Canzii and Anna Pilenga, ix+294pp.

*Programación en PASCAL*, McGraw-Hill, Madrid, 1983, Spanish translation of *A First Course in Computer Programming Using PASCAL* by Gonzalo León Serrano, José María Vela Bermúdez, and Antonio Vaquero Sánchez, xiii+304pp.

*Hajimeteno Programming: Pascal Ni Yoru (Your First Programming: Introduction by Pascal)*, McGraw-Hill Publishing Co., Japan, Ltd., 1988, Japanese translation of *A First Course in Computer Programming Using PASCAL* by Keiji Moro, xii+312pp.

**Book Chapters:**

"Privacy Issues in an Electronic Voting Machine," Arthur M. Keller, David Mertz, Joseph Lorenzo Hall, and Arnold Urken, in *Privacy and Technologies of Identity: A Cross-Disciplinary Conversation*, Katherine J. Strandburg and Daniela Stan Raicu, eds., Springer Science+Business Media: New York, 2006, pp. 313–334. Refereed.

"Penguin: Objects for Programs, Relations for Persistence," Arthur M. Keller and Gio Wiederhold, in *Succeeding with Object Databases*, Akmal B. Chaudhri and Roberto Zicari, eds., John Wiley, 2001, pp. 75-88. Refereed.

"Smart Catalogs and Virtual Catalogs," Arthur M. Keller, *Readings in Electronic Commerce*, Ravi Kalakota and Andrew Whinston, eds., Addison-Wesley, 1997. Refereed.

"The DIANA Approach to Mobile Computing," Arthur M. Keller, Tahir Ahmad, Mike Clary, Owen Densmore, Steve Gadol, Wei Huang, Behfar Razavi, and Robert Pang, *Mobile Computing*, Tomasz Imielinski and Henry F. Korth, eds., Kluwer Academic Press, fall 1995, pp. 651–679. Refereed.

"Typesetting by Authors," *TEX for Scientific Documentation*, Dario Lucarella, ed., Addison-Wesley, 1985, pp. 1–14. Invited paper.

"Updates to Relational Databases Through Views Involving Joins," *Improving Database Usability and Responsiveness*, Peter Scheuermann, ed., Academic Press, New York, 1982, pp. 363–384. Refereed.

**Journal Articles:**

"Using Infomaster to Create a Housewares Virtual Catalog," Arthur M. Keller and Michael R. Genesereth, in *Int. Journal of Electronic Markets*, Institute for Media and Communication Management, University of St. Gallen, Switzerland, Vol. 7, No. 4, 1997, p. 41–45.

"Multivendor Catalogs: Smart Catalogs and Virtual Catalogs," Arthur M. Keller and Michael R. Genesereth, in *EDI Forum, The Journal of Electronic Commerce*, Vol. 9, No. 3, September 1996.

"Zippering: Managing Intermittent Connectivity in DIANA," Arthur M. Keller, Owen Densmore, Wei Huang, and Behfar Razavi, in *ACM NOMAD* (Mobile Networks and Applications), Baltzer Science Publishers and ACM, Special Issue on Personal Communications, Vol. 2, pp. 357–364, 1997.

"A Predicate-based Caching Scheme for Client-Server Database Architectures," Arthur M. Keller and Julie Basu, *VLDB Journal*, 5:1, January 1996, pp. 35–47.

"Independent Updates and Incremental Agreement in Replicated Databases," Stefano Ceri, Maurice A.W. Houtsma, Arthur M. Keller, Pierangela Samarati, *Journal of Parallel and Distributed Databases*, 3:3, July 1995, pp. 225–246.

"Comments on Bancilhon and Spyratos' 'Update Semantics and Relational Views'" *ACM Trans. on Database Systems*, 12:3, September 1987, pp. 521–523.

"Set-Theoretic Problems of Null Completion in Relational Databases," *Information Processing Letters*, 22:5, 28 April 1986, pp. 261–265.

"The Role of Semantics in Translating View Updates," *IEEE Computer*, 19:1, January 1986, pp. 63–73.

"On the Use of an Extended Relational Model to Handle Changing Incomplete Information," by Arthur M. Keller and Marianne Winslett Wilkins, IEEE *Trans. on Software Eng.*, SE-11:7, July 1985, pp. 620–633.

