A. KELLER

U.S. DISTRICT COURT

FOURTH DISTRICT OF DELAWARE

| | |
|---|---|
| AFFINION NET PATENTS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Cause No. |
| vs. | ) 04-360-JJF |
| | ) |
| MARITZ, INC., | ) |
| | ) |
| Defendant. | ) |

VIDEO DEPOSITION OF DR. ARTHUR KELLER

Taken on behalf of the Plaintiff

July 7, 2006

Sheryl A. Pautler, CCR 871

1        A.   Excuse me.  I had a bug a few weeks ago and
2   I'm still suffering the lingering effects of it.  So I
3   apologize if I'm frequently clearing my throat.
4             My understanding is that a practical
5   implementation of such a system would benefit from
6   people -- from interaction between people who are expert
7   in -- who are knowledgeable -- sorry -- who are
8   knowledgeable in interactive frequency and award redemption
9   programs, as well as people who are knowledge about
10  business and database systems or electronic commerce
11  systems.  Go ahead.
12       Q.   (By Ms. Davis)  Okay.  And I take it you do not
13  view yourself as being a person with -- who is an expert
14  with respect to interactive, frequency, and award
15  redemption programs?
16       A.   The issue of interactive, frequency, and award
17  redemption programs is interesting.  I have been a
18  participant in, a user of, frequency and award redemption
19  programs through the airlines, through credit cards, and
20  the like.  I have, in terms of my studies of electronic
21  commerce, I have certainly been aware of those kinds of
22  systems and understanding some of the implications of those
23  systems on electronic commerce.
24            And in addition, the notion of interactive
25  frequency and award redemption programs are within the

1  larger field of promotions and frequency -- sorry --
2  promotions, incentives, and loyalty programs.  It's a
3  larger field of which -- of which incentive and loyalty
4  programs fit within.  And I have expertise and experience
5  within that larger field.
6           Q.   So are you saying that you do view yourself as
7  an expert in the field of interactive, frequency, and award
8  redemption programs?
9           A.   I see myself as having expertise in a larger
10 field that includes interactive, frequency, and award
11 redemption programs.
12          Q.   But within that larger field, do you have
13 expertise in the field of frequency and award redemption
14 programs?
15          A.   Let me explain, give you my answer by way of
16 an analogy.  Somebody who had expertise in database systems
17 and you say to that person, oh, well, do you know Oracle.
18 And they say, I don't know Oracle, I know Sybase or I know
19 DB2.  And you said, well, you have expertise in Oracle.
20 Well, if that person has expertise in Sybase or DB2, they
21 would be capable of understanding a lot of the principles
22 and issues involved in Oracle, independent of whether they
23 actually physically used Oracle for any extended period of
24 time.
25          A lot of the knowledge from using DB2 or

18

1  Sybase would translate over to a knowledge of using Oracle
2  because a lot of the principles and concepts are the same.
3         Q.   Well, what is it that you say you do have
4  expertise with that would make you an expert in the field
5  of frequency and award redemption programs?
6         A.   As I said earlier, I have expertise and
7  experience in the larger field of promotions, incentive
8  programs and loyalty programs.
9         Q.   What have you done -- what specifically have
10 you done in terms of experience or involvement with
11 promotions?
12        A.   My work in promotions involves several
13 different things.  One of the things that I've done
14 involves a company called Globallings Network, which I am
15 the CEO of.  And Globallings Network is involved in the
16 hospitality industry by providing Internet appliances in
17 hotel rooms to give guests access to the Internet as a free
18 amenity and also provides these guests through the Internet
19 appliance, Internet advertising including information about
20 the particular hotel property and surrounding community.
21        Q.   You said you had some experience with respect
22 to incentive programs.  Tell me about that.
23        A.   I have -- I do not at this point recall any
24 specific experience with respect to incentive programs.
25        Q.   And you also mentioned you had experience with