**Publications in Refereed Proceedings:**

"Understanding How Spammers Steal Your E-Mail Address: An Analysis of the First Six Months of Data from Project Honey Pot," Matthew B. Prince, Lee Holloway, Eric Langheinrich, Benjamin M. Dahl, and Arthur M. Keller, *Second Conference on Email and Anti-Spam, CEAS 2005*, Stanford, California, July 21–22, 2005.

"A PC-Based Open-Source Voting Machine with an Accessible Voter-Verifiable Paper Ballot," Arthur M. Keller, Alan Dechert, Karl Auerbach, and David Mertz, Amy Pearl, and Joseph Lorenzo Hall, in *USENIX '05, FREENIX track*, Anaheim, CA, April 10–15, 2005.

"Privacy Issues in an Electronic Voting Machine," (Extended Abstract) Arthur M. Keller, David Mertz, Joseph Lorenzo Hall, and Arnold Urken, in *Workshop on Privacy in the Electronic Society (WPES 2004)*, Washington, DC, October 28, 2004.

9

"No-Email-Collection Flag," Matthew Prince, Arthur M. Keller, and Ben Dahl, in *Conference on Email and Anti-Spam*, Mountain View, CA, July 30-31, 2004.

"Consistent Visualization and Querying of Spatial Databases by a Location-Aware Mobile Agent," by Suresh K. Lodha, Nikolai M. Faaland, Grant Wong, Amin P. Charaniya, Srikumar Ramalingam, and Arthur Keller, *Proceedings of Computer Graphics International (CGI)*, Tokyo, Japan, July 2003.

"Collaboration Software to Reduce Inventory and Increase Response" (extended abstract), by Indu Bingham, Barbara Hoefle, Kim Phan, Jim Sizemore, and Arthur M. Keller, *2003 ACM Conference on E-Commerce*, San Diego, CA, June 2003.

"High Performance and Scalability Through Associative Client-Side Caching," Julie Basu, Meikel Pöss, and Arthur M. Keller, in *Seventh International Workshop on High Performance Transaction Systems*, Pacific Grove, CA, September 1997.

"Centralized versus Distributed Index Schemes in OODBMS—A Performance Analysis," by Julie Basu, Arthur M. Keller, and Meikel Pöss, ADBIS, August 1997.

"Infomaster: An Information Integration System," by Michael R. Genesereth, Arthur M. Keller, and Oliver M. Duschka, in *ACM SIGMOD*, May 1997.

"Zippering: Managing Intermittent Connectivity in DIANA," Arthur M. Keller, Owen Densmore, Wei Huang, and Behfar Razavi, in *2nd Mobile Computing Workshop*, Hsinchu, Taiwan, March 1996.

"Infomaster: A Virtual Information System," Donald F. Geddis, Michael R. Genesereth, Arthur M. Keller, and Narinder P. Singh, in *Intelligent Information Agents Workshop*, at CIKM '95, December 1995.

"Smart Catalogs and Virtual Catalogs," (invited talk) in *An International Conference on Frontiers of Electronic Commerce, Sixth Organizational Computing, Coordination, and Collaboration Conference*, Austin, TX, October 1995.

"Migrating to Object Data Management," Arthur M. Keller and Paul Turner, *OOPSLA Workshop on Legacy Systems and Object Technology*, Austin, TX, October 1995.

"Architecting Object Applications for High Performance with Relational Databases," Shailesh Agarwal, Christopher Keene, and Arthur M. Keller, *OOPSLA Workshop on Object Database Behavior, Benchmarks, and Performance*, Austin, TX, October 1995.

"Reflections on Object-Relational Applications," Paul Turner and Arthur M. Keller, *OOPSLA Workshop on Object and Relational Databases*, Austin, TX, October 1995.

"Smart Catalogs and Virtual Catalogs," Arthur M. Keller, *Usenix Workshop on Electronic Commerce*, July 1995.

"Flexible Relation: An Approach for Integrating Data from Multiple, Possibly Inconsistent Databases," Shailesh Agarwal, Arthur M. Keller, Krishna Saraswat, Gio Wiederhold, *Int. Conf. on Data Engineering*, Taipei, Taiwan, March 1995.