1  loyalty programs.  Tell me about that.
2          A.  My experience with respect to loyalty programs
3  includes being a participant in a number of frequent flyer
4  programs, being a participant in various reward card
5  programs, as well as a participant in various other loyalty
6  programs operated by stores or chains.
7          Q.  So your experience with respect to loyalty
8  programs is based upon your experience as a user or
9  participant in those programs, not any of your professional
10 experience?
11         A.  As a professional computer scientist with
12 particular expertise in electronic commerce systems, I do
13 reading in the field which has included over the years
14 reading in systems, e-commerce systems, that include
15 reading about such -- reading about examples of e-commerce
16 systems.
17              In addition, as an expert in computer science,
18 when I am a participant in such a system, I often think
19 about how that system might operate, what the benefits and
20 drawbacks of the system are, what's the security
21 implication of that system.
22              I have on occasion found errors in the systems
23 and have reported such errors to the appropriate -- as far
24 as I could tell -- people within the various organizations
25 to report these kinds of errors.  So the level of expertise

1  that one would -- that I would gain through being involved
2  in these systems would be far in excess of somebody who
3  simply were to use a -- use one of these systems without
4  thinking or understanding anything about how those systems
5  operated.
6       Q.   But you've never done any work in implementing
7  or designing an incentive program or loyalty program?
8            MR. HARTLEY:  Object to the form.
9       A.   I've done work in the larger field of
10 promotions, incentives, and loyalty and some of that work
11 may -- crosses the line between the promotion field and the
12 loyalty field.
13      Q.   (By Ms. Davis)  What specifically in your mind
14 crossed the line between promotion and loyalty that you
15 were involved in with your work?
16      A.   I was one of the founders and chief technical
17 advisor and a principal -- the lead inventor on technology
18 that involved the use of determining what people were
19 purchasing and giving them coupons that would enable --
20 would give them rewards and discounts in terms of future
21 purchases.
22      Q.   Have you ever designed an incentive program?
23           MR. HARTLEY:  Object to the form.
24      A.   I do not believe I've ever specifically
25 designed an incentive program.

1    Q.   (By Ms. Davis)  Have you ever sold incentive
2  programs?
3         MR. HARTLEY:  Object to the form.
4    A.   I'm not a salesperson.
5    Q.   (By Ms. Davis)  Have you ever implemented an
6  incentive program?
7         MR. HARTLEY:  Same objection.
8    A.   I have never -- I do not believe I've ever
9  implemented a program that was specifically an incentive
10 program.
11   Q.   (By Ms. Davis)  Have you ever designed, sold,
12 or implemented a loyalty program?
13        MR. HARTLEY:  Object to the form.
14   A.   Earlier, I mentioned my work with the notion
15 of a promotion program that had some loyalty aspects to it.
16 And in that regard, I was involved in the design and -- of
17 that system.
18   Q.   (By Ms. Davis)  Are you referring there to the
19 coupon system you were discussing earlier or to the hotel
20 room Internet system?
21   A.   Well, I certainly was involved in both
22 systems.
23   Q.   I just wasn't sure which one you were
24 referring to as being the design of a loyalty program.
25   A.   I believe I refer to a promotion system that

22

1  involved a loyalty aspect.

2      Q.  And which project are you referring to or is

3  it a different project that you're referring to as being

4  one where you had a promotion system with a loyalty aspect?

5      A.  I'm specifically referring to the system that

6  involved keeping track of customers' purchases and offering

7  them rewards.

8      Q.  Did that system involve consumers having any

9  sort of account or was it more of a point of sale thing

10 where if you bought this, you got this kind of coupon?

11         MR. HARTLEY:  Object to the form.

12     A.  Consumers who were users of the system in

13 general had accounts.

14     Q.  (By Ms. Davis)  Okay.  You refer to yourself as

15 being an inventor with respect to that system.  Is that a

16 patented system?

17     A.  There were several patents filed, I believe

18 that one of those patents is still pending.