10

"Two-Level Caching of Composite Object Views of Relational Databases," Catherine Hamon and Arthur M. Keller, *Int. Conf. on Data Engineering*, Taipei, Taiwan, March 1995.

"A Version Numbering Scheme with a Useful Lexicographical Order," Arthur M. Keller and Jeffrey D. Ullman, *Int. Conf. on Data Engineering*, Taipei, Taiwan, March 1995.

"Developing an Internet Presence with On-line Electronic Catalogs," William T. Wong and Arthur M. Keller, *Workshop on Electronic Commerce*, December 1994.

"A Smart Catalog and Brokering Architecture for Electronic Commerce," Arthur M. Keller, Michael R. Genesereth, Narinder P. Singh, and Mustafa A. Syed, *Workshop on Electronic Commerce*, December 1994.

"The DIANA Approach to Mobile Computing," Tahir Ahmad, Mike Clary, Owen Densmore, Steve Gadol, Arthur M. Keller, and Robert Pang, *MOBIDATA: Workshop on Mobile and Wireless Information Systems*, New Brunswick, NJ, November 1994. Also appeared in *MOBIDATA: An Internet journal of mobile computing* Vol. 1, No. 1, November 1994, available through WWW at URL http://rags.rutgers.edu/journal/cover.html

"A Predicate-based Caching Scheme for Client-Server Database Architectures," Arthur M. Keller and Julie Basu, *Third International Conference on Parallel and Distributed Information Systems*, Austin, TX, September 1994.

"Implementation of Object View Query on a Relational Database," Tetsuya Takahashi and Arthur M. Keller, *Data and Knowledge Systems for Manufacturing and Engineering*, Hong Kong, May 1994.

"A C++ Binding for Penguin: a System for Data Sharing among Heterogeneous Object Models," Arthur M. Keller, Catherine Hamon, *Foundations on Data Organization (FODO) 93*, October 1993, Chicago.

"Querying Heterogeneous Object Views of a Relational Database," Tetsuya Takahashi and Arthur M. Keller, *Int. Symp. on Next Generation Database Systems and Their Applications (NDA) 93*, Fukuoka, Japan, September 1993.

"Persistence Software: Bridging Object-Oriented Programming and Relational Databases," Arthur M. Keller, Richard Jensen, and Shailesh Agarwal, *ACM SIGMOD*, May 1993.

"Achieving Incremental Consistency among Autonomous Replicated Databases," Stefano Ceri, Maurice A.W. Houtsma, Arthur M. Keller, Pierangela Samarati, *DS-5 (Semantic Interoperability)*, November 1992.

"The Case for Independent Updates," Stefano Ceri, Maurice A.W. Houtsma, Arthur M. Keller, Pierangela Samarati, Workshop on Management of Replicated Data II, Monterey California, November 1992.

"Flexible Relations: An Approach for Integrated Data in a Semiconductor Manufacturing Environment," S.S. Agarwal, K.C. Saraswat, G. Wiederhold, and A.M. Keller, *Seventh Annual SRC/DARPA CIM-IC Workshop*, Stanford California, August 1992.

11

"Adaptive Parallel Hash Join in Main-Memory Databases," Arthur M. Keller and Shaibal Roy, *First International Conference on Parallel and Distributed Information Systems (PDIS)*, Miami Florida, December 1991.

"Implementing Hypertext Database Relationships through Aggregations and Exceptions," Yoshinori Hara, Arthur M. Keller, and Gio Wiederhold, *ACM HYPERTEXT '91*, December 1991.

"Relationship Abstractions for an Effective Hypertext Design: Augmentation and Globalization," Yoshinori Hara, Arthur M. Keller, and Gio Wiederhold, *Database and Expert Systems Applications, DEXA '91*, August 1991.

"Updating Relational Databases through Object-Based Views," by Thierry Barsalou, Niki Siambela, Arthur M. Keller, and Gio Wiederhold, *ACM SIGMOD*, Denver, CO, May 1991.

"Unifying Database and Programming Language Concepts Using the Object Model" (extended abstract), *Int. Workshop on Object-Oriented Database Systems*, IEEE Computer Society, Pacific Grove, CA, September 1986.