19     Q.  Have any issued?

20     A.  Not yet.

21     Q.  Did you have co-inventors on those patents?

22     A.  Yes.

23     Q.  Who were your co-inventors?

24     A.  A gentleman by the name of Sanjai Tiwari was a

25 co-inventor.  I do not recall whether there were any other

1  co-inventors on -- I know on the patent that's still
2  pending, there were no other co-inventors. The other
3  patents that were abandoned, I do not know whether there
4  were any co-inventors besides Dr. Tiwari.
5      Q.  When was the application still pending, when
6  was it filed approximately?
7      A.  It was originally filed I believe in '99.
8      Q.  All right. Let me ask you to turn to Page 11
9  of Exhibit 272.
10     A.  Page 11?
11     Q.  Yes.
12     A.  Yes, ma'am.
13     Q.  You were asked to give your opinion as to the
14 validity of claim 10 of the '412 patent, correct?
15     A.  I believe that's correct.
16     Q.  And as part of that process, am I correct that
17 one of the things you had to do was to interpret the
18 elements or the limitations of claim 10 of the '412 patent
19 in order to determine what were all the limitations that
20 would have to be met by a piece of prior art in order to
21 render the claim invalid?
22     A.  As I understand you correctly, it was a
23 requirement of what I did to interpret the claim terms.
24     Q.  Now, in the first paragraph underneath the
25 text of claim 10 that you have set forth there on Page 11

1       A.    I have testified in areas that were beyond
2   computers and databases.
3       Q.    What areas?
4       A.    I've testified in the matter of computerized
5   catalogs and auction systems.  In particular, I was an
6   expert for EBay in the defense of their lawsuit brought by
7   Merck Exchange.  You may have heard of that lawsuit because
8   it went to the Supreme Court and I am mentioned in the
9   federal circuit decision in regard to that particular case.
10      Q.    Have you had any discussion with counsel for
11  Maritz as to whether or not you're going to be proffered at
12  trial as an expert in the area of incentive and frequency
13  award programs?
14      A.    I don't remember any specific discussion that
15  I would be proffered as expert in -- did you say incentive
16  and loyalty programs; was that your question?
17      Q.    Incentive and frequency award programs.
18      A.    Incentive and frequency award programs, I
19  don't recall any specific such discussion.
20      Q.    Do you view yourself as a person of ordinary
21  skill in the art in the area of incentive and frequency
22  award programs?
23           MR. HARTLEY:  Objection, vague.
24      A.    Could you define what you mean by a person of
25  ordinary skill in the art in incentive and frequency

136

1  programs?
2      Q.  (By Ms. Davis)  Have you reviewed any of the
3  definitions provided by any of the other experts that
4  provide that information?
5      A.  I have reviewed the definitions.  I am -- I
6  don't know which definition you'd like to use.
7      Q.  How about we use the definition of a person
8  with one to two years experience in designing, selling, or
9  implementing incentive or frequency award programs?
10     A.  To the extent that the experience identified
11 earlier with respect to the crossover between promotional
12 and loyalty programs we talked about earlier, then that
13 experience did exceed two years of -- you said design,
14 implementation -- what were --
15     Q.  Or sales.
16     A.  I participated in the design of that system
17 for more than two years.
18     Q.  And which system is that that you're referring
19 to?
20     A.  I was referring to the system implemented for
21 a company that was originally called buyermail.com, then
22 became CC Rewards, and then became Target Mining.
23     Q.  Was that program a customer based loyalty
24 program?
25         MR. HARTLEY:  Objection, vague.

1        A.    That program allowed customers to register
2   with the system.  There was a mechanism where customers
3   would inform us, the company, through the system, of their
4   purchases so the behavior that was being rewarded in this
5   particular case was the giving us of information about the
6   purchases that they had made on the Internet.
7              And as they provided us with more such
8   information, we would provide them with coupons based on
9   those purchases for which they could obtain discounts or
10  free products or whatever.
11       Q.    (By Ms. Davis)  And by whom were you employed
12  when you did that work?
13       A.    I did that work as chief technical advisor,
14  founder -- one of the founders, and a member of the board
15  of directors of that company.
16       Q.    Is that company still in business?
17       A.    No, it is not.
18       Q.    Did it fail or was it bought out or something
19  else?
20       A.    It was dissolved.
21       Q.    In Exhibit 272, Page 16.
22       A.    Yes, ma'am.
23       Q.    You're referring to the Look to Book program
24  and you state that travel agents enrolled in the Look to
25  Book program were provided with paper and electronic