"Choosing a View Update Translator by Dialog at View Definition Time," *12th Int. Conf. on Very Large Data Bases*, Kyoto, Japan, August 1986, pp. 467–474.

"Framework for the Security Component of an Ada DBMS" (extended abstract), by David Spooner, Arthur M. Keller, Gio Wiederhold, John Salasin, and Deborah Heystek, *12th Int. Conf. on Very Large Data Bases*, Kyoto, Japan, August 1986, pp. 347–354.

"Framework for the Security Component of an Ada DBMS" (extended abstract), by David Spooner, Arthur M. Keller, Gio Wiederhold, John Salasin, and Deborah Heystek, *Proc. National Computer Security Center Invitational Workshop on Database Security*, Baltimore, June 1986, 10 pp.

"Reference Model for Ada Interfaces to Database Management Systems," by Fred Friedman, Arthur Keller, John Salasin, Gio Wiederhold, Murray R. Berkowitz, and David L. Spooner, *Proc. 1986 IEEE Computer Society Data Engineering Conference*, Los Angeles, February 1986, pp. 492–506.

"Algorithms for Translating View Updates to Database Updates for Views Involving Selections, Projections, and Joins" (extended abstract), *Proc. of Fourth ACM SIGACT-SIGMOD Symp. on Principles of Database Systems*, March 1985, pp. 154–163.

"On Complementary and Independent Mappings on Databases," by Arthur M. Keller and Jeffrey D. Ullman, *1984 ACM-SIGMOD Int. Conf. on Management of Data*, Boston, June 1984, pp. 143–148.

"Approaches for Updating Databases With Incomplete Information and Nulls," by Arthur M. Keller and Marianne Winslett Wilkins, *IEEE Computer Society Int. Conf. on Data Engineering*, Los Angeles, April 1984, pp. 332–340.

"Validating Updates Against the Structural Model," by Arthur M. Keller and G. Wiederhold, in *Proc. IEEE Computer Society's Symposium on Reliability in Distributed Software and Database Systems*, Pittsburgh, July 1981.

12

"FLASH: A Language-Independent, Portable File System," by J. Allchin, A.M. Keller, and G. Wiederhold, *Proc. ACM-SIGMOD 1980 Int. Conf. Management of Data*, Santa Monica, May 1980, pp. 151–156.

**Other Publications:**

"Performance Analysis of an Associative Caching Scheme for Client-Server Databases," by Julie Basu, Meikel Pöss, and Arthur M. Keller, Technical Note STAN-CS-TN-97-61, Stanford University, Computer Science Dept., September 1997.

"Integrating Data into Objects Using Structural Knowledge," by Gio Wiederhold and Arthur M. Keller, in *Third International Symposium on Command and Control Research and Technology (3ICCRTS)*, National Defense University, 17-20 June 1997, pages 842–853.

"Performance Evaluation of Centralized and Distributed Index Schemes for a Page Server OODBMS," by Julie Basu, Arthur M. Keller and Meikel Pöss, Technical Note CS-TN-97-55, Stanford University, Computer Science Dept., March 1997.

"Infomaster and Information Integration," by Donald F. Geddis, Michael R. Genesereth, and Arthur M. Keller, Workshop on Artificial Intelligence-based Tools to Help W3 Users, at the 5th Int. World Wide Web Conf., Paris, May 1996.

"Electronic Catalogs," moderator of panel at International Conference on Data Engineering, New Orleans, LA, March 1, 1996.

"CommerceNet: Overview and Electronic Catalogs," by Arthur M. Keller, *Info Tech '95*, Osaka, Japan, October, 1995.

"Versions, Configurations, and Constraints in CEDB," H. Craig Howard, Arthur M. Keller, Ashish Gupta, Karthik, Krishnamurthy, Kincho H. Law, Paul M. Teicholz, Sanjai Tiwari, Jeffrey D. Ullman, CIFE Working Paper #31, Center for Integrated Facilities Engineering, Stanford University, April 1994.

"Integrated Data Exchange and Concurrent Design for Engineered Facilities," H. Craig Howard, Jeffrey Ullman, Kincho Law, Arthur Keller, Sanjai Tiwari, Ashish Gupta, and Karthik Krishnamurthy, Proceedings of NSF Scientific Database Projects 1991–1993, AAAS Workshop on Data Management for the Scientist and Engineer, Boston, February 1993.

"Independent Updates and Incremental Agreement in Replicated Databases," Stefano Ceri, Maurice A.W. Houtsma, Arthur M. Keller, Pierangela Samarati, Stanford University, Computer Science Technical Report STAN-CS-92-1446, October 1992.

"A Classification of Update Methods for Replicated Databases," Stefano Ceri, Maurice A.W. Houtsma, Arthur M. Keller, Pierangela Samarati, Stanford University, Computer Science Technical Report STAN-CS-91-1392, October 1991.

"Formal Methods Position Paper," Arthur M. Keller and John J. Kenney, TI/DARPA Open OODB Workshop II, Dallas, TX, September 1991.

13

"Implementing Hypertext Database Relationships through Aggregations and Exceptions," Yoshinori Hara, Arthur M. Keller, Peter K. Rathmann, and Gio Wiederhold, Stanford University, Computer Science Technical Report STAN-CS-91-1381, September 1991.

"Open OODB Issues," Arthur M. Keller and Doug Morgan, TI/DARPA Open OODB Workshop I, Dallas, TX, March 1991.

"Modularization of the DADAISM Ada Database System Architecture," Arthur M. Keller and Gio Wiederhold, working document, May 1991.

"Sequenced vs. Pipelined Parallel Joins in Paradata," by Zhu Liping, Arthur M. Keller, and Gio Wiederhold, Stanford University, Computer Science Dept., Technical Report STAN-CS-91-1351, February 1991.

"Selected Database Research at Stanford," by Arthur M. Keller, Peter Rathmann, Jeff Ullman, and Gio Wiederhold, SIGMOD Record, December 1990.

"Relational Updates Through View Objects," by Thierry Barsalou, Arthur M. Keller, and Gio Wiederhold, Knowledge Systems Laboratory Report KSL-90-29, Medical Computer Science, Stanford University, March 1990.

"Concurrent Use of B-trees with Variable-Length Entries," by Arthur M. Keller and Gio Wiederhold, SIGMOD Record, Vol. 17, No. 2, June 1988, pp. 89–90.

"Notes on Databases on Parallel Computers," by Gio Wiederhold and Arthur M. Keller, April 1988.

"A Prototype View Update Translation Facility," by Arthur M. Keller and Laurel Harvey, Report TR-87-45, Dept. of Computer Sciences, Univ. of Texas at Austin, December 1987, 11pp.

"A Reliable and Deadlock-Free Multi-Indexed $B^+$-Tree," Report TR-86-19, Dept. of Computer Sciences, Univ. of Texas at Austin, July 1986, 17pp.

"Modularization of an Ada Database System," by Gio Wiederhold, Arthur M. Keller, Sham Navathe, David Spooner, Murray Berkowitz, Bill Brykczynski, and John Salasin, International pre-VLDB Symposium, Beijing, China, August 1986, pp. 202–232. Also extended abstract presented at Advanced Database Symposium, Information Processing Society of Japan, Tokyo, August 1986, pp. 135–142.

"Computer Science Comprehensive Examinations 1981/82–1984/85," editor, by the faculty and students of the Computer Science Department of Stanford University, Report STAN-CS-85-1062, August 1985.

"Updating Relational Databases Through Views," Ph.D. dissertation, Stanford University, Computer Science Dept., Report STAN-CS-85-1040, February 1985.

"Databases: The Key to Organizing and Sharing Information," CIS Newsletter, Stanford Univ., June 1984.

"Updates to Relational Databases Through Views Involving Joins," IBM Research Report RJ3282, IBM Research Laboratory, San Jose, CA, October 1981.

14

"Anatomy of a TeX Macro Package," in TUGboat: The TeX Users Group Newsletter, American Mathematical Society, Providence, RI, **2**:1, February 1981, pp. 56–86.

"S-1 Linker," by A.M. Keller and G. Wiederhold, Stanford Univ. Digital Systems Lab, Technical Note 147, November 1978.

**Submitted for Publication:**

"A Deeper Look: Rebutting Shamos on e-Voting," Ronald E. Crane, Arthur M. Keller, Alan Dechert, Edward Cherlin, and David Mertz, submitted for publication.

Legal Consultancies:

| | |
|---|---|
| 1990 | Meris v. Memorial Health Technologies, for the defense. Tort. Robert Aitken. Ball, Hunt, Hart, Brown, and Baerwitz, Long Beach, CA Gave deposition, testified in court in San Jose. Found not liable in area of expertise. |
| 2001 | MercExchange v. GoTo.com, for the defense. Patent 6,085,176. Jack Berenzweig. Brinks Hofer Gilson & Lione, Chicago, IL. Drafted expert report, but it was never completed because of out-of-court settlement. |
| 2001 | Intouch Group v. Amazon.com, et al., for the defense. Patent 5,963,916. Beth Parker. McCutchen Doyle Brown & Enersen, LLP, San Francisco, CA. Wrote declaration in support of summary motion, which succeeded in invalidating 13 of the patent's 18 claims. Case settled. |
| 2001-2003 | MercExchange v. eBay, et al., for the defense. Patent 6,202,051. Tim Teter, Cooley Godward LLP, Palo Alto, CA. Patent ruled invalid. |
| 2002-2003 | Business Objects vs. Microstrategy, for the defense. Patent 5,555,403. Tom Mavrakakis, James Valentine. Howrey Simon Arnold & White, LLP, Menlo Park, CA. Judge ruled in favor of the defense in a motion for summary judgment of non-infringement. |
| 2003 | Microstrategy v. Gelco d/b/a GE Capital Fleet Services, for the plaintiff. Contract dispute. Greg Corbett. Kirkland & Ellis, Washington, DC. Case settled. |
| 2004–present | Trilogy Software, Inc., and Trilogy Development Group, Inc. v. Selectica, Inc., and counterclaims, for the defendant and counterclaimant. 9 patents in suit. Scott Wales. Howrey Simon Arnold & White LLP, San Francisco, CA. Case pending. |
| 2004–2005 | Financial System Technology Pty. v. Oracle, for the defendant. Patent case. Neel Chatterjee. Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA. Case pending. |
| 2005–present | Microstrategy v Business Objects, for the plaintiff. Patent case. Brian Rosenthal. Howrey Simon Arnold & White LLP, Washington, DC. |
| 2005–present | Starpay v. VISA, for the plaintiff. Patent case. Ed White. Ed White Law, Oklahoma City, OK. |
| 2005–present | Hyperion v. OutlookSoft, for the defense of counterclaim. Patent case. Ron Lopez. Thelen Reid and Priest, San Francisco, CA. |

2005–present        Hyperion v. Hyperroll, for the plaintiff (Hyperion) in Declaratory
                    Judgment. Patent case. Ron Lopez. Thelen Reid and Priest, San
                    Francisco, CA.

**Other Recent Consultancies:**

| | |
|---|---|
| 2000 | NEC Research Lab, San Jose, CA. One day meeting to advise on startup prospects. |
| various | McGraw-Hill, New York, NY. Royalties from book published in 1982. |
| 1998–2003 | buyermail.com, then ccRewards, then Target Mining Corp, Los Altos, CA. Chief Technical Advisor, Board Member, co-Founder, and seed investor. |
| 1996–1998, 1999 | Epistemics, then Mergent Systems, Cupertino, CA. Chief Financial Officer, Chief Operating Officer, Board Member, co-Founder, and Consultant. |
| 2000–2001 | Woosh, Sunnyvale, CA. Technical consultant. |
| 2000–2004 | Online HR, San Jose, CA. Chief Technical Advisor. |
| 2000–2001 | Propel Software, San Jose, CA. Member, Technical Advisory Board. |
| 2000–2002 | Virtual Giveaway, San Francisco, CA. Advisor. |
| 2001–present | Serus, Mountain View, CA. Advisor and seed investor. |
| 2000–2003 | Broader Minds, Austin, TX. Founding Advisor, Board Member, co-Founder. |
| 2001–2002 | Connotate Technologies, New Brunswick, NJ. Advisor. |
| 2000–present | Globallinx Network, Palo Alto, CA. Advisor, seed investor, Chairman of the Board, interim CEO. |
| 2003–present | Unspam Technologies, Inc., Park City, UT. Advisor and seed investor. |